**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LODERS CROKLAAN USA, LLC,** | ) | FILED: MARCH 19, 2008 |
| | ) | 08CV1610      TC |
| Plaintiff, | ) | JUDGE MANNING |
| | ) | Case No. MAGISTRATE JUDGE MASON |
| v. | ) | |
| | ) | |
| **EARTHFIRST TECHNOLOGIES, INC.** | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR BREACH OF GUARANTIES**

Plaintiff Loders Croklaan USA, LLC ("Loders"), by its attorneys Gerald B. Lurie and Janice L. Duban, states the following as its complaint against defendant EarthFirst Technologies, Inc. ("EFT"):

**PARTIES AND JURISDICTION**

1.     Loders is a limited liability company formed under the laws of the State of Illinois and has its principal place of business located in Channahon, Will County, Illinois. Loders' sole member is Loders Croklaan USA B.V., which is a corporation incorporated under the laws of the Netherlands and has it principal place of business located in the Netherlands.

2.     EFT is a corporation incorporated under the laws of Florida and has its principal place of business located in Tampa, Florida.

3.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between Loders and EFT, and the amount in controversy in this case, exclusive of interest and costs, exceeds $75,000.

## FACTUAL ALLEGATIONS

4.      Loders is in the business of, among other things, storing, marketing and distributing natural oil products used in the processing and manufacturing of biodiesel fuel.

5.      EarthFirst Americas, Inc. ("EFA"), which changed its name to Solardiesel Corporation in September, 2006, is in the business of processing and manufacturing biodiesel fuel.

6.      On April 11, 2007, Loders and EFA entered into two agreements.  One was a commercial lease (the "Lease") whereby EFA leased Loders' oil fractionation facility located at 24708 West Durkee Road in Channahon, Illinois (the "Premises") for the purpose of manufacturing biodiesel fuel at the Premises.  A true and correct copy of the Lease, without attachments, is attached as Exhibit 1.

7.      Also on April 11, 2007, Loders and EFA (under EFA's new name, Solardiesel Corporation) entered into a Product Supply Agreement (the "Supply Agreement") pursuant to which Loders was to sell to EFA certain natural oil products (the "Products") that EFA was to use in the biodiesel fuel manufacturing process at the Premises.  A true and correct copy of the Supply Agreement, without attachments, is attached as Exhibit 2.

8.      EFA never took possession of the Premises, and failed to pay the rent and other amounts due under the Lease commencing with the amounts due for the month of December, 2007.  As a result, on or about February 11, 2008, Loders served EFA with a Lessor's Notice of Default and Statutory Notice.  EFA failed to cure any defaults under the Lease and, on March 4, 2008, Loders terminated the Lease in accordance with its terms.

9.      Loders performed all of its obligations under the Lease.

10.    EFA also defaulted on its obligations under the Supply Agreement by, among other things, failing to provide Loders with notice of the Commercial Start Date and of EFA's intent to commence commercial operations under the Supply Agreement, as required by the provisions of paragraph 2.1 of the Supply Agreement.

11.    As a result of EFA's default on its obligations under the Supply Agreement, Loders terminated the Supply Agreement in accordance with its terms.

12.    Loders performed all of its obligations under the Supply Agreement.

13.    When Loders and EFA executed the Lease and Supply Agreement, that is to say on April 11, 2007, EFA's parent company, EFT, executed guaranties of EFA's performance of its obligations under both the Lease and the Supply Agreement.

14.    EFT's guaranty of EFA's performance of its obligations under the Lease (the "Lease Guaranty") is attached to the Lease directly following the last counterpart signature page of the Lease (page 43).   EFT's guaranty of EFA's performance of its obligations under the Supply Agreement appears on page 32 of that agreement.

<div align="center">

**COUNT I—BREACH OF LEASE GUARANTY**

</div>

15.    Loders realleges and incorporates in this Count I the allegations contained in paragraphs 5 through 15 of this complaint.

16.    Loders has suffered damages as a consequence of EFA's breach of the Lease in an amount exceeding $600,000 after application of all just credits due to EFA.   EFT is liable to Loders under the Lease Guaranty for those damages.

17.    Both the Lease and the Lease Guaranty obligate EFT to pay Loders' costs, expenses and reasonable attorneys' fees incurred in enforcing the Lease and the Lease Guaranty.

### COUNT II—BREACH OF SUPPLY AGREEMENT GUARANTY

18.    Loders realleges and incorporates in this Count II the allegations contained in paragraphs 5 through 15 of this complaint

19.    Loders has suffered damages as a consequence of EFA's breach of the Supply Agreement in an amount exceeding $60,000 after application of all just credits due to EFA.  EFT is liable to Loders under the Supply Agreement Guaranty for those damages.

**WHEREFORE**, Loders requests the entry of a judgment in its favor and against defendant EarthFirst Technologies, Inc. in an amount exceeding $$660,000 to be proved at trial.

**LODERS CROKLAAN USA, LLC**

By: _____ */s/  Janice L. Duban*_____
One of its attorneys

Gerald B. Lurie
Janice L. Duban
**DLA PIPER US LLP**
203 North La Salle Street
Suite 1900
Chicago, Illinois 60601-1293
(312) 368-4000

```
08CV1610                    TC
JUDGE MANNING
MAGISTRATE JUDGE MASON
```

# EXHIBIT 1

## CHANNAHON FACILITY
## LEASE AGREEMENT

by and between

### LODERS CROKLAAN USA, LLC,
an Illinois limited liability company

as Lessor,

and

### EARTHFIRST AMERICAS, INC.,
a Florida corporation

as Lessee

for                                   .

**PART OF LESSOR'S FACILITY AT
24708 WEST DURKEE ROAD
CHANNAHON, ILLINOIS 60410**

Dated as of April // , 2007

## TABLE OF CONTENTS

Page

**ARTICLE I      DEFINITIONS; INTERPRETATION** ........................................ 2

1.1    Definitions ................................................................................ 2
1.2    Construction of Agreement .......................................................... 6

**ARTICLE II     EXECUTION DATE AND LEASE TERM** ........................... 8

2.1    Execution Date ........................................................................ 8
2.2    Lease Term .............................................................................. 8

**ARTICLE III    LEASE OF LEASE PROPERTY AND ANCILLARY RIGHTS** ....... 8

3.1    Lease ..................................................................................... 8
3.2    Peaceful and Quiet Enjoyment ..................................................... 8
3.3    Lease Fees .............................................................................. 9
3.4    Common Areas, Limited Common Areas and Activity Based Charges ......... 9
3.5    River Cells .............................................................................. 10
3.6    Access to Other Property ........................................................... 10
3.7    Compliance with Work Rules ....................................................... 10

**ARTICLE IV     USE OF LEASE PROPERTY AND ANCILLARY RIGHTS** .......... 11

4.1    Uses of Property ...................................................................... 11
4.2    Right to Sublease ..................................................................... 12
4.3    Alteration of Lease Property by Lessor ........................................... 12
4.4    Alteration of Lease Property by Lessee ........................................... 12
4.5    Maintenance ........................................................................... 13
4.6    Utilities and Services ................................................................ 13
4.7    Removal of Movable Assets ........................................................ 13
4.8    Disposal of Personal Property ...................................................... 14
4.9    Access to Lease Property ............................................................ 14
4.10   Return of Lease Property ........................................................... 14
4.11   Liens Against Lessee's Leasehold Interest ....................................... 14
4.12   Rules and Regulations ............................................................... 17
4.13   Licenses ................................................................................ 17
4.14   Entrance ................................................................................ 17

**ARTICLE V      CONSTRUCTION** ......................................................... 17

5.1    Improvements .......................................................................... 17

**ARTICLE VI     OPERATIONS** ............................................................. 18

6.1    Obligation of Lessee to Perform Operations .................................... 18
6.2    Use of Lease Property ............................................................... 19
6.3    Exclusivity ............................................................................. 19
6.4    Standards of Performance ........................................................... 19
6.5    Duties to Cooperate .................................................................. 19
6.6    Performance Requirements .......................................................... 19
6.7    Labor .................................................................................... 19

## TABLE OF CONTENTS
### (continued)

Page

**ARTICLE VII    OBLIGATIONS OF THE PARTIES** ......................................... **20**

7.1    Obligations of the Parties ................................................................. 20

**ARTICLE VIII   LESSEE'S COVENANTS** ......................................................... **21**

8.1    Insurance ........................................................................................ 21
8.2    Environment .................................................................................... 22
8.3    Taxes .............................................................................................. 23
8.4    Licenses; Permits ........................................................................... 23
8.5    Security ........................................................................................... 23

**ARTICLE IX    LESSOR'S COVENANTS** ......................................................... **24**

9.1    Cooperation ..................................................................................... 24
9.2    No Interference ............................................................................... 24
9.3    Access ............................................................................................. 24
9.4    Communications Access .................................................................. 24
9.5    Logistics Access .............................................................................. 24
9.6    Intentionally Deleted ....................................................................... 25
9.7    Access to Premises; Rights of Way ................................................. 25
9.8    Utilities and Services ...................................................................... 25
9.9    Licenses; Permits; Plans ................................................................. 25
9.10   Taxes .............................................................................................. 25
9.11   Non-Disturbance; Subordination; Attornment ............................... 25

**ARTICLE X    FORCE MAJEURE** ..................................................................... **26**

10.1   Effect of Force Majeure .................................................................. 26
10.2   Lease Fees Abatement .................................................................... 26
10.3   Notice ............................................................................................. 26
10.4   Termination ..................................................................................... 27

**ARTICLE XI    DOCUMENTATION AND AUDITS** .......................................... **27**

11.1   Records and Reports ....................................................................... 27
11.2   Audits .............................................................................................. 28

**ARTICLE XII    REPRESENTATIONS AND WARRANTIES** ............................ **28**

12.1   Lessee Representations and Warranties ........................................... 28
12.2   Lessor Representations and Warranties ........................................... 29

**ARTICLE XIII   DEFAULT; TERMINATION** ................................................... **30**

13.1   Lessee Event of Default .................................................................. 30
13.2   Lessor Event of Default ................................................................... 30
13.3   Consequences of Expropriation and Default ................................... 31
13.4   Termination without Default ........................................................... 31
13.5   Events Not Constituting a Default ................................................... 32

**ARTICLE XIV   RIGHTS AND OBLIGATIONS UPON TERMINATION** ......... **33**

14.1   Procedures ...................................................................................... 33

TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 14.2 | Termination Payment | 33 |
| 14.3 | Surrender of Lease Property | 33 |
| 14.4 | Liquidated Damages | 34 |
| 14.5 | Cooperation; Exchange of Information | 35 |
| 14.6 | Hazardous Materials | 35 |

**ARTICLE XV    INDEMNITIES; LIABILITIES** ......................... **35**

| | | |
|---|---|---|
| 15.1 | Lessee Indemnity | 35 |
| 15.2 | Lessor Indemnity | 35 |
| 15.3 | Cumulative Remedies | 35 |
| 15.4 | Survival | 36 |

**ARTICLE XVI  GOVERNING LAW; DISPUTE RESOLUTION** ......... **36**

| | | |
|---|---|---|
| 16.1 | Governing Law | 36 |
| 16.2 | Disputes | 36 |
| 16.3 | Mutual Consultation | 36 |
| 16.4 | Binding Arbitration | 36 |

**ARTICLE XVII MISCELLANEOUS** ......................... **37**

| | | |
|---|---|---|
| 17.1 | Amendments | 37 |
| 17.2 | Assignment | 37 |
| 17.3 | Survival | 37 |
| 17.4 | Entire Agreement | 37 |
| 17.5 | Notices | 37 |
| 17.6 | Confidentiality | 38 |
| 17.7 | No Waiver | 39 |
| 17.8 | Severability | 39 |
| 17.9 | Further Assurances | 39 |
| 17.10 | Compliance with Laws; Officials Not to Benefit | 39 |
| 17.11 | Commissions | 40 |
| 17.12 | Rights Reserved to Lessor | 40 |
| 17.13 | Eminent Domain | 40 |
| 17.14 | Patriot Act Requirements | 41 |
| 17.15 | Attorney's Fees | 41 |
| 17.16 | Waiver of Jury Trial | 41 |
| 17.17 | Estoppel Certificates | 41 |
| 17.18 | Guaranty | 42 |

## LIST OF APPENDICES

| | |
|---|---|
| **Appendix A** | **Premises** |
| **Appendix B** | **Fixed Assets** |
| **Appendix C** | **Intentionally Deleted.** |
| **Appendix D** | **Development Plan** |
| **Appendix E** | **Common Area Activity Charges** |
| **Appendix F** | **Lease Fees** |
| **Appendix G** | **Intentionally Deleted.** |
| **Appendix H** | **Description of Operations** |
| **Appendix I** | **Insurance** |
| **Appendix J** | **Hazardous Substances** |
| **Appendix K** | **Termination Payment** |
| **Appendix L** | **Rules and Regulations** |

# CHANNAHON FACILITY

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Agreement" or "Lease") is made and entered into this _11_th day of April, 2007 ("Execution Date") by and between:

LODERS CROKLAAN USA, LLC, a limited liability company constituted under the laws of the State of Illinois, whose office is located at 24708 West Durkee Road, Channahon, Illinois 60410 ("Lessor"); and

EARTHFIRST AMERICAS, INC., a corporation organized under the laws of the State of Florida, whose headquarters is located at 2515 East Hanna Avenue, Tampa, Florida 33610 ("Lessee").

Each of Lessor and Lessee and their respective successors and permitted assigns are hereinafter referred to individually as a "Party" and collectively as the "Parties."

**WHEREAS,** Lessor has agreed to (i) lease to Lessee and Lessee has agreed to lease from Lessor (A) a certain portion of Lessor's Channahon, Illinois facility site located at 24708 West Durkee Road, Channahon, Illinois 60410 (the entirety of Lessor's facility site at such location being referenced herein as the "Property"), consisting of an inactive solvent fractionation plant and certain required land described and delineated in Appendix A, along with sufficient additional land in the location or locations determined by Lessor for the construction and operation of raw material storage tanks (the "Premises"), for operation by Lessee of a biodiesel manufacturing facility and (B) certain property affixed to the Premises as further described in Appendix B (the "Fixed Assets," and together with the Premises, the "Lease Property"); (ii) grant Lessee certain rights to use the Limited Common Areas, Common Areas and River Cells and all rights, easements and interests appurtenant thereto and all ways of ingress and egress and other public ways adjacent thereto and to the adjacent water and waterfront ("Ancillary Rights") and (iii) allow Lessee to remove from the Premises for the term of this Agreement certain movable property which is agreed upon by the Parties from time to time (the "Movable Assets") and make certain improvements to the Lease Property as further described in the development plan which is approved by the Parties and attached as Appendix D (the "Development Plan").

**WHEREAS,** the Parties desire to set forth the terms and conditions of Lessee's occupancy, demise and use of the Lease Property, and all of their respective rights and obligations related thereto.

## WITNESSETH

**NOW, THEREFORE,** in consideration of the mutual promises and agreements of the Parties herein expressed, as well as other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE 1

## DEFINITIONS; INTERPRETATION

1.1    Definitions. The following terms shall have the meanings specified in this Article when capitalized and used in this Agreement. The meanings specified are applicable to both the singular and plural.

"Activity Based Charge" means the allocated charge, based on actual usage, for property taxes, common area utilization, Utilities and Services and administrative and other services provided by Lessor to Lessee at the Premises in accordance with provisions of Sections 3.4 and 4.6 herein and the methodology set forth in Appendix E attached hereto.

"Affiliate" means, as to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person or is a director or officer of such Person.

"Agreement" means this Lease Agreement (including all appendices attached hereto), as amended and/or supplemented from time to time.

"AAA" has the meaning set forth in Section 16.4.

"Ancillary Rights" has the meaning set forth in the Recitals.

"Applicable Law" means any law, including Environmental Laws (as defined in Appendix J), statute, order, decree, injunction, license, permit, consent, approval, agreement or regulation of any Governmental Authority having jurisdiction over the matter in question, or other legislative or administrative action of a Governmental Authority, or a final decree, judgment or order of a court which relates to the Lease Property, the Operations or the interpretation or application of this Agreement, as the case may be. In the event of an inconsistency or conflict between any of the Applicable Laws, the law most specific to the subject matter shall apply.

"Biodiesel Improvements and Equipment" has the meaning set forth in Section 14.3.

"Biodiesel Output" has the meaning set forth in Section 6.6(c).

"Business Days" means a day, other than a Saturday or Sunday, on which commercial banks in New York, New York are not authorized or required to close.

"Confidentiality Agreement" has the meaning provided in Section 17.6.

"Confidential Information" has the meaning provided in Section 17.6 and the Confidentiality Agreement.

"Change in Law" means any amendment, modification, superseding act, deletion, addition or change in or to the Applicable Laws that occurs and takes effect after the Execution Date and demonstrably and adversely affects a Party's performance of its obligations hereunder.

"Channahon Facility" means the entire facility of Lessor located on the Property, including without limitation the Premises, the Fixed Assets, the Movable Assets, the Common Areas, and all other property rights and interests of Lessor located thereon or related thereto.

"Common Areas" means all areas and facilities outside the Premises and within the exterior land boundary lines of the Channahon Facility and the Property (including the River Cells) that are provided and designated by Lessor from time to time as "common areas" for general non-exclusive use, including areas designated by Lessor for ingress, egress and access to the Lease Property, parking, waste storage and removal, security and deliveries to and from the Premises and any other areas designated by mutual agreement of the Parties as common areas.

"Control" means the possession, direct or indirect, of the power to vote more than fifty percent (50%) of the voting interests of a Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting interests, by contract or otherwise. This definition shall also apply to the terms "controlling," "controlled by" and "under common control with."

"Day" or "day" means a calendar day.

"Defaulting Party" has the meaning set forth in Section 13.3.

"Development Plan" has the meaning set forth in the Recitals.

"Disclosing Party" has the meaning set forth in Section 17.6.

"Dispute" has the meaning set forth in Section 16.2.

"Dollar" or "$" mean the lawful currency of the United States of America.

"Execution Date" has the meaning set forth in the Preamble.

"Emergency" means a crisis, incident or other event that threatens the health, safety or welfare of natural persons or the operational integrity of the Facility or the equipment located on the Premises or that would result in the unplanned and immediate cessation of such operations, equipment or Facility.

"Event of Default" means a Lessee Event of Default or Lessor Event of Default, as applicable.

"Facility" means the biodiesel manufacturing facility to be developed and operated by Lessee on the Premises, using the Fixed Assets together with all Improvements thereto.

"First Deposit" means the refundable deposit of $500,000 to be paid by Lessee to Lessor in accordance with and pursuant to Section 7.1(d) of this Agreement.

"Fixed Assets" has the meaning set forth in the Recitals.

"Force Majeure" means any act that (a) renders it impossible for the affected Party to comply with its obligations under this Agreement, (b) is beyond such Party's reasonable control and not due to its fault or negligence and (c) could not have been prevented or avoided by such Party through the exercise of reasonable due diligence. Subject to the satisfaction of the foregoing conditions, Force Majeure shall include without limitation: (i) severe, adverse weather conditions such as storms or floods; (ii) earthquakes; (iii) pandemic or epidemic, terrorist acts, wars (declared or undeclared), civil disturbances, revolts, insurrections, public disorder, riots or sabotage; (iv) strikes or other labor disputes that are not due to the breach of any labor agreement by the Party claiming Force Majeure; (v) fires; (vi) actions or omissions by a Governmental Authority that were not induced or promoted voluntarily by the affected Party or were not caused by a noncompliance with its obligations under this Agreement or Applicable Law; (vii) Change in Law; (viii) the inability by the affected Party, despite its reasonable efforts, to timely and correctly obtain any permit that enables such Party to meet its obligations under this Agreement; or (ix) pollution that was not caused by the noncompliance of the Party claiming Force Majeure with its obligations under this Agreement or Applicable Law. "Force Majeure" specifically excludes (i) the failure of Lessor or Lessee to obtain approval for the construction of additional River Cells and (ii) a Party's inability economically to perform its obligations under any transaction or this Agreement whether caused by action or inaction of such Party or a Governmental Authority such as the elimination or reduction of a subsidy.

"Good Faith Deposit" means, collectively and to the extent that such deposits are required to have been made, the First Deposit, the Second Deposit and the Third Deposit.

"Governmental Authority" means any federal, state, regional or local governmental body, agency, instrumentality, authority, or council having jurisdiction over a Party, the Lease Property or the Operations, as the case may be.

"Guaranteed Rent Payment" has the meaning set forth in Appendix F.

"Improvements" has the meaning set forth in Section 5.1.

"Initial Term" has the meaning set forth in Section 2.2(a).

"Lease Fees" means, collectively, the Production Payment and the Guaranteed Rent Payment.

"Lease Property" has the meaning set forth in the Recitals. For avoidance of doubt, Lease Property shall also be deemed to include any Improvements thereon made by Lessee during the Lease Term in accordance with this Agreement.

"Lease Term" has the meaning set forth in Section 2.2(b).

"Lessee" has the meaning set forth in the Preamble.

"Lessee Event of Default" has the meaning set forth in Section 13.1.

"Lessor" has the meaning set forth in the Preamble.

"Lessor Capital Works" has the meaning set forth in Section 5.1.

"Lessor Event of Default" has the meaning set forth in Section 13.2.

"LIBOR" means the London Interbank Offered Rate for Dollar deposits, as published by The Wall Street Journal or, if not published, then by the Financial Times of London, applicable from the due date for payment and thereafter on the first day of each succeeding calendar month.

"Lienholder" has the meaning set forth in Section 9.11.

"Limited Common Areas" means those Common Areas which are designated by Lessor and Lessee as being solely for use by Lessee, which shall include without limitation the Lessor Capital Works.

"Loan Instrument" has the meaning set forth in Section 4.11.

"Material Adverse Effect of Lessee" means any change or circumstance that, individually or in the aggregate with all other changes or circumstances, has or is reasonably likely to have a materially adverse effect on (a) Lessee's assets, properties, or business in a manner relating to the Operations or any other transactions contemplated hereby or (b) Lessee's ability to perform its material obligations under this Agreement.

"Material Adverse Effect of Lessor" means any change or circumstance that, individually or in the aggregate with all other changes or circumstances has or is reasonably likely to have a materially adverse effect on (a) Lessor's assets, properties, or business in a manner relating to the transactions contemplated hereby or (b) Lessor's ability to perform its material obligations under this Agreement.

"Month" means a calendar month.

"Monthly Production Report" has the meaning set forth in Section 11.1(c).

"Mortgage" has the meaning set forth in Section 4.11.

"Mortgagee" has the meaning set forth in Section 4.11.

"Movable Assets" has the meaning set forth in the Recitals.

"Non-Defaulting Party" has the meaning set forth in Section 13.3.

"Note" has the meaning set forth in Section 4.11.

"Operations" has the meaning set forth in Section 6.1.

"Party" or "Parties" has the meaning set forth in the Preamble.

"Payment Goal" has the meaning set forth in Appendix K.

"Person" means any legal or natural person, including any individual, corporation, partnership, limited liability company, joint stock company, association, joint venture, trust, governmental or international body or agency, or other entity.

"Pipeline" has the meaning set forth in Section 5.1.

"Premises" has the meaning set forth in the Recitals.

"Production Payment" has the meaning set forth in Appendix F.

"Property" has the meaning set forth in the Recitals.

"Prudent Industry Standards" means the generally accepted practices, methods, techniques and standards employed by the biodiesel manufacturing industry in accordance with Applicable Law with respect to: (a) the development, operation and maintenance of biodiesel manufacturing facilities similar to the Facility; (b) personnel and terminal safety and environmental protection; and (c) optimizing the performance of the Operations.

"Receiving Party" has the meaning set forth in Section 17.6.

"Renewal Terms" has the meaning set forth in Section 2.2(b).

"Second Deposit" means the refundable deposit of $200,000 to be paid by Lessee to Lessor in accordance with and pursuant to Section 7.1(d) of this Agreement.

"Supply Agreement" has the meaning set forth in Section 7.1(a).

"Termination Date" has the meaning set forth in Section 2.2(a).

"Termination Payment" has the meaning set forth in Section 14.2.

"Third Deposit" means the refundable deposit of $200,000 to be paid by Lessee to Lessor in accordance with and pursuant to Section 7.1(d) of this Agreement.

"Threshold Price" has the meaning set forth in Appendix F.

"Transfer Fee" has the meaning set forth in Section 14.4(c).

"Utilities and Services" means infrastructure, equipment or services relating to the supply of electricity, water, fire protection, sewage and drainage, steam and natural gas to and within the Lease Property.

"WTI Index Price" has the meaning set forth in Appendix F.

1.2   Construction of Agreement.

(a)   Unless otherwise specified, all references herein are to the Articles, Sections, and Appendices of this Agreement and all Appendices are incorporated herein.

## ARTICLE II

## EXECUTION DATE AND LEASE TERM

2.1 Execution Date. The provisions of this Lease shall be in full force and effect, binding upon the Parties hereto, and enforceable in accordance with their terms, from the Execution Date.

2.2 Lease Term.

(n) *Initial Term.* The initial term of this Agreement (the "Initial Term") shall commence on the Execution Date and terminate on September 30, 2010, unless earlier terminated in accordance with the terms hereof. The date of such termination shall hereinafter be referred to as the "Termination Date."

(o) *Renewal Terms.* Lessee shall have the option to extend the term of this Lease for four (4) additional thirty six (36) month periods (hereinafter the "Renewal Terms") on the same terms and conditions as set forth in this Lease. The Initial Term and any Renewal Terms shall constitute the lease term (the "Lease Term"). Lessee shall give Lessor notice at least one hundred twenty (120) days prior to the expiration of the Lease Term of its intent to extend the term for a Renewal Term.

## ARTICLE III

## LEASE OF LEASE PROPERTY AND ANCILLARY RIGHTS

3.1 Lease. In consideration of the covenants and agreements set forth in this Agreement and other good and valuable consideration, Lessor shall lease the Lease Property to Lessee and Lessee shall lease the Lease Property and Ancillary Rights from Lessor, subject in each case to the terms and conditions set forth in this Agreement. Following delivery of proof of insurance and the Good Faith Deposit as provided in Section 7.1 within the time frame expressed therein, Lessor shall deliver possession of the Lease Property and Ancillary Rights to Lessee for the Lease Term. Lessor shall remain the owner of the Lease Property and Ancillary Rights except as expressly agreed to in writing by Lessor. Subject to the provisions of Sections 4.4 and 4.5 and except for the Improvements as may be required in connection with the Operations throughout the Lease Term, Lessee shall keep and maintain (i) the Premises in substantially the same condition (or better) in which it is originally transferred to Lessee and (ii) the Fixed Assets utilized by Lessee in good condition and working order, in each case reasonable wear and tear excepted.

3.2 Peaceful and Quiet Enjoyment. To the extent that Lessee complies with the terms and conditions of this Agreement and there are no uncured defaults by Lessee (after the expiration of any applicable notice, grace and cure periods provided herein) Lessee shall be unconditionally entitled to exclusively, peacefully and quietly hold, occupy and enjoy the Lease Property. If any third party (other than an Affiliate of Lessee or any other party claiming such rights or interest by, through or under Lessee) conducts activities or presents claims which interfere with Lessee's peaceful and quiet possession and enjoyment of the Lease Property,

Lessor shall indemnify, defend, and hold harmless Lessee from and against any such claims and any and all costs, expenses and losses occasioned thereby.

3.3    Lease Fees.

(a)    Lessee shall pay the Lease Fees monthly in advance on the first day of each calendar month during the Lease Term commencing on the date (the "Rent Commencement Date") that is the earlier of (i) October 1, 2007 and (ii) the date upon which Lessee commences its operations on the Property, in consideration of this Agreement in accordance with the terms and conditions set forth in Appendix F. All payments of Lease Fees shall be made in Dollars, in immediately available funds to an account of Lessor specified in writing to Lessee. Any amounts of Lease Fees (including, without limitation the Production Payment) due but not paid hereunder shall bear interest at the lesser of (a) LIBOR plus two percent (2%) and (b) the maximum rate permitted under Applicable Law. Any payments of Lease Fees due for partial calendar months occurring during the Lease Term shall be proportionally adjusted.

Notwithstanding the foregoing paragraph, if Lessor has not obtained the air quality permit referred to in Section 13.4 by October 1, 2007 for reasons other than Lessee's failure to take, or delay in taking, actions reasonably necessary to obtain the permit, the Lease Fees payable monthly shall be reduced by one-half until the earlier of (A) Lessee's receipt of the permit or (B) March 31, 2008.

(b)    If through no fault of Lessee, the Leased Property, Facility and related infrastructure, whether as currently existing or as potentially may be modified from time to time, are not or cannot be made capable of accepting and supporting, from a logistical standpoint, 45 million gallons per year of inbound biofeedstock oil deliveries and shipment of outbound biodiesel production, then the Lease Fees shall be reduced (but not below a minimum of 50% of the unreduced amount otherwise due absent this reduction) by 1.25% for every 1% below 45 million gallons per year that logistical capabilities drop.

(c)    If Lessor owes a Replacement Fee (as such term is used in the Supply Agreement) under the Supply Agreement, then the Guaranteed Rent Payments (as the same may be reduced pursuant to Section 3.3(b) above) for any time period in which Lessor commits a Supplier Default (as such term is used in the Supply Agreement) shall be reduced by a fraction, the numerator of which is the volume of Products (as such term is used in the Supply Agreement) that Lessor fails to supply during such time period based on a Supplier Default and the denominator of which is the volume of Products that Lessor was required to supply during such time period pursuant to the Supply Agreement. Pursuant to Section 15.4(b) of the Supply Agreement, in lieu of accepting a Replacement Fee (as such term is used in the Supply Agreement), Lessee may elect to offset such Replacement Fee against Lessee's Guaranteed Rent Payments.

3.4    Common Areas, Limited Common Areas and Activity Based Charges.    Lessor agrees and acknowledges that the Lease Property shall include the license and right of Lessee to use the Common Areas and any Limited Common Areas and that the entire Lease Property shall be exclusively occupied, used and controlled by Lessee during the Lease Term for the benefit of Lessee and its employees, contractors, customers and invitees pursuant to the terms of this Lease.

Additionally, Lessee shall pay to Lessor periodically all Activity Based Charges incurred or allocated with respect to the Premises and the Ancillary Rights as provided in and pursuant to Appendix E hereof. This obligation of Lessee to pay Lessor all Activity Based Charges applicable to the Premises and Lessee's use of the Common Areas, Limited Common Areas and Ancillary Rights shall be an independent, additional obligation of Lessee and subject to the same terms and conditions as the payment of Lease Fees herein. Any amounts of Activity Based Charges due but not paid hereunder shall bear interest at the lesser of (a) LIBOR plus two percent (2%) and (b) the maximum rate permitted under Applicable Law.

3.5    River Cells.    Subject to the provisions of this Section 3.5, Lessor agrees and acknowledges that the Lease Property and Ancillary Rights shall include a non-exclusive right of Lessee to receive oil products via the River Cells, provided that Lessor shall have exclusive operational control of all River Cells at all times. To the extent Lessee utilizes the River Cells, Lessor shall charge Lessee therefor as an Activity Based Charge. Lessor shall have the right of primary use of the River Cells, Lessee shall have access to the River Cells necessary to conduct the Operations and shall cooperate with Lessor to coordinate such Operations subject to Lessor's scheduled use of the River Cells such that each Party has the practical capability to use the River Cells in connection with its own operations. Further, even during periods scheduled for Lessee's use of the River Cells, in the event of an Emergency, Lessor shall have the right to control and direct the use, operation, repair, rehabilitation and access to the River Cells as needed to address the Emergency, for the good for the facility site and the benefit of both parties. Subject to Lessor's exercise of operational control as set forth above, Lessor shall take commercially reasonable actions to effect the rights herein provided to Lessee and seek to minimize the incurrence of any delay or demurrage charges imposed on Lessee for deliveries or shipments made as part of the Operations. Lessee acknowledges that unloading of oil at the River Cells is performed under an exclusive contract with a third party (the "Barge Company"). The Barge Company oversees compliance with all requirements of the United States Coast Guard, the United States Environmental Protection Agency and the Department of Homeland Security. The Barge Company is responsible for adherence with all procedures required to operate a barge terminal, coordination with the United States Coast Guard for each unloading and coordination with Lessor for each unloading. Lessee may enter and inspect the River Cells when a representative of the Barge Company is present for escort. The Barge Company will perform the unloading of all supplies from barge delivery on the river. Lessor reserves the right to select and contract with barge service companies to handle all vegetable oil or other liquids unloading from the River Cells. In addition, Lessor reserves the right not to use a third party Barge Company and to undertake the activities of the Barge Company on its own.

3.6    Access to Other Property.    Subject to Applicable Law and Lessor's prior written approval, which shall not be unreasonably conditioned, delayed or withheld, Lessee shall have the right to negotiate rights of way, easements and other types of access to land and other property and Utilities and Services near or adjacent to the Premises which Lessee reasonably determines are required to effectuate the Development Plan and Lessee's conduct of the Operations thereunder.

3.7    Compliance with Work Rules.    Lessee agrees that its personnel shall comply with all rules reasonably promulgated by Lessor for access, safety training, and transit to, from and upon the Premises, Common Areas, Limited Common Areas and Ancillary Rights and which are

consistent with all similar rules in effect with respect to the Channahon Facility and the Property and which are generally applicable thereto. In addition, Lessee agrees that its non-supervisory employees working at the Facility shall be members of the United Steelworkers Union, or the successor union to which Lessor's union employees belong, that such employees will not be members of the same organizational unit within such union as Lessor's employees, and that it will only hire contractors, service providers and other third parties to construct the Improvements or otherwise provide services in respect of the Facility and the Operations who agree to utilize union personnel in the performance of such work or services.

## ARTICLE IV

## USE OF LEASE PROPERTY AND ANCILLARY RIGHTS

4.1     Uses of Property.

(a)     *Permitted Uses.*  Lessee and its Affiliates shall only use the Lease Property and Ancillary Rights to perform the Operations and may not use the Lease Property and Ancillary Rights for any other purpose. Lessee shall not, subject to Section 4.2, allow any Person not within Lessee's control to occupy or use the Lease Property without Lessor's prior written approval, which may be granted or withheld in Lessor's sole and absolute discretion and which shall be deemed given for Persons under contract with Lessor. All activities and Operations of Lessee shall be conducted in full compliance with all applicable laws, codes, ordinances and regulations of any Governmental Authority. Additionally, Lessee shall keep and maintain the Lease Property and Ancillary Rights free and clear of any and all mechanics' liens and other similar third party claims arising as a result of Lessee's activities and its occupancy pursuant to this Lease. Lessee shall be entitled to bond over and contest any such claim with security reasonably acceptable to Lessor or alternatively such security or procedure as may be allowed by Applicable Law having the effect of relieving the Lease Property and Ancillary Rights from any such lien or claim. In the event that Lessee does not bond over or cure a lien within thirty (30) days after the filing of such lien, in addition to all other rights and remedies provided to Lessor under this Lease, Lessor shall have the right to cure such lien and to charge Lessee for all costs and expenses associated with curing such lien, including, without limitation, reasonable attorneys' fees.

(b)     *Prohibited Uses.*  Lessee shall not use or permit the Premises to be used in any manner which would violate any certificate of occupancy or permit currently affecting the Premises or the Property (and which it has received a copy of) or any Applicable Law. Lessee also shall not use the Premises (or permit any permitted use to be conducted on the Premises) in violation of any health, fire, environmental or other applicable codes or regulations or any such rules related thereto which are promulgated by Lessor with respect to its Channahon Facility and the Property (and which are generally applicable thereto and which have been delivered to Lessee) or in any manner which would constitute a public or private nuisance or waste (unless part of the Operations). Lessee shall not use or permit the Premises to be used in any manner whereby the policy or policies of insurance on the Property may become void or voidable or whereby the premium thereof may be increased; provided that Lessor shall provide Lessee with written notice of any such uses and, in addition, shall provide Lessee with written notice of any

uses known by Lessor which may result in a violation of these restrictions and copies of any notices received from third parties which allege the existence of such uses..

4.2     Right to Sublease. Lessee shall not sublease, assign or otherwise convey, or allow any unrelated third parties to use, the Premises or any portion thereof without Lessor's prior written consent, which may be granted or withheld in Lessor's sole and absolute discretion; provided, however, that Lessee may, with Lessor's reasonable consent, sublease, or allow third parties to use, up to twenty percent (20%) of the office space in the Premises to ship agents, forwarders, consultants and other Persons whose business operations are part of or support the Operations; provided, that (a) Lessee remains liable for the activities of such Persons and (b) any such sublease shall not relieve Lessee of any of its obligations hereunder.

4.3     Alteration of Lease Property by Lessor. In accordance with Applicable Law, Lessor shall have the right to alter the Premises without modifying the terms of this Agreement; provided, that (a) such alteration is required under Applicable Law and (b) such alteration (and the implementation thereof) does not interfere with Lessee's Operations, the Facility or Lessee's peaceful and quiet possession and enjoyment of the Lease Property.

4.4     Alteration of Lease Property by Lessee.

(a)     *Development Plan; Monthly Status Reports.* Lessee may (at its cost and expense) construct improvements and make modifications and/or alterations to the Lease Property reasonably required in connection with or in furtherance of the Development Plan (including without limitation the Improvements), subject to Lessor's approval of the Development Plan, which approval may be withheld in Lessor's sole and absolute discretion. If Lessor does not consent in writing to Lessee's proposed Development Plan within 15 days after submission thereof by Lessee, then Lessee shall be entitled to terminate this Lease, without cost or penalty, and Lessee shall have no further obligations hereunder. Upon the commencement of construction, Lessee shall, on a monthly basis, submit status reports to Lessor.

(b)     *Material Improvements.* Other than as specifically set forth in the approved Development Plan, Lessee shall not make any material capital improvements or material alterations to the Lease Property without Lessor's prior written approval, which may be granted or withheld in Lessor's sole and absolute discretion. In requesting such approval, Lessee shall furnish to Lessor the following no later than thirty (30) days prior to the proposed date for commencement of the work implementing such improvements or alterations: (i) the plans and drawings for such improvements or alterations, depicting, among other things, the desired locations of raw material storage tanks, (ii) the names and addresses of all proposed contractors and (iii) such other documentation as reasonably requested by Lessor in connection therewith.

(c)     *Other Improvements.* Lessee shall have the right to make all other additions, alterations and Improvements to the Lease Property as may be necessary for the Operations, without the Lessor's consent and at Lessee's cost and expense, consistent with the Development Plan, but Lessee agrees to provide at least 15 days' advance notice thereof to Lessor of all such works. In addition to the foregoing, Lessee shall comply with (and shall be entitled to make any alterations to the Lease Property required in its judgment to comply with) any applicable provisions of the Americans With Disabilities Act of 1990 (42 U.S.C. §12101 et

seq.) and all regulations and guidelines promulgated thereunder, as the same may be amended and supplemented from time to time (collectively referred to herein as the "ADA").

(d) *Applicable Standards.* The Lessee shall ensure that all permitted improvements and/or additions and alterations made to the Lease Premises are made in compliance with (i) Applicable Law and (ii) Prudent Industry Standards.

(e) *Rights of Lessor to Monitor and Inspect.* Lessor shall have the right to inspect the Lease Property and any permitted improvements, additions and alterations to the Fixed Assets or the Premises during performance of the same and after they have been completed, but only during Lessee's normal business hours and upon delivery of at lease one Business Day's prior written notice to Lessee, except in the case of an Emergency, in which case Lessor may enter the Lease Property without prior notice or consent but only to the extent required by such Emergency to save or protect life or property. No such inspection shall unreasonably interfere with Lessee's performance of the Operations.

4.5 Maintenance.

(a) *Lessee's Maintenance Obligations.* Lessee shall be responsible for all the maintenance and repair of the Lease Property and the Limited Common Areas; provided, that (i) Lessor shall be responsible for all maintenance and repair of the Common Areas and the River Cells (which shall be carried out in accordance with Applicable Law and Prudent Industry Standards) and (ii) Lessee shall contribute toward such maintenance and repair as part of the Activity Based Change. Lessee shall otherwise maintain the Lease Property and Limited Common Areas in good condition and repair, excluding normal wear and tear. The maintenance work performed by Lessee and Lessor shall comply with Applicable Law and Prudent Industry Standards.

(b) *Failure to Repair.* Lessee shall begin any maintenance or repairs of the Lease Property and Limited Common Areas as required hereunder within thirty (30) days after having been notified in writing by Lessor to perform such obligations or to pursue the completion of such repairs, except in the case of an Emergency or other situation requiring compliance with Applicable Law and Prudent Industry Standards prior to the expiration of such time period.

4.6 Utilities and Services. Lessor shall cause to be made available to the Lease Property and Limited Common Areas all Utilities and Services as required for the Facility and the Operations on an uninterrupted basis (as long as there is no interruption in service from the local utility company itself which is unrelated to Lessor's payment for such Utilities and Services). Lessee shall pay for the costs of providing all such utilities for the Lease Property and Limited Common Areas through the Activity Based Charge in accordance with Appendix E. To the extent economically feasible, Lessor shall install and maintain meters on the Premises, and Lessee shall reimburse Lessor for the cost of such installation and maintenance as part of the Activity Based Charges.

4.7 Removal of Movable Assets. The Parties acknowledge that Lessee, at its sole cost and expense, may disassemble, move, transfer and store the Movable Assets to facilitate

completion of the Development Plan and the Facility and engage in the Operations. Upon expiration of the Lease Term, Lessee shall (unless instructed otherwise by Lessor) return and install the Movable Assets to the same or similar condition on the Premises that existed as of the Execution Date, reasonable wear and tear excepted. Upon any termination of this Lease prior to the expiration of the Lease Term, Lessee shall follow Lessor's instructions with respect to the return of the Movable Assets.

4.8    Disposal of Personal Property. Lessee shall not, without the prior written consent of Lessor, sell, offer to sell or otherwise transfer, exchange, hypothecate or dispose of any equipment or other personal property (other than biodiesel fuels and other products that Lessee is in the business of selling) located on the Premises unless in the normal course of business such equipment or other personal property is being replaced by property of similar nature and of equal or greater value or such equipment or other personal property is obsolete.

4.9    Access to Lease Property.

(a)    *By Lessor.* Lessee shall permit Lessor and its designated representatives and agents, upon prior notice and during Lessee's normal working hours to enter and inspect the Lease Property for the purpose of verifying Lessee's compliance with this Agreement and any other requirements under Applicable Law; provided, that (i) any such visit shall not unreasonably interfere with Lessee's performance of the Operations; and (ii) at least one (1) Business Day prior to any visit, Lessor shall notify Lessee in writing of the names of the individuals to be permitted access and the time and date of such visit. Notwithstanding the foregoing, Lessor shall not be required to provide Lessee with such prior written notice in the event of an Emergency, to the extent entry is required to save or protect life or property.

(b)    *By Governmental Authorities.* Notwithstanding the provisions of subsection (a) above, (i) Lessee shall grant access to the Premises to Governmental Authorities for the purpose of carrying out any activities which they are legally entitled to carry out on the Premises pursuant to Applicable Law and (ii) other than in the case of an Emergency (and then only to the extent required thereby) no voluntary access, or access by consent shall be given to Governmental Authorities by Lessor to the Lease Property, without prior authorization from Lessee.

4.10    Return of Lease Property. At the end of the Lease Term, Lessee shall return possession and control of the Lease Property to Lessor, reasonable wear and tear excepted; provided, that Lessee shall retain an ownership interest in and shall be entitled, or required, as the case may be, to remove any and all Improvements thereto in accordance with Section 14.3 hereof.

4.11    Liens Against Lessee's Leasehold Interest.

(a)    Except as specifically provided below, Lessee shall not encumber by mortgage, deed of trust or security agreement Lessee's leasehold estate in the Lease Property or Lessee's rights and interests in the buildings, fixtures, equipment and improvements situated thereon or any rents, issues, profits, revenues and other income to be derived by Lessee therefrom:

(i)     any permitted Mortgage (as defined hereinafter) shall in no event encumber Lessor's fee title and interest in the Lease Property (other than the Improvements) or any of the Biodiesel Output (defined below, and which expressly is not intended to cover, and does not cover, Lessee's inventory, whether feedstock, work-in-progress or finished inventory) and otherwise shall be subordinate to Lessor's title and interest and the interest of any of Lessor's present or future creditors;

(ii)     Lessee may encumber by mortgage, deed of trust or security agreement (herein referred to as a "Mortgage") Lessee's leasehold estate in the Lease Property (and no other real property) together with Lessee's rights and interests in all buildings, fixtures, equipment and improvements situated thereon and all rents, issues, profits, revenues and other income to be derived by Lessee therefrom, to secure such loans from time to time made by a person, firm or corporation (herein called a "Mortgage") to Lessee provided such loan or loans shall mature prior to the expiration of the Lease Term, shall be released upon the termination of this Lease and be subject to the further terms and conditions hereinafter specified;

(iii)     the Mortgage and all rights acquired under it shall be subject to each and every covenant, condition and restriction contained in this Lease and to all rights and interests of Lessor and its lenders hereunder;

(iv)     the Mortgage, the amount of the loan secured by the Mortgage and the form and substance of the Mortgage, the promissory note (hereinafter called the "Note") secured thereby and the other instruments if any to be executed in connection therewith (the Note, the Mortgage and such other instruments hereinafter called the "Loan Instruments") shall be approved in advance by Lessor, which approval shall not be unreasonably withheld, conditioned or delayed;

(v)     the Loan Instruments shall expressly provide that there can be no extensions of the due date of the Note, additions to the Loan evidenced by the Note, alteration of any provision of the Loan Instruments or any refinancing of the unpaid principal balance of the Note without the prior written consent of Lessor;

(vi)     the Loan Instruments shall provide that any proceeds from fire or extended coverage insurance or condemnation awards or proceeds shall be used for repair or restoration of the leasehold improvements and not to repay the indebtedness secured by the Mortgage;

(vii)     the Mortgage shall not cover any interest in any real property other than Lessee's interest in the Lease Property under this Lease and shall not secure any indebtedness other than the Note and indebtedness arising under the terms of the Mortgage upon default by the Mortgagor thereunder to perform a covenant contained therein; and

(viii)     the Loan Instruments shall provide that copies of all notices of default under the Loan Instruments shall be sent to Lessor at the same time they are sent

to Lessee or other mortgagor thereunder, at the address specified in this Lease for Lessor, or such other address registered with Mortgagee.

(b)     Lessor shall serve notice to Lessee's Mortgagee of any default by Lessee hereunder provided the Mortgagee shall notify Lessor in writing of the existence of the Mortgage encumbering Lessee's interest hereunder and the address to which notices should be delivered. The Mortgagee shall have the right to correct or cure any such default within the same period of time after receipt of such notice as is given to Lessee under this Lease to correct or cure defaults. Lessor will accept performance by the Mortgagee of any covenant, condition or agreement on Lessee's part to be performed hereunder with the same force and effect as though performed by Lessee, if, at the time of such performance, Lessor shall be furnished with evidence reasonably satisfactory to Lessor of the interest in this Lease claimed by the person tendering such performance. If this Lease should terminate by reason of the happening of any Lessee Event of Default or any reason of a disaffirmance of this Lease by a receiver, liquidator or trustee for the property of Lessee, or by any department of the city, state or federal government which had taken possession of the business or property of Lessee by reason of the insolvency or alleged insolvency of Lessee and if, at the time of such termination, the Mortgage constitutes a first lien upon the leasehold estate of Lessee, Lessor shall give notice thereof to the Mortgagee and upon request of the Mortgagee made within sixty (60) days after the giving of notice by Lessor to the Mortgagee, and, upon payment to Lessor of all monies due and payable by Lessee hereunder immediately prior to the termination of this Lease, as well as all sums which would become payable hereunder by Lessee to Lessor to the date of execution and delivery of the new lease hereunder mentioned, had this Lease not been terminated, together with reasonable attorney's fees and expenses in connection therewith and in connection with the removal of Lessee from the leased property, and the curing of all defaults hereunder which are within the power of the Mortgagee to cure, and the performance of all the covenants and provisions hereunder which are within the power of the Mortgagee to perform up to the date of the execution and delivery of the new lease hereinafter mentioned, giving credit, however, for any net income actually collected by Lessor from the leased property, other than payments made by Lessee hereunder, Lessor shall enter into a new lease of the leased property with the Mortgagee for the remainder of the Lease Term, on the same terms and conditions as contained in this Lease and dated as of the date of termination of this Lease and the Improvements shall be included in the Lease Property. The estate of the Mortgagee, as Lessee hereunder shall exist as if this Lease were continuing (that is, there shall be no charge, lien or burden upon the leased property prior to or superior to the estate granted by such new lease which was not prior to or superior to the estate of Lessee under this Lease as of the date immediately preceding the date this Lease went into default, except, however, any charge, lien or burden which should not have been permitted and/or should have been discharged by Lessee under the terms of this Lease). Nothing herein contained shall be deemed to impose any obligation upon Lessor to deliver physical possession of the Lease Property to the Mortgagee. The Mortgagee shall pay all expenses, including reasonable attorney's fees, incident to the execution and delivery of such new lease and quitclaim deed.

(c)     The Mortgagee or any purchaser in foreclosure proceedings, including any corporation formed by the Mortgagee or the holder of the Note or other obligations secured by the Mortgage, may become the legal owner and holder of the leasehold estate under this Lease, including the improvements, equipment, fixtures and other property assigned as additional security for such Mortgage, by foreclosure of the Mortgage or as a result of the assignment or

conveyance in lieu of foreclosure PROVIDED THE OWNER OR OPERATOR IS APPROVED BY THE LESSOR, WHICH APPROVAL SHALL NOT BE UNREASONABLY WITHHELD, CONDITIONED OR DELAYED. Lessee hereby acknowledges and agrees that it would not be unreasonable for Lessor to withhold approval of the owner or operator based on such entity's financial insecurity or lack of experience in the conduct of business operations as contemplated herein or if such proposed owner or operator is a competitor of Lessor.

(d)     Lessee shall, promptly upon receipt of any notice of default under any of the Loan Instruments or acceleration of the maturity of the Note, deliver a true copy thereof to Lessor.   Lessee shall comply in all respects with the terms and provisions of the Loan Instruments

4.12     Rules and Regulations. Lessee shall comply with those rules and regulations set forth in Appendix L which are applicable to the entire Channahon Facility site and the Property and do not conflict with the terms and conditions of this Lease. If there is any conflict between such rules and regulations and the terms and conditions of this Lease the terms and conditions of this Lease shall govern. Lessor shall be entitled to revise such rules and regulations from time to time after the Execution Date and Lessee shall comply with such revised rules and regulations, provided it receives a copy thereof and such revised rules and regulations are applicable to the entire Channahon Facility site and the Property and do not conflict with the terms and conditions of this Lease or have any potential adverse impact on the Operations or the Facility.

4.13     Licenses. Lessor shall grant Lessee one or more licenses to construct, at Lessee's sole cost and expense, Pipelines from the River Cells to the Premises and the Limited Common Areas in the locations determined by Lessor, provided that the construction and use of such pipes does not interfere with the business operations of Lessor or other parties at the Property and subject to such other terms and conditions as Lessor may reasonably impose. In addition, Lessor may, in its sole discretion, grant Lessee a license to construct, at Lessee's sole cost and expense, a rail spur through the Common Areas to the Limited Common Area in the location determined by Lessor, provided that the construction and use of such rail spur does not interfere with the business operations of Lessor or other parties at the Property and subject to such other terms and conditions as Lessor may reasonably impose.

4.14     Entrance. Lessor may, in its sole discretion, designate a different entrance to and through the Property to access the Premises than the existing entrance, in which case Lessor shall construct such entrance and an access road to such entrance, and Lessor and Lessee shall share evenly in the cost of such construction.

## ARTICLE V

## CONSTRUCTION

5.1     Improvements. Subject to Section 4.4, Lessee, at its sole cost and expense, shall be entitled to have constructed and to develop on the Lease Property capital improvements of a nature referenced in the Development Plan as reasonably required to complete the Facility and approved by Lessor (the "Improvements"); provided, that all such construction and development occurring on the Property and which is not located on the Premises shall be performed by

Persons who either are being supervised by Lessor or who have been approved in advance by Lessor (in its sole and absolute discretion). The costs and expenses for the Improvements and for the engineering, design, procurement and construction of all non-incidental improvements and modifications required to be completed with respect to those portions of the Property not included within the Premises in order to accommodate the Lessee's permitted use of the Lease Property (including without limitation (a) any expansion, installation, replacement or use of any incoming or outgoing pipeline to carry biodiesel fuel to or from the Lease Property (the "Pipeline"); (b) additional River Cell and docking improvements which may be reasonably requested by Lessee to enable the efficient delivery and acceptance of feedstock and other cargo (including biodiesel) to and from the Lease Property and have been approved by all applicable Governmental Authorities and (c) any required modifications to the Limited Common Areas) (collectively, the "Lessor Capital Works") shall be borne by Lessee. Lessor and Lessee shall meet and agree upon which Lessor Capital Works are reasonably required in connection with the Operations, having due regard for the requirements of Applicable Law, Prudent Industry Standards, the configuration of the Facility, and Lessor's continued use of that portion of the Common Area, the River Cells and of the Channahon Facility not included as part of the Lease Property. Lessor Capital Works shall be designed and constructed within a timeframe which is reasonably acceptable to Lessee, having due regard for Lessee's project development schedule and schedule of commencement of Operations and Lessor's operations and use of the Channahon Facility. Unless otherwise determined by written notice from Lessor to Lessee, Lessee shall be responsible for the construction of the Lessor Capital Works and shall comply with and cause its appointed contractor undertaking the construction of the Lessor Capital Works to comply with all such rules and regulations pertaining to the manner in which such construction is to be carried out as the Lessor reasonably may impose from time to time, but in any event Lessor shall approve the construction of the Lessor Capital Works (provided, that if Lessor undertakes the construction it shall have no right to commit Lessee to any expenditure relating thereto or to any change order or other amendment to any contract therefor) and Lessee (and Lessee's representatives or agents) shall be entitled to inspect the Lessor Capital Works to ensure that such improvements are being designed and constructed in accordance with Lessee's plans and specifications (including those contained in the Development Plan), Applicable Law, Prudent Industry Standards and any other requirements of this Agreement. In addition to the Improvements, Lessee may, at its own risk and expense, install, make or cause to be made on the Lease Property such other non-structural improvements as may be necessary or appropriate for conducting the Operations and completing the Facility, consistent with the Development Plan. Lessor acknowledges and agrees that it shall have no title or ownership interest in the Improvements or such other improvements, except as provided in Section 14.4 below.

## ARTICLE VI

## OPERATIONS

6.1    Obligation of Lessee to Perform Operations. Lessee may use the Lease Property as necessary to manufacture and sell biodiesel, palm based oils and chemicals and other non-food grade products except that Lessee may manufacture and sell from the Facility USP or other grades of glycerin or glycerin based products or specialty products resulting from residual palm oleo-chemical biodiesel by-products in the nature of methylpalmitate, tocotrienol, carotene and

phytosteroland and conduct related operations and activities, including shipping, receiving, processing, storage, office activities, and other operations related to the foregoing.

6.2    Use of Lease Property.  Lessee shall only perform the Operations within the Premises and shall use the Lease Property, Limited Common Areas and Ancillary Rights for the sole purpose of performing the Operations in accordance with this Agreement.

6.3    Exclusivity.  Subject and pursuant to the terms of this Lease, Lessee shall have the exclusive right during the Lease Term to perform the Operations within the Premises (including the operation and maintenance of the Facility) and to occupy and utilize the Lease Property and the Limited Common Areas in any manner permitted hereunder.

6.4    Standards of Performance.  Lessee shall perform the Operations in accordance with Applicable Law and Prudent Industry Standards.

6.5    Duties to Cooperate.  The Parties shall cooperate in good faith to ensure the smooth and effective demise and possession of the Lease Property and Ancillary Rights from Lessor to Lessee, and to enable Lessee to perform the Operations and operate and maintain the Facility in an efficient, cost-effective manner.

6.6    Performance Requirements.

(a)    *General Requirements*.  Lessee shall use commercially reasonable efforts to conduct its Operations on the Lease Property in a continuous manner (subject to seasonal rates and variations) in order to achieve commercial utilization of the Facility in a manner which is consistent with Applicable Law, Prudent Industry Practices and the requirements of this Lease.

(b)    *Interruptions*.  Notwithstanding the foregoing, Operations may be interrupted in order to carry out maintenance or restoration of the Improvements or the other Lease Property or the Facility.  During any such repairs or maintenance or in the event of an accident or Emergency requiring immediate interruption of the Operations or use of the Lease Property or the Facility, the Lessee may take all necessary measures to manage the same.

(c)    *Throughput Rates*.  Lessee shall maintain complete and accurate records of all biodiesel throughput volumes produced and sold from Operations at the Facility (such quantities produced during the Lease Term referred to as the "Biodiesel Output").  Lessor shall have the right to review such records once during each calendar month during the Lease Term, during Lessee's normal business hours and on five (5) days' prior written notice to Lessee.

6.7    Labor.

(a)    *Qualified Personnel*.  Lessee shall select and employ sufficient, suitably skilled and qualified personnel to enable it to perform the Operations and operate and maintain the Facility in accordance with this Agreement.

(b)    *Training*.  Lessee shall be responsible for the preparation and implementation of all training of all staff working within the Facility at the Premises.

## ARTICLE VII

## OBLIGATIONS OF THE PARTIES

7.1    Obligations of the Parties.

(a)    *Execution and Delivery of the Supply Agreement.*  Contemporaneously with the execution of this Agreement, each Party shall duly execute and deliver to the other Party a requirements contract for the supply of feedstock from Lessor or its Affiliate to Lessee as necessary to conduct the Operations (the "Supply Agreement").

(b)    *Representations and Warranties of Lessee.*  The representations and warranties of Lessee in Section 12.1 shall be true and correct in all material respects when made and at and as of the Execution Date and the Rent Commencement Date with the same effect as though made at and as of such time, except that those representations and warranties which are made as of a specific date shall be true and correct in all material respects as of such date.

(c)    *Covenants of Lessee.*  Lessee shall duly perform and comply in all material respects with all covenants and agreements contained in this Agreement.

(d)    *Refundable Good Faith Deposit.*  Within ten Business Days after the Execution Date, Lessee shall pay to Lessor and Lessor shall receive the refundable First Deposit. On or prior to October 1, 2008, Lessee shall pay to Lessor and Lessor shall receive the refundable Second Deposit. On or prior to October 1, 2009, Lessee shall pay to Lessor and Lessor shall receive the refundable Third Deposit. The Good Faith Deposit shall serve as security for Lessee's faithful performance of its obligations under this Agreement. If Lessee fails to pay the Lease Fee or other charges due hereunder, or a Lessee Event of Default occurs and is not remedied within any applicable cure period, after written notice to Lessee, subject to Section 14.4 (c), Lessor may use, apply or retain all or any portion of the Good Faith Deposit for the payment of any amount due to Lessor or to reimburse or compensate Lessor for any direct, nonconsequential liability, cost, expense, loss or damage (including attorneys' fees) which Lessor may suffer or incur by reason thereof. Lessee shall, within 10 days after Lessor's notice, replenish any amount properly withdrawn by Lessor from the Good Faith Deposit, and provide funds to Lessor in the amount of such withdrawal. If Lessee fails to replenish the Good Faith Deposit, Lessor, in addition to all other remedies provided under this Lease, shall have the right to apply Lessee's Lease Fee payments towards replenishing the Good Faith Deposit and increase the next required Lease Fee payment by the amount of such shortfall. Lessor shall keep the Good Faith Deposit in an interest bearing account that is separate from its general accounts. Lessor shall, at the expiration or earlier termination of this Agreement and after Lessee has vacated the Premises in the manner as prescribed in Article 14.3, return to Lessee (or at Lessor's option, to the last assignee, if any, of Lessee's interest herein), that portion of the Good Faith Deposit (together with all accrued interest thereon) not used or applied by Lessor to Lessee's obligations hereunder.

(e)    *Evidence of Insurance.*  Within ten Business Days after the Execution Date, Lessee shall deliver to Lessor certificates of insurance evidencing that Lessee has obtained the insurance coverage on the Premises required under Section 8.1. At Lessor's option and upon

written request, Lessee shall provide Lessor with a certificate of insurance evidencing the existence of such insurance policies and endorsements and reflecting that Lessor has been added as an additional insured to such policies to the extent of its interest in the property covered thereby.

(f)    *Representations* and *Warranties of Lessor*.    The representations and warranties of Lessor in Section 12.2 shall be true and correct in all material respects when made and at and as of the Execution Date and the Rent Commencement Date with the same effect as though made at and as of such time, except that those representations and warranties which are made as of a specific date shall be true and correct in all material respects as of such date.

(g)    *Covenants of Lessor*.    Lessor shall duly perform and comply in all material respects with all covenants and agreements contained in this Agreement required to be performed or complied with by it.

(h)    *Governmental Authority Consents*.    Lessor and Lessee shall cooperate to ensure that all consents, permits, approvals or authorizations of any Governmental Authority which are necessary for Lessee to construct the Improvements and to commence and continue daily Operations with regard to the Facility shall have been made or obtained, to the satisfaction of Lessee in its sole and absolute discretion, and no action of any Governmental Authority shall have imposed any charge, tariff, order or condition that would make the Operations impossible or economically unfeasible.

(i)    *Environmental Review*.    Lessee shall complete such review and make such assessment of the environmental condition of the Premises and the remainder of the Channahon Facility and the Property as it deems reasonable to ensure compliance with Applicable Law, the absence of any environmental condition for which it may be responsible thereunder and the ability of the Facility and the Operations to comply with the requirements set forth in Appendix I.

(j)    *Filing*.    The Parties shall file a memorandum of lease containing the principal terms of this Agreement with the real property records of the appropriate Governmental Authority within fifteen (15) days after the Rent Commencement Date.

## ARTICLE VIII

### LESSEE'S COVENANTS

8.1    Insurance.

(a)    *Required Insurance*.    As of the Execution Date and for the remainder of the Lease Term Lessee shall obtain and maintain, at its expense, the insurance coverages described in Appendix I on terms and conditions stated therein. All insurance policies shall be purchased from insurance companies reasonably acceptable to Lessor, which approval shall not be unreasonably conditioned, delayed or withheld. Lessee may provide such insurance in the form of a blanket policy, covering other of Lessee's operations and/or properties.

(b)     *Modifications of Insurance Coverage.*  All insurance policies required by this Agreement shall provide that the same shall not be modified or terminated without at least thirty (30) days prior written notice to Lessor.  If Lessee at any time fails to secure and maintain in full force and effect any and all of the insurance coverages required under this Agreement, Lessor may procure or renew such insurance, and all reasonable costs incurred by Lessor in connection therewith shall be paid by Lessee.

(c)     *Waiver of Subrogation.*  Lessor and Lessee agree to have all fire and extended coverage and other property damage insurance which may be carried by either of them endorsed with a clause providing that any release from liability of, or waiver of claim for, recovery from the other Party entered into in writing by the insured thereunder prior to any loss or damage shall not affect the validity of said policy or the right of the insured to recover thereunder, and providing further that the insurer waives all rights of subrogation which such insurer might have against the other Party.  Without limiting any release or waiver of liability or recovery set forth elsewhere in this Lease, and notwithstanding anything in this Lease which may appear to be to the contrary, each of the Parties waives all claims for recovery from the other Party for any loss or damage to any of its property insured under valid and collectible insurance policies to the extent of any recovery collectible under such insurance policies.  Notwithstanding the foregoing or anything contained in the Lease to the contrary, any release or any waiver of claims shall not be operative, nor shall the foregoing endorsements be required, in any case where the effect of such release or waiver is to invalidate insurance coverage or invalidate the right of the insured to recover thereunder or to increase the cost thereof (provided, that in the case of increased cost the other Party shall have the right, within ten (10) days following written notice, to pay such increased cost and keep such release or waiver in full force and effect).

8.2     Environment.

(a)     *Obligation to Comply with Environmental Laws.*  In the conduct of its Operations Lessee shall comply with all Applicable Laws concerning the protection of the environment, and shall take all steps necessary to prevent and control any Release (as defined in Appendix J hereto) of any Hazardous Materials (as defined in Appendix J hereto) or the pollution of the air, land and sea by Hazardous Materials (as defined in Appendix J) in, on, under or about the Premises and which may be occasioned thereby, all as required by such Applicable Laws and in accordance with Prudent Industry Practices.  In addition, each Party shall comply with the applicable provisions of Appendix J attached hereto, in its handling, use, management and disposal of Hazardous Materials covered thereby.

(b)     *Hazardous Materials Disposal.*  Lessee, at its sole cost and expense, shall arrange for the disposal of Hazardous Materials generated, stored or otherwise managed at the Premises in accordance with Applicable Laws and Prudent Industry Practices.

(c)     *Obligation to Notify.*  If any Release of Hazardous Materials or an adverse effect to the environment occurs as a result of the Operations that may have a material adverse effect on the Premises, any other portion of the Property or any other off-site location and violates, or is reasonably anticipated to have caused a violation of, Applicable Law, Lessee shall (i) inform Lessor immediately of the same, (ii) take all measures required under Applicable Law and Prudent Industry Practices for detecting, remediating, cleaning up and/or containing such

Hazardous Materials to Lessor's reasonable satisfaction ("Response Actions"), provided that Lessee shall not encumber the Premises, the Channahon Facility or any other portion of the Property with any institutional controls or engineered barriers in undertaking any Response Actions and (iii) provide Lessor with frequent written updates regarding such Response Actions being taken or remaining to be taken by Lessee pursuant to Applicable Law and Prudent Industry Practices with respect to such condition. Lessor hereby gives Lessee a right and license to enter any portion of the Channahon Facility and the Property as may be necessary (in Lessor's sole discretion) to conduct Response Actions with respect to the release of a Hazardous Material caused by the Operations or Lessee's use or occupancy of the Premises.

(d) *Pre-Existing Hazardous Materials.* Lessee shall not be responsible for the cost of containment, removal and/or remediation of Hazardous Materials existing on the Premises or the Property prior to the Execution Date or which may be attributable to any condition not on the Premises or the Property but existing as of such date; provided, however, that if any of the Operations exacerbate or disturb any such pre-existing condition, Lessee shall be responsible therefor and shall indemnify and hold harmless Lessor from all additional costs, damages and expenses (including all reasonable legal fees and costs of litigation) directly attributable to such exacerbating or disturbing conduct; and provided further, however, that, for the avoidance of doubt, such indemnity obligations shall not cover the existence of the pre-existing Hazardous Material itself, which shall not be Lessee's responsibility. Lessor shall indemnify, defend and hold harmless Lessee from all costs, damages and expenses (including all reasonable legal fees and costs of litigation) that Lessee may suffer as a result of or in connection with such pre-existing Hazardous Materials or any actions or claims involving the existence of such Hazardous Materials. Lessor represents and warrants to Lessee that it has received no notices of violation of Environmental Laws since Lessor's receipt of that certain NFR letter recorded in the Will County Recorder's Office on May 21, 2004 as Document Number R2004090858.

(e) *Emergencies.* In the event of any Emergency endangering life or a material portion of the Lease Property, Lessee shall take such action as may be reasonable and necessary to prevent, avoid, or mitigate injury, damage, or loss and shall, as soon as possible, report any such incidents, including Lessee's response thereto, to Lessor.

8.3 Taxes. Lessee shall pay any taxes, levies, duties, withholdings, or other fees levied by Governmental Authorities and are required by Applicable Law to be paid by Lessee as a result of the conduct of the Operations and performance of its obligations hereunder, including without limitation any real estate taxes as applicable to the Premises, which shall be part of the Activity Based Charge.

8.4 Licenses; Permits. Lessee shall obtain and keep in force all necessary licenses and permits that are required under Applicable Law and are necessary for Lessee to fulfill its obligations hereunder, including without limitation, the performance of the Operations.

8.5 Security. During the Lease Term, Lessee shall be responsible for the general security of the Lease Property inside the existing security fence of the Premises. Lessor shall be responsible for the general security of all other portions of the Property.

## ARTICLE IX

## LESSOR'S COVENANTS

9.1    Cooperation. Lessor shall cooperate with Lessee as reasonably necessary to enable Lessee to perform its responsibilities under this Agreement, including the provision by Lessor of copies of drawings, plans, policies, papers, records, reports, data and other information directly related to the Premises and within Lessor's possession or control and which are reasonably necessary for Lessee to complete the Development Plan, construct the Improvements, perform the Operations and manage the Lease Property. Lessee shall cooperate with Lessor as reasonably necessary to enable Lessor to perform its responsibilities hereunder.

9.2    No Interference. Lessor shall ensure that its personnel or invitees located at the Channahon Facility or the Property do not cause unreasonable delay or interference with the performance of Lessee's Operations or any obligations of Lessee or with Lessee's personnel in the execution of their duties.

9.3    Access. Lessor shall, at all times possible, keep road, railway and barge access within the Property open and in good repair so that the Premises may be accessible for use by Lessee for the performance of its Operations, including the receipt of feedstock and the transport of biodiesel. Further, Lessee shall not block or impair access to the Channahon Facility or the remainder of the Property or cause interference with the use thereof by Lessor and all parties claiming rights under Lessor.

9.4    Communications Access. Lessor shall provide and maintain for the benefit of Lessee and the Lease Property unimpeded access to cable and or satellite based communication systems for voice, video and data by truck, barge and rail functions.

9.5    Logistics Access. Lessor shall provide:

(a)    *Access and Navigation.* Lessor shall provide, maintain or cause to be maintained the river and railway approaches and access points, slips in the River Cells, sidings, tracks and navigation aids situated within the Property and necessary for accessing the Premises and the Property, at its sole expense.

(b)    *Safety Regulations.* Lessor shall comply with all Applicable Laws and those work rules referenced in Section 3.7 hereof regarding the use, maintenance and operation, if any, of all railway, road and river access to the Premises.

(c)    *Dredging.* Lessor shall cooperate with applicable Governmental Authorities to ensure that the channel to the Premises and the Property (including without limitation the face of the River Cells), are dredged in accordance with Prudent Industry Standards and shall comply with applicable rules and regulations promulgated by the Army Corps of Engineers, the United States Coast Guard or any other Governmental Authority with respect thereto. Any additional costs incurred by Lessor in so complying or cooperating as a result of Lessee's requirements or Operations at the Premises shall be paid to Lessor by Lessee promptly following notice thereof (which details the additional charges).

9.6     Intentionally Deleted.

9.7     Access to Premises; Rights of Way. Lessor shall grant Lessee, its employees, its customers and suppliers with road and rail access upon the Property and to the Premises in existence as of the Execution Date, subject to Applicable Laws, as necessary to conduct the Operations. Such access shall be provided on a non-exclusive, shared basis with Lessor and other licensees of Lessor entitled to enter the Property and the Channahon Facility. Lessee shall indemnify and hold harmless Lessor, its affiliates and their respective officers, directors, managers, employees and agents against any and all losses, damages and other expenses, including, without limitation, reasonable attorneys' fees, incurred as a result of Lessee's disruption of access to any portions of the Property, and such disruption shall be a default under this Lease.

9.8     Utilities and Services. Neither Lessor nor Lessee shall take any action which is detrimental to the efficient supply of Utilities and Services to either party. Lessee shall provide reasonable assistance to Lessor in making arrangements required to establish the availability of all Utilities and Services to the Premises, which is the Lessor's responsibility.

9.9     Licenses; Permits; Plans. Lessor shall obtain and, to the extent in Lessor's control, keep in force at all times during the Lease Term all licenses, permits, including, without limitation, environmental and health and safety-related permits, and warranties which are necessary for Lessor to fulfill its obligations hereunder and shall provide reasonable assistance to Lessee in its efforts to obtain and keep in force all licenses and permits required to be obtained or maintained by Lessee under Section 8.4 or which are otherwise obtained in connection with the Facility and/or the Operations. Lessee shall conduct its Operations and activities on the Premises in compliance with all such licenses and permits and shall not unduly interfere with Lessor's operations on the Property pursuant to such licenses and permits. Lessee, at its sole cost and expense, shall also develop and implement all programs and plans required to comply with Applicable Laws, including, without limitation, spill control, containment and countermeasures plans, and filings and plans required by the federal Emergency Planning and Community Right to Know Act. Lessee shall provide Lessor with copies of all permits, licenses, warranties, plans and filings required in connection with the Operations on an ongoing basis.

9.10    Taxes. Lessor shall pay any taxes, levies, duties, assessments, or other fees levied by any Governmental Authority and which are required by Applicable Law to be paid by Lessor as a result of the performance of its obligations hereunder or as the owner of the Property, the Channahon Facility and the Lease Property. Lessee shall reimburse Lessor on a monthly or quarterly basis, at Lessor's election (in line with Appendix E), as part of the Activity Based Charge and following notice for the taxes paid by Lessor which are allocable to the Lease Property and any Improvements.

9.11    Non-Disturbance; Subordination; Attornment.

        (a)     Lessor herby covenants and agrees that it shall not allow any land or ground lease or any liens or encumbrances, including, but not limited to any mortgage, trust deed or security agreement, to be place against any of the Lease Property during the Lease Term without first providing a reasonable non-disturbance and attornment agreement from the

mortgagee, holder of a trust deed, secured party, land or ground lessor, or the like (such party being referred to herein as a "Lienholder"), in favor of Lessee, in customary form and which is satisfactory to Lessee, in its sole discretion, and which does not adversely affect Lessee's use of the Lease Property for the Operations or any of its other rights hereunder.

(b)     Lessee shall not be required to subordinate this Lease to any such Lienholder, unless and until a non-disturbance agreement executed and delivered, all in accordance with the foregoing provisions of this Section 9.11; and this Lease shall be superior to any land or ground lease, mortgage, trust deed, lien or encumbrance, unless provided otherwise in such non-disturbance and attornment agreement and compliance with any such agreement shall be a condition precedent to the performance of any Lessee's obligations hereunder affecting same, but shall not affect the exercise of Lessee's rights hereunder.

(c)     Lessee shall not be required to attorn to any successor in interest or purchaser of any of the Lease Property (or any portion thereof or of Lessor's interest in the Lease Property, or any portion of such interest therein) unless (i) Lessor is not in default of any material representation, warranty, covenant, agreement, term or provision of this Lease and (ii) such successor in interest or purchaser assumes, in a writing upon which Lessee may rely, all of Lessor's obligations under this Lease arising on or after the date of such assumption.

## ARTICLE X

## FORCE MAJEURE

10.1     Effect of Force Majeure.  If a Party cannot perform its obligations hereunder due to a Force Majeure event, such Party shall be excused from the performance of such obligations and shall not be considered to have committed an Event of Default from the date such Force Majeure event has commenced and until a reasonable period of time after the termination thereof.  The Parties shall consult and cooperate with each other if a Force Majeure event occurs and shall take all reasonable steps to minimize any losses to either Party resulting therefrom.  The affected Party shall resume the performance of its obligations hereunder as soon as reasonably practicable after such Force Majeure event has terminated.

10.2     Lease Fees Abatement.  The parties agree that in the event of a Force Majeure, the Lease Fees payable hereunder shall be abated to the extent the Force Majeure reduces Lessee's production capability at the Facility unless the loss was incurred as the result of the negligence of Lessee, its officers, agents or employees, provided that Lessor shall be entitled to receive any business interruption insurance properly allocated or specifically designated to compensate for rent.

10.3     Notice.  A Party affected by a Force Majeure event shall, as soon as practicable, provide written notice to the other Party of the occurrence of such Force Majeure event.  Such notice shall include a detailed description of the Force Majeure event, an estimate of the duration of such event, the reasons for which such Party is unable to perform its obligations hereunder due to such event and a plan to mitigate and remedy such event, if possible.  Such Party shall provide the other Party with regular updates of the foregoing information until such time as the Force Majeure event has terminated.

10.4     Termination.  If a Force Majeure event extends for more than one hundred eighty (180) non-consecutive days within a period of nine (9) consecutive Months during the Lease Term or one hundred twenty (120) consecutive days, or a Force Majeure event causes substantial damage or destruction to the Lease Property so that it is not capable of being repaired within one hundred eighty (180) days after the termination of such Force Majeure event, then either Party may terminate this Agreement by giving not less than thirty (30) days written notice of such termination to the other Party.  If Lessor elects to terminate this Lease in accordance with the foregoing sentence, Lessee may, notwithstanding such election, extend the Lease Term and rebuild that portion of the Lease Property and the Facility required to enable it to resume Operations, upon written notice to Lessor.  In such instance, the Lease Fees shall be abated until the earlier of nine (9) months after notice of such election and the substantial completion of the required construction and remediation of the Lease Property.

## ARTICLE XI

## DOCUMENTATION AND AUDITS

11.1     Records and Reports.

(a)     *Accounting.*  Lessee shall maintain and furnish to the Lessor suitable and complete accounting and non-accounting records that summarize all technical, commercial, financial and personnel information relating to the Operations on or before the thirtieth (30th) day after the end of each calendar quarter.  All such information relating to the Biodiesel Output shall be retained in a form that shall permit audits by Lessor; Lessor shall have no other rights to audit or inspect Lessee's records without approval.  Financial records and accounts shall be maintained in accordance with applicable United States generally accepted accounting principles.  Technical records (including without limitation engineering designs and drawings) shall be maintained in accordance with Prudent Industry Practices.

(b)     *Lease Property.*  Lessee shall prepare and maintain current records of the Lease Property as reasonably required by Lessor and in sufficient detail to provide a full understanding of the location and state of the Lease Property.  Such records shall be comprised of physical drawings, databases and calculation sheets along with historical records relating to the constitution, repairs and maintenance of the Lease Property, including all works carried out as replacements, rehabilitation and maintenance.  Physical plans for any buildings located on the Premises shall clearly identify and describe the as-built profiles.  Lessee shall keep accurate records on (i) the removal and storage of any Movable Assets, including the location of any storage thereof and (ii) the erection of all Improvements on the Lease Property and all other alterations thereof.

(c)     *Monthly Production Report.*  Lessee shall prepare a monthly production report which shall include, at a minimum, the Biodiesel Output for the previous calendar month, on the basis of gallons sold, subject to credits for refunds, unpaid accounts, or fuel consumed in the conduct of Operations ("Monthly Production Report").  Lessee shall submit to Lessor the Monthly Production Report within thirty (30) days after the end of each calendar month during the Lease Term.  The Parties shall agree upon the exact format and content of the Monthly Production Report.  Lessee shall provide any clarification of the Monthly Production Report

reasonably requested by Lessor. Also, upon request by Lessor, Lessee shall certify such report as accurate.

(d)　　*Retention Requirements.*  Lessee shall retain all records pertaining to hazardous materials, environmental compliance and permits required by Governmental Authorities for at least three (3) years after the Termination Date.

11.2　Audits.  Lessor may, but not more often than once in any 12 month period during the Lease Term, at its own cost and expense, appoint an independent auditor to audit the books and records of Lessee, but only in respect of verifying (a) the amounts included on the Biodiesel Output and Monthly Production Reports and (b) any amounts then owed or payable by Lessee to Lessor. If any audit reflects errors greater than ten percent (10%) and with a minimum aggregate value of at least $10,000, Lessee shall pay for the cost of the audit in addition to any other amounts payable to Lessor us a result of such errors.

## ARTICLE XII

## REPRESENTATIONS AND WARRANTIES

12.1　Lessee Representations and Warranties.  Lessee represents and warrants that:

(a)　　It is a corporation duly organized and validly existing under the laws of the State of Florida and is authorized and qualified to do business in the United States and the State of Illinois.

(b)　　It is not in violation of any Applicable Law or judgment entered by any Governmental Authority, which violations, individually or in the aggregate, would affect its performance of any obligations under this Agreement. There are no legal or arbitration proceedings or any proceeding by or before any Governmental Authority, now pending or (to the best knowledge of Lessee) threatened against Lessee that, if adversely determined, could reasonably be expected to have a material adverse effect on the financial condition, operations, prospects or business, as a whole, of Lessee, or its ability to perform under this Agreement.

(c)　　Neither the execution and delivery of this Agreement, nor the compliance with the terms and provisions hereof will conflict with or result in a breach of, or require any consent under, the articles of incorporation, by-laws or any other governing document of Lessee, or any Applicable Law or order, writ, injunction or decree of any court, or any agreement or instrument to which Lessee is a party or by which it is bound or to which it is subject, or constitute a default under any such agreement or instrument.

(d)　　It has all necessary power and authority to execute, deliver and perform its obligations under this Agreement; the execution, delivery and performance by Lessee of this Agreement has been duly authorized by all necessary action on its part; and this Agreement has been duly and validly executed and delivered by Lessee and constitutes a legal, valid and binding obligation of Lessee enforceable in accordance with its terms.

(e)　　It will obtain all approvals, consents and authorization required under Applicable Law for the Operations and to consummate the transactions contemplated herein.

(f)    It is financially solvent, able to pay all debts as they mature and possesses sufficient working capital to perform its obligations hereunder.

(g)    It has (i) carefully examined this Agreement, together with all Appendices attached hereto, thoroughly and become familiar with all their respective terms and provisions; (ii) investigated to its satisfaction all Applicable Laws and it can perform its obligations hereunder in accordance therewith; (iii) the experience, resources, qualifications, and capabilities to perform its obligations hereunder; and (iv) made all investigations and inspections that it deems necessary to perform its obligations hereunder, including without limitation investigations and inspections of the Lease Property, and, subject to the terms of this Lease, accepts the Lease Property in its existing condition.

12.2    Lessor Representations and Warranties. Lessor represents and warrants that:

(a)    It is a limited liability company duly constituted and validly existing under the laws of the State of Illinois.

(b)    It is not in violation of any Applicable Law or judgment entered by any Governmental Authority, which violations, individually or in the aggregate, would affect its performance of any obligations under this Agreement. There are no legal or arbitration proceedings or any proceeding by or before any Governmental Authority, now pending or (to the best knowledge of Lessor) threatened against Lessor or involving any of the Lease Property that, if adversely determined, could reasonably be expected to have a material adverse effect on the financial condition, operations, prospects or business, as a whole, of Lessor, or its ability to perform under this Agreement, or the intended use of the Lease Property by Lessee.

(c)    Neither the execution and delivery of this Agreement, nor the compliance with the terms and provisions hereof will conflict with or result in a breach of, or require any consent under, the charter, operating agreement or other governing documents of Lessor, or any Applicable Law or order, writ, injunction or decree of any court, or any agreement or instrument to which Lessor is a party or by which it is bound or to which it is subject, or constitute a default under any such agreement or instrument.

(d)    It has all necessary power and authority to execute, deliver and perform its obligations under this Agreement; the execution, delivery and performance by Lessor of this Agreement has been duly authorized by all necessary action on its part; and this Agreement has been duly and validly executed and delivered by Lessor and constitutes a legal, valid and binding obligation of Lessor enforceable in accordance with its terms.

(e)    It has obtained all approvals, consents and authorizations that are required from any Governmental Authority under Applicable Law to consummate the transactions contemplated herein.

(f)    It has good title to the Movable Assets and other Lease Property and full legal right and power to demise such Movable Assets and other Lease Property to Lessee in the manner contemplated by this Agreement. Upon execution of this Agreement and timely payment of all amounts due hereunder pursuant to the terms hereof Lessee shall have the rights of occupancy and use of the Lease Property, as specified herein free and clear of all liens, other

than the obligation to obtain any required authorizations or consents by a Governmental Authority in connection with the demise of any such Movable Assets and other Lease Property. There is no land or ground lease, mortgage or deed of trust or other interest of any Lienholder affecting or encumbering the Lease Property.

(g) It has received no notice from any Governmental Authority of, and has no knowledge of, any violation of Applicable Law in respect of the Lease Property, or with respect to any environmental condition existing on any portion of the Channahon Facility or the Property.

## ARTICLE XIII

## DEFAULT; TERMINATION

13.1 Lessee Event of Default. Except if resulting from a Lessor Event of Default or Force Majeure, each of the following events shall be considered to constitute a "Lessee Event of Default:"

(a) Lessee declares bankruptcy or is declared bankrupt, makes a general assignment of its assets for the benefit of its creditors, petitions or applies to any court or tribunal for the appointment of a receiver or a trustee for itself or substantially all of its property, or commences or has commenced against it any legal proceedings for its reorganization, readjustment of debt, dissolution or liquidation which are not vacated or terminated within ninety (90) days.

(b) Lessee fails to pay the Lease Fees in accordance with Appendix F.

(c) Lessee commits a breach of any other material provision of this Agreement.

(d) Lessee fails to pay the Activity Based Charge or any payment payable under this Lease as and when due under this Lease.

13.2 Lessor Event of Default. Except if resulting from a Lessee Event of Default or Force Majeure, each of the following events shall be considered to constitute a "Lessor Event of Default:"

(a) Lessor declares bankruptcy or is declared bankrupt, makes a general assignment of its assets for the benefit of its creditors, petitions or applies to any court or tribunal for the appointment of a receiver or a trustee for itself or substantially all of its property, or commences or has commenced against it any legal proceedings for its reorganization, readjustment of debt, dissolution or liquidation which are not vacated or terminated within ninety (90) days.

(b) Lessor commits a breach of a material provision of this Agreement.

13.3    Consequences of Expropriation and Default.

(a)    *Expropriation.*    Subject to Section 17.13, upon a condemnation or expropriation of the Lease Property such that Lessee cannot utilize the same for the Operations or any other use and purposes herein provided, Lessee may immediately terminate this Agreement.

(b)    *Insolvency.*    Upon an Event of Default described in Section 13.1(a) or 13.2(a), the Party that is not in default may immediately terminate this Agreement.

(c)    *Other Events of Default.*    Upon an Event of Default described in Section 13.1(b), (c) or (d) or in Section 13.2(b), the Party that is not in default (the "Non-Defaulting Party") shall personally deliver to the Party which is in default (the "Defaulting Party"), a written notice describing the alleged Event of Default and granting not less than fifteen (15) days from the Defaulting Party's receipt of such notice for the Defaulting Party to deliver a written response to the Non-Defaulting Party. If the Defaulting Party fails to respond to the Non-Defaulting Party within such fifteen (15) day period, then the Non-Defaulting Party may terminate this Agreement. If, however, the Defaulting Party responds to the Non-Defaulting Party, then, the Defaulting Party shall be granted not more than seven (7) days in the event the breach involves a failure to make any payment payable hereunder or in other cases, a reasonable period of time in the light of the circumstances surrounding such Event of Default (but not less than (30) days) to remedy such Event of Default in light of the circumstances surrounding such Event of Default. If such time period expires and the Defaulting Party has not cured the Event of Default, the Non-Defaulting Party thereafter may terminate this Agreement upon notice duly given to the Defaulting Party. If an Event of Default results in an Emergency, the Non-Defaulting Party may take such actions as it reasonably deems necessary to cure the Event of Default or mitigate the potential impacts of such Event of Default prior to the expiration of the Defaulting Party's cure period. The reasonable costs incurred by the Non-Defaulting Party in such instance shall be promptly reimbursed by the Defaulting Party.

(d)    *Lessor's Right to Re-Enter.*    If this Agreement is terminated in accordance with subsection (c) above, Lessee shall surrender possession, remove all Hazardous Materials on the Premises, the Property or other property brought there by Lessee or its subtenants, agents, employees or invitees and vacate the Premises and immediately deliver possession thereof to Lessor, and Lessor may re-enter and take complete and peaceful possession of the Premises, with process of law (full and complete license so to do being hereby granted to Lessor) and Lessor may remove all occupants and property therefrom, (including without limitation the Improvements) using such lawful force as may be necessary, with process of law and without being deemed in any manner guilty of trespass, eviction or forcible entry and detainer and, subject to Sections 14.3 and 14.4, without relinquishing Lessor's right to Lease Fees or any other right given to Lessor hereunder or under Applicable Law.

13.4    Termination without Default.    Notwithstanding any provision of this Agreement to the contrary, this Lease shall be subject to termination by the Party specified below without cause or default, upon the occurrence of any of the following conditions:

(a)     By Lessor or Lessee upon the occurrence of a Force Majeure event which lasts for more than the time periods specified in Section 10.4 hereof;

(b)     By Lessee, without cost of penalty (and with complete refund of any Good Faith Deposit previously made) and without any further obligations hereunder if prior to that date (the "Approval Contingency Deadline") which is ninety (90) days after the Execution Date Lessee does not receive all approvals from Governmental Authorities which it reasonably believes are required for the Operations after making commercially reasonable and continuous good faith efforts to obtain such approvals in a timely manner; provided, however, that either Party may, by written notice to the other party, extend the Approval Contingency Deadline by two hundred seventy (270) days.

(c)     By Lessee, without cost of penalty (and with complete refund of any Good Faith Deposit previously made) and without any further obligations hereunder if prior to that date which is ninety (90) days after the Execution Date the Parties do not agree on the Development Plan pursuant to Section 4.4(a) hereof; provided, however, that this Section 13.4(c) shall not apply unless Lessee submits its proposed revised Development Plan to Lessor on or prior to the date that is sixty (60) days after the Execution Date and such Development Plan does not materially differ from the Development Plan attached hereto as Appendix D other than adjustments for dates and updated information consistent with this Lease and the Supply Agreement.

(d)     By Lessee on or before March 31, 2008, if Lessor is unable, after using commercially reasonable efforts to do so within such timeframe, to obtain air quality permits from the State of Illinois sufficient to permit Lessee's anticipated Operations.

(e)     By Lessee pursuant to Section 17.13.

(f)     By Lessor if the Supply Agreement is terminated.

13.5    Events Not Constituting a Default. Notwithstanding anything to the contrary contained in this Agreement, the following events shall not constitute a Lessor Event of Default:

(a)     Lessor's failure to undertake any activity or any obligation under this Lease due to Lessor being prohibited to do so by a Governmental Authority or any Applicable Law.

(b)     Lessor's inability or unwillingness to permit Lessee to construct or use additional River Cells.

(c)     If Lessor relocates or abandons its facilities at the Property, then the Lessee shall select one of the following courses of action: (A) to terminate the Lease or (B) to use the Common Areas, Limited Common Areas and such portions of the Property as are reasonably necessary to operate the Utilities and Services required to support its Operations at its cost for the duration of the Lease Term but without paying Activity Based Charges. Any capital costs reasonably incurred by Lessee to enable it to economically continue its business consistent with its then current levels of Operations shall be an offset against the Lease Fees provided in Section 3.3.

CHGO2\40169281.11                    32

## ARTICLE XIV

## RIGHTS AND OBLIGATIONS UPON TERMINATION

14.1    Procedures.  On or before that date which is one year prior to the scheduled expiration of the Lease Term, the Parties shall agree to the procedures to be adopted and followed by them relating to the transfer of the Lease Property on such termination. Lessor shall have the right, at its own expense, to take any measures during the last year of the Lease Term (or as the case may be, upon any earlier termination) necessary to ensure the continuity of the performance of the Operations after such termination. Each Party shall be responsible for the costs and expenses incurred by it in performing its obligations under this Article. Notwithstanding the foregoing, if Lessor terminates this Agreement as a result of a Lessee Event of Default, Lessee shall pay the Lessor for all such costs and expenses.

14.2    Termination Payment.  The Parties intend that the Lease Fees should equal or exceed certain Payment Goals during the Lease Term. Therefore, if Lessee does not exercise one or more of its options to extend the Lease Term as permitted under Section 2.2(b) (and Lessor has not received Lease Fees in excess of the applicable Payment Goals as of the Termination Date, then Lessor shall be due a termination payment ("Termination Payment") in accordance with Appendix K. The Parties intend that any Termination Payment that is due and payable by Lessee to Lessor shall be paid out of the Good Faith Deposit. Notwithstanding anything in this Agreement to the contrary, Lessor shall not be entitled to a Termination Payment if: (i) Lessee does not exercise a Renewal Term due to the occurrence or existence of a Lessor Event of Default; or (ii) the Operations or Biodiesel Output were materially curtailed during the Lease Term due to any event of Force Majeure. If any of the foregoing events in (i) or (ii) occur, and a Termination Payment would otherwise be due and payable, the Parties agree to negotiate in good faith a reasonable reduction of the Termination Payment to reflect the reduced production capacity or other factor limiting the production of Biodiesel Output at the Facility. The Parties do not intend that any Termination Payment shall be payable in the event of any termination pursuant to Section 13.4(b) or Section 13.4(c) hereof.

14.3    Surrender of Lease Property.  Within thirty (30) days prior to any scheduled Termination Date, each Party shall survey the Lease Property at its own cost. On the Termination Date, all rights and interests of Lessee in the Lease Property, excluding the assets and Improvements installed or affixed to the Premises by Lessee pursuant to Section 4.4 (the "Biodiesel Improvements and Equipment"), shall cease immediately, and Lessee shall peaceably and quietly surrender to Lessor the Lease Property in a good working condition in accordance with Prudent Industry Practices (excluding reasonable wear and tear). Lessor shall, provided that there is no unpaid obligation on the part of the Lessee, allow Lessee to remove that portion of the Biodiesel Improvements and Equipment acquired or owned by Lessee that Lessee elects to retain and can remove without causing substantial damage to the Lease Property in a reasonable manner within sixty (60) days after the Termination Date, and shall provide Lessee (and its representatives) sufficient access to the Premises to enable them to so remove such Biodiesel Improvements and Equipment and restore the Lease Property following such removal, at Lessee's expense, to the condition it was in at the beginning of the Lease Term, reasonable wear and tear excepted. Further, Lessor may require Lessee, at Lessee's own expense, to return and re-install the Movable Assets to the same or similar condition that existed (excluding reasonable

wear and tear) before they were removed from the Premises by Lessee and to remove any other personal property (such personal property to be determined at Lessor's discretion) from the Premises. Upon any such surrender and delivery as required herein, Lessee and Lessor agree that Lessor shall, subject to Lessee's having satisfied the Lessor that title to such Improvements can be taken over by the Lessor without challenge, delay or contest, provide Lessee with a credit for the lesser of the scrap value or book value as carried in the Lessee's accounts of such Improvements made by or at the expense of Lessee to the Premises and which are not removed therefrom. The payment of such credit amount to Lessee shall only be made by Lessor to the extent that it exceeds the balance of any of Lessee's unpaid obligations hereunder at the Termination Date.

14.4    Liquidated Damages.

(a)    *Liquidated Damages.* Notwithstanding the provisions of Section 14.3, if Lessor terminates this Agreement prior to the end of the Lease Term in accordance with Section 13.1 due to a Lessee Event of Default, then Lessee shall pay all sums due to Lessor prior to the Termination Date and, in lieu of exercising the other remedies provided to it under the Lease, Lessor may elect to retain the Biodiesel Improvements and Equipment as liquidated damages. The Parties acknowledge and agree that because of the unique nature of the Lease Property, and the effect of any default upon relations with the customers and Lessor's ability to continue to deliver and process certain feedstock, it is difficult or impossible to determine with precision the amount of damages that would or might be incurred by Lessor as a result of a Lessee Event of Default. It is understood and agreed by the Parties that (i) Lessor shall be damaged by failure of Lessee to meet such obligations; (ii) it would be impracticable or extremely difficult to fix the actual damages resulting therefrom; (iii) any sums that would be payable under this Section 14.4(a) are in the nature of liquidated damages and not a penalty and are fair and reasonable; and (iv) such payment represents a reasonable estimate of fair compensation for the losses that may reasonably be anticipated from such failure. Nothing herein is intended to affect or limit Lessor's right to recover any outstanding sums due by the Lessee to the Lessor and any damages of Lessor which may otherwise be payable by Lessee to Lessor under the Supply Agreement. In addition, nothing herein shall limit Lessor's rights and remedies pursuant to Lessee's environmental indemnification obligations under this Lease.

(b)    *Release of Liability.* As additional consideration for the liquidated damages provision in Section 14.4(a), if Lessor terminates this Agreement due to a Lessee Event of Default, Lessee shall be relieved of all responsibility for claims or damages under or related to this Agreement or such Event of Default (other than responsibility under Lessee's environmental indemnification obligations under this Agreement and except as provided in Section 14.4 (a)) by delivering, without challenge, delay or contest, title to the Biodiesel Improvements and Equipment to Lessor, free and clear of all liens. The Biodiesel Improvements and Equipment shall be transferred on an "as-is, where-is basis", with no warranties, express or implied other than a warranty of title.

(c)    *Transfer Fee.* If Lessee transfers the Biodiesel Improvements and Equipment to Lessor in accordance with Section 14.4(a) upon the termination of this Agreement due to a Lessee Event of Default, Lessee shall be entitled to receive (i) a transfer fee from Lessor equal to $.05 per gallon for any and all gallons of biodiesel produced by Lessor or one or more of

its Affiliates at the Premises or using the Biodiesel Improvements and Equipment (the "Transfer Fee") within twenty four (24) months after the Termination Date and continuing for a period of sixty (60) months after any biodiesel production is recommenced following the Termination Date (but not to exceed in the aggregate any Termination Payment and Lessee's unrecovered capital costs) and (ii) the prompt return of the Good Faith Deposit, together with accrued interest thereon. The Transfer Fee shall be due and payable to Lessee on or before the fifteenth (15th) day of each calendar month for all production which occurred in the previous calendar month. The provisions of Article XI shall apply to Lessor with respect to Transfer Fee payments as if it were Lessee thereunder, mutatis mutandis, including the obligation to maintain accurate records and the right to audit biodiesel production calculations. This Section 14.4(c) shall survive the termination or expiration of this Agreement. The Parties acknowledge and agree that Lessor may offset any Transfer Fee payment obligation against sums which may be due to Lessor under the Supply Agreement as a result of Lessee's breach of any of the terms thereof.

14.5    Cooperation; Exchange of Information.    Lessee shall use its commercially reasonable efforts and cooperate with Lessor or any new lessee that Lessor may appoint to take over responsibility from Lessee to perform the Operations on or after the Termination Date; provided, that the foregoing shall not require Lessee to assume any liability, obligation or exposure in excess of that existing as of such date.

14.6    Hazardous Materials.    At or prior to the Termination Date, Lessee shall remove all Hazardous Materials on the Premises, the Property or neighboring property that were brought there by Lessee or its subtenants, agents, employees or invitees.

## ARTICLE XV

## INDEMNITIES; LIABILITIES

15.1    Lessee Indemnity.    To the fullest extent permitted by Applicable Law, Lessee shall indemnify, defend, and hold harmless Lessor, from and against any and all liabilities, losses, expenses, and claims for personal injury or property damage or any penalties or fines imposed on Lessor that arise from or out of (i) Lessee's willful misconduct or negligent acts or omissions, (ii) the presence or Release of Hazardous Materials caused or permitted by Lessee or its subtenants, agents, employees or invitees, (iii) environmental contamination or violation of Environmental Laws caused or permitted by Lessee or its subtenants, agents, employees or invitees, (iv) permit violations, (v) a breach of a representation or warranty, including, without limitation, environmental representations and warranties or (vi) any construction activities performed by Lessee.

15.2    Lessor Indemnity.    To the fullest extent permitted by Applicable Law, Lessor shall indemnify, defend, and hold harmless Lessee, from and against any and all liabilities, losses, expenses, and claims for personal injury or property damage or any penalties or fines imposed on Lessee that arise from or out of Lessor's willful misconduct or negligent acts or omissions.

15.3    Cumulative Remedies.    Except as specifically set forth herein, (a) all rights and remedies provided hereunder to Lessor and all rights and remedies available to Lessor under

Applicable Law shall be cumulative and concurrent and (b) the exercise by Lessor of its rights or remedies under this Agreement shall not operate as a waiver of its rights and remedies under Applicable Law.

15.4    Survival.    Sections 15.1 and 15.2 shall survive the expiration or sooner termination of this Lease.

## ARTICLE XVI

## GOVERNING LAW; DISPUTE RESOLUTION

16.1    Governing Law. This Agreement shall be governed by, construed and enforced in accordance with the laws of Illinois.

16.2    Disputes. Any dispute, controversy or claim arising out of or in relation to or in connection with this Agreement and the activities carried out hereunder, including without limitation any dispute as to the construction, validity, interpretation, enforceability or breach of this Agreement (each a "Dispute"), shall be exclusively and finally settled pursuant to the dispute resolution process described in Sections 16.3 and 16.4.

16.3    Mutual Consultation. If either Party believes that a Dispute exists, it may deliver a notice to the other Party requesting that the Dispute be referred to the senior management of the Parties. Any such notice shall include the names of the senior management of the Party nominated to attempt to resolve the Dispute, and a schedule of their availability during the twenty one (21) day period following the date of such notice. Within seven (7) days after receipt of a notice pursuant to the preceding sentence, the other Party shall provide a notice to the requesting Party indicating the names of its senior management nominated to attempt to resolve the Dispute, and a schedule of their availability during the remainder of the twenty one (21) day period following the date of the notice. During the remainder of such twenty one (21) day period, the nominated members of the senior management of the Parties shall meet as frequently as possible and shall attempt in good faith to resolve the Dispute.

16.4    Binding Arbitration. If the Parties cannot resolve the Dispute in accordance with the procedure specified in Section 16.3, then any Party may submit such Dispute to arbitration by notice to the other Party. Such arbitration proceeding shall be governed by the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), as in effect on the date of such notice. The arbitral tribunal shall consist of three (3) arbitrators. The Party initiating the arbitration proceeding shall provide written notice to the other Party of the arbitrator that it nominates. Within fourteen (14) Days of the receipt of such notice, the other Party shall provide to the initiating Party a written notice identifying the name of a second nominated arbitrator, with the understanding that if such nomination is not made within such fourteen (14) Day period, then the AAA shall make such appointment. Within fourteen (14) Days following the date of the appointment of the second arbitrator, the two arbitrators shall appoint the third arbitrator, with the understanding that if the two arbitrators are not able to agree on a third arbitrator within such fourteen (14) Day period, then the third arbitrator shall be appointed by the AAA. All three of the arbitrators shall be experienced in contracts of a similar nature to this Agreement, and all three individuals shall also be proficient in the written and spoken forms of the English language.

The arbitration proceedings shall be conducted and all related communications shall be in the English language. The arbitration shall be conducted in Joliet, Illinois or such other place as the Parties may mutually agree. Any decision of the arbitral tribunal shall be final and binding upon the Parties. The Parties hereby waive, to the extent permitted by Applicable Law, any right to appeal or to review of such reward by any court or tribunal. Any award of the arbitral tribunal may be entered in any court having jurisdiction for purposes of enforcement. The arbitral tribunal shall presumptively award legal fees and arbitral costs to the winning party, but the arbitral tribunal shall retain the right to make such other equitable allocation with regard to such fees and costs as it may determine.

## ARTICLE XVII

## MISCELLANEOUS

17.1    Amendments. No change, amendment, or modification of this Agreement shall be valid or binding upon the Parties hereto unless such change, amendment, or modification shall be in writing and duly executed by both Parties hereto.

17.2    Assignment. Lessee shall not sublease or assign this Agreement in whole or in part, or delegate its obligations hereunder, in whole or in part, except with Lessor's consent which Lessor shall not unreasonably withhold, condition or delay. Notwithstanding the preceding sentence, no consent shall be required for a transfer of this Agreement to an Affiliate by assignment, merger or otherwise or an assignment for collateral purposes. Lessor may assign this Agreement as a part of a sale of the Premises, the Common Areas or the limited Common Areas, as applicable. The transferor shall remain jointly and severally liable with the transferee for the full performance of the transferor's obligations under this Agreement unless the transferee assumes in writing all of the obligations of the transferor; any assignment not in accordance with the provisions of this Section shall be void and without force or effect. Lessee hereby acknowledges and agrees that it would not be unreasonable for Lessor to withhold approval of any transfer of this Lease based on the transferee's financial insecurity or lack of experience in the conduct of business operations as contemplated herein or if any such transfer is sought to a competitor of Lessor.

17.3    Survival. All rights accrued prior to the termination of this Agreement shall survive its termination.

17.4    Entire Agreement. The terms and provisions contained in this Agreement and the Supply Agreement (including all exhibits and appendices thereto) constitute the entire agreement between the Parties with respect to the subject matter hereof.

17.5    Notices. Any notice, demand or document that either Party is required or may desire to give under this Agreement must be (a) in writing and (b) except to the extent specifically provided otherwise in this Agreement, given by personal delivery, overnight courier, facsimile or United States registered or certified mail, return receipt requested, with the postage prepaid and properly addressed or communicated to such Party at its address or facsimile number shown below, or at such other address as either Party may have furnished to the other by notice given in accordance with this Section 17.5. Any notice delivered or made by personal delivery,

overnight courier, facsimile, or United States mail shall be deemed to be given on the date of actual delivery as shown by the receipt for personal delivery or overnight courier delivery, the addresser's machine confirmation for facsimile delivery, or the registry or certification receipt for registered or certified mail.

If to EFA:

Earthfirst Americas, Inc.
2515 East Hanna Avenue
Tampa, Florida 33610
Attn:  D. Massari, Senior Vice President
Facsimile No.: 813.238.8490

With a copy to (which shall not constitute notice):

Squire, Sanders & Dempsey LLP
201 North Franklin Street, Suite 2100, Tampa, Florida 33602
Attn: Joseph D. Edwards, Esq.
Facsimile No.: 813.202.1313

If to Supplier:

Loders Croklaan USA, LLC
24708 West Durkee Road
Channahon, Illinois  60410
Attn: Julian Veitch
Facsimile No.: 815-730-5202

With a copy to (which shall not constitute notice):

DLA Piper US LLP
203 North LaSalle Street, Suite 1900
Chicago, Illinois  60601
Attn: Donald A. Shindler, Esq.
Facsimile No.: 312-630-5344

17.6   Confidentiality.

(a)   *Obligation of Confidentiality.* Each Party agrees to hold in confidence for a period of five (5) years following the termination of this Agreement, any information supplied to such Party (the "Receiving Party") by the other Party (the "Disclosing Party") and related to the Lease Property, the Biodiesel Improvements and Equipment, the Movable Assets, the Operations or this Agreement as more fully described in the Confidentiality Agreement between the Parties dated September 8, 2006 (the "Confidential Information"). Each Receiving Party shall maintain in complete confidence and will not disclose to any Person any such information except (i) as may be required by court order, Applicable Law or a Governmental Authority (including, if required, to comply with the disclosure requirements of the Securities and Exchange Commission, the New York Stock Exchange, the American Stock Exchange or any

self-regulatory organization), (ii) to such Receiving Party's or its Affiliates' employees, auditors, consultants, banks, financial advisors and legal advisors, or (iii) as provided in Section 17.6(c).

(b)    *Exceptions.*    The provisions of Section 17.6(a) shall not apply to information within any one of the following categories or any combination thereof: (i) information that was in the public domain prior to the Receiving Party's receipt thereof from the Disclosing Party or that subsequently becomes part of the public domain by publication or otherwise except by the Receiving Party's wrongful act; (ii) information that the Receiving Party can show was lawfully in its possession prior to receipt thereof from the Disclosing Party through no breach of any confidentiality obligation; or (iii) information received by the Receiving Party from a third party having no obligation of confidentiality with respect thereto. It shall not be a breach of the obligation of confidentiality contained herein if the Receiving Party discloses confidential information as required by Applicable Law or any Governmental Authority.

(c)    *Tax Disclosure.*    Notwithstanding anything herein to the contrary, the Parties (and their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind from the commencement of discussions, the U.S. federal income and state tax treatment and tax structure of the transactions herein contemplated and all materials of any kind (including opinions or other tax analyses) that are provided to the Parties relating to such tax treatment and tax structure, except where confidentiality is reasonably necessary to comply with securities laws. For this purpose, "tax structure" is limited to facts relevant to the U.S. federal income and state tax treatment of the transactions herein contemplated and does not include information relating to the identity of the Parties, their Affiliates, agents or advisors.

17.7    No Waiver. Any failure of any Party to enforce any of the provisions of this Agreement or to require compliance with any of its terms at any time during the term of this Agreement shall in no way affect the validity of this Agreement, or any part hereof, and shall not be deemed a waiver of the right of such Party thereafter to enforce any and each such provision.

17.8    Severability. The invalidity of one or more phrases, sentences, clauses, sections or articles contained in this Agreement shall not affect the validity of the remaining portions of this Agreement so long as the material purposes of this Agreement can be determined and effectuated.

17.9    Further Assurances. The Parties agree to provide such information, execute and deliver any such instruments and documents and to take such other actions as may be necessary or reasonably requested by the other Party (to the extent not inconsistent with the provisions of this Agreement and that do not involve the assumptions of obligations other than those provided for herein) in order to give full effect to this Agreement and to carry out the intent hereof.

17.10    Compliance with Laws; Officials Not to Benefit. Lessee shall comply with all Applicable Laws applicable to its performance under this Agreement, including those dealing with improper or illegal payments, gifts or gratuities. In any event, each Party represents and warrants to the other that it has not paid, promised to pay or authorized the payment of, and agrees that it shall not pay, promise to pay or authorize the payment of, any money or anything

of value, directly or indirectly to any person (whether a government official or private individual) or Governmental Authority for the purpose of or where there is a likelihood of illegally or improperly inducing any official, political party or official thereof or Governmental Authority to obtain or retain business, or to take any other favorable action in relation to the Lease Property, the Movable Assets, the Operations, Lessor, Lessee, or any third party.

17.11  Commissions. Each Party represents to the other that it has not authorized any broker or finder to act on its behalf in connection with this Agreement and that it has not dealt with any broker of finder purporting to act on behalf of any other Party. Each Party agrees to indemnify and hold harmless the other Party from and against any and all claims, losses, damages, costs or expenses of any kind or character arising out of or resulting from any agreement, arrangement or understanding alleged to have been made by such Party or on its behalf with any broker or finder in connection with the Agreement or the transactions contemplated hereby.

17.12  Rights Reserved to Lessor. Lessor reserves the following rights, exercisable without notice and without liability to Lessee for damage or injury to property, person or business and without effecting an eviction or disturbance of Lessee's use or possession of the Lease Property or giving rise to any claim for setoff or abatement of Lease Payments or affecting any of Lessee's other obligations under this Lease:

        (a)    to change the name or street address of the Channahon Facility;

        (b)    to install and maintain signs on the exterior and interior of the buildings other than the Premises;

        (c)    to reasonably prescribe the location and style of Lessee's identification sign or lettering on and for the Premises; provided, that Lessee's use of its unique name, style and lettering shall be Lessee's decision;

        (d)    to retain at all times, and to use in appropriate instances, pass keys to the Premises.

17.13  Eminent Domain. If the entire Premises, or a substantial part thereof, or any part thereof which includes all or a substantial part of the Premises or any necessary appurtenances (whether or not located on the Premises and including without limitation the River Cells) shall be taken or condemned by any competent authority for any public or quasi public use or purpose, the Lease Term shall end upon and not before the earlier of (a) the date when the possession of the part so taken shall be required for such use or purpose or (b) the effective date of the taking, and without apportionment of the award to or for the benefit of Lessee. If any condemnation proceeding shall be instituted in which it is sought to take or damage any part of the Premises or the Property, the taking of which would, in Lessee's reasonable opinion, prevent the economical operation of the Premises or the Operations, or if the grade of any street or alley adjacent to the Premises is changed by any competent authority, and such taking, damage or change of grade makes it necessary or desirable to remodel the Premises to conform to the taking, damage or changed grade, Lessee shall have the right to terminate this Lease upon not less than ninety (90) days' notice prior to the date of termination designated in the notice. In such event the Lease

Fees at the then-current rate shall be apportioned as of the date of the termination. No money or other consideration shall be payable by Lessor to Lessee for the right of termination and Lessee shall have no right to share in the condemnation award, whether for a total or partial taking, for any loss of Lessee's leasehold interests or Improvements or other loss or expenses, or in any judgment for damages caused by the change of grade; provided, that Lessee may, by separate action, seek an award for loss of its Improvements or other equipment fixtures and personal property and for moving expenses, if such separate action shall not reduce Lessor's condemnation proceeds or, if it so does, Lessor shall recover the reduction from such separate award. If this Lease is not terminated on account of any condemnation, Lessor shall proceed with reasonable promptness to repair and restore the Premises, subject to reasonable delays caused by matters beyond Lessor's reasonable control and also subject to zoning laws and building codes then in effect.

17.14   Patriot Act Requirements.  The parties acknowledge that the President of the United States of America has issued Executive Order 13224 (the "Executive Order") prohibiting transactions with terrorists and terrorist organizations and that the government of the United States has adopted and may in the future adopt other anti-terrorism measures (the "Anti-Terrorism Measures"). Each party represents and warrants to the other that it is not and has not been determined to be a person listed in the Annex to Executive Order 13224, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as periodically amended (the "Prohibited Persons").

17.15   Attorney's Fees.  If any Party brings a legal action or arbitration proceeding to enforce its rights or for declaration of its rights or an alleged breach or default hereunder or pursuant to the transactions contemplated hereby, the prevailing Party in such action or proceeding shall be entitled to an award of its reasonable attorney's fees and costs expended in any such court and/or arbitration proceeding, in addition to any other damages or relief awarded to such Party.

17.16   Waiver of Jury Trial.  It is mutually agreed by and between Lessor and Lessee that the respective Parties hereto shall, and they hereby do, waive trial by jury in any action, proceeding or counterclaim brought by either of the Parties hereto against the other on any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Lessor and Lessee, Lessee's use of or occupancy of the Premises or any claim of injury or damage and any emergency statutory or any other statutory remedy related thereto.

17.17   Estoppel Certificates.  Lessee agrees that, from time to time (but not more than once in any 12 month period) upon not less than twenty (20) days' prior request by Lessor or the holder of any Mortgage or any ground lessor, Lessee (or any permitted assignee of Lessee's rights hereunder) will deliver to Lessor, or to the holder of any Mortgage or any ground lessor, a statement in writing signed by Lessee certifying to the knowledge of Lessee that (a) this Lease is unmodified and in full force and effect (or if there have been modifications, that this Lease as modified is in full force and effect and identifying the modifications); (b) the date upon which Lessee began paying Lease Fees and the dates to which the Lease Fees and any Activity Based Charge have been paid; (c) Lessor is not in default under any provision of this Lease, or, if in default, the nature thereof; (d) Lessee is occupying the Premises and is paying Lease Fees on a current basis with no offsets or claims; (e) there has been no prepayment of Lease Fees other

than as provided for in this Lease; and (f) there are no actions, whether voluntary or otherwise, pending against Lessee under the bankruptcy laws of the United States or any state thereof.

17.18  Guaranty.  Contemporaneously with Lessee's execution of this Agreement, Lessee shall cause its parent entity, EarthFirst Technologies, Inc., to execute the guaranty attached hereto and deliver same to Lessor.  Further, in the event of any consolidation, transfer, combination or other action such that a new parent is created for Lessee or EarthFirst Technologies, Inc. becomes a subsidiary of another company, or both, then the entity which becomes the new parent of Lessee and/or the entity which becomes the new parent of EarthFirst Technologies, Inc. each, as the case may be, shall execute and deliver a guaranty, in the form attached, to Lessor and each such new guarantor shall be jointly and severally liable with EarthFirst Technologies, Inc. and Lessee for Lessee's duties and obligations under this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, each Party has caused its authorized representatives to execute this Agreement in the space provided below, effective as of the Execution Date.

LESSOR:

Loders Croklaan USA LLC

By: _____
Name: Julian Veitch
Title: President

LESSEE:

Earthfirst Americas, Inc.

By: _____
Name: Domenic Massari
Title: Senior Vice President

IN WITNESS WHEREOF, each Party has caused its authorized representatives to execute this Agreement in the space provided below, effective as of the Execution Date.

LESSOR:                                          LESSEE:

Loders Croklaan USA, LLC                         Earthfirst Americas, Inc.

By: _____                      By: _____
Name: Julian Veitch                              Name: Domenic Massari
Title: President                                 Title: Senior Vice President

## GUARANTY

**THIS GUARANTY** (the "Guaranty") is made and entered into as of this _//\(_ day of April, 2007 by the undersigned ("Guarantor") who, having received a copy of that certain Lease Agreement dated April _/\_ , 2007 (the "Lease"), between **Loders Croklaan USA, LLC,** an Illinois limited liability company ("Lessor"), and **EarthFirst Americas, Inc.,** a Florida corporation ("Lessee"), has examined the Lease and is familiar with all the terms, covenants and provisions contained therein, and as an inducement to Lessor to enter into the Lease, does hereby unconditionally guarantee to Lessor: (i) the full and prompt payment of all Lease Fees, Activity Based Charges and all other sums and charges payable by Lessee under the Lease; (ii) the full and timely performance and observance of all the covenants, terms, conditions, and agreements therein provided to be performed and observed by Lessee; (iii) the full and prompt payment of all costs, expenses and reasonable attorneys' fees incurred by Lessor in enforcing the Lease and/or this Guaranty, to the extent Lessor is entitled to recover same under the Lease; and (iv) the full and prompt payment to Lessor of the amount of any payments made to Lessor which are recovered from Lessor by a trustee, receiver or creditor of the Guarantor or Lessee pursuant to applicable law; and the Guarantor hereby covenants and agrees to and with Lessor that if default shall at any time be made by Lessee in the payment of any Lease Fees, Activity Based Charges, or any other sum or charge payable by Lessee under said Lease, or if Lessee should default in the performance and observance of any of the covenants, terms, conditions, or agreements contained in said Lease, the Guarantor will forthwith pay such rent and such other sums and charges to Lessor, and any arrears thereof, and shall forthwith faithfully perform and fulfill all of such terms, covenants, conditions, and agreements.

This Guaranty is an absolute and unconditional guaranty of payment and of performance, and not of collection. It shall be enforceable against the Guarantor without the necessity of any suit or proceedings on Lessor's part of any kind or nature whatsoever against Lessee and without the necessity of any notice of nonpayment, nonperformance or nonobservance or of any notice of acceptance of this Guaranty or of any other notice or demand to which the Guarantor might otherwise be entitled, all of which the Guarantor hereby expressly waives; and the Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of the Guarantor hereunder shall in no way be terminated, affected, diminished, or impaired by reason of the assertion or the failure to assert by Lessor against Lessee, or against Lessee's successors and assigns, any of the rights or remedies reserved to Lessor pursuant to the provisions of said Lease or by relief of Lessee from any of Lessee's obligations under the Lease or otherwise, including, but not by way of limitation, the rejection of said Lease in connection with proceedings under the bankruptcy laws now or hereafter in effect.

This Guaranty shall be a continuing guaranty and the liability of the Guarantor hereunder shall in no way be affected, modified or diminished by reason of any assignment, renewal, modification, or extension of the Lease or by reason of any modification or waiver of or change in any of the terms, covenants, conditions, or provisions of the Lease, or by reason of any extension of time that may be granted by Lessor to Lessee, or a changed or different use of the Leased Premises, or by reason of any dealings or transactions or matters or things occurring between Lessor and Lessee, whether or not notice thereof is given to the Guarantor.

The Guarantor hereby unconditionally waives (a) presentment, notice of dishonor, protest, demand for payment, and all notices of any kind, including, without limitation, notice of acceptance hereof; notice of nonpayment, non-performance, or other default under the Lease; and notice of any action taken to collect upon or enforce any of the terms and provisions of the Lease; (b) any subrogation to the rights of Lessor against Lessee until all of the obligations of Lessee under the Lease have been fully complied with and the Lease has expired or terminated and such payments made by the Guarantor are not subject to a right of recovery; and (c) any setoffs or counterclaims against Lessor which would otherwise impair Lessor's rights against the Guarantor hereunder.

The assignment by Lessor of the Lease and/or the rents, profits, avails, and/or proceeds thereof made either with or without notice to the Guarantor shall in no manner whatsoever release the Guarantor from any liability as Guarantor.

All of Lessor's rights and remedies under the Lease and under this Guaranty are intended to be distinct, separate and cumulative and no such right or remedy therein or herein mentioned is intended to be in exclusion of or a waiver of any of the others.

Notice of acceptance of this Guaranty and any obligations or liabilities contracted or incurred by Lessee are all hereby waived by the Guarantor.

This Guaranty shall be governed by and construed in accordance with the laws of the State of Illinois.

All of the provisions of this Guaranty shall inure to the benefit of Lessor and its grantees, successors and assigns and shall inure to the benefit of any future owner of the fee title of which the Premises are a part, and all the provisions of this Guaranty shall be binding upon the Guarantor and its legal representatives, successors, and assigns.

Initially capitalized terms used but not otherwise defined herein have the same meanings given them in the Lease.

*[signature page follows next]*

**IN WITNESS WHEREOF**, the undersigned has executed this Guaranty as of the date first written above.

EARTHFIRST TECHNOLOGIES INC.

By: _____

Name: John Stanton

Its: Chairman and CEO

08CV 1610                    TC
JUDGE MANNING
MAGISTRATE JUDGE MASON

# EXHIBIT 2

## TABLE OF CONTENTS

Page

**ARTICLE 1     DEFINITIONS AND CONSTRUCTION OF AGREEMENT** ............... 1
  1.1    Definitions ................................................................... 1
  1.2    Construction of Agreement ............................................ 8
**ARTICLE 2     TERM AND TERMINATION** .......................................... 9
  2.1    Commercial Start Date ................................................. 9
  2.2    Initial Term ............................................................... 9
  2.3    Renewal Term ........................................................... 9
**ARTICLE 3     PRODUCT SUPPLY** .................................................... 9
  3.1    Commissioning Period .................................................. 9
  3.2    Supply and Purchase Obligations ................................... 9
  3.3    Products .................................................................. 11
  3.4    Conformance with Specifications .................................... 11
  3.5    EFA's Orders ............................................................ 11
  3.6    Supplier Notice Requirement For Orders ........................... 11
**ARTICLE 4     DELIVERY AND TRANSPORTATION** ............................... 11
  4.1    Delivery Obligations ................................................... 11
  4.2    Title and Risk of Loss ................................................. 11
  4.3    Warranty of Title ....................................................... 12
  4.4    Vessels ................................................................... 12
  4.5    Vessel Nominations .................................................... 12
  4.6    Vessel Insurance ....................................................... 12
  4.7    Loading, Shipment and Delivery Costs .............................. 12
  4.8    Measurement ............................................................ 13
  4.9    Inspection of Vessel Deliveries ..................................... 13
  4.10   Off-Spec Products ...................................................... 13
  4.11   Quality and Quantity Claims .......................................... 14
  4.12   Disclaimer of Warranties ............................................. 14
  4.13   Storage ................................................................... 14
  4.14   New Orleans Storage ................................................... 14
**ARTICLE 5     PRICE** .................................................................. 14

CHGO1309065740.10

# TABLE OF CONTENTS
(continued)

Page

5.1    Purchase Price .............................................................................. 14

5.2    Pre-Payment ................................................................................. 15

5.3    Margin Payment ........................................................................... 15

5.4    Method of Payment ...................................................................... 15

**ARTICLE 6      INVOICING AND PAYMENT** ............................................. 15

6.1    Delivery Invoices and Cargo Documents ................................... 15

6.2    Other Invoices .............................................................................. 15

6.3    Invoice Due Date .......................................................................... 15

6.4    Monthly True-Up .......................................................................... 16

6.5    Payment ........................................................................................ 16

6.6    Disputed Invoices ......................................................................... 16

6.7    Interest ......................................................................................... 16

6.8    Mutual Guaranty .......................................................................... 16

**ARTICLE 7      PRESS RELEASE/ANNOUNCEMENTS** ........................... 16

**ARTICLE 8      REPRESENTATIONS AND WARRANTIES** ..................... 17

**ARTICLE 9      LIMITATIONS ON LIABILITY** ................................... 18

**ARTICLE 10     TAXES** ......................................................................... 18

10.1   Liability for Taxes ........................................................................ 18

10.2   Import Duties ................................................................................ 19

**ARTICLE 11     COMPLIANCE WITH LAWS** ....................................... 19

11.1   Pollution Prevention and Responsibility .................................... 19

11.2   Corrupt Practices ......................................................................... 20

11.3   Applicable Law ............................................................................. 20

**ARTICLE 12     FORCE MAJEURE** ...................................................... 20

12.1   Event of Force Majeure ................................................................ 20

12.2   Notice of Force Majeure ............................................................... 20

12.3   Termination of Transactions ....................................................... 20

12.4   Alternative Supplies in the Event of Force Majeure ................... 21

**ARTICLE 13     AUDIT RIGHTS** .......................................................... 21

13.1   Books and Records ....................................................................... 21

CHGO1\30906740.10

# TABLE OF CONTENTS
## (continued)

Page

13.2 Audit True-Up .............................................................................................. 21

**ARTICLE 14 INDEMNIFICATION** ....................................................................... 21

14.1 Duty to Indemnify ........................................................................................ 21

14.2 No Third Party Rights ................................................................................. 22

14.3 Third Party Claims ....................................................................................... 22

14.4 Claim Procedure .......................................................................................... 22

14.5 Settlement ..................................................................................................... 22

14.6 Insurance ...................................................................................................... 22

**ARTICLE 15 DEFAULT AND TERMINATION** ................................................... 23

15.1 Events of Default .......................................................................................... 23

15.2 Remedies Upon Event of Default ............................................................... 24

15.3 EFA's Failure to Take Delivery .................................................................. 24

15.4 Supplier's Failure to Deliver ..................................................................... 24

15.5 Early Termination of Transactions ............................................................ 25

15.6 Non-Exclusive Remedy ............................................................................... 25

15.7 Indemnification ............................................................................................ 26

**ARTICLE 16 TERMINATION PROCESS** ............................................................. 26

16.1 Expiration or Termination in the Absence of an Event of Default ......... 26

16.2 Final Accounting .......................................................................................... 26

16.3 Lease .............................................................................................................. 26

**ARTICLE 17 GOVERNING LAW AND JURISDICTION** ................................... 26

17.1 Choice of Law ............................................................................................... 26

17.2 Arbitration .................................................................................................... 26

17.3 Waivers .......................................................................................................... 27

17.4 Time Period for Making Claims ................................................................. 27

**ARTICLE 18 ASSIGNMENT** .................................................................................. 27

18.1 Assignment ................................................................................................... 27

18.2 Assignment Absent Consent ...................................................................... 28

**ARTICLE 19 NOTICES** ........................................................................................... 28

**ARTICLE 20 CONFIDENTIALITY** ....................................................................... 28

iii

CHGO1\30906740.10

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 20.1 | Confidentiality | 28 |
| 20.2 | Disclosure | 29 |
| 20.3 | Tax Disclosure | 29 |
| **ARTICLE 21** | **MISCELLANEOUS** | 29 |
| 21.1 | Entire Agreement | 29 |
| 21.2 | Single Agreement | 30 |
| 21.3 | Mutual Cooperation | 30 |
| 21.4 | No Agency, Partnership or Joint Venture | 30 |
| 21.5 | No Waiver | 30 |
| 21.6 | Cumulative Remedies | 30 |
| 21.7 | Severability | 30 |
| 21.8 | Successors and Assigns and No Third-Party Beneficiaries | 30 |
| 21.9 | Further Assurances | 31 |
| 21.10 | Survival | 31 |
| 21.11 | Counterparts | 31 |

CHGO1\30906740.10

# PRODUCT SUPPLY AGREEMENT

This Product Supply Agreement (this "Agreement") is entered into this //ᵗʰday of April 2007 (the "Effective Date") between Solar Diesel, Inc. f/k/a Earthfirst Americas, Inc., a Florida corporation ("EFA"), and Loders Croklaan USA, LLC, an Illinois limited liability company ("Supplier") (each of the foregoing referred to individually as a "Party" or collectively as the "Parties").

## RECITALS

WHEREAS, Supplier owns the Facility and is engaged in the business of storing, distributing, supplying and marketing Products;

WHEREAS, Supplier desires to lease the Facility to EFA for the purposes of operating a biodiesel manufacturing facility;

WHEREAS, EFA desires to lease the Facility from Supplier and to modify and improve the Facility as required in order to process Products into biodiesel fuel;

WHEREAS, in order to conduct its proposed business, EFA requires a long-term supply of Products from Supplier;

WHEREAS, Supplier desires to sell and supply Products to EFA and EFA desires to purchase and receive Products from Supplier on a regularly scheduled basis upon the terms and conditions hereof; and

WHEREAS, Supplier's Parent is willing to guarantee the Obligations of Suppler herein contained and EFA's Parent is willing to guarantee the obligations of EFA herein contained.

NOW, THEREFORE, in consideration of the premises and the respective promises, conditions and agreements contained herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, EFA and Supplier do hereby agree as follows:

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION OF AGREEMENT

1.1    Definitions. For purposes of this Agreement, including the foregoing Recitals, the following terms shall have the meanings indicated below:

"Affiliate" means, in relation to a Party, any Person that (i) directly or indirectly controls such Party; (ii) is directly or indirectly controlled by such Party; or (iii) is directly or indirectly controlled by a Person that directly or indirectly controls such Party. For this purpose, "control" of any entity or Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through the ownership of a majority of issued shares or voting power or control in fact of the entity or Person or otherwise.

"Agreement" or "this Agreement" means this Product Supply Agreement, as such agreement may be amended, modified, supplemented, extended, renewed or restated from time to time in accordance with the terms hereof, including the Exhibits attached hereto.

"Applicable Law" means, with respect to any Governmental Authority, (i) any law, statute, regulation, code, ordinance, license, decision, order, writ, injunction, decision, directive, judgment, policy, decree and any judicial or administrative interpretations thereof, (ii) any agreement, concession or arrangement with any other Governmental Authority and (iii) any license, permit or compliance requirement, in each case applicable to either Party, the Products, the Vessel or the Facility, and as amended or modified from time to time.

"Bankrupt" means that a Party (i) is dissolved, other than pursuant to a consolidation, amalgamation or merger, (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due, (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors, (iv) institutes a Proceeding or files a petition seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditor's rights, including a voluntary petition under chapter 7 or chapter 11 of the Bankruptcy Code (or any similar law applicable to a Party), (v) has instituted against it a Proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditor's rights, including an order for relief under the U.S. Bankruptcy Code (or any similar law applicable to a Party), or a petition is presented for its winding-up or liquidation, including an involuntary petition under chapter 7 or chapter 11 of the Bankruptcy Code (or any similar law applicable to a Party), and such Proceeding results in a judgment or is not dismissed or permanently stayed within 120 days of the filing of such Proceeding, (vi) has a resolution passed for its winding-up, official management or liquidation, other than pursuant to a consolidation, amalgamation or merger, (vii) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for all or substantially all of its assets, (viii) has one or more secured parties take possession of all or substantially all of its assets, or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all of its assets, (ix) files an answer or other pleading admitting or failing to contest the allegations of a petition filed against it in any Proceeding of the foregoing nature or (x) takes any other action to authorize any of the foregoing actions.

"Bankruptcy Code" means chapter 11 of Title 11, U.S. Code, as amended.

"Breakage Costs" means all out-of-pocket losses and expenses incurred by the Performing Party as a result of termination and liquidation of a Transaction, including reasonable attorneys' fees, court costs, collection costs, interest charges and other disbursements and any brokerage fees and commissions, damages, losses and expenses incurred in obtaining, maintaining, replacing or liquidating commercially reasonable hedges or trading positions relating to the Transactions that are being terminated and liquidated, actual transport and storage fees (including any fees resulting from unused cargo space on Vessels) and all applicable import duties, all as determined in a commercially reasonable manner by the Performing Party.

2

"Business Day" means a day on which banks are open for general commercial business in New York, New York.

"Claim" means a dispute, claim or controversy whether based on contract, tort, strict liability, statute or other legal or equitable theory (including any claim of fraud, misrepresentation or fraudulent inducement or any question of validity or effect of an agreement).

"Commercial Start Date" means the date on which the Facility has secured all permits, approvals and authorizations from all Governmental Authorities which are required to commence receiving and processing at least 3000 MT per month of Products into biodiesel fuel.

"Commissioning Period" means the period commencing on the Effective Date and terminating on the Commercial Start Date.

"Confidential Information" has the meaning set forth in the Confidentiality Agreement.

"Confidentiality Agreement" means that certain Confidentiality Agreement dated September 8, 2006 among Supplier, EFA and EarthFirst Technologies, Inc.

"Contract Value" means the U.S. dollar value of any Transaction for the purchase and sale of Products under this Agreement as specified in the applicable Transaction documents.

"Cover Costs" means as applicable, either (i) the positive difference between the Replacement Value and the Contract Value for replacement Products purchased by EFA in substitution for Products not delivered to EFA by Supplier (or properly rejected by EFA as non-conforming), or (ii) the positive difference between the Contract Value and the Replacement Value incurred by Supplier in disposing of Products improperly rejected or otherwise not properly accepted by EFA, in each case as evidenced by appropriate supporting documentation and pursuant to an arms-length purchase from or sale to, at no more than then current market rates and terms, a third party of the same quality of Products, in each case plus Breakage Costs incurred by the applicable Party.

"Default" or an "Event of Default" means an occurrence of any of the events or circumstances described in Section 15.1.

"Default Interest Rate" means the lesser of (i) twelve percent (12%) per annum and (ii) the maximum rate permitted by Applicable Law.

"Default Termination Date" has the meaning specified in Section 15.5.

"Defaulting Party" has the meaning specified in Section 15.2.

"Delivery Point" means either the First Delivery Point or the Second Delivery Point, as applicable.

"Disclosing Party" has the meaning specified in Section 20.1(a).

"Early Termination Date" has the meaning specified in Section 16.1.

"EFA" has the meaning specified in the Preamble of this Agreement.

"EFA's Parent" means EarthFirst Technologies, Inc., a Florida corporation.

"EFA Default" has the meaning specified in Section 15.3.

"Effective Date" means the date first written above, upon which this Agreement becomes binding upon and enforceable by and against the Parties.

"Environmental Law" means any existing Applicable Law that governs the protection of persons, natural resources or the environment (including the protection of ambient air, surface water, groundwater, land surface or subsurface strata, endangered species or wetlands), occupational health and safety and the manufacture, processing, distribution, use, generation, handling, treatment, storage, disposal, transportation, release, management or remediation of solid waste, industrial waste or hazardous substances or materials.

"Facility" means Supplier's inactive (as of the date hereof) fractionation facility located in Channahon, Illinois.

"Firm Order" means EFA's acceptance of Supplier's quotation for a specified quantity of each Product, at a specified price for delivery to the Load Port during a specified Loading Month.

"First Delivery Point" means the point where Product enters the inlet valve of EFA's tankage or receiving transport (which shall include rail cars, barges and motor carriage) in New Orleans, Louisiana or such other US port as the Parties agree in writing to be the First Delivery Point for the purposes of this Agreement. For purposes of this definition, EFA's tankage or receiving transport shall mean tankage leased or subleased by EFA and transports chartered or contracted for by EFA or its representatives or agents.

"Force Majeure" means any cause or event beyond the reasonable control of a Party and which a Party, with the exercise of due diligence and prudence, could not avoid or overcome (or avoid, overcome or mitigate the effects of), including fires, earthquakes, pandemic, lightning, floods, explosions, storms, adverse weather, landslides and other acts of natural calamity or acts of God; navigational accidents or maritime peril; Vessel damage or loss; strikes, grievances, actions by or among workers or lock-outs; accidents at, closing of, or restrictions upon the use of mooring facilities, docks, ports, pipelines, harbors, railroads or other navigational or transportation mechanisms; disruption or breakdown of or explosions or accidents to storage plants, terminals, machinery or other facilities; acts of war, hostilities (whether declared or undeclared), civil commotion, embargoes, blockades, terrorism, sabotage or acts of a public enemy; curtailment, interference, passage of an import or export fee, charge or tariff or other financial disincentive, prohibition or financial imposition on or relating to the Products or intended use of the Products by any Governmental Authority; failure or cessation of supplies reasonably beyond the control of a Party or an Affiliate of a Party; or any other cause reasonably beyond the control of a Party, whether similar or dissimilar to those above, which, by the exercise of due diligence, such Party should not have been able to avoid or overcome. Subject to

4

the foregoing, a Party's inability economically to perform its Obligations under any Transaction or this Agreement shall not constitute an event of Force Majeure hereunder.

"FOSFA" as used herein means the Federation of Oils, Seeds and Fats Associations Limited.

"FOSFA Contract" as used herein means the then current version of FOSFA Contract 81 dealing with delivery of palm oil products on a CIF basis, a copy of the current version of which is attached as Exhibit A.

"Governmental Authority" means any foreign or U.S. federal, state, regional, local or municipal governmental body, agency, instrumentality, board, bureau, commission, department, authority or entity established or controlled by a government or subdivision thereof, including any legislative, administrative or judicial body, or any person purporting to act therefor, exercising jurisdiction over either Party, which exercise of jurisdiction impacts this Agreement.

"Guarantor" means Supplier's Parent and EFA's Parent, as applicable.

"Indemnified Party" has the meaning specified in Section 14.1.

"Indemnifying Party" has the meaning specified in Section 14.1.

"Independent Inspector" means Intertek/Caleb-Brett Laboratories, or similar professional laboratory, mutually acceptable to the Parties, who performs any sampling, quality analysis and quantity determination of the Products purchased or sold hereunder.

"Initial Term" has the meaning specified in Section 2.2.

"Interest Rate" means the one-month LIBOR rate.

"ISPS Code" means the International Code for the Security of Ships and of Port Facilities and the relevant 2002 amendments to Chapter XI of the International Convention for the Safety of Life at Sea, 1974.

"Lease" means that certain Channahon Facility Lease Agreement by and between Supplier and EFA, dated on or about the date hereof.

"Liabilities" means any losses, charges, damages, deficiencies, assessments, interests, penalties, costs and expenses of any kind related to or that arise out of this Agreement or any Transaction (including reasonable attorneys' fees, other fees, court costs and other disbursements), including any liabilities that arise out of or are related to any Claim, Proceeding, judgment, settlement or judicial or administrative order made or commenced by any third party or Governmental Authority, as related to or that arise out of this Agreement or any Transaction.

"LIBOR" means, as of the date of any determination, the London Interbank Offered Rate for one-month U.S. dollar deposits appearing on Page 3750 of the Telerate screen (or any successor page) at approximately 11:00 a.m. (London time). If such rate does not appear on Page 3750 of the Telerate screen (or otherwise on such screen), LIBOR shall be determined by

reference to such other comparable publicly available service for displaying eurodollar rates as the Parties may mutually agree. LIBOR shall be established on the first day on which a determination of the Interest Rate is to be made under this Agreement and shall be adjusted daily based on the one-month LIBOR quotes made available for such day through the foregoing sources.

"Load Port" means the port at which a cargo of Product is loaded onto a Vessel for transport to the Delivery Point.

"Loading Month" means the month specified by Supplier in which a vessel will load Product for shipment to the First or Second Delivery Point, as the case may be.

"Locked-In Market Price" means the Market Price quoted to EFA for a lot of the Products which quote is accepted and agreed to in a Firm Order.

"Market Price" means a price equal to the price, in U.S. dollars, which the Supplier would have to pay if ordering for itself the same quantity and Product (expressed in U.S. Dollars per MT, FOB Malaysian port) for the same shipment dates without mark-up, surcharge, enhancement or premium; provided that, such price shall be no more than the daily average price quotation for Products as published by Reuters and adjusted as appropriate with respect to the actual nature, quality, location and method of delivery of a particular Product, subject to variances by an amount usually not to exceed +/-5$/MT. If Reuters ceases to publish the foregoing price reports, the Parties shall cooperate in good faith to select an alternative publication or other reference source.

"Maximum Quantity" has the meaning specified in Section 3.2(c).

"Minimum Quantity" has the meaning specified in Section 3.2(b).

"MPOB" means the Malaysian Palm Oil Board.

"MT" means metric tons.

"MTSA" means the U.S. Maritime Transportation Security Act of 2002.

"Obligations" means a Party's prompt and complete payment and/or performance of its covenants and obligations required pursuant to this Agreement or under any Transaction.

"Order Completion Date" means the last day of the third calendar month prior to the Loading Month. For example if the Loading Month is July, the Order Completion Date is April 30th.

"Party" or "Parties" has the meaning specified in the Preamble to this Agreement.

"Payment Date" means the date specified for payment in Supplier's commercial invoice for a Transaction, which date shall be no sooner than forty-five (45) days from the date the Vessel departs the Load Port and commences its voyage to the Delivery Point for the applicable

Transaction; with the exception that during the first three (3) months after the Commercial Start Date, Product delivered from Supplier's Channahon inventory shall be paid for prior to delivery.

"Performing Party" has the meaning specified in Section 15.2.

"Person" means any individual, sole proprietorship, partnership, joint venture, limited liability company, trust, unincorporated organization, association, corporation, institution, entity, party, Governmental Authority, court or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Proceeding" means any action, suit, Claim, investigation, review or other proceeding, at law or in equity, before any Governmental Authority or before any arbitrator, board of arbitration or similar entity.

"Products" means any of (i) RBD Olein, (ii) RBD Stearin, and (iii) RBD Palm Oil, or other similar palm products, including finished biodiesel which Supplier can acquire through its supply chain now or in the future, including those more fully set forth on Schedule 4.8A.

"Purchase Price" has the meaning specified in Section 5.1.

"Receiving Party" has the meaning specified in Section 20.1(a).

"Release" has the meaning specified in Section 11.1.

"Related Agreements" means the Lease Agreement for the Facility dated of even date herewith and executed contemporaneously herewith between the Parties and any other agreements or documents executed in connection with or as described or required in or under this Agreement or the Lease Agreement or for any transaction. The Parties acknowledge that this Agreement and the Lease Agreement comprise the controlling documents of a unitary transaction between the Parties for the purpose of allowing EFA to produce biodiesel at the Facility and that this Agreement and the Lease Agreement are interdependent and have little or no rationale or value independent of each other.

"Renewal Term" has the meaning specified in Section 2.3.

"Replacement Fee" has the meaning specified in Section 15.4(b).

"Replacement Value" means the U.S. dollar value of Products purchased or sold, as the case may be, from or to a third party as a substitute transaction for the purchase or sale, as the case may be, of Products pursuant to the terms of this Agreement.

"Second Delivery Point" means the point where Product enters the inlet valve to EFA's own tankage or processing unit at the Facility, whichever occurs first.

"Specifications" has the meaning specified in Section 3.4.

"Supplier" has the meaning specified in the Preamble of this Agreement.

"Supplier Default" has the meaning specified in Section 15.4

"Supplier's Parent" means IOI Corporation Berhad, a Malaysian corporation, parent company of Supplier.

"Term" has the meaning specified in Section 2.3.

"Termination Payment" has the meaning specified in Section 15.5.

"Third Party Claim" has the meaning specified in Section 14.3.

"Transaction" means Firm Orders accumulated for a shipment on a single Vessel.

"Vessel" means an ocean-going tanker, barge or inland barge used to transport Products.

1.2     Construction of Agreement.

(a)     Unless otherwise specified, all references herein are to the Articles, Sections, and Exhibits of this Agreement (and where applicable the Lease) and all Exhibits are incorporated herein.

(b)     All headings herein are intended solely for convenience of reference and shall not affect the meaning or interpretation of the provisions of this Agreement.

(c)     Unless expressly provided otherwise, the word "including" as used herein does not limit the preceding words or terms and shall be read to be followed by the words "without limitation" or words having similar import.

(d)     Unless expressly provided otherwise, all references to days, weeks, months and quarters mean calendar days, weeks, months and quarters, respectively.

(e)     Unless expressly provided otherwise, references herein to "consent" mean the prior written consent of the Party at issue, which shall not be unreasonably withheld, delayed or conditioned.

(f)     A reference to any Party to this Agreement or another agreement or document includes the Party's permitted successors and assigns.

(g)     Unless the contrary clearly appears from the context, for purposes of this Agreement, the singular number includes the plural number and vice versa; and each gender includes the other gender.

(h)     Except where specifically stated otherwise, any reference to any Applicable Law or agreement shall be a reference to the same as amended, supplemented or enacted from time to time.

(i)     The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(j)    The Parties acknowledge that they and their counsel have reviewed and revised this Agreement and that no presumption of contract interpretation or construction shall apply to the advantage or disadvantage of either Party.

(k)    All references to "Dollars" or "$" herein or in any invoice or communication issued hereunder shall refer to the lawful currency of the United States of America.

## ARTICLE 2
## TERM AND TERMINATION

2.1    Commercial Start Date. No later than thirty (30) days in advance of the first day of the intended Commercial Start Date, EFA shall give Supplier notice of the Commercial Start Date and its intent to commence commercial operations.

2.2    Initial Term. The initial term of this Agreement (the "Initial Term") shall commence on the Effective Date and shall continue in full force and effect until thirty-six (36) months from October 1, 2007.

2.3    Renewal Term. In each case, as long as the Lease is renewed, EFA shall have the option of up to four (4) additional three (3) year renewal terms (each a "Renewal Term") provided that EFA shall have substantially complied with all material terms, conditions and obligations on the part of EFA to be performed hereunder. EFA must notify Supplier of its desire to elect the applicable Renewal Term no later than sixty (60) days prior to the expiration of the then current term. Subject to the provisions of this Agreement, the Initial Term together with any Renewal Terms shall be the "Term."

## ARTICLE 3
## PRODUCT SUPPLY

3.1    Commissioning Period. During the Commissioning Period, Supplier shall supply that reasonable quantity of Products, up to 1,000 MT per month, as are necessary for the commissioning and testing of the Facility subject to reasonable and prompt confirmation by EFA. The Parties shall mutually cooperate and provide each other with as much notice as is possible concerning the quantities of Products needed during the Commissioning Period; provided, that during the Commissioning Period, EFA shall only purchase and Supplier shall only sell the types of Products that are then available at the Supplier's facility located in Channahon, Illinois, and the Purchase Price therefor shall be determined in accordance with the last sentence of Section 5.1.

3.2    Supply and Purchase Obligations.

(a)    Subject to the provisions of this Article 3, on and after the Commercial Start Date, Supplier shall supply Products to EFA on a delivered basis to the First Delivery Point (CIF New Orleans, Incoterms 2000). No later than thirty (30) days prior to the expected date of arrival of a shipment at the First Delivery Point, EFA shall have the right to designate whether the Products shall be delivered ex-tank in New Orleans, or to an alternate delivery tank or transshipment vessel. Notwithstanding the foregoing, for

the initial eighteen (18) months of the Term, EFA shall take delivery of Products at the Second Delivery Point, at Supplier's actual cost of transport. After the initial eighteen (18) months of the Term, EFA shall bear all risk of arranging transport to the Second Delivery Point. Notwithstanding the foregoing, Supplier will always use commercially reasonable efforts to help arrange delivery logistics for EFA to the Second Delivery Point.

(b)  Subject to the occurrence of an event of Force Majeure, EFA agrees to purchase and Supplier agrees to sell the minimum quantities of Products ("Minimum Quantity") and maximum quantities of Products ("Maximum Quantity") such that the volumes of Products delivered (which deliveries, for the initial eighteen (18) months of the Term, shall occur at the Second Delivery Point and thereafter, shall occur at the First Delivery Point) shall be as set forth on Schedule 3.2; provided, that, the Minimum Quantity shall be prorated, as applicable, for any period less than that so indicated.

(c)  If EFA requires quantities in excess of the Maximum Quantity, Supplier shall use its commercially reasonable efforts to procure such excess quantities.

(d)  Supplier agrees that during 12 months after the Commercial Start Date it shall not enter into any feedstock or supply agreement to provide any of the Products in the states of Indiana, Illinois, Iowa, Missouri, Kansas, Nebraska, Minnesota and South Dakota to or for any party, entity or person, who or which, to Supplier's knowledge, plan to use such Products as a biodiesel feedstock.

(e)  Nothing herein shall preclude EFA from acquiring any quantity of Product (in excess of the Minimum Quantity) or other biodiesel feedstock from any other source if the prices offered by Supplier to EFA exceed the prices offered by such sources by more than 5%. However, in such event EFA shall be solely responsible for all transportation to the Second Delivery Point and such transportation and delivery shall not interfere with Supplier's business operations at the Facility. Notwithstanding the foregoing, the limitations set forth in this paragraph shall not apply to any purchases of Products by EFA in excess of the Maximum Quantity.

(f)  Supplier warrants and represents that all Products provided hereunder are of Malaysian or Indonesian origin and that the growing of the fruit and production of the oil were in accordance with or are progressing towards compliance with the Roundtable on Sustainable Palm guidelines and member policies and in all ways consistent with Supplier and Supplier's Parent's published materials on the "sustainable" nature of the trees and plantations from which the Products are produced.

(g)  EFA warrants and represents that it shall not use any Product purchased from Supplier or other feedstock to be processed or sold from the Facility in any edible food application, except that EFA may manufacture and sell from the Facility USP or other grades of glycerin or glycerin based products or specialty resulting palm oleo-chemical biodiesel by-products in the nature of methylpalmitate, tocotrienol, carotene and phytosterol.

3.3    Products. EFA shall be entitled to nominate for purchase any combination of Products set forth on Schedule 4.8A; provided that, the volume of Palm Stearin nominated shall not exceed twenty percent (20%) of the total volume of Products so nominated and any other non-olein fraction (ie: Super-Olein of IV 65 and below and RBD Palm Kernel Oil) shall not exceed twenty percent (20%) of the total of any Order.

3.4    Conformance with Specifications. All such Products shall conform to the Product specifications (the "Specifications") set forth on Schedule 4.8A. If EFA elects to use soy oil or other alternate feedstocks at the Facility, Supplier shall use commercially reasonable efforts to assist EFA in locating such alternative feedstock supply; provided that, the foregoing shall not affect EFA's obligation to purchase the Minimum Quantity hereunder.

3.5    EFA's Orders. EFA agrees to place Firm Orders consistent with its Minimum Quantity and Maximum Quantity requirements by Order Completion Dates during the Term. Unless otherwise agreed, the minimum quantity of a Firm Order for any one Product placed by EFA shall be at least 100 MT and the maximum quantity of all Firm Orders placed by EFA on any day shall not exceed 1,000 MT. In the event that EFA fails to place Firm Orders for the Minimum Quantity, Supplier shall be entitled to reimbursement from EFA for unused transport space at a rate equal to the greater of  (a) $20/MT or (b) Supplier's actual costs and expenses incurred for shipping and transport relating to such failure.

3.6    Supplier Notice Requirement For Orders.  Supplier shall notify EFA of the availability of a Vessel for each Loading Month. The notice shall include anticipated loading and discharge dates and Vessel name and the expected date of arrival at the First or Second Delivery Point, as the case may be. As provided in Section 3.2(a), for the first eighteen (18) months of the Term, Supplier shall be responsible for arranging all shipping and logistical services from the Load Port to the Second Delivery Point. For all periods thereafter, Supplier shall only be responsible for arranging shipping and logistical services to the First Delivery Point and EFA shall be solely responsible for arranging any and all shipping and logistical services to the Second Delivery Point.

## ARTICLE 4
## DELIVERY AND TRANSPORTATION

Except as otherwise specifically provided herein, the applicable requirements of the FOSFA Contract shall apply to this Article 4 and to the extent of any inconsistencies between this Article 4 and the FOFSA Contract, the provisions of the FOSFA Contract shall govern.

4.1    Delivery Obligations. Provided that Supplier has timely received EFA's Firm Orders, Supplier shall supply the Products specified in the Firm Orders to EFA from shipments occurring during the applicable Loading Month.

4.2    Title and Risk of Loss. Title to the Products that are the subject of a Transaction shall pass from Supplier to EFA upon Supplier's receipt, in full, of the Purchase Price. However, risk of loss of the Products shall pass from Supplier to EFA only at the applicable Delivery Point where EFA takes final delivery and possession of the Products in accordance with Sections 3.2(a) and 3.6 hereof. Prior to transfer of risk of loss, Supplier shall assume all responsibility for

all losses, contamination and damages attributable to handling, transportation, resale and use of the Products. If any Product loss occurs after the passage of title to EFA but prior to transfer of risk of loss in accordance with this Section, in Supplier's discretion, EFA shall have the right to either obtain substitute goods from Supplier for all or a part of the loss, or to receive insurance proceeds therefor. If Supplier elects to make an insurance claim, Supplier shall use commercially reasonable efforts to prosecute such claim against any insurance coverages applicable to such loss (on behalf of EFA) and EFA shall be entitled to receive any and all insurance proceeds received by Supplier therefrom solely with respect to the loss of such Product. Notwithstanding the foregoing, Supplier shall be responsible for the payment of any applicable insurance deductible or self-insured retention, and EFA's award of insurance proceeds shall be grossed up by an amount equal to such deductible or self-insured retention, to the extent applicable to EFA's claim.

4.3     Warranty of Title.  Supplier represents and warrants that it has (and will have) good and marketable title to all Products delivered hereunder, and all Products will at the time of delivery to EFA at the applicable Delivery Point, be free and clear of all liens, claims, encumbrances and adverse claims of every type and description.

4.4     Vessels.  The requirements of paragraph 5 of the FOSFA Contract shall apply. Supplier shall ensure that the Vessel is in compliance with all Applicable Laws, including, but not limited to, the ISPS Code and the MTSA.

4.5     Vessel Nominations.  Upon the written request of EFA, not later than five (5) days prior to the scheduled loading date for cargo on a ship and not later than one (1) day prior to the scheduled loading date for cargo on a barge, Supplier shall notify EFA of the information specified below:

    (a)     name of the Vessel and, in reasonable detail, the dimensions, specifications, operator and owner of such Vessel;

    (b)     name of the Load Port;

    (c)     expected departure date of the Vessel from Load Port;

    (d)     estimated arrival date at the Facility; and

    (e)     any changes in Firm Product Quantities.

4.6     Vessel Insurance.  Supplier shall ensure that insurance coverage on all Products is maintained through the time that risk of loss passes to EFA. The value of the insurance shall be sufficient to fully compensate EFA for any lost or damaged Product.

4.7     Loading, Shipment and Delivery Costs.  Supplier shall pay all the freight and insurance and other costs necessary to accomplish delivery of the Products to EFA. As part of the Purchase Price, EFA shall reimburse Supplier for its pro-rata share of Supplier's actual and documented cost for freight and insurance and directly related costs (including costs for tankage at the First Delivery Point and transport from the First Delivery Point to the Second Delivery Point, if applicable, as advised from time to time by Supplier) for a Transaction, without mark-

up, surcharge or premium; provided that, (i) charges incurred for freight, insurance and related costs shall be consistent with those normally incurred by Supplier in its customary supply chain and consistent with market rates at the time of contracting for such services, and (ii) Supplier shall use commercially reasonable efforts to obtain competitive rates.

4.8    Measurement. (a) The quality of the Products shall be determined in accordance with Schedule 4.8A and (b) and quantity of the Products shall be determined in accordance with the latest established API 17 standards for the method of delivery, provided on Schedule 4.8B hereto. Quantities delivered into or from pipelines shall be determined using the respective pipeline's calibrated meters. If there is a discrepancy between the volume used to calculate the Purchase Price and the volume of Product determined at the relevant Delivery Point, the latter shall control and the Purchase Price shall be adjusted pursuant to a post-delivery true-up, as more specifically set forth in Section 6.4.

4.9    Inspection of Vessel Deliveries. Each Party may have a representative present at the time of discharge, gauging and measurement of Products delivered from any Vessel. If a Party declines to have a representative present, the results of the other Party's measurements and tests shall be deemed to be correct. Unless otherwise agreed, the Parties shall share inspection costs equally. Upon arrival at the First Delivery Point, samples shall be taken by an Independent Inspector from each delivery method prior to transfer of the Risk of Loss to EFA. From these samples, a volumetrically correct composite sample of the Vessel's cargo compartments that are being discharged will be made and tested by the Independent Inspector in respect of the Products discharged at the applicable Delivery Point. The Parties shall instruct the Independent Inspector to obtain and retain appropriate samples of the Products for a period of ninety (90) days from the date of measurement. If discharge occurs at the Second Delivery Point, prior to unloading, a volumetrically correct composite sample from each barge, car or other container, will be made and tested by Supplier, the results of which will be promptly provided to EFA. If EFA does not object within 4 business hours after presentation of such results to EFA, then the shipment shall be deemed initially accepted. If EFA objects to the results of Supplier's testing within such time period, it may select an Independent Inspector to sample and test the Products to be discharged at the Second Delivery Point. Any certificates of quality and quantity countersigned by an Independent Inspector shall be final and binding on both Parties in the absence of manifest error or fraud.

4.10    Off-Spec Products. EFA may reject Products that do not conform to the applicable Specifications. If title and risk to the off-Specification Product has already passed to EFA, such title and risk shall be deemed to have reverted to Supplier. EFA may elect, at its sole discretion and at Supplier's sole expense, to return any off-Specification Products to Supplier. EFA shall have the option to either purchase replacement Products or have Supplier replace the off-Specification Products. Supplier shall bear all commercially reasonable costs associated with replacement of the off-Specification Products. If EFA purchases replacement Products, Supplier shall reimburse EFA upon receipt of EFA's invoice and supporting documentation for EFA's Cover Costs. If EFA accepts the off-Specification Products, the Parties shall agree in advance on a reduced price that reflects such Products' market value, quality or utility or such other agreement of the Parties. If EFA rejects Products that conform to the applicable Specifications, EFA shall reimburse Supplier upon receipt of Supplier's invoice and supporting documentation for Supplier's Cover Costs.

4.11   Quality and Quantity Claims.  Any Claim regarding the quality or quantity of Products delivered shall be waived unless submitted to Supplier in writing, together with supporting documentation and reasonable details of the facts on which the Claim is based, within forty-five (45) days from the delivery date of the Products. The delivery date for Products shall be determined by the applicable bill of lading.

4.12   Disclaimer of Warranties.  OTHER THAN THE WARRANTY OF TITLE AND CONFORMANCE OF THEIR PRODUCTS TO THEIR SPECIFICATIONS UNDER ANY TRANSACTION, SUPPLIER MAKES NO OTHER REPRESENTATION OR WARRANTY, WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OR WARRANTY THAT THE PRODUCTS WILL BE FIT, SUITABLE OR MERCHANTABLE FOR A PARTICULAR PURPOSE.

4.13   Storage.  Supplier agrees to provide incoming feedstock storage on a co-mingled basis with its own products for a six (6) month period commencing three months after the Commercial Start Date. Thereafter, EFA shall have constructed and utilize its own incoming Product storage tanks (which tanks shall have a capacity of at least 6,000MT), provided Supplier in its capacity as landlord under the Lease has supervised or permitted the construction of pipelines and all other necessary infrastructure to allow Product unloading to EFA's incoming storage tanks, as more fully set forth in Section 5.1 of the Lease. EFA hereby acknowledges that Supplier has advised EFA to construct such storage tanks that are sufficient for the storage of at least 1.5x of EFA's monthly incoming and outgoing Products. All storage provided by Supplier shall be in suitable, heated tanks with connection by pipeline to EFA's biodiesel facility.

4.14   New Orleans Storage.  EFA hereby acknowledges and agrees that any storage of Products in Supplier's transfer tanks at the First Delivery Point shall be for no longer than thirty (30) days after offloading from the delivery Vessel.

## ARTICLE 5
## PRICE

5.1   Purchase Price.  The price to be paid to Supplier for any Transaction hereunder (the "Purchase Price") for the volumes of Products delivered to and received at the applicable Delivery Point where risk of loss transfers to EFA pursuant to this Agreement shall be equal to the Locked-In Market Price for the quantity of Products actually delivered, plus Supplier's actual and documented costs for the transportation (freight and insurance), storage and delivery of Products to the applicable Delivery Point at which EFA takes physical delivery and the applicable import duties.  However, during the Commissioning Period and the first three (3) months after the Commercial Start Date, the Purchase Price shall be the Market Price as of the date of ordering plus $0.0585 per pound, and, if not ordered more than ninety (90) days in advance of required delivery, an additional charge of .015/lb.

5.2   Pre-Payment.  Supplier shall be entitled to a partial pre-payment in an amount equal to ten percent (10%) of any Firm Order. This amount shall be payable on the date the Firm Order is accepted by EFA. This ten percent (10%) deposit shall be applied in reduction of the Purchase Price of the Transaction which is comprised, in part, by the Firm Order.

5.3    Margin Payment. Supplier shall be entitled to a margin payment by EFA, upon demand, in the event that at any time the Total Locked-In Market Price of all pending and unpaid Firm Orders, whether or not shipped, calculated on a Product by Product basis, is greater than ten percent (10%) more than the current Market Price of the applicable Products purchased in all pending and unpaid Firm Orders based on Supplier's price quotes for the same day. The margin payment shall be made on the next Business Day following a written demand from Supplier to EFA containing the detailed margin payment calculation, per Transaction or Firm Orders, as applicable. In addition, in the event that, following a margin payment by EFA, as a result of changed market conditions, there is an increase in the current Market Price of the applicable Products purchased, then EFA shall be entitled to a corresponding refund by Supplier of any excess margin payments made by EFA on the next Business Day following a written demand from EFA to Supplier containing the detailed margin refund calculation; provided, that in no event shall EFA be entitled to a refund of any portion of its deposit pursuant to Section 5.2. For purposes of this Section 5.3, the current Market Price shall be calculated daily on a Product by Product basis and margin payments attributable to any Transaction shall be applied in reduction of the Purchase Price of the Transaction. The following example is for illustrative purposes only:

> In the event that, the Total Locked-In Price for pending and unpaid Firm Orders is $100 and, on a particular day, the Market Price is $90, no margin payment shall be due from EFA. If, however, the Market Price on such day is $85, Supplier shall be entitled to an $5 margin payment from EFA. If, on a subsequent day, the Market Price is further reduced to $80, Supplier shall be entitled to an additional $5 margin payment. If the Market Price increases to $86, Supplier shall refund $6 of EFA's excess margin payment and if the Market Price subsequently increases to $92, Supplier shall refund the remaining $4 of EFA's excess margin payment, but no part of said deposit shall be refunded.

5.4    Method of Payment. All payments made to Supplier hereunder shall be in U.S. dollars and shall be delivered by wire transfer to Supplier's designated U.S. banking account. All wire transfer costs shall be borne by EFA.

## ARTICLE 6
## INVOICING AND PAYMENT

6.1    Delivery Invoices and Cargo Documents.

(a)    Supplier shall invoice EFA for the Purchase Price for a Transaction on the date Supplier receives the Bill of Lading for a shipment containing the Products which are the subject of a Transaction.

(b)    Contemporaneously with the invoice, if available, Supplier or its representative shall furnish to EFA any and all documentation sufficient to enable the Vessel and its cargo to clear customs in the United States of America.

6.2    Other Invoices. Except as provided in Section 6.1, if any sums of money are due from one Party to the other Party hereunder, then the Party to whom such sums of money are

15

owed shall furnish to the other Party an invoice therefor, together with relevant supporting documents showing the basis for the calculation thereof.

6.3    Invoice Due Date. Each invoice referred to in Section 6.1 for Products delivered to EFA shall become due and payable to Supplier on the Payment Date upon Supplier's presentment of the shipping documents specified in Section 11 of the FOSFA Contract or the delivery of a guaranty or letter of indemnity, in form and substance customarily used in the industry, in substitution thereof.

6.4    Monthly True-Up. The parties agree that if any discrepancy or variation occurs from their intended Transaction or if any adjustments are due for differences in actual amounts delivered, the Parties agree to true-up with each other by the last Business Day of each month. Promptly after the completion of the delivery of Products at the applicable Delivery Point, EFA or its representative shall furnish to Supplier an outturn survey report of quantity and quality of Product received at the applicable Delivery Point at which EFA took actual delivery of the Product. EFA shall furnish to Supplier by e-mail or facsimile a true-up statement based on the outturn survey report with supporting documentation within ten (10) Business Days of the date of receipt of the outturn survey report. The Party to whom the aggregate net difference is owed shall pay the difference to the other Party within five (5) Business Days.

6.5    Payment. Any Party owing money pursuant to an invoice issued hereunder shall pay all undisputed amounts of any such invoice on or before the due date thereof. Such payments shall be made in immediately available funds in the United States of America to such account or accounts with such bank and in such location as shall have been designated in writing by a Party. If a Payment Date falls due on a non-Business Day, then payment shall be made no later than the next Business Day.

6.6    Disputed Invoices. If a Party in good faith disputes the amount of any invoice issued by the other Party, it shall pay the undisputed portion of the invoice by the due date and inform the other Party in writing why it disagrees with the balance of the invoice amount. The Parties shall cooperate in resolving the dispute expeditiously. If the Parties agree that the disputing Party owes some or all of the disputed amount, such Party shall pay such amount, together with interest at the Interest Rate from the original due date, within two (2) Business Days from the date of their agreement.

6.7    Interest. Except as provided in Section 6.6, interest shall accrue on late payments under this Agreement at the Default Interest Rate from the date that payment is due until the date that payment is actually received by the owed Party. The payment of interest shall not be construed as either Party's agreement to extend credit to the other Party or to extend the payment due date of any amounts payable hereunder.

6.8    Mutual Guaranty. Contemporaneously with the execution of this Agreement, Supplier's Parent and EFA's Parent shall each execute its respective guaranty following the signatures of Supplier and EFA, respectively, as additional security for performance of each Party's Obligations hereunder for the Initial Term, and each Renewal Term hereunder.

16

## ARTICLE 7
## PRESS RELEASE/ANNOUNCEMENTS

Subject to the provisions of Article 21 below and the Confidentiality Agreement, neither Party shall make any public announcement or issue any press release regarding this Agreement or the Related Agreements, the transactions contemplated hereby or thereby, or the status of negotiations between the Parties regarding the same, or otherwise release or file such documents with any Governmental Authority without first conferring with the other Party. If the Parties are unable to agree as to the text or time of release of any such announcement, or the release or filing of such documents, no announcement, release or filing shall be made unless the Party proposing the announcement, release or filing is advised by legal counsel that the announcement, release or filing is legally required to be made, in which case the other Party shall be immediately advised of the text and time of release of the announcement, or the timing with respect to the release or filing of the documents, as the case may be. Supplier acknowledges that EFA will be required to announce the existence of this Agreement and general terms, but not required to disclose the price or other financial terms and these shall be kept as confidential between the Parties. Notwithstanding the foregoing, in the event and to the extent either Party or any Affiliate of either Party is required to disclose any Confidential Information to any Governmental Authority, such disclosure shall not be deemed a violation of this Article 7 or of Article 21 below or of any Non-Disclosure and Confidentiality Agreement entered into between the parties hereto or that certain Lease Agreement executed by the Parties contemporaneously herewith.

## ARTICLE 8
## REPRESENTATIONS AND WARRANTIES

Each Party represents and warrants to the other Party as of the Effective Date and the date of each Transaction under this Agreement as follows:

(a)     Neither it nor any of its Affiliates has negotiated with any finder, broker or other intermediary in connection with the negotiations relating to this Agreement or the Related Agreements and the transactions contemplated hereby and thereby who is entitled to any compensation with respect thereto.

(b)     It is duly organized and validly existing under the Applicable Laws of the jurisdiction of its organization or incorporation and is in good standing under such Applicable Laws.

(c)     It has the legal capacity, authority and power to execute this Agreement and the Related Agreements, to deliver this Agreement and the Related Agreements and to perform its Obligations under this Agreement and the Related Agreements, and has taken all necessary action to authorize the foregoing.

(d)     The execution, delivery and performance of its respective Obligations set forth in this Agreement do not violate or conflict with any Applicable Law, any provision of its organizational or other charter documents, any order or judgment of any Governmental Authority applicable to it or any of its assets, or any contractual restriction binding on or affecting it or any of its assets.

17

(e)     All authorizations, approvals, consents, notices and filings of a Governmental Authority that are required to have been obtained or, to the extent not yet required, to be obtained in the future or submitted by it in respect of this Agreement and the Related Agreements, have been obtained or submitted and are in full force and effect or, to the extent not yet required, will be submitted on a timely basis, and all conditions of any such authorizations, approvals, consents, notices and filings have been complied with.

(f)     Its respective Obligations under this Agreement and the Related Agreements constitute its legal, valid and binding obligations, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application regardless of whether enforcement is sought in a Proceeding in equity or at law).

(g)     No Event of Default under Article 15 with respect to it has occurred and is continuing.

(h)     There is no Proceeding pending or, to its actual knowledge, threatened against it or any of its Affiliates that is likely to affect the legality, validity or enforceability against it of this Agreement or its ability to perform its Obligations under this Agreement or the Related Agreements.

(i)     It is not relying upon any representations of the other Party other than those expressly set forth in this Agreement or the Related Agreements.

(j)     It has entered into this Agreement and the Related Agreements as a principal (and not as an advisor, agent, broker or in any other capacity, fiduciary or otherwise) and with a full understanding of the material terms and risks of this Agreement and the Related Agreements, and has made its own independent decision to enter into this Agreement and as to whether this Agreement and the Related Agreements are appropriate or suitable for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.

(k)     It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice) this Agreement and the Related Agreements and the transactions contemplated hereby and thereby, understands and accepts the terms, conditions and risks of this Agreement and the Related Agreements (and such transactions), and is capable of assuming, and assumes, the risks thereof.

## ARTICLE 9
## LIMITATIONS ON LIABILITY

A Party's liability for damages is limited to direct, actual damages only and neither Party shall be liable for specific performance, lost profits or other business interruption damages, or special, consequential, incidental, punitive, exemplary or indirect damages, in tort, contract or otherwise, of any kind, arising out of or in any way connected with the performance, the suspension of performance, the failure to perform or the termination of a Transaction or this

Agreement. Each Party acknowledges the duty to mitigate damages in a commercially reasonable manner.

## ARTICLE 10
## TAXES

10.1    Liability for Taxes. All taxes of any Governmental Authority related solely to the purchase, sale or import, transportation and storage of Products shall be for EFA's account and shall be included in the Purchase Price; provided that, notwithstanding the foregoing, EFA shall have no liability for any taxes imposed by any Governmental Authority as a result of Supplier's activities causing it to have a permanent establishment in the jurisdiction of the Delivery Point or which taxes are based on the income or revenue of Supplier. If Supplier subsequently receives any refund of taxes which EFA has paid as part of the Purchase Price, Supplier shall promptly pay such refund to EFA, subject to Supplier's right to offset any amounts then owed it by EFA. Supplier shall keep complete and accurate records of all taxes incident to Transactions hereunder. To the extent applicable, each Party shall provide the other Party with proper federal, state or local notification, exemption or resale certificates or direct pay permits as may be required or permitted by Applicable Law and shall take commercially reasonable actions to reduce any liability of either Party for taxes related to the transactions herein contemplated.

10.2    Import Duties. Supplier shall be responsible for paying to the applicable Governmental Authority all duties, charges and other fees that may be assessed by any Governmental Authority upon importation of the Products into the United States and such amounts shall be included in the Purchase Price to be paid by EFA. All duties, charges and other fees that may be assessed by any Governmental Authority upon the export of the Products from the Load Port or other point of origin shall be the responsibility of Supplier.

## ARTICLE 11
## COMPLIANCE WITH LAWS

11.1    Pollution Prevention and Responsibility. Upon the occurrence of any environmental spill or discharge reportable under Applicable Law or other environmental pollution or other disposal of Product (each a "Release") in connection with any transfer, delivery, transportation or receipt of Products pursuant to this Agreement, and without limitation of the rights and obligations of either Party hereunder or under Applicable Law, the Parties shall take any action required under Applicable Law, including actions to prevent or mitigate damage arising from a Release occurring in connection with the performance of this Agreement. Even if not required by Applicable Law, a Party may take such actions to prevent or mitigate damage arising from a Release occurring in connection with the performance of this Agreement as it deems appropriate or is required by any Governmental Authority, in which case such Party shall notify the other Party immediately of any such actions, and shall take such actions in accordance with Applicable Law, or as may be directed by the U.S. Coast Guard or any other Governmental Authority. If either Party incurs costs to clean up or contain a spill or discharge or to prevent or mitigate damage arising from a Release occurring in connection with the performance of this Agreement, such Party reserves any rights provided by Applicable Law or this Agreement to recover such costs from the other Party or from any third party. If a third party is found to be legally liable for such costs and expenses, each Party shall cooperate with the other Party for the

purpose of obtaining reimbursement from such third party. Each Party also shall cooperate with the other Party for the purpose of obtaining reimbursement from any other applicable entity or source under Applicable Law. Notwithstanding the foregoing, the Parties acknowledge that Supplier shall indemnify and hold EFA and its Affiliates and representatives harmless from any and all Liabilities arising from any environmental pollutions in connection with the purchase, transportation, storage, handling or disposal of Products prior to the transfer of risk of loss to EFA pursuant to Section 4.2, including without limitation any liability resulting from the negligence or other misconduct of the Vessel owner or operator.

11.2    Corrupt Practices. Each Party hereby acknowledges that certain laws of the United States of America (including the United States Foreign Corrupt Practices Act), as well as the laws of other Governmental Authorities where this Agreement is to be performed, prohibit any person from offering to make or making any payment of money or anything of value, directly or indirectly, to any governmental official, political party, candidate for political office, or official of a public international organization for the purpose of obtaining or retaining business or providing an improper advantage. Each Party hereby represents, warrants and covenants to the other Party that, in the performance of its obligations hereunder, it has not made or offered to make, and will not make or offer to make, any such prohibited payment. In the event of a breach of any such laws, the Party in breach shall fully indemnify (on an after tax basis), protect, defend and hold harmless the other Party and its affiliates, officers, directors, agents and employees from and against any and all claims, losses and liabilities attributable to any such breach.

11.3    Applicable Law. Each Party shall comply with all Applicable Law with respect to the performance of its Obligations under this Agreement.

### ARTICLE 12
### FORCE MAJEURE

12.1    Event of Force Majeure. Neither Party shall be liable to the other Party if it is rendered unable by an event of Force Majeure to perform in whole or in part any Obligation or condition of this Agreement, for so long as the event of Force Majeure exists and to the extent that performance is hindered by the event of Force Majeure; provided, however, that the Party unable to perform, has used and shall continue to use commercially reasonable efforts to avoid or remove the event of Force Majeure. During the period that a Party's performance of its Obligations has been suspended in whole or part by reason of an event of Force Majeure, the other Party likewise may suspend the performance of all or part of its Obligations affected by the event of Force Majeure to the extent that such suspension is commercially reasonable; provided, that the foregoing shall not include any Obligations of EFA related to Products subject to a Firm Order in the event of a Force Majeure due to a prohibition or financial imposition on or relating to the Products or intended use of the Products by any Governmental Authority.

12.2    Notice of Force Majeure. The Party rendered unable to perform shall inform the other Party by oral notification as soon as practicable but no later than within one (1) Business Day after learning of the occurrence of a Force Majeure event, including, to the extent feasible, the details and the expected duration of the Force Majeure event and the volume of Products affected. Promptly thereafter, the Party rendered unable to perform shall confirm such

information in writing. Such Party also shall promptly notify the other Party in writing when any such Force Majeure event is terminated.

12.3    Termination of Transactions. If a Party's performance of this Agreement is suspended due to an event of Force Majeure, in excess of one hundred eighty (180) consecutive days from the date that notice of such event is given, and so long as such event is continuing, the non-claiming Party, in its sole discretion, may terminate this Agreement by written notice to the other Party, and neither Party shall have any further liability to the other Party in respect of this Agreement except for the rights and remedies previously accrued. For the avoidance of doubt, it is the intention of the Parties hereto that EFA shall not be entitled to claim Force Majeure with respect to any Transaction that is subject to a Firm Order in the event of a Force Majeure due to a prohibition or financial imposition on or relating to the Products or intended use of the Products by any Governmental Authority.

12.4    Alternative Supplies in the Event of Force Majeure. Notwithstanding anything herein to the contrary, if Supplier notifies EFA that as a result of an event of Force Majeure it will be unable meet its delivery Obligations hereunder, EFA shall have the right, in its sole discretion, but only until such time as EFA shall have received notice that the event of Force Majeure declared by Supplier no longer is continuing, to procure from alternative sources volumes of Products to replace all or any portion of the volumes that Supplier is unable to deliver; and EFA's obligation to purchase the Minimum Quantity for the applicable period (as set forth on Schedule 3.2) shall be reduced by an amount equal to the volume of Product EFA was required to purchase from an alternate supplier.

## ARTICLE 13
## AUDIT RIGHTS

13.1    Books and Records. Each Party shall keep accurate books of account and shall record all sales and other evidence of transactions in accordance with generally accepted accounting principles in the United States. All records relating to the transactions contemplated by this Agreement, including any stored electronically, shall be kept by each Party for two (2) years at such Party's office and shall be made available to the other Party for inspection (at the inspecting Party's sole cost and expense) at such offices upon reasonable notice during each Party's regular business hours.

13.2    Audit True-Up. A Party or its authorized representative may, at the inspecting Party's sole cost and expense, appoint an independent accounting firm of international reputation to conduct an independent review of the manner in which the pricing and payment for Products during each month was calculated. If, as a result of such review, it is determined that there has been an overpayment by EFA, then Supplier shall reimburse EFA for such overpayment, with interest accruing on such amount at the Interest Rate from the date of such overpayment until the date of EFA's reimbursement. If, as a result of such review, it is determined that there has been an underpayment by EFA, then EFA shall pay Supplier the amount of such underpayment, with interest accruing at the Interest Rate from the date of such underpayment until the date that payment is made to Supplier. Any payment due pursuant to this Section 13.2 from one Party to the other, which is not the subject of a good faith dispute by such other Party, shall be due and payable within three (3) Business Days of the date that the Party requesting payment provides

the other Party with a written invoice, together with supporting documentation of its claim. If the amount of an overpayment by a Party exceeds the greater of $10,000.00 or ten percent (10%) of the total amount of the payment examined, due to the other Party's error, the Party causing the overpayment shall be responsible for the costs of the inspection. Any dispute relating to the results of the review not resolved by the Parties within thirty (30) days after the completion of such review shall be handled pursuant to FOSFA rules and procedures.

## ARTICLE 14
## INDEMNIFICATION

14.1    Duty to Indemnify. Each Party (the "Indemnifying Party") shall indemnify and hold the other Party, its Affiliates, and their employees, directors, officers, representatives, agents and contractors (collectively, the "Indemnified Party") harmless from and against any and all Liabilities arising from the Indemnifying Party's (i) breach of this Agreement, (ii) failure to comply with Applicable Law with respect to the sale, transportation, storage, handling or disposal of the Products, unless and to such extent that such liability results from the Indemnified Party's negligence or willful misconduct or (iii) representations or warranties made under this Agreement which prove to be materially incorrect or misleading when made.

14.2    No Third Party Rights. The Parties' obligations to defend, indemnify and hold each other harmless under the terms of this Agreement shall not vest any rights in any third party, whether a Governmental Authority or private entity, nor shall they be considered an admission of liability or responsibility for any purposes other than those enumerated in this Agreement.

14.3    Third Party Claims. The Indemnified Party shall notify the Indemnifying Party as soon as practicable after receiving notice of any Claim or Proceeding brought against it that might give rise to an indemnity Claim under this Agreement (each, a "Third Party Claim") and shall furnish to the Indemnifying Party the complete details within its knowledge. Any delay or failure by the Indemnified Party to give notice to the Indemnifying Party shall not relieve the Indemnifying Party of its Obligations except to the extent, if any, that the Indemnifying Party shall have been materially prejudiced by reason of such delay or failure.

14.4    Claim Procedure. The Indemnifying Party shall have the right to assume the defense, at its own expense and by its own counsel, of any Third Party Claim; provided, however, that such counsel is reasonably acceptable to the Indemnified Party. Notwithstanding the Indemnifying Party's appointment of counsel to represent an Indemnified Party, the Indemnified Party shall have the right to employ separate counsel, and the Indemnifying Party shall bear the reasonable fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the Indemnifying Party to represent the Indemnified Party would present such counsel with a conflict of interest or (ii) the Indemnifying Party shall not have employed counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such Third Party Claim. If requested by the Indemnifying Party, the Indemnified Party agrees to reasonably cooperate with the Indemnifying Party and its counsel in contesting any Claim or Proceeding that the Indemnifying Party defends, including, if appropriate, making any counterclaim or cross-complaint. All costs and expenses incurred in connection with the Indemnified Party's cooperation shall be borne by the Indemnifying Party.

14.5    Settlement.  No Third Party Claim may be settled or compromised (i) by the Indemnified Party without the consent of the Indemnifying Party or (ii) by the Indemnifying Party without the consent of the Indemnified Party, which shall not be unreasonably withheld, conditioned or delayed.  Notwithstanding the foregoing, an Indemnifying Party shall not be entitled to assume responsibility for and control of any Proceeding if such Proceeding involves a continuing Event of Default incurred by or which is the responsibility of the Indemnifying Party under this Agreement.

14.6    Insurance.  The mere purchase and existence of insurance does not reduce or release either Party from any liability incurred or assumed under this Agreement or any Transaction.  Notwithstanding the foregoing, Supplier shall at all times during the Term keep in full force and effect the insurance coverages substantially similar to those set forth in Exhibit B (subject to such changes as Supplier may determine in its reasonable discretion) and shall provide EFA with evidence of such insurance coverages (including evidence that EFA is an additional insured with respect to such coverages).

## ARTICLE 15
## DEFAULT AND TERMINATION

15.1    Events of Default.  Notwithstanding any other provision of this Agreement or the Related Agreements, a "Default" or "Event of Default" shall be deemed to occur under this Agreement when:

(a)    Either Party fails to make payment when due under this Agreement within three (3) Business Days of a written demand therefor.

(b)    Any representation or warranty contained in this Agreement or the Related Agreements shall prove untrue in any material respect on or as of the date it was made.

(c)    Either Party fails to perform any Obligation to the other Party or breaches any covenant made to the Party under this Agreement, which, if capable of being cured, is not cured to the satisfaction of the other Party (in its sole and reasonable discretion) within thirty (30) Business Days from the date that such Party receives notice that corrective action is needed.

(d)    Either Party defaults under the Related Agreements, which is not cured within the applicable time period, if any; provided, however, the Party defaulting under such Related Agreement may not claim the default as an Event of Default under this Agreement.

(e)    Either Party becomes Bankrupt.

(f)    Any material covenant, agreement or obligation of any Party contained in or evidenced by this Agreement or any Related Agreement shall cease to be enforceable in accordance with its terms.

(g)    Either Party to this Agreement or any Related Agreement shall repudiate, deny or disaffirm its Obligations under this Agreement or any Related Agreement.

23

(h)　　This Agreement or any Related Agreement is canceled, terminated, revoked or rescinded without the express prior consent of the other Party.

(i)　　Any court or other Governmental Authority shall issue a judgment, order, decree or ruling to the effect that any of the Obligations of any Party to this Agreement or any Related Agreement is illegal, invalid or unenforceable.

(j)　　Either Party repeatedly fails to perform its Obligations under this Agreement and as a result of such failure (i) the Performing Party has reasonable grounds for insecurity concerning the breaching Party's performance of its Obligations under this Agreement, and (ii) the business and/or operations of the Performing Party is materially and adversely affected as a result thereof.

15.2　　Remedies Upon Event of Default. Notwithstanding any other provision of this Agreement or any Related Agreements, upon the occurrence of an Event of Default with respect to either Party (the "Defaulting Party"), the other Party (the "Performing Party") may, in its sole discretion, in addition to all other remedies available to it and without incurring any Liabilities to the Defaulting Party or to third parties (for demurrage or any other costs arising from delay or otherwise), do any one or more of the following: (i) withhold or suspend its Obligations under this Agreement and any Transaction and enter into substitute transactions (including Supplier's right to sell Product in the case of EFA's default and EFA's right to purchase replacement Product in the case of Supplier's default) without prior notice to the Defaulting Party, (ii) proceed against the Defaulting Party for damages occasioned by the Defaulting Party's failure to perform in accordance with the provisions of Sections 15.3 and 15.4, and (iii) upon one (1) Business Day's prior notice to the Defaulting Party, immediately terminate this Agreement and, at the Performing Party's option, the Related Agreements and liquidate all Transactions between the Parties by calculating the Termination Payments in the manner set forth in Section 15.5. Notwithstanding the foregoing, in the case of an Event of Default described in Section 15.1(e), no prior notice shall be required.

15.3　　EFA's Failure to Take Delivery. Except as otherwise provided in Section 15.5, if for any reason not expressly permitted under this Agreement, other than (i) Force Majeure or (ii) reasons attributable to Supplier or any of its agents, EFA fails to take delivery of a cargo of Products included in a Firm Order (any such event, an "EFA Default"), the Parties shall use reasonable efforts to reschedule such cargo. If the Parties are unable to reschedule such cargo, Supplier shall use reasonable efforts to sell such cargo to a third party. In the event of an EFA Default where the cargo cannot be rescheduled, Supplier shall issue EFA an invoice pursuant to Article 6 and EFA shall pay to Supplier:

(a)　　if Supplier is able to sell such total or partial cargo of Products to a third party, a net amount equal to (x) the Contract Value of such Products, less (y) the Replacement Value of a substitute sale, plus (z) documented Breakage Costs incurred by Supplier as a result of EFA's failure to take delivery, plus actual shipping costs (to the extent not included in Breakage Costs), less any shipping cost saved in such actual sale; provided, however, that if the net amount is negative, such net amount shall be retained by Supplier for its own account; and

24

(b)    if Supplier is unable to sell such total or partial cargo of Products to a third party, an amount equal to the Contract Value, plus documented Breakage Costs incurred, plus actual shipping costs by Supplier as a result of EFA's failure to take delivery.

Any payments made pursuant to this Section 15.3 shall be Supplier's sole and exclusive monetary remedy for any EFA Default where the cargo cannot be rescheduled.

15.4    Supplier's Failure to Deliver.  Except as otherwise provided herein, if for any reason not expressly permitted under this Agreement, other than (i) Force Majeure, (ii) reasons attributable to EFA, or (iii) reasons attributable to the Facility, Seller fails to deliver a cargo of Products included in a Firm Order (any such event, a "Supplier Default"), the Parties shall use reasonable efforts to reschedule such cargo.  If the Parties are unable to reschedule such cargo, then EFA may notify Supplier that it requires Supplier not to deliver such cargo, and EFA shall use reasonable efforts to procure equivalent Products from a third party.  In the event of a Supplier Default where the cargo cannot be rescheduled, EFA shall issue to Supplier an invoice pursuant to Article 6 and Supplier shall pay to EFA:

(a)    if EFA is able to procure replacement Products from a third party, the net amount equal to (x) the Replacement Value of such substitute Products of equivalent volume and specifications, plus (y) documented Breakage Costs incurred by EFA as a result of Supplier's failure to deliver, less (z) the Contract Value plus any shipping and insurance costs (to the extent not included in Breakage Costs); provided, however, if the net amount is negative, such net amount shall be retained by EFA for its own account; and

(b)    if EFA is unable to procure from a third party substantially equivalent replacement Products, an amount equal to (i) the Contract Value if, but only if, EFA has already paid Supplier such Contract Value in connection with the subject Transaction, and (ii) a fee (the "Replacement Fee") equal to twelve percent (12%) of the greater of the Contract Value or the Replacement Value for the subject Transaction.  If EFA is able to procure a volume less than the Transaction volume, then the payment provided for in this Section 15.4(b) shall be prorated to reflect the volume of Product not delivered.  For the avoidance of doubt, the Replacement Fee shall only apply to volumes not delivered to EFA or not otherwise covered in a replacement transaction pursuant to Section 15.4(a).  In lieu of payment to EFA, EFA may elect that any Replacement Fee instead be offset against any Guaranteed Rent Payment (as such term is defined in the Lease) then due from EFA under the Lease.

15.5    Early Termination of Transactions.

(a)    When an Event of Default has occurred and is continuing, the Performing Party may, by notice given to the Defaulting Party, designate a date not earlier than the date of such notice (the "Default Termination Date") on which all Transactions shall terminate and the Performing Party shall then determine the liquidation amount which shall be based on Cover Costs.  For purposes of this Section 15.5, the phrase "all Transactions" means only those Transactions subject to a Firm Order prior to and including the Default Termination Date.  The Performing Party shall notify the

Defaulting Party of the liquidation amount due from or due to the Defaulting Party, after taking into account any margin held by either Party (the "Termination Payment").

(b)    As soon as reasonably practicable after the Default Termination Date, the Performing Party shall provide the Defaulting Party with a statement showing, in reasonable detail, the calculation of the Termination Payment. If the Defaulting Party owes the Termination Payment to the Performing Party, the Defaulting Party shall pay the Termination Payment on the first Business Day after it receives the statement. If the Performing Party owes the Termination Payment to the Defaulting Party, the Performing Party shall pay the Termination Payment once it has reasonably determined all amounts, if any, owed by the Defaulting Party to it, which date shall be no more than forty-five (45) days from the date of the statement.

15.6    Non-Exclusive Remedy. Except as set forth herein to the contrary, a Performing Party's rights under this Article 15 shall be in addition to, and not in limitation or exclusion of, any other rights of setoff, recoupment, combination of accounts, lien or other right which it may have, whether by other provisions of this Agreement, other agreements, operation of law or otherwise. No delay or failure on the part of a Performing Party to exercise any right or remedy shall constitute an abandonment of such right or remedy and the Performing Party shall be entitled to exercise such right or remedy at any time after an Event of Default has occurred.

15.7    Indemnification. Subject to Article 9 and without limitation of the monetary remedies specified in Sections 15.3 and 15.4, a Defaulting Party shall indemnify and hold harmless the Performing Party for all Liabilities incurred as a result of the Default or in the exercise of any remedies under this Article 15. A Party shall reimburse the other Party for its costs and expenses, including reasonable attorneys' fees, incurred in connection with the other Party's enforcement of, suing for or collecting any amounts payable by it under this Agreement.

## ARTICLE 16
## TERMINATION PROCESS

16.1    Expiration or Termination in the Absence of an Event of Default. Prior to expiration of the Term of this Agreement and in the absence of an Event of Default, the Parties mutually may agree on a termination date ("Early Termination Date"), at which time Supplier shall cease supplying Products to EFA for the Facility. EFA shall purchase all Products that are in transit on the Early Termination Date and such purchases otherwise shall be subject to the terms and conditions set forth in this Agreement. In such event, the Parties shall cooperate fully with each other in terminating this Agreement and resolving all then outstanding items as a result.

16.2    Final Accounting. Upon expiration or termination of this Agreement (other than due to the declaration of an Early Termination Date) as provided in Section 16.1 above, Supplier shall calculate a final accounting and true-up of all amounts owed by one Party to the other Party hereunder and shall prepare an invoice with appropriate supporting documentation. Such invoice shall be payable by the owing Party within five (5) Business Days after the date of receipt thereof.

16.3    Lease. Any termination of, or expiration of the Term of, this Agreement shall not result in a termination of the Lease, unless otherwise terminated pursuant to Section 15.2.

## ARTICLE 17
## GOVERNING LAW AND JURISDICTION

17.1    Choice of Law. This Agreement and the rights and duties of the Parties shall be governed by and construed in accordance with the substantive laws of the State of Illinois, without regard to its conflict of laws provisions.

17.2    Arbitration. If any controversy or dispute shall arise between the Parties hereto in connection with, arising from, or in respect to this Agreement, any provision hereof, or any provision of any instrument, document, agreement, certification or other writing delivered pursuant hereto, or with respect to the validity of this Agreement or any such document, agreement, certification or other writing, and if such controversy or dispute shall not be resolved within thirty (30) days after the same shall arise, then such dispute or controversy shall be submitted for arbitration in accordance with the arbitration provisions set forth in the Lease, except that substantive matters shall be determined in accordance with the substantive rules of FOSFA then in effect. The arbitrators may award any relief deemed proper in the circumstances, without regard to the relief which would otherwise be available to either Party hereto in a court of law or equity, including, without limitation, an award of money damages (including interest on unpaid amounts, calculated from the due date of any such amount, at a rate per annum determined by said arbitrator), specific performance and injunctive relief.

The award and findings of the arbitrators shall be conclusive and binding upon the parties thereto, and judgment upon such award may be entered in any court of competent jurisdiction. If not expressly set forth in the arbitrators' award, the Party against whom the arbitrators' award is issued shall pay the fees of the arbitrators. With respect to any enforcement of an arbitral award, each Party hereby irrevocably submits to the exclusive jurisdiction of any federal court of competent jurisdiction situated in the City of Chicago, Illinois, or, if any such federal court declines to exercise or is determined not to have jurisdiction, to the jurisdiction of any Illinois state court in or serving the City of Joliet, Illinois (without recourse to arbitration unless both Parties agree in writing), and to service of process by certified mail, delivered to the Party at the most recent designated address, as set forth herein. The provisions of the UN Convention on International Sale of Goods (1980) are hereby excluded from this Agreement.

17.3    Waivers. Each Party further hereby irrevocably waives, to the fullest extent permitted by Applicable Law, any objection to personal jurisdiction, whether on grounds of venue, residence or domicile. Each Party further waives, to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any Proceeding relating to this Agreement.

17.4    Time Period for Making Claims. Except when a shorter period is expressly provided under this Agreement, any Claim arising under this Agreement or any Transaction shall be made within two (2) years from the first date of the event (or events) giving rise to the Claim, and, if not made within such time period, shall be deemed waived and barred without recourse to litigation.

27

## ARTICLE 18
## ASSIGNMENT

18.1    Assignment. Neither Party shall transfer or assign this Agreement or any of its rights or interests hereunder, in whole or in part, or delegate its obligations hereunder, in whole or in part, without the prior consent of the other Party, which shall not be unreasonably withheld; provided, however, that no consent shall be required for (i) transfer of this Agreement to an Affiliate by assignment, merger or otherwise, (ii) an assignment for collateral security purposes, or (iii) an assignment in connection with the sale of the Supplier or substantially all of the assets of the Supplier; provided that the assignee in any such case is at least as creditworthy as the assignor and is able to fulfill the supply and delivery obligations under this Agreement. The transferor shall remain jointly and severally liable with the transferee for the full performance of the transferor's Obligations under this Agreement unless the transferee assumes in writing all of the Obligations of the transferor.

18.2    Assignment Absent Consent. Any attempted assignment in violation of this Article 18 shall be null and void *ab initio* and the non-assigning Party shall have the right, without prejudice to any other rights or remedies it may have hereunder or otherwise, to terminate this Agreement effective immediately upon notice to the Party attempting such assignment.

## ARTICLE 19
## NOTICES

Any notice, demand or document that either Party is required or may desire to give under this Agreement must be (i) in writing and, (ii) except to the extent specifically provided otherwise in this Agreement, given by personal delivery, overnight courier, facsimile or United States registered or certified mail, return receipt requested, with the postage prepaid and properly addressed or communicated to such Party at its address or facsimile number shown below, or at such other address as either Party may have furnished to the other by notice given in accordance with this Article 19. Any notice delivered or made by personal delivery, overnight courier, facsimile, or United States mail shall be deemed to be given on the date of actual delivery as shown by the receipt for personal delivery or overnight courier delivery, the addresser's machine confirmation for facsimile delivery, or the registry or certification receipt for registered or certified mail.

If to EFA:

Earthfirst Americas, Inc.
2515 East Hanna Avenue
Tampa, Florida 33610
Attn: Domenic Massari
Facsimile No.: 813.238.8490

If to Supplier:

Loders Croklaan USA, LLC
24708 West Durkee Road
Channahon, Illinois 60410
Attn: Julian Veitch
Facsimile No.: 815.730.5202

## ARTICLE 20
## CONFIDENTIALITY

20.1   Confidentiality.

(a)     *Obligation of Confidentiality.*   Each Party shall maintain in complete confidence any Confidential Information supplied to such Party (the "Receiving Party") by the other Party (the "Disclosing Party") except (i) as may be required by court order, Applicable Law or a Governmental Authority (including, if required, to comply with the disclosure requirements of the U.S. Securities and Exchange Commission, the New York Stock Exchange, the American Stock Exchange, the Kuala Lumpur Stock Exchange or any self-regulatory organization), whether with respect to either Party or either Party's Affiliates (ii) to such Party's or its Affiliates' employees, auditors, consultants, banks, financial advisors and legal advisors, or (iii) as provided in Section 20.3.    The confidentiality obligations under this Agreement shall survive termination of this Agreement for a period of two (2) years following termination. In the event that any of the provisions of this Agreement (including Article 7 and Article 20) conflict with the provisions of the Confidentiality Agreement, the provisions of this Agreement shall govern.

(b)     *Exceptions.*   The provisions of Section 20.1(a) shall not apply to information within any one of the following categories or any combination thereof: (i) information that was in the public domain prior to the Receiving Party's receipt thereof from the Disclosing Party or that subsequently becomes part of the public domain by publication or otherwise except by the Receiving Party's wrongful act; (ii) information that the Receiving Party can show was lawfully in its possession prior to receipt thereof from the Disclosing Party through no breach of any confidentiality obligation; or (iii) information received by the Receiving Party from a third party having no obligation of confidentiality with respect thereto.  It shall not be a breach of the obligation of confidentiality contained herein, or contained in the Lease, if the Receiving Party discloses confidential information as required by Applicable Law or any Governmental Authority.

20.2   Disclosure.  In the case of disclosure covered by clause (a) of Section 20.1 (other than disclosures required by the organizations described in the parenthetical) and if the disclosing Party's counsel advises that it is permissible to do so, the disclosing Party shall notify the other Party in writing of any Proceeding of which it is aware which may result in disclosure, and use reasonable efforts to prevent or limit such disclosure. The Parties shall be entitled to all

29

remedies available at law, or in equity, to enforce or seek relief in connection with the confidentiality obligations contained herein.

20.3    Tax Disclosure. Notwithstanding anything herein to the contrary, the Parties (and their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind from the commencement of discussions, the U.S. federal income and state tax treatment and tax structure of the transactions herein contemplated and all materials of any kind (including opinions or other tax analyses) that are provided to the Parties relating to such tax treatment and tax structure, except where confidentiality is reasonably necessary to comply with securities laws. For this purpose, "tax structure" is limited to facts relevant to the U.S. federal income and state tax treatment of the transactions herein contemplated and does not include information relating to the identity of the Parties, their Affiliates, agents or advisors.

### ARTICLE 21
### MISCELLANEOUS

21.1    Entire Agreement.  This Agreement together with the Related Agreements constitute the entire and exclusive agreement between the Parties and supersedes all prior oral or written and all contemporaneous oral agreements and understandings between the Parties with respect to the subject matter hereof and thereof.  Neither this Agreement, nor any Related Agreement may be altered, amended, modified or otherwise changed in any respect or particular whatsoever except in writing duly executed by the authorized representative of each Party.

21.2    Single Agreement. The Parties intend that this Agreement and all Transactions shall comprise a single integrated agreement between them and are willing to enter into Transactions in reliance on that fact.

21.3    Mutual Cooperation. From time to time after the Commencement Date of this Agreement, each of the Parties will execute and deliver or cause to be executed and delivered, such reasonable documents and instruments, and take such other reasonable and lawful action as the other Party may deem necessary to enforce its obligations and enjoy its material rights and benefits under this Agreement and the Related Agreements or to otherwise effectuate the purposes of this Agreement and the Related Agreements.

21.4    No Agency, Partnership or Joint Venture. Nothing in this Agreement will serve to create any agency, employment or other master and servant relationship or partnership or joint venture relationship between the Parties, and neither Party shall have the right or power to bind the other Party.

21.5    No Waiver. Neither the failure nor any delay on the part of any Party to exercise any right, remedy, power or privilege under this Agreement will operate as a waiver of such right, remedy, power or privilege. No single or partial exercise of any right, remedy, power or privilege under this Agreement will preclude any other or further exercise of such right, remedy, power or privilege of any other right, remedy, power or privilege. No waiver of any right, remedy, power or privilege with respect to any occurrence will be construed as a waiver of such right, remedy, power or privilege with respect to any subsequent or other occurrence.

21.6    Cumulative Remedies.  Each and every right granted to a Party under this Agreement or allowed it by law or equity shall be cumulative and may be exercised from time to time in accordance with the terms thereof and Applicable Law.

21.7    Severability.  If any part of this Agreement is contrary to, prohibited by, or deemed invalid under Applicable Law, such provision will be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid.  The remainder of this Agreement will not be invalidated by such Applicable Law and will be given effect so far as possible, provided that each Party can continue to fulfill its material obligations and enjoy its material rights and benefits under this Agreement.

21.8    Successors and Assigns and No Third-Party Beneficiaries.  This Agreement and the Related Agreements are for the exclusive benefit of the Parties and no other Persons (other than the respective Guarantors) will have any right or Claim against any Party under any of the terms or provisions of it or be entitled to enforce any of the terms or provisions of it against any Party.  This Agreement and the Related Agreements shall be binding on the Parties and their respective successors and permitted assigns.

21.9    Further Assurances.  Each Party agrees, from time to time and upon reasonable request, to execute, deliver and acknowledge, or to use commercially reasonable efforts to cause any third party to execute, deliver and acknowledge, such further agreements, documents and instruments as one Party might reasonably request in order to more fully effect the purposes of the transactions contemplated hereby, including acknowledgements or certificates certifying each Party's continued performance hereunder.

21.10    Survival.    All audit rights, payment, confidentiality and indemnification obligations shall survive the expiration or termination of this Agreement

21.11    Counterparts.   This Agreement may be executed by the Parties in separate counterparts and initially delivered by facsimile transmission or otherwise, with original signature pages to follow, and all such counterparts shall together constitute one and the same instrument.

**[Remainder of Page Intentionally Left Blank]**

Product Supply Agreement Signature Page

**IN WITNESS WHEREOF,** each Party has caused its authorized representatives to execute this Agreement in the space provided below, effective as of the Effective Date.

**SUPPLIER:**                                              **EFA:**

**Loders Croklaan USA, LLC**                  **Earthfirst Americas, Inc.**

By: _____                         By: _____
Name:  Julien Veitch                                  Name:  Domenic Massari
Title:  President                                          Title:  Senior Vice President

### GUARANTY BY SUPPLIER'S PARENT

The undersigned, the parent company of Loders Croklaan USA, LLC, ("Supplier"), hereby irrevocably agrees to and does hereby guaranty the full and faithful performance by Supplier of all of its Obligations under the Product Supply Agreement set forth above.

**IOI Corporation Berhad**

By: _____
Name:  Dato' Lee Yeow Chor
Title:  Group Executive Director

### GUARANTY BY EFA'S PARENT

The undersigned, the parent company of EarthFirst Americas, Inc. ("EFA"), hereby irrevocably agrees to and does hereby guaranty the full and faithful performance by EFA of all of its obligations under the Product Supply Agreement set forth above.

**EarthFirst Technologies, Inc.**

By: _____
Name:  John Stanton
Title:  Chairman and Chief Executive Officer

32

CHGO1\30067413.8

Product Supply Agreement Signature Page

**IN WITNESS WHEREOF,** each Party has caused its authorized representatives to execute this Agreement in the space provided below, effective as of the Effective Date.

**SUPPLIER:**                                    **EFA:**

Loders Croklaan USA, LLC                         Earthfirst Americas, Inc.

By: _____                       By: _____
Name: Julien Veitch                              Name: Domenic Mastari
Title: President                                 Title: Senior Vice President

## GUARANTY BY SUPPLIER'S PARENT

The undersigned, the parent company of Loders Croklaan USA, LLC, ("Supplier"), hereby irrevocably agrees to and does hereby guaranty the full and faithful performance by Supplier of all of its Obligations under the Product Supply Agreement set forth above.

**IOI Corporation Berhad**

By: _____
Name: Dato' Lee Yeow Chor
Title: Group Executive Director

## GUARANTY BY EFA'S PARENT

The undersigned, the parent company of EarthFirst Americas, Inc. ("EFA"), hereby irrevocably agrees to and does hereby guaranty the full and faithful performance by EFA of all of its obligations under the Product Supply Agreement set forth above.

**EarthFirst Technologies, Inc.**

By: _____
Name: John Stanton
Title: Chairman and Chief Executive Officer

32

Product Supply Agreement Signature Page

**IN WITNESS WHEREOF,** each Party has caused its authorized representatives to execute this Agreement in the space provided below, effective as of the Effective Date.

**SUPPLIER:**                           **EFA:**

**Loders Croklaan USA, LLC**            **Earthfirst Americas, Inc.**

By: _____            By: _____
Name:  Julien Veitch                    Name:  Domenic Massari
Title:  President                       Title:  Senior Vice President

## GUARANTY BY SUPPLIER'S PARENT

The undersigned, the parent company of Loders Croklaan USA, LLC, ("Supplier"), hereby irrevocably agrees to and does hereby guaranty the full and faithful performance by Supplier of all of its Obligations under the Product Supply Agreement set forth above.

**IOI Corporation Berhad**

By: _____
Name:  Dato' Lee Yeow Chor
Title:  Group Executive Director

## GUARANTY BY EFA'S PARENT

The undersigned, the parent company of EarthFirst Americas, Inc. ("EFA"), hereby irrevocably agrees to and does hereby guaranty the full and faithful performance by EFA of all of its obligations under the Product Supply Agreement set forth above.

**EarthFirst Technologies, Inc.**

By: _____
Name:  John Stanton
Title:  Chairman and Chief Executive Officer

32