UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **LODERS CROKLAAN USA, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-cv-01610 |
| | ) | |
| **EARTHFIRST TECHNOLOGIES, INC.** | ) | Honorable Blanche M. Manning |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF THOMAS LYNN CAIN

I, Thomas Lynn Cain, certify under penalty of perjury under the laws of the United States of America, as follows:

1.      I am over 21 years of age and have personal knowledge of the matters stated in this affidavit. If called as a witness in this case, I could testify competently as to those matters.

2.      I submit this Affidavit in support of the entry of a default judgment in favor of plaintiff Loders Croklaan USA, LLC ("Loders") and against defendant EarthFirst Technologies, Inc. ("EFT") in connection with the captioned lawsuit.

3.      I have been employed by Loders for the last 23 years. I am currently the Manager for Safety, Heath and Environment for Loders. As Loders' Manager for Safety, Health and Environment, I report directly to Loders' president on business matters relating to Loders' overall responsibility for, and the coordination of, all safety, health and environment compliance and enforcement within the Loders' vegetable oil manufacturing facility. In that capacity, I deal with governmental compliance issues, including interfacing on behalf of Loders with OSHA, the EPA, Coast Guard and the FDA, and Loders' internal training and auditing relating to such issues. In that capacity, on Loders' behalf, I also represented Loders in negotiating most of the

terms of the Lease and Supply Agreement (identified below) with EarthFirst Americas, Inc. ("EFA"), and its parent, EFT.

4.　　Loders is a limited liability company formed under the laws of the State of Illinois and has its principal place of business located in Channahon, Will County, Illinois. Loders' sole member is Loders Croklaan USA B.V., which is a corporation incorporated under the laws of the Netherlands and has it principal place of business located in the Netherlands.

5.　　Attached to my Affidavit as Exhibit 1 is a record obtained by Loders' attorneys from the Secretary of State of the State of Florida indicating that EFT is a corporation incorporated under the laws of the State of Florida and based in Tampa, Florida.

6.　　Loders is in the business of, among other things, storing, marketing and distributing natural oil products used in the processing and manufacturing of biodiesel fuel.

7.　　EFA, which changed its name to Solardiesel Corporation in September, 2006, is in the business of processing and manufacturing biodiesel fuel.

8.　　On April 11, 2007, Loders and EFA entered into two agreements. One was a commercial lease (the "Lease") whereby EFA leased Loders' oil fractionation facility located at 24708 West Durkee Road in Channahon, Illinois (the "Premises") for the purpose of manufacturing biodiesel fuel at the Premises.

9.　　Also on April 11, 2007, Loders and EFA (under EFA's new name, Solardiesel Corporation) entered into a Product Supply Agreement (the "Supply Agreement") pursuant to which Loders was to sell to EFA certain natural oil products (the "Products") that EFA was to use in the biodiesel fuel manufacturing process at the Premises.

10.　　EFA never took possession of the Premises, and failed to pay the rent and other amounts due under the Lease commencing with the amounts due for the month of December,

2007. As a result, on or about February 11, 2008, Loders served EFA with a Lessor's Notice of Default and Statutory Notice. EFA failed to cure any defaults under the Lease and, on March 4, 2008, Loders terminated the Lease in accordance with its terms.

11.    Loders performed all of its obligations under the Lease.

12.    EFA also defaulted on its obligations under the Supply Agreement by, among other things, failing to provide Loders with notice of the Commercial Start Date and of EFA's intent to commence commercial operations under the Supply Agreement, as required by the provisions of paragraph 2.1 of the Supply Agreement.

13.    As a result of EFA's default on its obligations under the Supply Agreement, Loders terminated the Supply Agreement in accordance with its terms.

14.    Loders performed all of its obligations under the Supply Agreement.

15.    When Loders and EFA executed the Lease and Supply Agreement, that is to say on April 11, 2007, EFA's parent company, EFT, executed guaranties of EFA's performance of its obligations under both the Lease and the Supply Agreement (the "Lease Guaranty" and the "Supply Agreement Guaranty", respectively, and collectively, the "Guaranties").

16.    Loders has suffered damages as a consequence of EFA's breach of the Lease in the amount of $621,702.86 after application of all just credits due to EFA. These damages, and the Lease provisions entitling Loders to them in the event of EFA's default, are itemized on Exhibit 2 to this Affidavit.

17.    Loders has also suffered damages in the amount of $155,298.55, consisting of Loders' attorneys' fees and expenses incurred in connection with the negotiation and documentation of the transactions contemplated by the Lease and Supply Agreement. EFT is liable to Loders under the Lease Guaranty for those damages.

18.    Loders has also suffered damages as a consequence of EFA's breach of the Supply Agreement in the amount of $59,537.74. These damages, and the Supply Agreement provisions entitling Loders to them in the event of EFA's default, are itemized on Exhibit 3 to this Affidavit. EFT is liable to Loders under the Supply Agreement Guaranty for those damages.

19.    Both the Lease (page 41) and the Lease Guaranty obligate EFT to pay Loders' costs, expenses and reasonable attorneys' fees incurred in enforcing their provisions. Loders has incurred reasonable attorneys' fees in connection with such enforcement totaling $5,680.00.

20.    The total amount for which Loders therefore requests the entry of judgment in its favor and against EarthFirst Technologies, Inc. is $842,219.15 (*i.e.*, $621,702.86 + $155,298.55 + $59,537.74 + $5,680.00).

21.    For the Court's reference, true and correct copies of the Complaint, the Lease and the Supply Agreement are attached hereto as Exhibits 4-6. The Lease Guaranty appears after the signature pages thereto. The Supply Agreement Guaranty appears on page 32 of that agreement.

_Thomas Lynn Cain_
Thomas Lynn Cain

Prepared by:
Gerald B. Lurie
Janice L. Duban
**DLA PIPER US LLP**
203 North La Salle Street
Suite 1900
Chicago, Illinois 60601-1293
(312) 368-4000

_Catherine A Torres_
May 9, 2008

OFFICIAL SEAL
CATHERINE A. TORRES
Notary Public - State of Illinois
My Commission Expires Jul 24, 2011

**EXHIBIT 1**



FLORIDA DEPARTMENT OF STATE
DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | Help |

Previous on List    Next on List    Return To List

Events    Name History

Entity Name Search

# Detail by Entity Name

## Florida Profit Corporation

EARTHFIRST TECHNOLOGIES, INCORPORATED

## Filing Information

| | |
|---|---|
| Document Number | P97000067689 |
| FEI Number | 593462501 |
| Date Filed | 08/04/1997 |
| State | FL |
| Status | ACTIVE |
| Effective Date | 07/28/1997 |
| Last Event | AMENDMENT |
| Event Date Filed | 06/20/2005 |
| Event Effective Date | NONE |

## Principal Address

2515 EAST HANNA AVENUE
TAMPA FL 33610 US

Changed 04/26/2006

## Mailing Address

2515 EAST HANNA AVENUE
TAMPA FL 33610 US

Changed 04/26/2006

## Registered Agent Name & Address

CAREY, MICHAEL R
712 SOUTH OREGON AVENUE
TAMPA FL 33606 US

Name Changed: 10/10/2000

Address Changed: 04/29/2004

## Officer/Director Detail

Name & Address

Title PD

STANTON, JOHN
2515 EAST HANNA AVENUE
TAMPA FL 33610

Title D

TOMASSETTI, NICHOLAS R
853 VANDERBILT BEACH RD.
NAPLES FL 34108

Title D

CROWE, DAVID E
2515 EAST HANNA AVENUE
TAMPA FL 33610

Title D

MARKOWITZ, BARRY G
2515 EAST HANNA AVENUE
TAMPA FL 33610

Title D

JURADO, JAIME
2515 EAST HANNA AVENUE
TAMPA FL 33610

## Annual Reports

| Report Year | Filed Date |
|---|---|
| 2005 | 04/26/2005 |
| 2006 | 04/26/2006 |
| 2007 | 04/30/2007 |

## Document Images

04/30/2007 -- ANNUAL REPORT

04/26/2006 -- ANNUAL REPORT

06/20/2005 -- Amendment

04/26/2005 -- ANNUAL REPORT

05/06/2004 -- Amendment

04/29/2004 -- ANNUAL REPORT

04/23/2003 -- ANNUAL REPORT

05/01/2002 -- ANNUAL REPORT

04/28/2001 -- ANNUAL REPORT

03/01/2001 -- Amendment

10/10/2000 -- Reg. Agent Change

06/26/2000 -- Amendment and Name Change

06/02/2000 -- ANNUAL REPORT

03/30/1999 -- Amendment

02/26/1999 -- ANNUAL REPORT

11/23/1998 -- Amendment

01/27/1998 -- ANNUAL REPORT

08/04/1997 -- Domestic Profit Articles

**Note:** This is not official record. See documents if question or conflict.

Home  Contact us  Document Searches  E-Filing Services  Forms  Help
Copyright and Privacy Policies
Copyright © 2007 State of Florida, Department of State.

## EXHIBIT 2

### LODERS' DAMAGES ARISING UNDER LEASE AND LEASE GUARANTY

| Pay to | Reference | Amount | Totals | Lease Reference |
|---|---|---|---|---|
| Illinois EPA - Air Permit | Permit Fee | $10,000.00 | $10,000.00 | ¶ 3.4 and Appendix E |
| Aware Environmental – Air Permit | 12/8/2006 | $1,586.75 | | |
| | 12/22/07 | $1,976.75 | | |
| | 1/5/2007 | $295.00 | | |
| | 1/19/2007 | $1,169.50 | | |
| | 2/16/2007 | $858.39 | | |
| | 3/2/2007 | $1,183.50 | | |
| | 3/16/2007 | $1,210.45 | | |
| | 3/30/2007 | $301.72 | | |
| | 3/20/2007 | $705.02 | | |
| | 3/8/2007 | $1,213.90 | | |
| | 3/17/2007 | $676.25 | | |
| | | | $11,177.23 | ¶ 3.4 and Appendix E |
| Rent - Facility Rent | October | $187,500.00 | | |
| | November | $187,500.00 | | |
| | December | $187,500.00 | | |
| | January | $187,500.00 | | |
| | February | $187,500.00 | | |
| | | | $937,500.00 | ¶ 3.3 and Appendix F |
| 7 % Interest Rate = Prime plus 1% on unpaid rent through termination | 3/1/08 - 3/31/08 | $113.38 | $3,514.78 | ¶ 3.3 |
| Activity Based Charges | October | $31,902.17 | | |
| | November | $31,902.17 | | |
| | December | $31,902.17 | | |
| | January | $31,902.17 | | |
| | February | $31,902.17 | | |
| | | | $159,510.85 | ¶ 3.4 and Appendix E |
| Paid by EarthFirst | Security Deposit | ($500,000.00) | ($500,000) | |
| TOTAL DUE | | | $621,702.86 | |

# EXHIBIT 3

## LODERS' DAMAGES ARISING UNDER SUPPLY AGREEMENT AND GUARANTY

| Pay to | Reference | Amount | Totals | Supply Agreement Reference |
|---|---|---|---|---|
| Kinder Morgan--Oil Storage | Tank in NO | | | |
| | April thru July 2007 | $58,880.00 | $58,880.00 | Art. 9, p. 18 |
| Wortmann Excavating - Repairs | Fire Main | $16,890.00 | $16,890.00 | Art. 9, p. 18 |
| Tal-Mar | Potable Water | $1,992.00 | $1,992.00 | Art. 9, p. 18 |
| Travel to EarthFirst | | $5,000.00 | $5,000.00 | Art. 9, p. 18 |
| Paid by EarthFirst | | ($23,224.26) | ($23,224.26) | |
| TOTAL DUE | | | $59,537.74 | |

**EXHIBIT 4**

CHGO1\31211202.1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LODERS CROKLAAN USA, LLC,               )
                                        )       FILED: MARCH 19, 2008
            Plaintiff,                  )       08CV1610      TC
                                        )       JUDGE MANNING
    v.                                  )   Case No. MAGISTRATE JUDGE MASON
                                        )
EARTHFIRST TECHNOLOGIES, INC.           )
                                        )
            Defendant.                  )

## COMPLAINT FOR BREACH OF GUARANTIES

Plaintiff Loders Croklaan USA, LLC ("Loders"), by its attorneys Gerald B. Lurie and Janice L. Duban, states the following as its complaint against defendant EarthFirst Technologies, Inc. ("EFT"):

### PARTIES AND JURISDICTION

1.      Loders is a limited liability company formed under the laws of the State of Illinois and has its principal place of business located in Channahon, Will County, Illinois. Loders' sole member is Loders Croklaan USA B.V., which is a corporation incorporated under the laws of the Netherlands and has it principal place of business located in the Netherlands.

2.      EFT is a corporation incorporated under the laws of Florida and has its principal place of business located in Tampa, Florida.

3.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between Loders and EFT, and the amount in controversy in this case, exclusive of interest and costs, exceeds $75,000.

### FACTUAL ALLEGATIONS

4.      Loders is in the business of, among other things, storing, marketing and distributing natural oil products used in the processing and manufacturing of biodiesel fuel.

5.      EarthFirst Americas, Inc. ("EFA"), which changed its name to Solardiesel Corporation in September, 2006, is in the business of processing and manufacturing biodiesel fuel.

6.      On April 11, 2007, Loders and EFA entered into two agreements.  One was a commercial lease (the "Lease") whereby EFA leased Loders' oil fractionation facility located at 24708 West Durkee Road in Channahon, Illinois (the "Premises") for the purpose of manufacturing biodiesel fuel at the Premises.  A true and correct copy of the Lease, without attachments, is attached as Exhibit 1.

7.      Also on April 11, 2007, Loders and EFA (under EFA's new name, Solardiesel Corporation) entered into a Product Supply Agreement (the "Supply Agreement") pursuant to which Loders was to sell to EFA certain natural oil products (the "Products") that EFA was to use in the biodiesel fuel manufacturing process at the Premises.  A true and correct copy of the Supply Agreement, without attachments, is attached as Exhibit 2.

8.      EFA never took possession of the Premises, and failed to pay the rent and other amounts due under the Lease commencing with the amounts due for the month of December, 2007.  As a result, on or about February 11, 2008, Loders served EFA with a Lessor's Notice of Default and Statutory Notice.  EFA failed to cure any defaults under the Lease and, on March 4, 2008, Loders terminated the Lease in accordance with its terms.

9.      Loders performed all of its obligations under the Lease.

10.    EFA also defaulted on its obligations under the Supply Agreement by, among other things, failing to provide Loders with notice of the Commercial Start Date and of EFA's intent to commence commercial operations under the Supply Agreement, as required by the provisions of paragraph 2.1 of the Supply Agreement.

11.    As a result of EFA's default on its obligations under the Supply Agreement, Loders terminated the Supply Agreement in accordance with its terms.

12.    Loders performed all of its obligations under the Supply Agreement.

13.    When Loders and EFA executed the Lease and Supply Agreement, that is to say on April 11, 2007, EFA's parent company, EFT, executed guaranties of EFA's performance of its obligations under both the Lease and the Supply Agreement.

14.    EFT's guaranty of EFA's performance of its obligations under the Lease (the "Lease Guaranty") is attached to the Lease directly following the last counterpart signature page of the Lease (page 43).  EFT's guaranty of EFA's performance of its obligations under the Supply Agreement appears on page 32 of that agreement.

## Count I—Breach of Lease Guaranty

15.    Loders realleges and incorporates in this Count I the allegations contained in paragraphs 5 through 15 of this complaint.

16.    Loders has suffered damages as a consequence of EFA's breach of the Lease in an amount exceeding $600,000 after application of all just credits due to EFA.  EFT is liable to Loders under the Lease Guaranty for those damages.

17.    Both the Lease and the Lease Guaranty obligate EFT to pay Loders' costs, expenses and reasonable attorneys' fees incurred in enforcing the Lease and the Lease Guaranty.

## COUNT II—BREACH OF SUPPLY AGREEMENT GUARANTY

18.    Loders realleges and incorporates in this Count II the allegations contained in paragraphs 5 through 15 of this complaint

19.    Loders has suffered damages as a consequence of EFA's breach of the Supply Agreement in an amount exceeding $60,000 after application of all just credits due to EFA. EFT is liable to Loders under the Supply Agreement Guaranty for those damages.

**WHEREFORE,** Loders requests the entry of a judgment in its favor and against defendant EarthFirst Technologies, Inc. in an amount exceeding $$660,000 to be proved at trial.

**LODERS CROKLAAN USA, LLC**

By: _____ */s/ Janice L. Duban* _____
One of its attorneys

Gerald B. Lurie
Janice L. Duban
**DLA PIPER US LLP**
203 North La Salle Street
Suite 1900
Chicago, Illinois 60601-1293
(312) 368-4000

# EXHIBIT 5

CHGO1\31211202.1

# CHANNAHON FACILITY
# LEASE AGREEMENT

by and between

## LODERS CROKLAAN USA, LLC,
an Illinois limited liability company

as Lessor,

and

## EARTHFIRST AMERICAS, INC.,
a Florida corporation

as Lessee

for

### PART OF LESSOR'S FACILITY AT
### 24708 WEST DURKEE ROAD
### CHANNAHON, ILLINOIS 60410

Dated as of April //, 2007

## TABLE OF CONTENTS

Page

**ARTICLE I    DEFINITIONS; INTERPRETATION** ........................................ 2

1.1    Definitions ................................................................................. 2
1.2    Construction of Agreement .......................................................... 6

**ARTICLE II    EXECUTION DATE AND LEASE TERM** .............................. 8

2.1    Execution Date ........................................................................... 8
2.2    Lease Term ................................................................................. 8

**ARTICLE III    LEASE OF LEASE PROPERTY AND ANCILLARY RIGHTS** ........ 8

3.1    Lease .......................................................................................... 8
3.2    Peaceful and Quiet Enjoyment ..................................................... 8
3.3    Lease Fees .................................................................................. 9
3.4    Common Areas, Limited Common Areas and Activity Based Charges ......... 9
3.5    River Cells .................................................................................. 10
3.6    Access to Other Property .............................................................. 10
3.7    Compliance with Work Rules ......................................................... 10

**ARTICLE IV    USE OF LEASE PROPERTY AND ANCILLARY RIGHTS** ........... 11

4.1    Uses of Property .......................................................................... 11
4.2    Right to Sublease ........................................................................ 12
4.3    Alteration of Lease Property by Lessor ............................................ 12
4.4    Alteration of Lease Property by Lessee ............................................ 12
4.5    Maintenance ............................................................................... 13
4.6    Utilities and Services ................................................................... 13
4.7    Removal of Movable Assets ........................................................... 13
4.8    Disposal of Personal Property ........................................................ 14
4.9    Access to Lease Property ............................................................... 14
4.10   Return of Lease Property ............................................................... 14
4.11   Liens Against Lessee's Leasehold Interest ......................................... 14
4.12   Rules and Regulations .................................................................. 17
4.13   Licenses ..................................................................................... 17
4.14   Entrance .................................................................................... 17

**ARTICLE V    CONSTRUCTION** ............................................................. 17

5.1    Improvements ............................................................................. 17

**ARTICLE VI    OPERATIONS** ................................................................ 18

6.1    Obligation of Lessee to Perform Operations ..................................... 18
6.2    Use of Lease Property ................................................................... 19
6.3    Exclusivity .................................................................................. 19
6.4    Standards of Performance .............................................................. 19
6.5    Duties to Cooperate ..................................................................... 19
6.6    Performance Requirements ............................................................ 19
6.7    Labor ......................................................................................... 19

TABLE OF CONTENTS
(continued)

Page

ARTICLE VII    OBLIGATIONS OF THE PARTIES .................................................. 20

7.1    Obligations of the Parties .................................................................. 20

ARTICLE VIII    LESSEE'S COVENANTS .......................................................... 21

8.1    Insurance ........................................................................................ 21
8.2    Environment .................................................................................... 22
8.3    Taxes ............................................................................................... 23
8.4    Licenses; Permits ............................................................................ 23
8.5    Security .......................................................................................... 23

ARTICLE IX    LESSOR'S COVENANTS ........................................................... 24

9.1    Cooperation .................................................................................... 24
9.2    No Interference ............................................................................... 24
9.3    Access ............................................................................................. 24
9.4    Communications Access .................................................................. 24
9.5    Logistics Access .............................................................................. 24
9.6    Intentionally Deleted ....................................................................... 25
9.7    Access to Premises; Rights of Way .................................................. 25
9.8    Utilities and Services ....................................................................... 25
9.9    Licenses; Permits; Plans .................................................................. 25
9.10   Taxes ............................................................................................... 25
9.11   Non-Disturbance; Subordination; Attornment ................................. 25

ARTICLE X    FORCE MAJEURE ..................................................................... 26

10.1   Effect of Force Majeure ................................................................... 26
10.2   Lease Fees Abatement ..................................................................... 26
10.3   Notice .............................................................................................. 26
10.4   Termination ..................................................................................... 27

ARTICLE XI    DOCUMENTATION AND AUDITS .............................................. 27

11.1   Records and Reports ....................................................................... 27
11.2   Audits .............................................................................................. 28

ARTICLE XII    REPRESENTATIONS AND WARRANTIES ................................. 28

12.1   Lessee Representations and Warranties ........................................... 28
12.2   Lessor Representations and Warranties ............................................ 29

ARTICLE XIII    DEFAULT; TERMINATION ...................................................... 30

13.1   Lessee Event of Default ................................................................... 30
13.2   Lessor Event of Default ................................................................... 30
13.3   Consequences of Expropriation and Default .................................... 31
13.4   Termination without Default ............................................................ 31
13.5   Events Not Constituting a Default .................................................... 32

ARTICLE XIV    RIGHTS AND OBLIGATIONS UPON TERMINATION .............. 33

14.1   Procedures ...................................................................................... 33

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 14.2 | Termination Payment | 33 |
| 14.3 | Surrender of Lease Property | 33 |
| 14.4 | Liquidated Damages | 34 |
| 14.5 | Cooperation; Exchange of Information | 35 |
| 14.6 | Hazardous Materials | 35 |

**ARTICLE XV INDEMNITIES; LIABILITIES** .......... 35

| | | |
|---|---|---|
| 15.1 | Lessee Indemnity | 35 |
| 15.2 | Lessor Indemnity | 35 |
| 15.3 | Cumulative Remedies | 35 |
| 15.4 | Survival | 36 |

**ARTICLE XVI GOVERNING LAW; DISPUTE RESOLUTION** .......... 36

| | | |
|---|---|---|
| 16.1 | Governing Law | 36 |
| 16.2 | Disputes | 36 |
| 16.3 | Mutual Consultation | 36 |
| 16.4 | Binding Arbitration | 36 |

**ARTICLE XVII MISCELLANEOUS** .......... 37

| | | |
|---|---|---|
| 17.1 | Amendments | 37 |
| 17.2 | Assignment | 37 |
| 17.3 | Survival | 37 |
| 17.4 | Entire Agreement | 37 |
| 17.5 | Notices | 37 |
| 17.6 | Confidentiality | 38 |
| 17.7 | No Waiver | 39 |
| 17.8 | Severability | 39 |
| 17.9 | Further Assurances | 39 |
| 17.10 | Compliance with Laws; Officials Not to Benefit | 39 |
| 17.11 | Commissions | 40 |
| 17.12 | Rights Reserved to Lessor | 40 |
| 17.13 | Eminent Domain | 40 |
| 17.14 | Patriot Act Requirements | 41 |
| 17.15 | Attorney's Fees | 41 |
| 17.16 | Waiver of Jury Trial | 41 |
| 17.17 | Estoppel Certificates | 41 |
| 17.18 | Guaranty | 42 |

LIST OF APPENDICES

| | |
|---|---|
| Appendix A | Premises |
| Appendix B | Fixed Assets |
| Appendix C | Intentionally Deleted. |
| Appendix D | Development Plan |
| Appendix E | Common Area Activity Charges |
| Appendix F | Lease Fees |
| Appendix G | Intentionally Deleted. |
| Appendix H | Description of Operations |
| Appendix I | Insurance |
| Appendix J | Hazardous Substances |
| Appendix K | Termination Payment |
| Appendix L | Rules and Regulations |

# CHANNAHON FACILITY

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Agreement" or "Lease") is made and entered into this _11_ day of April, 2007 ("Execution Date") by and between:

LODERS CROKLAAN USA, LLC, a limited liability company constituted under the laws of the State of Illinois, whose office is located at 24708 West Durkee Road, Channahon, Illinois 60410 ("Lessor"); and

EARTHFIRST AMERICAS, INC., a corporation organized under the laws of the State of Florida, whose headquarters is located at 2515 East Hanna Avenue, Tampa, Florida 33610 ("Lessee").

Each of Lessor and Lessee and their respective successors and permitted assigns are hereinafter referred to individually as a "Party" and collectively as the "Parties."

**WHEREAS,** Lessor has agreed to (i) lease to Lessee and Lessee has agreed to lease from Lessor (A) a certain portion of Lessor's Channahon, Illinois facility site located at 24708 West Durkee Road, Channahon, Illinois 60410 (the entirety of Lessor's facility site at such location being referenced herein as the "Property"), consisting of an inactive solvent fractionation plant and certain required land described and delineated in Appendix A, along with sufficient additional land in the location or locations determined by Lessor for the construction and operation of raw material storage tanks (the "Premises"), for operation by Lessee of a biodiesel manufacturing facility and (B) certain property affixed to the Premises as further described in Appendix B (the "Fixed Assets," and together with the Premises, the "Lease Property"); (ii) grant Lessee certain rights to use the Limited Common Areas, Common Areas and River Cells and all rights, easements and interests appurtenant thereto and all ways of ingress and egress and other public ways adjacent thereto and to the adjacent water and waterfront ("Ancillary Rights") and (iii) allow Lessee to remove from the Premises for the term of this Agreement certain movable property which is agreed upon by the Parties from time to time (the "Movable Assets") and make certain improvements to the Lease Property as further described in the development plan which is approved by the Parties and attached as Appendix D (the "Development Plan").

**WHEREAS,** the Parties desire to set forth the terms and conditions of Lessee's occupancy, demise and use of the Lease Property, and all of their respective rights and obligations related thereto.

## WITNESSETH

**NOW, THEREFORE,** in consideration of the mutual promises and agreements of the Parties herein expressed, as well as other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE I

## DEFINITIONS; INTERPRETATION

1.1    Definitions. The following terms shall have the meanings specified in this Article when capitalized and used in this Agreement. The meanings specified are applicable to both the singular and plural.

"Activity Based Charge" means the allocated charge, based on actual usage, for property taxes, common area utilization, Utilities and Services and administrative and other services provided by Lessor to Lessee at the Premises in accordance with provisions of Sections 3.4 and 4.6 herein and the methodology set forth in Appendix E attached hereto.

"Affiliate" means, as to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person or is a director or officer of such Person.

"Agreement" means this Lease Agreement (including all appendices attached hereto), as amended and/or supplemented from time to time.

"AAA" has the meaning set forth in Section 16.4.

"Ancillary Rights" has the meaning set forth in the Recitals.

"Applicable Law" means any law, including Environmental Laws (as defined in Appendix J), statute, order, decree, injunction, license, permit, consent, approval, agreement or regulation of any Governmental Authority having jurisdiction over the matter in question, or other legislative or administrative action of a Governmental Authority, or a final decree, judgment or order of a court which relates to the Lease Property, the Operations or the interpretation or application of this Agreement, as the case may be.  In the event of an inconsistency or conflict between any of the Applicable Laws, the law most specific to the subject matter shall apply.

"Biodiesel Improvements and Equipment" has the meaning set forth in Section 14.3.

"Biodiesel Output" has the meaning set forth in Section 6.6(c).

"Business Days" means a day, other than a Saturday or Sunday, on which commercial banks in New York, New York are not authorized or required to close.

"Confidentiality Agreement" has the meaning provided in Section 17.6.

"Confidential Information" has the meaning provided in Section 17.6 and the Confidentiality Agreement.

"Change in Law" means any amendment, modification, superseding act, deletion, addition or change in or to the Applicable Laws that occurs and takes effect after the Execution Date and demonstrably and adversely affects a Party's performance of its obligations hereunder.

"Channahon Facility" means the entire facility of Lessor located on the Property, including without limitation the Premises, the Fixed Assets, the Common Areas, and all other property rights and interests of Lessor located thereon or related thereto.

"Common Areas" means all areas and facilities outside the Premises and within the exterior land boundary lines of the Channahon Facility and the Property (including the River Cells) that are provided and designated by Lessor from time to time as "common areas" for general non-exclusive use, including areas designated by Lessor for ingress, egress and access to the Lease Property, parking, waste storage and removal, security and deliveries to and from the Premises and any other areas designated by mutual agreement of the Parties as common areas.

"Control" means the possession, direct or indirect, of the power to vote more than fifty percent (50%) of the voting interests of a Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting interests, by contract or otherwise. This definition shall also apply to the terms "controlling," "controlled by" and "under common control with."

"Day" or "day" means a calendar day.

"Defaulting Party" has the meaning set forth in Section 13.3.

"Development Plan" has the meaning set forth in the Recitals.

"Disclosing Party" has the meaning set forth in Section 17.6.

"Dispute" has the meaning set forth in Section 16.2.

"Dollar" or "$" mean the lawful currency of the United States of America.

"Execution Date" has the meaning set forth in the Preamble.

"Emergency" means a crisis, incident or other event that threatens the health, safety or welfare of natural persons or the operational integrity of the Facility or the equipment located on the Premises or that would result in the unplanned and immediate cessation of such operations, equipment or Facility.

"Event of Default" means a Lessee Event of Default or Lessor Event of Default, as applicable.

"Facility" means the biodiesel manufacturing facility to be developed and operated by Lessee on the Premises, using the Fixed Assets together with all Improvements thereto.

"First Deposit" means the refundable deposit of $500,000 to be paid by Lessee to Lessor in accordance with and pursuant to Section 7.1(d) of this Agreement.

"Fixed Assets" has the meaning set forth in the Recitals.

"Force Majeure" means any act that (a) renders it impossible for the affected Party to comply with its obligations under this Agreement, (b) is beyond such Party's reasonable control and not due to its fault or negligence and (c) could not have been prevented or avoided by such Party through the exercise of reasonable due diligence. Subject to the satisfaction of the foregoing conditions, Force Majeure shall include without limitation: (i) severe, adverse weather conditions such as storms or floods; (ii) earthquakes; (iii) pandemic or epidemic, terrorist acts, wars (declared or undeclared), civil disturbances, revolts, insurrections, public disorder, riots or sabotage; (iv) strikes or other labor disputes that are not due to the breach of any labor agreement by the Party claiming Force Majeure; (v) fires; (vi) actions or omissions by a Governmental Authority that were not induced or promoted voluntarily by the affected Party or were not caused by a noncompliance with its obligations under this Agreement or Applicable Law; (vii) Change in Law; (viii) the inability by the affected Party, despite its reasonable efforts, to timely and correctly obtain any permit that enables such Party to meet its obligations under this Agreement; or (ix) pollution that was not caused by the noncompliance of the Party claiming Force Majeure with its obligations under this Agreement or Applicable Law. "Force Majeure" specifically excludes (i) the failure of Lessor or Lessee to obtain approval for the construction of additional River Cells and (ii) a Party's inability economically to perform its obligations under any transaction or this Agreement whether caused by action or inaction of such Party or a Governmental Authority such as the elimination or reduction of a subsidy.

"Good Faith Deposit" means, collectively and to the extent that such deposits are required to have been made, the First Deposit, the Second Deposit and the Third Deposit.

"Governmental Authority" means any federal, state, regional or local governmental body, agency, instrumentality, authority, or council having jurisdiction over a Party, the Lease Property or the Operations, as the case may be.

"Guaranteed Rent Payment" has the meaning set forth in Appendix F.

"Improvements" has the meaning set forth in Section 5.1.

"Initial Term" has the meaning set forth in Section 2.2(a).

"Lease Fees" means, collectively, the Production Payment and the Guaranteed Rent Payment.

"Lease Property" has the meaning set forth in the Recitals. For avoidance of doubt, Lease Property shall also be deemed to include any Improvements thereon made by Lessee during the Lease Term in accordance with this Agreement.

"Lease Term" has the meaning set forth in Section 2.2(b).

"Lessee" has the meaning set forth in the Preamble.

"Lessee Event of Default" has the meaning set forth in Section 13.1.

"Lessor" has the meaning set forth in the Preamble.

"Lessor Capital Works" has the meaning set forth in Section 5.1.

"Lessor Event of Default" has the meaning set forth in Section 13.2.

"LIBOR" means the London Interbank Offered Rate for Dollar deposits, as published by The Wall Street Journal or, if not published, then by the Financial Times of London, applicable from the due date for payment and thereafter on the first day of each succeeding calendar month.

"Lienholder" has the meaning set forth in Section 9.11.

"Limited Common Areas" means those Common Areas which are designated by Lessor and Lessee as being solely for use by Lessee, which shall include without limitation the Lessor Capital Works.

"Loan Instrument" has the meaning set forth in Section 4.11.

"Material Adverse Effect of Lessee" means any change or circumstance that, individually or in the aggregate with all other changes or circumstances, has or is reasonably likely to have a materially adverse effect on (a) Lessee's assets, properties, or business in a manner relating to the Operations or any other transactions contemplated hereby or (b) Lessee's ability to perform its material obligations under this Agreement.

"Material Adverse Effect of Lessor" means any change or circumstance that, individually or in the aggregate with all other changes or circumstances has or is reasonably likely to have a materially adverse effect on (a) Lessor's assets, properties, or business in a manner relating to the transactions contemplated hereby or (b) Lessor's ability to perform its material obligations under this Agreement.

"Month" means a calendar month.

"Monthly Production Report" has the meaning set forth in Section 11.1(c).

"Mortgage" has the meaning set forth in Section 4.11.

"Mortgagee" has the meaning set forth in Section 4.11.

"Movable Assets" has the meaning set forth in the Recitals.

"Non-Defaulting Party" has the meaning set forth in Section 13.3.

"Note" has the meaning set forth in Section 4.11.

"Operations" has the meaning set forth in Section 6.1.

"Party" or "Parties" has the meaning set forth in the Preamble.

"Payment Goal" has the meaning set forth in Appendix K.

"Person" means any legal or natural person, including any individual, corporation, partnership, limited liability company, joint stock company, association, joint venture, trust, governmental or international body or agency, or other entity.

"Pipeline" has the meaning set forth in Section 5.1.

"Premises" has the meaning set forth in the Recitals.

"Production Payment" has the meaning set forth in Appendix F.

"Property" has the meaning set forth in the Recitals.

"Prudent Industry Standards" means the generally accepted practices, methods, techniques and standards employed by the biodiesel manufacturing industry in accordance with Applicable Law with respect to: (a) the development, operation and maintenance of biodiesel manufacturing facilities similar to the Facility; (b) personnel and terminal safety and environmental protection; and (c) optimizing the performance of the Operations.

"Receiving Party" has the meaning set forth in Section 17.6.

"Renewal Terms" has the meaning set forth in Section 2.2(b).

"Second Deposit" means the refundable deposit of $200,000 to be paid by Lessee to Lessor in accordance with and pursuant to Section 7.1(d) of this Agreement.

"Supply Agreement" has the meaning set forth in Section 7.1(a).

"Termination Date" has the meaning set forth in Section 2.2(a).

"Termination Payment" has the meaning set forth in Section 14.2.

"Third Deposit" means the refundable deposit of $200,000 to be paid by Lessee to Lessor in accordance with and pursuant to Section 7.1(d) of this Agreement.

"Threshold Price" has the meaning set forth in Appendix F.

"Transfer Fee" has the meaning set forth in Section 14.4(e).

"Utilities and Services" means infrastructure, equipment or services relating to the supply of electricity, water, fire protection, sewage and drainage, steam and natural gas to and within the Lease Property.

"WTI Index Price" has the meaning set forth in Appendix F.

1.2    Construction of Agreement.

(a)    Unless otherwise specified, all references herein are to the Articles, Sections, and Appendices of this Agreement and all Appendices are incorporated herein.

## ARTICLE II

## EXECUTION DATE AND LEASE TERM

2.1    Execution Date. The provisions of this Lease shall be in full force and effect, binding upon the Parties hereto, and enforceable in accordance with their terms, from the Execution Date.

2.2    Lease Term.

(n)    *Initial Term.* The initial term of this Agreement (the "Initial Term") shall commence on the Execution Date and terminate on September 30, 2010, unless earlier terminated in accordance with the terms hereof. The date of such termination shall hereinafter be referred to as the "Termination Date."

(o)    *Renewal Terms.* Lessee shall have the option to extend the term of this Lease for four (4) additional thirty six (36) month periods (hereinafter the "Renewal Terms") on the same terms and conditions as set forth in this Lease. The Initial Term and any Renewal Terms shall constitute the lease term (the "Lease Term"). Lessee shall give Lessor notice at least one hundred twenty (120) days prior to the expiration of the Lease Term of its intent to extend the term for a Renewal Term.

## ARTICLE III

## LEASE OF LEASE PROPERTY AND ANCILLARY RIGHTS

3.1    Lease. In consideration of the covenants and agreements set forth in this Agreement and other good and valuable consideration, Lessor shall lease the Lease Property to Lessee and Lessee shall lease the Lease Property and Ancillary Rights from Lessor, subject in each case to the terms and conditions set forth in this Agreement. Following delivery of proof of insurance and the Good Faith Deposit as provided in Section 7.1 within the time frame expressed therein, Lessor shall deliver possession of the Lease Property and Ancillary Rights to Lessee for the Lease Term. Lessor shall remain the owner of the Lease Property and Ancillary Rights except as expressly agreed to in writing by Lessor. Subject to the provisions of Sections 4.4 and 4.5 and except for the Improvements as may be required in connection with the Operations throughout the Lease Term, Lessee shall keep and maintain (i) the Premises in substantially the same condition (or better) in which it is originally transferred to Lessee and (ii) the Fixed Assets utilized by Lessee in good condition and working order, in each case reasonable wear and tear excepted.

3.2    Peaceful and Quiet Enjoyment. To the extent that Lessee complies with the terms and conditions of this Agreement and there are no uncured defaults by Lessee (after the expiration of any applicable notice, grace and cure periods provided herein) Lessee shall be unconditionally entitled to exclusively, peacefully and quietly hold, occupy and enjoy the Lease Property. If any third party (other than an Affiliate of Lessee or any other party claiming such rights or interest by, through or under Lessee) conducts activities or presents claims which interfere with Lessee's peaceful and quiet possession and enjoyment of the Lease Property,

Lessor shall indemnify, defend, and hold harmless Lessee from and against any such claims and any and all costs, expenses and losses occasioned thereby.

### 3.3  Lease Fees.

(a)  Lessee shall pay the Lease Fees monthly in advance on the first day of each calendar month during the Lease Term commencing on the date (the "Rent Commencement Date") that is the earlier of (i) October 1, 2007 and (ii) the date upon which Lessee commences its operations on the Property, in consideration of this Agreement in accordance with the terms and conditions set forth in Appendix F. All payments of Lease Fees shall be made in Dollars, in immediately available funds to an account of Lessor specified in writing to Lessee.  Any amounts of Lease Fees (including, without limitation the Production Payment) due but not paid hereunder shall bear interest at the lesser of (a) LIBOR plus two percent (2%) and (b) the maximum rate permitted under Applicable Law.  Any payments of Lease Fees due for partial calendar months occurring during the Lease Term shall be proportionally adjusted.

Notwithstanding the foregoing paragraph, if Lessor has not obtained the air quality permit referred to in Section 13.4 by October 1, 2007 for reasons other than Lessee's failure to take, or delay in taking, actions reasonably necessary to obtain the permit, the Lease Fees payable monthly shall be reduced by one-half until the earlier of (A) Lessee's receipt of the permit or (B) March 31, 2008.

(b)  If through no fault of Lessee, the Leased Property, Facility and related infrastructure, whether as currently existing or as potentially may be modified from time to time, are not or cannot be made capable of accepting and supporting, from a logistical standpoint, 45 million gallons per year of inbound biofeedstock oil deliveries and shipment of outbound biodiesel production, then the Lease Fees shall be reduced (but not below a minimum of 50% of the unreduced amount otherwise due absent this reduction) by 1.25% for every 1% below 45 million gallons per year that logistical capabilities drop.

(c)  If Lessor owes a Replacement Fee (as such term is used in the Supply Agreement) under the Supply Agreement, then the Guaranteed Rent Payments (as the same may be reduced pursuant to Section 3.3(b) above) for any time period in which Lessor commits a Supplier Default (as such term is used in the Supply Agreement) shall be reduced by a fraction, the numerator of which is the volume of Products (as such term is used in the Supply Agreement) that Lessor fails to supply during such time period based on a Supplier Default and the denominator of which is the volume of Products that Lessor was required to supply during such time period pursuant to the Supply Agreement.  Pursuant to Section 15.4(b) of the Supply Agreement, in lieu of accepting a Replacement Fee (as such term is used in the Supply Agreement), Lessee may elect to offset such Replacement Fee against Lessee's Guaranteed Rent Payments.

### 3.4  Common Areas, Limited Common Areas and Activity Based Charges.  Lessor agrees and acknowledges that the Lease Property shall include the license and right of Lessee to use the Common Areas and any Limited Common Areas and that the entire Lease Property shall be exclusively occupied, used and controlled by Lessee during the Lease Term for the benefit of Lessee and its employees, contractors, customers and invitees pursuant to the terms of this Lease.

Additionally, Lessee shall pay to Lessor periodically all Activity Based Charges incurred or allocated with respect to the Premises and the Ancillary Rights as provided in and pursuant to Appendix E hereof. This obligation of Lessee to pay Lessor all Activity Based Charges applicable to the Premises and Lessee's use of the Common Areas, Limited Common Areas and Ancillary Rights shall be an independent, additional obligation of Lessee and subject to the same terms and conditions as the payment of Lease Fees herein. Any amounts of Activity Based Charges due but not paid hereunder shall bear interest at the lesser of (a) LIBOR plus two percent (2%) and (b) the maximum rate permitted under Applicable Law.

3.5     River Cells. Subject to the provisions of this Section 3.5, Lessor agrees and acknowledges that the Lease Property and Ancillary Rights shall include a non-exclusive right of Lessee to receive oil products via the River Cells, provided that Lessor shall have exclusive operational control of all River Cells at all times. To the extent Lessee utilizes the River Cells, Lessor shall charge Lessee therefor as an Activity Based Charge. Lessor shall have the right of primary use of the River Cells, Lessee shall have access to the River Cells necessary to conduct the Operations and shall cooperate with Lessor to coordinate such Operations subject to Lessor's scheduled use of the River Cells such that each Party has the practical capability to use the River Cells in connection with its own operations. Further, even during periods scheduled for Lessee's use of the River Cells, in the event of an Emergency, Lessor shall have the right to control and direct the use, operation, repair, rehabilitation and access to the River Cells as needed to address the Emergency, for the good for the facility site and the benefit of both parties. Subject to Lessor's exercise of operational control as set forth above, Lessor shall take commercially reasonable actions to effect the rights herein provided to Lessee and seek to minimize the incurrence of any delay or demurrage charges imposed on Lessee for deliveries or shipments made as part of the Operations. Lessee acknowledges that unloading of oil at the River Cells is performed under an exclusive contract with a third party (the "Barge Company"). The Barge Company oversees compliance with all requirements of the United States Coast Guard, the United States Environmental Protection Agency and the Department of Homeland Security. The Barge Company is responsible for adherence with all procedures required to operate a barge terminal, coordination with the United States Coast Guard for each unloading and coordination with Lessor for each unloading. Lessee may enter and inspect the River Cells when a representative of the Barge Company is present for escort. The Barge Company will perform the unloading of all supplies from barge delivery on the river. Lessor reserves the right to select and contract with barge service companies to handle all vegetable oil or other liquids unloading from the River Cells. In addition, Lessor reserves the right not to use a third party Barge Company and to undertake the activities of the Barge Company on its own.

3.6     Access to Other Property. Subject to Applicable Law and Lessor's prior written approval, which shall not be unreasonably conditioned, delayed or withheld, Lessee shall have the right to negotiate rights of way, easements and other types of access to land and other property and Utilities and Services near or adjacent to the Premises which Lessee reasonably determines are required to effectuate the Development Plan and Lessee's conduct of the Operations thereunder.

3.7     Compliance with Work Rules. Lessee agrees that its personnel shall comply with all rules reasonably promulgated by Lessor for access, safety training, and transit to, from and upon the Premises, Common Areas, Limited Common Areas and Ancillary Rights and which are

consistent with all similar rules in effect with respect to the Channahon Facility and the Property and which are generally applicable thereto. In addition, Lessee agrees that its non-supervisory employees working at the Facility shall be members of the United Steelworkers Union, or the successor union to which Lessor's union employees belong, that such employees will not be members of the same organizational unit within such union as Lessor's employees, and that it will only hire contractors, service providers and other third parties to construct the Improvements or otherwise provide services in respect of the Facility and the Operations who agree to utilize union personnel in the performance of such work or services.

## ARTICLE IV

## USE OF LEASE PROPERTY AND ANCILLARY RIGHTS

4.1    Uses of Property.

(a)    *Permitted Uses.* Lessee and its Affiliates shall only use the Lease Property and Ancillary Rights to perform the Operations and may not use the Lease Property and Ancillary Rights for any other purpose. Lessee shall not, subject to Section 4.2, allow any Person not within Lessee's control to occupy or use the Lease Property without Lessor's prior written approval, which may be granted or withheld in Lessor's sole and absolute discretion and which shall be deemed given for Persons under contract with Lessor. All activities and Operations of Lessee shall be conducted in full compliance with all applicable laws, codes, ordinances and regulations of any Governmental Authority. Additionally, Lessee shall keep and maintain the Lease Property and Ancillary Rights free and clear of any and all mechanics' liens and other similar third party claims arising as a result of Lessee's activities and its occupancy pursuant to this Lease. Lessee shall be entitled to bond over and contest any such claim with security reasonably acceptable to Lessor or alternatively such security or procedure as may be allowed by Applicable Law having the effect of relieving the Lease Property and Ancillary Rights from any such lien or claim. In the event that Lessee does not bond over or cure a lien within thirty (30) days after the filing of such lien, in addition to all other rights and remedies provided to Lessor under this Lease, Lessor shall have the right to cure such lien and to charge Lessee for all costs and expenses associated with curing such lien, including, without limitation, reasonable attorneys' fees.

(b)    *Prohibited Uses.* Lessee shall not use or permit the Premises to be used in any manner which would violate any certificate of occupancy or permit currently affecting the Premises or the Property (and which it has received a copy of) or any Applicable Law. Lessee also shall not use the Premises (or permit any permitted use to be conducted on the Premises) in violation of any health, fire, environmental or other applicable codes or regulations or any such rules related thereto which are promulgated by Lessor with respect to its Channahon Facility and the Property (and which are generally applicable thereto and which have been delivered to Lessee) or in any manner which would constitute a public or private nuisance or waste (unless part of the Operations). Lessee shall not use or permit the Premises to be used in any manner whereby the policy or policies of insurance on the Property may become void or voidable or whereby the premium thereof may be increased; provided that Lessor shall provide Lessee with written notice of any such uses and, in addition, shall provide Lessee with written notice of any

uses known by Lessor which may result in a violation of these restrictions and copies of any notices received from third parties which allege the existence of such uses..

4.2    Right to Sublease. Lessee shall not sublease, assign or otherwise convey, or allow any unrelated third parties to use, the Premises or any portion thereof without Lessor's prior written consent, which may be granted or withheld in Lessor's sole and absolute discretion; provided, however, that Lessee may, with Lessor's reasonable consent, sublease, or allow third parties to use, up to twenty percent (20%) of the office space in the Premises to ship agents, forwarders, consultants and other Persons whose business operations are part of or support the Operations; provided, that (a) Lessee remains liable for the activities of such Persons and (b) any such sublease shall not relieve Lessee of any of its obligations hereunder.

4.3    Alteration of Lease Property by Lessor. In accordance with Applicable Law, Lessor shall have the right to alter the Premises without modifying the terms of this Agreement; provided, that (a) such alteration is required under Applicable Law and (b) such alteration (and the implementation thereof) does not interfere with Lessee's Operations, the Facility or Lessee's peaceful and quiet possession and enjoyment of the Lease Property.

4.4    Alteration of Lease Property by Lessee.

(a)    Development Plan; Monthly Status Reports. Lessee may (at its cost and expense) construct improvements and make modifications and/or alterations to the Lease Property reasonably required in connection with or in furtherance of the Development Plan (including without limitation the Improvements), subject to Lessor's approval of the Development Plan, which approval may be withheld in Lessor's sole and absolute discretion. If Lessor does not consent in writing to Lessee's proposed Development Plan within 15 days after submission thereof by Lessee, then Lessee shall be entitled to terminate this Lease, without cost or penalty, and Lessee shall have no further obligations hereunder. Upon the commencement of construction, Lessee shall, on a monthly basis, submit status reports to Lessor.

(b)    Material Improvements. Other than as specifically set forth in the approved Development Plan, Lessee shall not make any material capital improvements or material alterations to the Lease Property without Lessor's prior written approval, which may be granted or withheld in Lessor's sole and absolute discretion. In requesting such approval, Lessee shall furnish to Lessor the following no later than thirty (30) days prior to the proposed date for commencement of the work implementing such improvements or alterations: (i) the plans and drawings for such improvements or alterations, depicting, among other things, the desired locations of raw material storage tanks, (ii) the names and addresses of all proposed contractors and (iii) such other documentation as reasonably requested by Lessor in connection therewith.

(c)    Other Improvements. Lessee shall have the right to make all other additions, alterations and Improvements to the Lease Property as may be necessary for the Operations, without the Lessor's consent and at Lessee's cost and expense, consistent with the Development Plan, but Lessee agrees to provide at least 15 days' advance notice thereof to Lessor of all such works. In addition to the foregoing, Lessee shall comply with (and shall be entitled to make any alterations to the Lease Property required in its judgment to comply with) any applicable provisions of the Americans With Disabilities Act of 1990 (42 U.S.C. §12101 et

seq.) and all regulations and guidelines promulgated thereunder, as the same may be amended and supplemented from time to time (collectively referred to herein as the "ADA").

(d)    *Applicable Standards.*  The Lessee shall ensure that all permitted improvements and/or additions and alterations made to the Lease Premises are in compliance with (i) Applicable Law and (ii) Prudent Industry Standards.

(e)    *Rights of Lessor to Monitor and Inspect.*  Lessor shall have the right to inspect the Lease Property and any permitted improvements, additions and alterations to the Fixed Assets or the Premises during performance of the same and after they have been completed, but only during Lessee's normal business hours and upon delivery of at lease one Business Day's prior written notice to Lessee, except in the case of an Emergency, in which case Lessor may enter the Lease Property without prior notice or consent but only to the extent required by such Emergency to save or protect life or property.  No such inspection shall unreasonably interfere with Lessee's performance of the Operations.

4.5    Maintenance.

(a)    *Lessee's Maintenance Obligations.*  Lessee shall be responsible for all the maintenance and repair of the Lease Property and the Limited Common Areas; provided, that (i) Lessor shall be responsible for all maintenance and repair of the Common Areas and the River Cells (which shall be carried out in accordance with Applicable Law and Prudent Industry Standards) and (ii) Lessee shall contribute toward such maintenance and repair as part of the Activity Based Change.  Lessee shall otherwise maintain the Lease Property and Limited Common Areas in good condition and repair, excluding normal wear and tear.  The maintenance work performed by Lessee and Lessor shall comply with Applicable Law and Prudent Industry Standards.

(b)    *Failure to Repair.*  Lessee shall begin any maintenance or repairs of the Lease Property and Limited Common Areas as required hereunder within thirty (30) days after having been notified in writing by Lessor to perform such obligations or to pursue the completion of such repairs, except in the case of an Emergency or other situation requiring compliance with Applicable Law and Prudent Industry Standards prior to the expiration of such time period.

4.6    Utilities and Services.  Lessor shall cause to be made available to the Lease Property and Limited Common Areas all Utilities and Services as required for the Facility and the Operations on an uninterrupted basis (as long as there is no interruption in service from the local utility company itself which is unrelated to Lessor's payment for such Utilities and Services).  Lessee shall pay for the costs of providing all such utilities for the Lease Property and Limited Common Areas through the Activity Based Charge in accordance with Appendix E.  To the extent economically feasible, Lessor shall install and maintain meters on the Premises, and Lessee shall reimburse Lessor for the cost of such installation and maintenance as part of the Activity Based Charges.

4.7    Removal of Movable Assets.  The Parties acknowledge that Lessee, at its sole cost and expense, may disassemble, move, transfer and store the Movable Assets to facilitate

completion of the Development Plan and the Facility and engage in the Operations. Upon expiration of the Lease Term, Lessee shall (unless instructed otherwise by Lessor) return and install the Movable Assets to the same or similar condition on the Premises that existed as of the Execution Date, reasonable wear and tear excepted. Upon any termination of this Lease prior to the expiration of the Lease Term, Lessee shall follow Lessor's instructions with respect to the return of the Movable Assets.

4.8    Disposal of Personal Property. Lessee shall not, without the prior written consent of Lessor, sell, offer to sell or otherwise transfer, exchange, hypothecate or dispose of any equipment or other personal property (other than biodiesel fuels and other products that Lessee is in the business of selling) located on the Premises unless in the normal course of business such equipment or other personal property is being replaced by property of similar nature and of equal or greater value or such equipment or other personal property is obsolete.

4.9    Access to Lease Property.

(a)    By Lessor. Lessee shall permit Lessor and its designated representatives and agents, upon prior notice and during Lessee's normal working hours to enter and inspect the Lease Property for the purpose of verifying Lessee's compliance with this Agreement and any other requirements under Applicable Law; provided, that (i) any such visit shall not unreasonably interfere with Lessee's performance of the Operations; and (ii) at least one (1) Business Day prior to any visit, Lessor shall notify Lessee in writing of the names of the individuals to be permitted access and the time and date of such visit. Notwithstanding the foregoing, Lessor shall not be required to provide Lessee with such prior written notice in the event of an Emergency, to the extent entry is required to save or protect life or property.

(b)    By Governmental Authorities. Notwithstanding the provisions of subsection (a) above, (i) Lessee shall grant access to the Premises to Governmental Authorities for the purpose of carrying out any activities which they are legally entitled to carry out on the Premises pursuant to Applicable Law and (ii) other than in the case of an Emergency (and then only to the extent required thereby) no voluntary access, or access by consent shall be given to Governmental Authorities by Lessor to the Lease Property, without prior authorization from Lessee.

4.10    Return of Lease Property. At the end of the Lease Term, Lessee shall return possession and control of the Lease Property to Lessor, reasonable wear and tear excepted; provided, that Lessee shall retain an ownership interest in and shall be entitled, or required, as the case may be, to remove any and all Improvements thereto in accordance with Section 14.3 hereof.

4.11    Liens Against Lessee's Leasehold Interest.

(a)    Except as specifically provided below, Lessee shall not encumber by mortgage, deed of trust or security agreement Lessee's leasehold estate in the Lease Property or Lessee's rights and interests in the buildings, fixtures, equipment and improvements situated thereon or any rents, issues, profits, revenues and other income to be derived by Lessee therefrom:

(i)    any permitted Mortgage (as defined hereinafter) shall in no event encumber Lessor's fee title and interest in the Lease Property (other than the Improvements) or any of the Biodiesel Output (defined below, and which expressly is not intended to cover, and does not cover, Lessee's inventory, whether feedstock, work-in-progress or finished inventory) and otherwise shall be subordinate to Lessor's title and interest and the interest of any of Lessor's present or future creditors;

(ii)    Lessee may encumber by mortgage, deed of trust or security agreement (herein referred to as a "Mortgage") Lessee's leasehold estate in the Lease Property (and no other real property) together with Lessee's rights and interests in all buildings, fixtures, equipment and improvements situated thereon and all rents, issues, profits, revenues and other income to be derived by Lessee therefrom, to secure such loans from time to time made by a person, firm or corporation (herein called a "Mortgage") to Lessee provided such loan or loans shall mature prior to the expiration of the Lease Term, shall be released upon the termination of this Lease and be subject to the further terms and conditions hereinafter specified;

(iii)    the Mortgage and all rights acquired under it shall be subject to each and every covenant, condition and restriction contained in this Lease and to all rights and interests of Lessor and its lenders hereunder;

(iv)    the Mortgage, the amount of the loan secured by the Mortgage and the form and substance of the Mortgage, the promissory note (hereinafter called the "Note") secured thereby and the other instruments if any to be executed in connection therewith (the Note, the Mortgage and such other instruments hereinafter called the "Loan Instruments") shall be approved in advance by Lessor, which approval shall not be unreasonably withheld, conditioned or delayed;

(v)    the Loan Instruments shall expressly provide that there can be no extensions of the due date of the Note, additions to the Loan evidenced by the Note, alteration of any provision of the Loan Instruments or any refinancing of the unpaid principal balance of the Note without the prior written consent of Lessor;

(vi)    the Loan Instruments shall provide that any proceeds from fire or extended coverage insurance or condemnation awards or proceeds shall be used for repair or restoration of the leasehold improvements and not to repay the indebtedness secured by the Mortgage;

(vii)    the Mortgage shall not cover any interest in any real property other than Lessee's interest in the Lease Property under this Lease and shall not secure any indebtedness other than the Note and indebtedness arising under the terms of the Mortgage upon default by the Mortgagor thereunder to perform a covenant contained therein; and

(viii)    the Loan Instruments shall provide that copies of all notices of default under the Loan Instruments shall be sent to Lessor at the same time they are sent

to Lessee or other mortgagor thereunder, at the address specified in this Lease for Lessor, or such other address registered with Mortgagee.

(b)    Lessor shall serve notice to Lessee's Mortgagee of any default by Lessee hereunder provided the Mortgagee shall notify Lessor in writing of the existence of the Mortgage encumbering Lessee's interest hereunder and the address to which notices should be delivered. The Mortgagee shall have the right to correct or cure any such default within the same period of time after receipt of such notice as is given to Lessee under this Lease to correct or cure defaults. Lessor will accept performance by the Mortgagee of any covenant, condition or agreement on Lessee's part to be performed hereunder with the same force and effect as though performed by Lessee, if, at the time of such performance, Lessor shall be furnished with evidence reasonably satisfactory to Lessor of the interest in this Lease claimed by the person tendering such performance. If this Lease should terminate by reason of the happening of any Lessee Event of Default or any reason of a disaffirmance of this Lease by a receiver, liquidator or trustee for the property of Lessee, or by any department of the city, state or federal government which had taken possession of the business or property of Lessee by reason of the insolvency or alleged insolvency of Lessee and if, at the time of such termination, the Mortgage constitutes a first lien upon the leasehold estate of Lessee, Lessor shall give notice thereof to the Mortgagee and upon request of the Mortgagee made within sixty (60) days after the giving of notice by Lessor to the Mortgagee, and, upon payment to Lessor of all monies due and payable by Lessee hereunder immediately prior to the termination of this Lease, as well as all sums which would become payable hereunder by Lessee to Lessor to the date of execution and delivery of the new lease hereunder mentioned, had this Lease not been terminated, together with reasonable attorney's fees and expenses in connection therewith and in connection with the removal of Lessee from the leased property, and the curing of all defaults hereunder which are within the power of the Mortgagee to cure, and the performance of all the covenants and provisions hereunder which are within the power of the Mortgagee to perform up to the date of the execution and delivery of the new lease hereinafter mentioned, giving credit, however, for any net income actually collected by Lessor from the leased property, other than payments made by Lessee hereunder, Lessor shall enter into a new lease of the leased property with the Mortgagee for the remainder of the Lease Term, on the same terms and conditions as contained in this Lease and dated as of the date of termination of this Lease and the Improvements shall be included in the Lease Property. The estate of the Mortgagee, as Lessee hereunder shall exist as if this Lease were continuing (that is, there shall be no charge, lien or burden upon the leased property prior to or superior to the estate granted by such new lease which was not prior to or superior to the estate of Lessee under this Lease as of the date immediately preceding the date this Lease went into default, except, however, any charge, lien or burden which should not have been permitted and/or should have been discharged by Lessee under the terms of this Lease). Nothing herein contained shall be deemed to impose any obligation upon Lessor to deliver physical possession of the Lease Property to the Mortgagee. The Mortgagee shall pay all expenses, including reasonable attorney's fees, incident to the execution and delivery of such new lease and quitclaim deed.

(c)    The Mortgagee or any purchaser in foreclosure proceedings, including any corporation formed by the Mortgagee or the holder of the Note or other obligations secured by the Mortgage, may become the legal owner and holder of the leasehold estate under this Lease, including the improvements, equipment, fixtures and other property assigned as additional security for such Mortgage, by foreclosure of the Mortgage or as a result of the assignment or

conveyance in lieu of foreclosure PROVIDED THE OWNER OR OPERATOR IS APPROVED BY THE LESSOR, WHICH APPROVAL SHALL NOT BE UNREASONABLY WITHHELD, CONDITIONED OR DELAYED. Lessee hereby acknowledges and agrees that it would not be unreasonable for Lessor to withhold approval of the owner or operator based on such entity's financial insecurity or lack of experience in the conduct of business operations as contemplated herein or if such proposed owner or operator is a competitor of Lessor.

(d)    Lessee shall, promptly upon receipt of any notice of default under any of the Loan Instruments or acceleration of the maturity of the Note, deliver a true copy thereof to Lessor.  Lessee shall comply in all respects with the terms and provisions of the Loan Instruments

4.12    Rules and Regulations.  Lessee shall comply with those rules and regulations set forth in Appendix L which are applicable to the entire Channahon Facility site and the Property and do not conflict with the terms and conditions of this Lease.  If there is any conflict between such rules and regulations and the terms and conditions of this Lease the terms and conditions of this Lease shall govern.  Lessor shall be entitled to revise such rules and regulations from time to time after the Execution Date and Lessee shall comply with such revised rules and regulations, provided it receives a copy thereof and such revised rules and regulations are applicable to the entire Channahon Facility site and the Property and do not conflict with the terms and conditions of this Lease or have any potential adverse impact on the Operations or the Facility.

4.13    Licenses.  Lessor shall grant Lessee one or more licenses to construct, at Lessee's sole cost and expense, Pipelines from the River Cells to the Premises and the Limited Common Areas in the locations determined by Lessor, provided that the construction and use of such pipes does not interfere with the business operations of Lessor or other parties at the Property and subject to such other terms and conditions as Lessor may reasonably impose.  In addition, Lessor may, in its sole discretion, grant Lessee a license to construct, at Lessee's sole cost and expense, a rail spur through the Common Areas to the Limited Common Area in the location determined by Lessor, provided that the construction and use of such rail spur does not interfere with the business operations of Lessor or other parties at the Property and subject to such other terms and conditions as Lessor may reasonably impose.

4.14    Entrance.  Lessor may, in its sole discretion, designate a different entrance to and through the Property to access the Premises than the existing entrance, in which case Lessor shall construct such entrance and an access road to such entrance, and Lessor and Lessee shall share evenly in the cost of such construction.

## ARTICLE V

## CONSTRUCTION

5.1    Improvements.  Subject to Section 4.4, Lessee, at its sole cost and expense, shall be entitled to have constructed and to develop on the Lease Property capital improvements of a nature referenced in the Development Plan as reasonably required to complete the Facility and approved by Lessor (the "Improvements"); provided, that all such construction and development occurring on the Property and which is not located on the Premises shall be performed by

Persons who either are being supervised by Lessor or who have been approved in advance by Lessor (in its sole and absolute discretion). The costs and expenses for the Improvements and for the engineering, design, procurement and construction of all non-incidental improvements and modifications required to be completed with respect to those portions of the Property not included within the Premises in order to accommodate the Lessee's permitted use of the Lease Property (including without limitation (a) any expansion, installation, replacement or use of any incoming or outgoing pipeline to carry biodiesel fuel to or from the Lease Property (the "Pipeline"); (b) additional River Cell and docking improvements which may be reasonably requested by Lessee to enable the efficient delivery and acceptance of feedstock and other cargo (including biodiesel) to and from the Lease Property and have been approved by all applicable Governmental Authorities and (c) any required modifications to the Limited Common Areas) (collectively, the "Lessor Capital Works") shall be borne by Lessee. Lessor and Lessee shall meet and agree upon which Lessor Capital Works are reasonably required in connection with the Operations, having due regard for the requirements of Applicable Law, Prudent Industry Standards, the configuration of the Facility, and Lessor's continued use of that portion of the Common Area, the River Cells and of the Channahon Facility not included as part of the Lease Property. Lessor Capital Works shall be designed and constructed within a timeframe which is reasonably acceptable to Lessee, having due regard for Lessee's project development schedule and schedule of commencement of Operations and Lessor's operations and use of the Channahon Facility. Unless otherwise determined by written notice from Lessor to Lessee, Lessee shall be responsible for the construction of the Lessor Capital Works and shall comply with and cause its appointed contractor undertaking the construction of the Lessor Capital Works to comply with all such rules and regulations pertaining to the manner in which such construction is to be carried out as the Lessor reasonably may impose from time to time, but in any event Lessor shall approve the construction of the Lessor Capital Works (provided, that if Lessor undertakes the construction it shall have no right to commit Lessee to any expenditure relating thereto or to any change order or other amendment to any contract therefor) and Lessee (and Lessee's representatives or agents) shall be entitled to inspect the Lessor Capital Works to ensure that such improvements are being designed and constructed in accordance with Lessee's plans and specifications (including those contained in the Development Plan), Applicable Law, Prudent Industry Standards and any other requirements of this Agreement. In addition to the Improvements, Lessee may, at its own risk and expense, install, make or cause to be made on the Lease Property such other non-structural improvements as may be necessary or appropriate for conducting the Operations and completing the Facility, consistent with the Development Plan. Lessor acknowledges and agrees that it shall have no title or ownership interest in the Improvements or such other improvements, except as provided in Section 14.4 below.

## ARTICLE VI

## OPERATIONS

6.1    Obligation of Lessee to Perform Operations. Lessee may use the Lease Property as necessary to manufacture and sell biodiesel, palm based oils and chemicals and other non-food grade products except that Lessee may manufacture and sell from the Facility USP or other grades of glycerin or glycerin based products or specialty products resulting from residual palm oleo-chemical biodiesel by-products in the nature of methylpalmitate, tocotrienol, carotene and

phytosteroland and conduct related operations and activities, including shipping, receiving, processing, storage, office activities, and other operations related to the foregoing.

6.2    Use of Lease Property.  Lessee shall only perform the Operations within the Premises and shall use the Lease Property, Limited Common Areas and Ancillary Rights for the sole purpose of performing the Operations in accordance with this Agreement.

6.3    Exclusivity.  Subject and pursuant to the terms of this Lease, Lessee shall have the exclusive right during the Lease Term to perform the Operations within the Premises (including the operation and maintenance of the Facility) and to occupy and utilize the Lease Property and the Limited Common Areas in any manner permitted hereunder.

6.4    Standards of Performance.  Lessee shall perform the Operations in accordance with Applicable Law and Prudent Industry Standards.

6.5    Duties to Cooperate.  The Parties shall cooperate in good faith to ensure the smooth and effective demise and possession of the Lease Property and Ancillary Rights from Lessor to Lessee, and to enable Lessee to perform the Operations and operate and maintain the Facility in an efficient, cost-effective manner.

6.6    Performance Requirements.

(a)    *General Requirements*.  Lessee shall use commercially reasonable efforts to conduct its Operations on the Lease Property in a continuous manner (subject to seasonal rates and variations) in order to achieve commercial utilization of the Facility in a manner which is consistent with Applicable Law, Prudent Industry Practices and the requirements of this Lease.

(b)    *Interruptions*.  Notwithstanding the foregoing, Operations may be interrupted in order to carry out maintenance or restoration of the Improvements or the other Lease Property or the Facility.  During any such repairs or maintenance or in the event of an accident or Emergency requiring immediate interruption of the Operations or use of the Lease Property or the Facility, the Lessee may take all necessary measures to manage the same.

(c)    *Throughput Rates*.  Lessee shall maintain complete and accurate records of all biodiesel throughput volumes produced and sold from Operations at the Facility (such quantities produced during the Lease Term referred to as the "Biodiesel Output").  Lessor shall have the right to review such records once during each calendar month during the Lease Term, during Lessee's normal business hours and on five (5) days' prior written notice to Lessee.

6.7    Labor.

(a)    *Qualified Personnel*.  Lessee shall select and employ sufficient, suitably skilled and qualified personnel to enable it to perform the Operations and operate and maintain the Facility in accordance with this Agreement.

(b)    *Training*.  Lessee shall be responsible for the preparation and implementation of all training of all staff working within the Facility at the Premises.

## ARTICLE VII

## OBLIGATIONS OF THE PARTIES

7.1    Obligations of the Parties.

(a)    *Execution and Delivery of the Supply Agreement*.   Contemporaneously with the execution of this Agreement, each Party shall duly execute and deliver to the other Party a requirements contract for the supply of feedstock from Lessor or its Affiliate to Lessee as necessary to conduct the Operations (the "Supply Agreement").

(b)    *Representations and Warranties of Lessee*.   The representations and warranties of Lessee in Section 12.1 shall be true and correct in all material respects when made and at and as of the Execution Date and the Rent Commencement Date with the same effect as though made at and as of such time, except that those representations and warranties which are made as of a specific date shall be true and correct in all material respects as of such date.

(c)    *Covenants of Lessee*.   Lessee shall duly perform and comply in all material respects with all covenants and agreements contained in this Agreement.

(d)    *Refundable Good Faith Deposit*.   Within ten Business Days after the Execution Date, Lessee shall pay to Lessor and Lessor shall receive the refundable First Deposit. On or prior to October 1, 2008, Lessee shall pay to Lessor and Lessor shall receive the refundable Second Deposit.  On or prior to October 1, 2009, Lessee shall pay to Lessor and Lessor shall receive the refundable Third Deposit.  The Good Faith Deposit shall serve as security for Lessee's faithful performance of its obligations under this Agreement.  If Lessee fails to pay the Lease Fee or other charges due hereunder, or a Lessee Event of Default occurs and is not remedied within any applicable cure period, after written notice to Lessee, subject to Section 14.4 (c), Lessor may use, apply or retain all or any portion of the Good Faith Deposit for the payment of any amount due to Lessor or to reimburse or compensate Lessor for any direct, nonconsequential liability, cost, expense, loss or damage (including attorneys' fees) which Lessor may suffer or incur by reason thereof. Lessee shall, within 10 days after Lessor's notice, replenish any amount properly withdrawn by Lessor from the Good Faith Deposit, and provide funds to Lessor in the amount of such withdrawal.  If Lessee fails to replenish the Good Faith Deposit, Lessor, in addition to all other remedies provided under this Lease, shall have the right to apply Lessee's Lease Fee payments towards replenishing the Good Faith Deposit and increase the next required Lease Fee payment by the amount of such shortfall.  Lessor shall keep the Good Faith Deposit in an interest bearing account that is separate from its general accounts. Lessor shall, at the expiration or earlier termination of this Agreement and after Lessee has vacated the Premises in the manner as prescribed in Article 14.3, return to Lessee (or at Lessor's option, to the last assignee, if any, of Lessee's interest herein), that portion of the Good Faith Deposit (together with all accrued interest thereon) not used or applied by Lessor to Lessee's obligations hereunder.

(e)    *Evidence of Insurance*.   Within ten Business Days after the Execution Date, Lessee shall deliver to Lessor certificates of insurance evidencing that Lessee has obtained the insurance coverage on the Premises required under Section 8.1. At Lessor's option and upon

written request, Lessee shall provide Lessor with a certificate of insurance evidencing the existence of such insurance policies and endorsements and reflecting that Lessor has been added as an additional insured to such policies to the extent of its interest in the property covered thereby..

     (f)    *Representations* and *Warranties of Lessor*.  The representations and warranties of Lessor in Section 12.2 shall be true and correct in all material respects when made and at and as of the Execution Date and the Rent Commencement Date with the same effect as though made at and as of such time, except that those representations and warranties which are made as of a specific date shall be true and correct in all material respects as of such date.

     (g)    *Covenants of Lessor*.  Lessor shall duly perform and comply in all material respects with all covenants and agreements contained in this Agreement required to be performed or complied with by it.

     (h)    *Governmental Authority Consents*.  Lessor and Lessee shall cooperate to ensure that all consents, permits, approvals or authorizations of any Governmental Authority which are necessary for Lessee to construct the Improvements and to commence and continue daily Operations with regard to the Facility shall have been made or obtained, to the satisfaction of Lessee in its sole and absolute discretion, and no action of any Governmental Authority shall have imposed any charge, tariff, order or condition that would make the Operations impossible or economically unfeasible.

     (i)    *Environmental Review*.  Lessee shall complete such review and make such assessment of the environmental condition of the Premises and the remainder of the Channahon Facility and the Property as it deems reasonable to ensure compliance with Applicable Law, the absence of any environmental condition for which it may be responsible thereunder and the ability of the Facility and the Operations to comply with the requirements set forth in Appendix I.

     (j)    *Filing*.  The Parties shall file a memorandum of lease containing the principal terms of this Agreement with the real property records of the appropriate Governmental Authority within fifteen (15) days after the Rent Commencement Date.

## ARTICLE VIII

## LESSEE'S COVENANTS

8.1    Insurance.

     (a)    *Required Insurance*.  As of the Execution Date and for the remainder of the Lease Term Lessee shall obtain and maintain, at its expense, the insurance coverages described in Appendix I on terms and conditions stated therein.  All insurance policies shall be purchased from insurance companies reasonably acceptable to Lessor, which approval shall not be unreasonably conditioned, delayed or withheld.  Lessee may provide such insurance in the form of a blanket policy, covering other of Lessee's operations and/or properties.

(b)     *Modifications of Insurance Coverage.*  All insurance policies required by this Agreement shall provide that the same shall not be modified or terminated without at least thirty (30) days prior written notice to Lessor.  If Lessee at any time fails to secure and maintain in full force and effect any and all of the insurance coverages required under this Agreement, Lessor may procure or renew such insurance, and all reasonable costs incurred by Lessor in connection therewith shall be paid by Lessee.

(c)     *Waiver of Subrogation.*  Lessor and Lessee agree to have all fire and extended coverage and other property damage insurance which may be carried by either of them endorsed with a clause providing that any release from liability of, or waiver of claim for, recovery from the other Party entered into in writing by the insured thereunder prior to any loss or damage shall not affect the validity of said policy or the right of the insured to recover thereunder, and providing further that the insurer waives all rights of subrogation which such insurer might have against the other Party.  Without limiting any release or waiver of liability or recovery set forth elsewhere in this Lease, and notwithstanding anything in this Lease which may appear to be to the contrary, each of the Parties waives all claims for recovery from the other Party for any loss or damage to any of its property insured under valid and collectible insurance policies to the extent of any recovery collectible under such insurance policies.  Notwithstanding the foregoing or anything contained in the Lease to the contrary, any release or any waiver of claims shall not be operative, nor shall the foregoing endorsements be required, in any case where the effect of such release or waiver is to invalidate insurance coverage or invalidate the right of the insured to recover thereunder or to increase the cost thereof (provided, that in the case of increased cost the other Party shall have the right, within ten (10) days following written notice, to pay such increased cost and keep such release or waiver in full force and effect).

8.2    Environment.

(a)     *Obligation to Comply with Environmental Laws.*  In the conduct of its Operations Lessee shall comply with all Applicable Laws concerning the protection of the environment, and shall take all steps necessary to prevent and control any Release (as defined in Appendix J hereto) of any Hazardous Materials (as defined in Appendix J hereto) or the pollution of the air, land and sea by Hazardous Materials (as defined in Appendix J) in, on, under or about the Premises and which may be occasioned thereby, all as required by such Applicable Laws and in accordance with Prudent Industry Practices.  In addition, each Party shall comply with the applicable provisions of Appendix J attached hereto, in its handling, use, management and disposal of Hazardous Materials covered thereby.

(b)     *Hazardous Materials Disposal.*  Lessee, at its sole cost and expense, shall arrange for the disposal of Hazardous Materials generated, stored or otherwise managed at the Premises in accordance with Applicable Laws and Prudent Industry Practices.

(c)     *Obligation to Notify.*  If any Release of Hazardous Materials or an adverse effect to the environment occurs as a result of the Operations that may have a material adverse effect on the Premises, any other portion of the Property or any other off-site location and violates, or is reasonably anticipated to have caused a violation of, Applicable Law, Lessee shall (i) inform Lessor immediately of the same, (ii) take all measures required under Applicable Law and Prudent Industry Practices for detecting, remediating, cleaning up and/or containing such

Hazardous Materials to Lessor's reasonable satisfaction ("Response Actions"), provided that Lessee shall not encumber the Premises, the Channahon Facility or any other portion of the Property with any institutional controls or engineered barriers in undertaking any Response Actions and (iii) provide Lessor with frequent written updates regarding such Response Actions being taken or remaining to be taken by Lessee pursuant to Applicable Law and Prudent Industry Practices with respect to such condition. Lessor hereby gives Lessee a right and license to enter any portion of the Channahon Facility and the Property as may be necessary (in Lessor's sole discretion) to conduct Response Actions with respect to the release of a Hazardous Material caused by the Operations or Lessee's use or occupancy of the Premises.

(d)    *Pre-Existing Hazardous Materials.*  Lessee shall not be responsible for the cost of containment, removal and/or remediation of Hazardous Materials existing on the Premises or the Property prior to the Execution Date or which may be attributable to any condition not on the Premises or the Property but existing as of such date; provided, however, that if any of the Operations exacerbate or disturb any such pre-existing condition, Lessee shall be responsible therefor and shall indemnify and hold harmless Lessor from all additional costs, damages and expenses (including all reasonable legal fees and costs of litigation) directly attributable to such exacerbating or disturbing conduct; and provided further, however, that, for the avoidance of doubt, such indemnity obligations shall not cover the existence of the pre-existing Hazardous Material itself, which shall not be Lessee's responsibility.  Lessor shall indemnify, defend and hold harmless Lessee from all costs, damages and expenses (including all reasonable legal fees and costs of litigation) that Lessee may suffer as a result of or in connection with such pre-existing Hazardous Materials or any actions or claims involving the existence of such Hazardous Materials.  Lessor represents and warrants to Lessee that it has received no notices of violation of Environmental Laws since Lessor's receipt of that certain NFR letter recorded in the Will County Recorder's Office on May 21, 2004 as Document Number R2004090858.

(e)    *Emergencies.*  In the event of any Emergency endangering life or a material portion of the Lease Property, Lessee shall take such action as may be reasonable and necessary to prevent, avoid, or mitigate injury, damage, or loss and shall, as soon as possible, report any such incidents, including Lessee's response thereto, to Lessor.

8.3    Taxes.  Lessee shall pay any taxes, levies, duties, withholdings, or other fees levied by Governmental Authorities and are required by Applicable Law to be paid by Lessee as a result of the conduct of the Operations and performance of its obligations hereunder, including without limitation any real estate taxes as applicable to the Premises, which shall be part of the Activity Based Charge.

8.4    Licenses; Permits.  Lessee shall obtain and keep in force all necessary licenses and permits that are required under Applicable Law and are necessary for Lessee to fulfill its obligations hereunder, including without limitation, the performance of the Operations.

8.5    Security.  During the Lease Term, Lessee shall be responsible for the general security of the Lease Property inside the existing security fence of the Premises. Lessor shall be responsible for the general security of all other portions of the Property.

## ARTICLE IX

## LESSOR'S COVENANTS

9.1    Cooperation.  Lessor shall cooperate with Lessee as reasonably necessary to enable Lessee to perform its responsibilities under this Agreement, including the provision by Lessor of copies of drawings, plans, policies, papers, records, reports, data and other information directly related to the Premises and within Lessor's possession or control and which are reasonably necessary for Lessee to complete the Development Plan, construct the Improvements, perform the Operations and manage the Lease Property.  Lessee shall cooperate with Lessor as reasonably necessary to enable Lessor to perform its responsibilities hereunder.

9.2    No Interference.  Lessor shall ensure that its personnel or invitees located at the Channahon Facility or the Property do not cause unreasonable delay or interference with the performance of Lessee's Operations or any obligations of Lessee or with Lessee's personnel in the execution of their duties.

9.3    Access.  Lessor shall, at all times possible, keep road, railway and barge access within the Property open and in good repair so that the Premises may be accessible for use by Lessee for the performance of its Operations, including the receipt of feedstock and the transport of biodiesel.  Further, Lessee shall not block or impair access to the Channahon Facility or the remainder of the Property or cause interference with the use thereof by Lessor and all parties claiming rights under Lessor.

9.4    Communications Access.  Lessor shall provide and maintain for the benefit of Lessee and the Lease Property unimpeded access to cable and or satellite based communication systems for voice, video and data by truck, barge and rail functions.

9.5    Logistics Access.  Lessor shall provide:

(a)    Access and Navigation.  Lessor shall provide, maintain or cause to be maintained the river and railway approaches and access points, slips in the River Cells, sidings, tracks and navigation aids situated within the Property and necessary for accessing the Premises and the Property, at its sole expense.

(b)    Safety Regulations.  Lessor shall comply with all Applicable Laws and those work rules referenced in Section 3.7 hereof regarding the use, maintenance and operation, if any, of all railway, road and river access to the Premises.

(c)    Dredging.  Lessor shall cooperate with applicable Governmental Authorities to ensure that the channel to the Premises and the Property (including without limitation the face of the River Cells), are dredged in accordance with Prudent Industry Standards and shall comply with applicable rules and regulations promulgated by the Army Corps of Engineers, the United States Coast Guard or any other Governmental Authority with respect thereto.  Any additional costs incurred by Lessor in so complying or cooperating as a result of Lessee's requirements or Operations at the Premises shall be paid to Lessor by Lessee promptly following notice thereof (which details the additional charges).

9.6    Intentionally Deleted.

9.7    Access to Premises; Rights of Way.  Lessor shall grant Lessee, its employees, its customers and suppliers with road and rail access upon the Property and to the Premises in existence as of the Execution Date, subject to Applicable Laws, as necessary to conduct the Operations.  Such access shall be provided on a non-exclusive, shared basis with Lessor and other licensees of Lessor entitled to enter the Property and the Channahon Facility.  Lessee shall indemnify and hold harmless Lessor, its affiliates and their respective officers, directors, managers, employees and agents against any and all losses, damages and other expenses, including, without limitation, reasonable attorneys' fees, incurred as a result of Lessee's disruption of access to any portions of the Property, and such disruption shall be a default under this Lease.

9.8    Utilities and Services.  Neither Lessor nor Lessee shall take any action which is detrimental to the efficient supply of Utilities and Services to either party.  Lessee shall provide reasonable assistance to Lessor in making arrangements required to establish the availability of all Utilities and Services to the Premises, which is the Lessor's responsibility.

9.9    Licenses; Permits; Plans.  Lessor shall obtain and, to the extent in Lessor's control, keep in force at all times during the Lease Term all licenses, permits, including, without limitation, environmental and health and safety-related permits, and warranties which are necessary for Lessor to fulfill its obligations hereunder and shall provide reasonable assistance to Lessee in its efforts to obtain and keep in force all licenses and permits required to be obtained or maintained by Lessee under Section 8.4 or which are otherwise obtained in connection with the Facility and/or the Operations.  Lessee shall conduct its Operations and activities on the Premises in compliance with all such licenses and permits and shall not unduly interfere with Lessor's operations on the Property pursuant to such licenses and permits.  Lessee, at its sole cost and expense, shall also develop and implement all programs and plans required to comply with Applicable Laws, including, without limitation, spill control, containment and countermeasures plans, and filings and plans required by the federal Emergency Planning and Community Right to Know Act.  Lessee shall provide Lessor with copies of all permits, licenses, warranties, plans and filings required in connection with the Operations on an ongoing basis.

9.10    Taxes.  Lessor shall pay any taxes, levies, duties, assessments, or other fees levied by any Governmental Authority and which are required by Applicable Law to be paid by Lessor as a result of the performance of its obligations hereunder or as the owner of the Property, the Channahon Facility and the Lease Property.  Lessee shall reimburse Lessor on a monthly or quarterly basis, at Lessor's election (in line with Appendix E), as part of the Activity Based Charge and following notice for the taxes paid by Lessor which are allocable to the Lease Property and any Improvements.

9.11    Non-Disturbance; Subordination; Attornment.

(a)    Lessor herby covenants and agrees that it shall not allow any land or ground lease or any liens or encumbrances, including, but not limited to any mortgage, trust deed or security agreement, to be place against any of the Lease Property during the Lease Term without first providing a reasonable non-disturbance and attornment agreement from the

mortgagee, holder of a trust deed, secured party, land or ground lessor, or the like (such party being referred to herein as a "Lienholder"), in favor of Lessee, in customary form and which is satisfactory to Lessee, in its sole discretion, and which does not adversely affect Lessee's use of the Lease Property for the Operations or any of its other rights hereunder.

(b)    Lessee shall not be required to subordinate this Lease to any such Lienholder, unless and until a non-disturbance agreement executed and delivered, all in accordance with the foregoing provisions of this Section 9.11; and this Lease shall be superior to any land or ground lease, mortgage, trust deed, lien or encumbrance, unless provided otherwise in such non-disturbance and attornment agreement and compliance with any such agreement shall be a condition precedent to the performance of any Lessee's obligations hereunder affecting same, but shall not affect the exercise of Lessee's rights hereunder.

(c)    Lessee shall not be required to attorn to any successor in interest or purchaser of any of the Lease Property (or any portion thereof or of Lessor's interest in the Lease Property, or any portion of such interest therein) unless (i) Lessor is not in default of any material representation, warranty, covenant, agreement, term or provision of this Lease and (ii) such successor in interest or purchaser assumes, in a writing upon which Lessee may rely, all of Lessor's obligations under this Lease arising on or after the date of such assumption.

## ARTICLE X

## FORCE MAJEURE

10.1    Effect of Force Majeure.  If a Party cannot perform its obligations hereunder due to a Force Majeure event, such Party shall be excused from the performance of such obligations and shall not be considered to have committed an Event of Default from the date such Force Majeure event has commenced and until a reasonable period of time after the termination thereof. The Parties shall consult and cooperate with each other if a Force Majeure event occurs and shall take all reasonable steps to minimize any losses to either Party resulting therefrom. The affected Party shall resume the performance of its obligations hereunder as soon as reasonably practicable after such Force Majeure event has terminated.

10.2    Lease Fees Abatement.  The parties agree that in the event of a Force Majeure, the Lease Fees payable hereunder shall be abated to the extent the Force Majeure reduces Lessee's production capability at the Facility unless the loss was incurred as the result of the negligence of Lessee, its officers, agents or employees, provided that Lessor shall be entitled to receive any business interruption insurance properly allocated or specifically designated to compensate for rent.

10.3    Notice.  A Party affected by a Force Majeure event shall, as soon as practicable, provide written notice to the other Party of the occurrence of such Force Majeure event. Such notice shall include a detailed description of the Force Majeure event, an estimate of the duration of such event, the reasons for which such Party is unable to perform its obligations hereunder due to such event and a plan to mitigate and remedy such event, if possible. Such Party shall provide the other Party with regular updates of the foregoing information until such time as the Force Majeure event has terminated.

10.4    Termination. If a Force Majeure event extends for more than one hundred eighty (180) non-consecutive days within a period of nine (9) consecutive Months during the Lease Term or one hundred twenty (120) consecutive days, or a Force Majeure event causes substantial damage or destruction to the Lease Property so that it is not capable of being repaired within one hundred eighty (180) days after the termination of such Force Majeure event, then either Party may terminate this Agreement by giving not less than thirty (30) days written notice of such termination to the other Party. If Lessor elects to terminate this Lease in accordance with the foregoing sentence, Lessee may, notwithstanding such election, extend the Lease Term and rebuild that portion of the Lease Property and the Facility required to enable it to resume Operations, upon written notice to Lessor. In such instance, the Lease Fees shall be abated until the earlier of nine (9) months after notice of such election and the substantial completion of the required construction and remediation of the Lease Property.

## ARTICLE XI

## DOCUMENTATION AND AUDITS

11.1    Records and Reports.

(a)    *Accounting*. Lessee shall maintain and furnish to the Lessor suitable and complete accounting and non-accounting records that summarize all technical, commercial, financial and personnel information relating to the Operations on or before the thirtieth (30th) day after the end of each calendar quarter. All such information relating to the Biodiesel Output shall be retained in a form that shall permit audits by Lessor; Lessor shall have no other rights to audit or inspect Lessee's records without approval. Financial records and accounts shall be maintained in accordance with applicable United States generally accepted accounting principles. Technical records (including without limitation engineering designs and drawings) shall be maintained in accordance with Prudent Industry Practices.

(b)    *Lease Property*. Lessee shall prepare and maintain current records of the Lease Property as reasonably required by Lessor and in sufficient detail to provide a full understanding of the location and state of the Lease Property. Such records shall be comprised of physical drawings, databases and calculation sheets along with historical records relating to the constitution, repairs and maintenance of the Lease Property, including all works carried out as replacements, rehabilitation and maintenance. Physical plans for any buildings located on the Premises shall clearly identify and describe the as-built profiles. Lessee shall keep accurate records on (i) the removal and storage of any Movable Assets, including the location of any storage thereof and (ii) the erection of all Improvements on the Lease Property and all other alterations thereof.

(c)    *Monthly Production Report*. Lessee shall prepare a monthly production report which shall include, at a minimum, the Biodiesel Output for the previous calendar month, on the basis of gallons sold, subject to credits for refunds, unpaid accounts, or fuel consumed in the conduct of Operations ("Monthly Production Report"). Lessee shall submit to Lessor the Monthly Production Report within thirty (30) days after the end of each calendar month during the Lease Term. The Parties shall agree upon the exact format and content of the Monthly Production Report. Lessee shall provide any clarification of the Monthly Production Report

reasonably requested by Lessor.  Also, upon request by Lessor, Lessee shall certify such report as accurate.

(d)  *Retention Requirements*.  Lessee shall retain all records pertaining to hazardous materials, environmental compliance and permits required by Governmental Authorities for at least three (3) years after the Termination Date.

11.2  Audits.  Lessor may, but not more often than once in any 12 month period during the Lease Term, at its own cost and expense, appoint an independent auditor to audit the books and records of Lessee, but only in respect of verifying (a) the amounts included on the Biodiesel Output and Monthly Production Reports and (b) any amounts then owed or payable by Lessee to Lessor.  If any audit reflects errors greater than ten percent (10%) and with a minimum aggregate value of at least $10,000, Lessee shall pay for the cost of the audit in addition to any other amounts payable to Lessor as a result of such errors.

## ARTICLE XII

## REPRESENTATIONS AND WARRANTIES

12.1  Lessee Representations and Warranties.  Lessee represents and warrants that:

(a)  It is a corporation duly organized and validly existing under the laws of the State of Florida and is authorized and qualified to do business in the United States and the State of Illinois.

(b)  It is not in violation of any Applicable Law or judgment entered by any Governmental Authority, which violations, individually or in the aggregate, would affect its performance of any obligations under this Agreement.  There are no legal or arbitration proceedings or any proceeding by or before any Governmental Authority, now pending or (to the best knowledge of Lessee) threatened against Lessee that, if adversely determined, could reasonably be expected to have a material adverse effect on the financial condition, operations, prospects or business, as a whole, of Lessee, or its ability to perform under this Agreement.

(c)  Neither the execution and delivery of this Agreement, nor the compliance with the terms and provisions hereof will conflict with or result in a breach of, or require any consent under, the articles of incorporation, by-laws or any other governing document of Lessee, or any Applicable Law or order, writ, injunction or decree of any court, or any agreement or instrument to which Lessee is a party or by which it is bound or to which it is subject, or constitute a default under any such agreement or instrument.

(d)  It has all necessary power and authority to execute, deliver and perform its obligations under this Agreement; the execution, delivery and performance by Lessee of this Agreement has been duly authorized by all necessary action on its part; and this Agreement has been duly and validly executed and delivered by Lessee and constitutes a legal, valid and binding obligation of Lessee enforceable in accordance with its terms.

(e)  It will obtain all approvals, consents and authorization required under Applicable Law for the Operations and to consummate the transactions contemplated herein.

(f)    It is financially solvent, able to pay all debts as they mature and possesses sufficient working capital to perform its obligations hereunder.

(g)    It has (i) carefully examined this Agreement, together with all Appendices attached hereto, thoroughly and become familiar with all their respective terms and provisions; (ii) investigated to its satisfaction all Applicable Laws and it can perform its obligations hereunder in accordance therewith; (iii) the experience, resources, qualifications, and capabilities to perform its obligations hereunder; and (iv) made all investigations and inspections that it deems necessary to perform its obligations hereunder, including without limitation investigations and inspections of the Lease Property, and, subject to the terms of this Lease, accepts the Lease Property in its existing condition.

12.2    Lessor Representations and Warranties. Lessor represents and warrants that:

(a)    It is a limited liability company duly constituted and validly existing under the laws of the State of Illinois.

(b)    It is not in violation of any Applicable Law or judgment entered by any Governmental Authority, which violations, individually or in the aggregate, would affect its performance of any obligations under this Agreement. There are no legal or arbitration proceedings or any proceeding by or before any Governmental Authority, now pending or (to the best knowledge of Lessor) threatened against Lessor or involving any of the Lease Property that, if adversely determined, could reasonably be expected to have a material adverse effect on the financial condition, operations, prospects or business, as a whole, of Lessor, or its ability to perform under this Agreement, or the intended use of the Lease Property by Lessee.

(c)    Neither the execution and delivery of this Agreement, nor the compliance with the terms and provisions hereof will conflict with or result in a breach of, or require any consent under, the charter, operating agreement or other governing documents of Lessor, or any Applicable Law or order, writ, injunction or decree of any court, or any agreement or instrument to which Lessor is a party or by which it is bound or to which it is subject, or constitute a default under any such agreement or instrument.

(d)    It has all necessary power and authority to execute, deliver and perform its obligations under this Agreement; the execution, delivery and performance by Lessor of this Agreement has been duly authorized by all necessary action on its part; and this Agreement has been duly and validly executed and delivered by Lessor and constitutes a legal, valid and binding obligation of Lessor enforceable in accordance with its terms.

(e)    It has obtained all approvals, consents and authorizations that are required from any Governmental Authority under Applicable Law to consummate the transactions contemplated herein.

(f)    It has good title to the Movable Assets and other Lease Property and full legal right and power to demise such Movable Assets and other Lease Property to Lessee in the manner contemplated by this Agreement.  Upon execution of this Agreement and timely payment of all amounts due hereunder pursuant to the terms hereof Lessee shall have the rights of occupancy and use of the Lease Property, as specified herein free and clear of all liens, other

than the obligation to obtain any required authorizations or consents by a Governmental Authority in connection with the demise of any such Movable Assets and other Lease Property. There is no land or ground lease, mortgage or deed of trust or other interest of any Lienholder affecting or encumbering the Lease Property.

(g)　　It has received no notice from any Governmental Authority of, and has no knowledge of, any violation of Applicable Law in respect of the Lease Property, or with respect to any environmental condition existing on any portion of the Channahon Facility or the Property.

## ARTICLE XIII

### DEFAULT; TERMINATION

13.1　Lessee Event of Default.　Except if resulting from a Lessor Event of Default or Force Majeure, each of the following events shall be considered to constitute a "Lessee Event of Default:"

(a)　　Lessee declares bankruptcy or is declared bankrupt, makes a general assignment of its assets for the benefit of its creditors, petitions or applies to any court or tribunal for the appointment of a receiver or a trustee for itself or substantially all of its property, or commences or has commenced against it any legal proceedings for its reorganization, readjustment of debt, dissolution or liquidation which are not vacated or terminated within ninety (90) days.

(b)　　Lessee fails to pay the Lease Fees in accordance with Appendix F.

(c)　　Lessee commits a breach of any other material provision of this Agreement.

(d)　　Lessee fails to pay the Activity Based Charge or any payment payable under this Lease as and when due under this Lease.

13.2　Lessor Event of Default.　Except if resulting from a Lessee Event of Default or Force Majeure, each of the following events shall be considered to constitute a "Lessor Event of Default:"

(a)　　Lessor declares bankruptcy or is declared bankrupt, makes a general assignment of its assets for the benefit of its creditors, petitions or applies to any court or tribunal for the appointment of a receiver or a trustee for itself or substantially all of its property, or commences or has commenced against it any legal proceedings for its reorganization, readjustment of debt, dissolution or liquidation which are not vacated or terminated within ninety (90) days.

(b)　　Lessor commits a breach of a material provision of this Agreement.

13.3    Consequences of Expropriation and Default.

(a)    *Expropriation.*  Subject to Section 17.13, upon a condemnation or expropriation of the Lease Property such that Lessee cannot utilize the same for the Operations or any other use and purposes herein provided, Lessee may immediately terminate this Agreement.

(b)    *Insolvency.*  Upon an Event of Default described in Section 13.1(a) or 13.2(a), the Party that is not in default may immediately terminate this Agreement.

(c)    *Other Events of Default.*  Upon an Event of Default described in Section 13.1(b), (c) or (d) or in Section 13.2(b), the Party that is not in default (the "Non-Defaulting Party") shall personally deliver to the Party which is in default (the "Defaulting Party"), a written notice describing the alleged Event of Default and granting not less than fifteen (15) days from the Defaulting Party's receipt of such notice for the Defaulting Party to deliver a written response to the Non-Defaulting Party. If the Defaulting Party fails to respond to the Non-Defaulting Party within such fifteen (15) day period, then the Non-Defaulting Party may terminate this Agreement. If, however, the Defaulting Party responds to the Non-Defaulting Party, then, the Defaulting Party shall be granted not more than seven (7) days in the event the breach involves a failure to make any payment payable hereunder or in other cases, a reasonable period of time in the light of the circumstances surrounding such Event of Default (but not less than (30) days) to remedy such Event of Default in light of the circumstances surrounding such Event of Default. If such time period expires and the Defaulting Party has not cured the Event of Default, the Non-Defaulting Party thereafter may terminate this Agreement upon notice duly given to the Defaulting Party. If an Event of Default results in an Emergency, the Non-Defaulting Party may take such actions as it reasonably deems necessary to cure the Event of Default or mitigate the potential impacts of such Event of Default prior to the expiration of the Defaulting Party's cure period. The reasonable costs incurred by the Non-Defaulting Party in such instance shall be promptly reimbursed by the Defaulting Party.

(d)    *Lessor's Right to Re-Enter.*  If this Agreement is terminated in accordance with subsection (c) above, Lessee shall surrender possession, remove all Hazardous Materials on the Premises, the Property or other property brought there by Lessee or its subtenants, agents, employees or invitees and vacate the Premises and immediately deliver possession thereof to Lessor, and Lessor may re-enter and take complete and peaceful possession of the Premises, with process of law (full and complete license so to do being hereby granted to Lessor) and Lessor may remove all occupants and property therefrom, (including without limitation the Improvements) using such lawful force as may be necessary, with process of law and without being deemed in any manner guilty of trespass, eviction or forcible entry and detainer and, subject to Sections 14.3 and 14.4, without relinquishing Lessor's right to Lease Fees or any other right given to Lessor hereunder or under Applicable Law.

13.4    Termination without Default.  Notwithstanding any provision of this Agreement to the contrary, this Lease shall be subject to termination by the Party specified below without cause or default, upon the occurrence of any of the following conditions:

(a)    By Lessor or Lessee upon the occurrence of a Force Majeure event which lasts for more than the time periods specified in Section 10.4 hereof;

(b)    By Lessee, without cost of penalty (and with complete refund of any Good Faith Deposit previously made) and without any further obligations hereunder if prior to that date (the "Approval Contingency Deadline") which is ninety (90) days after the Execution Date Lessee does not receive all approvals from Governmental Authorities which it reasonably believes are required for the Operations after making commercially reasonable and continuous good faith efforts to obtain such approvals in a timely manner; provided, however, that either Party may, by written notice to the other party, extend the Approval Contingency Deadline by two hundred seventy (270) days.

(c)    By Lessee, without cost of penalty (and with complete refund of any Good Faith Deposit previously made) and without any further obligations hereunder if prior to that date which is ninety (90) days after the Execution Date the Parties do not agree on the Development Plan pursuant to Section 4.4(a) hereof; provided, however, that this Section 13.4(c) shall not apply unless Lessee submits its proposed revised Development Plan to Lessor on or prior to the date that is sixty (60) days after the Execution Date and such Development Plan does not materially differ from the Development Plan attached hereto as Appendix D other than adjustments for dates and updated information consistent with this Lease and the Supply Agreement.

(d)    By Lessee on or before March 31, 2008, if Lessor is unable, after using commercially reasonable efforts to do so within such timeframe, to obtain air quality permits from the State of Illinois sufficient to permit Lessee's anticipated Operations.

(e)    By Lessee pursuant to Section 17.13.

(f)    By Lessor if the Supply Agreement is terminated.

13.5    Events Not Constituting a Default.    Notwithstanding anything to the contrary contained in this Agreement, the following events shall not constitute a Lessor Event of Default:

(a)    Lessor's failure to undertake any activity or any obligation under this Lease due to Lessor being prohibited to do so by a Governmental Authority or any Applicable Law.

(b)    Lessor's inability or unwillingness to permit Lessee to construct or use additional River Cells.

(c)    If Lessor relocates or abandons its facilities at the Property, then the Lessee shall select one of the following courses of action: (A) to terminate the Lease or (B) to use the Common Areas, Limited Common Areas and such portions of the Property as are reasonably necessary to operate the Utilities and Services required to support its Operations at its cost for the duration of the Lease Term but without paying Activity Based Charges. Any capital costs reasonably incurred by Lessee to enable it to economically continue its business consistent with its then current levels of Operations shall be an offset against the Lease Fees provided in Section 3.3.

## ARTICLE XIV

## RIGHTS AND OBLIGATIONS UPON TERMINATION

14.1    Procedures.    On or before that date which is one year prior to the scheduled expiration of the Lease Term, the Parties shall agree to the procedures to be adopted and followed by them relating to the transfer of the Lease Property on such termination. Lessor shall have the right, at its own expense, to take any measures during the last year of the Lease Term (or as the case may be, upon any earlier termination) necessary to ensure the continuity of the performance of the Operations after such termination. Each Party shall be responsible for the costs and expenses incurred by it in performing its obligations under this Article. Notwithstanding the foregoing, if Lessor terminates this Agreement as a result of a Lessee Event of Default, Lessee shall pay the Lessor for all such costs and expenses.

14.2    Termination Payment.    The Parties intend that the Lease Fees should equal or exceed certain Payment Goals during the Lease Term. Therefore, if Lessee does not exercise one or more of its options to extend the Lease Term as permitted under Section 2.2(b) (and Lessor has not received Lease Fees in excess of the applicable Payment Goals as of the Termination Date, then Lessor shall be due a termination payment ("Termination Payment") in accordance with Appendix K. The Parties intend that any Termination Payment that is due and payable by Lessee to Lessor shall be paid out of the Good Faith Deposit. Notwithstanding anything in this Agreement to the contrary, Lessor shall not be entitled to a Termination Payment if: (i) Lessee does not exercise a Renewal Term due to the occurrence or existence of a Lessor Event of Default; or (ii) the Operations or Biodiesel Output were materially curtailed during the Lease Term due to any event of Force Majeure. If any of the foregoing events in (i) or (ii) occur, and a Termination Payment would otherwise be due and payable, the Parties agree to negotiate in good faith a reasonable reduction of the Termination Payment to reflect the reduced production capacity or other factor limiting the production of Biodiesel Output at the Facility. The Parties do not intend that any Termination Payment shall be payable in the event of any termination pursuant to Section 13.4(b) or Section 13.4(c) hereof.

14.3    Surrender of Lease Property.    Within thirty (30) days prior to any scheduled Termination Date, each Party shall survey the Lease Property at its own cost. On the Termination Date, all rights and interests of Lessee in the Lease Property, excluding the assets and Improvements installed or affixed to the Premises by Lessee pursuant to Section 4.4 (the "Biodiesel Improvements and Equipment"), shall cease immediately, and Lessee shall peaceably and quietly surrender to Lessor the Lease Property in a good working condition in accordance with Prudent Industry Practices (excluding reasonable wear and tear). Lessor shall, provided that there is no unpaid obligation on the part of the Lessee, allow Lessee to remove that portion of the Biodiesel Improvements and Equipment acquired or owned by Lessee that Lessee elects to retain and can remove without causing substantial damage to the Lease Property in a reasonable manner within sixty (60) days after the Termination Date, and shall provide Lessee (and its representatives) sufficient access to the Premises to enable them to so remove such Biodiesel Improvements and Equipment and restore the Lease Property following such removal, at Lessee's expense, to the condition it was in at the beginning of the Lease Term, reasonable wear and tear excepted. Further, Lessor may require Lessee, at Lessee's own expense, to return and re-install the Movable Assets to the same or similar condition that existed (excluding reasonable

wear and tear) before they were removed from the Premises by Lessee and to remove any other personal property (such personal property to be determined at Lessor's discretion) from the Premises. Upon any such surrender and delivery as required herein, Lessee and Lessor agree that Lessor shall, subject to Lessee's having satisfied the Lessor that title to such Improvements can be taken over by the Lessor without challenge, delay or contest, provide Lessee with a credit for the lesser of the scrap value or book value as carried in the Lessee's accounts of such Improvements made by or at the expense of Lessee to the Premises and which are not removed therefrom. The payment of such credit amount to Lessee shall only be made by Lessor to the extent that it exceeds the balance of any of Lessee's unpaid obligations hereunder at the Termination Date.

14.4    Liquidated Damages.

(a)    *Liquidated Damages.* Notwithstanding the provisions of Section 14.3, if Lessor terminates this Agreement prior to the end of the Lease Term in accordance with Section 13.1 due to a Lessee Event of Default, then Lessee shall pay all sums due to Lessor prior to the Termination Date and, in lieu of exercising the other remedies provided to it under the Lease, Lessor may elect to retain the Biodiesel Improvements and Equipment as liquidated damages. The Parties acknowledge and agree that because of the unique nature of the Lease Property, and the effect of any default upon relations with the customers and Lessor's ability to continue to deliver and process certain feedstock, it is difficult or impossible to determine with precision the amount of damages that would or might be incurred by Lessor as a result of a Lessee Event of Default. It is understood and agreed by the Parties that (i) Lessor shall be damaged by failure of Lessee to meet such obligations; (ii) it would be impracticable or extremely difficult to fix the actual damages resulting therefrom; (iii) any sums that would be payable under this Section 14.4(a) are in the nature of liquidated damages and not a penalty and are fair and reasonable; and (iv) such payment represents a reasonable estimate of fair compensation for the losses that may reasonably be anticipated from such failure. Nothing herein is intended to affect or limit Lessor's right to recover any outstanding sums due by the Lessee to the Lessor and any damages of Lessor which may otherwise be payable by Lessee to Lessor under the Supply Agreement. In addition, nothing herein shall limit Lessor's rights and remedies pursuant to Lessee's environmental indemnification obligations under this Lease.

(b)    *Release of Liability.* As additional consideration for the liquidated damages provision in Section 14.4(a), if Lessor terminates this Agreement due to a Lessee Event of Default, Lessee shall be relieved of all responsibility for claims or damages under or related to this Agreement or such Event of Default (other than responsibility under Lessee's environmental indemnification obligations under this Agreement and except as provided in Section 14.4 (a)) by delivering, without challenge, delay or contest, title to the Biodiesel Improvements and Equipment to Lessor, free and clear of all liens. The Biodiesel Improvements and Equipment shall be transferred on an "as-is, where-is basis", with no warranties, express or implied other than a warranty of title.

(c)    *Transfer Fee.* If Lessee transfers the Biodiesel Improvements and Equipment to Lessor in accordance with Section 14.4(a) upon the termination of this Agreement due to a Lessee Event of Default, Lessee shall be entitled to receive (i) a transfer fee from Lessor equal to $.05 per gallon for any and all gallons of biodiesel produced by Lessor or one or more of

its Affiliates at the Premises or using the Biodiesel Improvements and Equipment (the "Transfer Fee") within twenty four (24) months after the Termination Date and continuing for a period of sixty (60) months after any biodiesel production is recommenced following the Termination Date (but not to exceed in the aggregate any Termination Payment and Lessee's unrecovered capital costs) and (ii) the prompt return of the Good Faith Deposit, together with accrued interest thereon. The Transfer Fee shall be due and payable to Lessee on or before the fifteenth (15th) day of each calendar month for all production which occurred in the previous calendar month. The provisions of Article XI shall apply to Lessor with respect to Transfer Fee payments as if it were Lessee thereunder, mutatis mutandis, including the obligation to maintain accurate records and the right to audit biodiesel production calculations. This Section 14.4(c) shall survive the termination or expiration of this Agreement. The Parties acknowledge and agree that Lessor may offset any Transfer Fee payment obligation against sums which may be due to Lessor under the Supply Agreement as a result of Lessee's breach of any of the terms thereof.

14.5    Cooperation; Exchange of Information.    Lessee shall use its commercially reasonable efforts and cooperate with Lessor or any new lessee that Lessor may appoint to take over responsibility from Lessee to perform the Operations on or after the Termination Date; provided, that the foregoing shall not require Lessee to assume any liability, obligation or exposure in excess of that existing as of such date.

14.6    Hazardous Materials.    At or prior to the Termination Date, Lessee shall remove all Hazardous Materials on the Premises, the Property or neighboring property that were brought there by Lessee or its subtenants, agents, employees or invitees.

### ARTICLE XV

### INDEMNITIES; LIABILITIES

15.1    Lessee Indemnity.    To the fullest extent permitted by Applicable Law, Lessee shall indemnify, defend, and hold harmless Lessor, from and against any and all liabilities, losses, expenses, and claims for personal injury or property damage or any penalties or fines imposed on Lessor that arise from or out of (i) Lessee's willful misconduct or negligent acts or omissions, (ii) the presence or Release of Hazardous Materials caused or permitted by Lessee or its subtenants, agents, employees or invitees, (iii) environmental contamination or violation of Environmental Laws caused or permitted by Lessee or its subtenants, agents, employees or invitees, (iv) permit violations, (v) a breach of a representation or warranty, including, without limitation, environmental representations and warranties or (vi) any construction activities performed by Lessee.

15.2    Lessor Indemnity.    To the fullest extent permitted by Applicable Law, Lessor shall indemnify, defend, and hold harmless Lessee, from and against any and all liabilities, losses, expenses, and claims for personal injury or property damage or any penalties or fines imposed on Lessee that arise from or out of Lessor's willful misconduct or negligent acts or omissions.

15.3    Cumulative Remedies.    Except as specifically set forth herein, (a) all rights and remedies provided hereunder to Lessor and all rights and remedies available to Lessor under

Applicable Law shall be cumulative and concurrent and (b) the exercise by Lessor of its rights or remedies under this Agreement shall not operate as a waiver of its rights and remedies under Applicable Law.

15.4    Survival.    Sections 15.1 and 15.2 shall survive the expiration or sooner termination of this Lease.

## ARTICLE XVI

## GOVERNING LAW; DISPUTE RESOLUTION

16.1    Governing Law.    This Agreement shall be governed by, construed and enforced in accordance with the laws of Illinois.

16.2    Disputes.    Any dispute, controversy or claim arising out of or in relation to or in connection with this Agreement and the activities carried out hereunder, including without limitation any dispute as to the construction, validity, interpretation, enforceability or breach of this Agreement (each a "Dispute"), shall be exclusively and finally settled pursuant to the dispute resolution process described in Sections 16.3 and 16.4.

16.3    Mutual Consultation.    If either Party believes that a Dispute exists, it may deliver a notice to the other Party requesting that the Dispute be referred to the senior management of the Parties.  Any such notice shall include the names of the senior management of the Party nominated to attempt to resolve the Dispute, and a schedule of their availability during the twenty one (21) day period following the date of such notice.  Within seven (7) days after receipt of a notice pursuant to the preceding sentence, the other Party shall provide a notice to the requesting Party indicating the names of its senior management nominated to attempt to resolve the Dispute, and a schedule of their availability during the remainder of the twenty one (21) day period following the date of the notice.  During the remainder of such twenty one (21) day period, the nominated members of the senior management of the Parties shall meet as frequently as possible and shall attempt in good faith to resolve the Dispute.

16.4    Binding Arbitration.    If the Parties cannot resolve the Dispute in accordance with the procedure specified in Section 16.3, then any Party may submit such Dispute to arbitration by notice to the other Party.  Such arbitration proceeding shall be governed by the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), as in effect on the date of such notice.  The arbitral tribunal shall consist of three (3) arbitrators.  The Party initiating the arbitration proceeding shall provide written notice to the other Party of the arbitrator that it nominates.  Within fourteen (14) Days of the receipt of such notice, the other Party shall provide to the initiating Party a written notice identifying the name of a second nominated arbitrator, with the understanding that if such nomination is not made within such fourteen (14) Day period, then the AAA shall make such appointment.  Within fourteen (14) Days following the date of the appointment of the second arbitrator, the two arbitrators shall appoint the third arbitrator, with the understanding that if the two arbitrators are not able to agree on a third arbitrator within such fourteen (14) Day period, then the third arbitrator shall be appointed by the AAA.  All three of the arbitrators shall be experienced in contracts of a similar nature to this Agreement, and all three individuals shall also be proficient in the written and spoken forms of the English language.

The arbitration proceedings shall be conducted and all related communications shall be in the English language. The arbitration shall be conducted in Joliet, Illinois or such other place as the Parties may mutually agree. Any decision of the arbitral tribunal shall be final and binding upon the Parties. The Parties hereby waive, to the extent permitted by Applicable Law, any right to appeal or to review of such reward by any court or tribunal. Any award of the arbitral tribunal may be entered in any court having jurisdiction for purposes of enforcement. The arbitral tribunal shall presumptively award legal fees and arbitral costs to the winning party, but the arbitral tribunal shall retain the right to make such other equitable allocation with regard to such fees and costs as it may determine.

## ARTICLE XVII

## MISCELLANEOUS

17.1    Amendments. No change, amendment, or modification of this Agreement shall be valid or binding upon the Parties hereto unless such change, amendment, or modification shall be in writing and duly executed by both Parties hereto.

17.2    Assignment. Lessee shall not sublease or assign this Agreement in whole or in part, or delegate its obligations hereunder, in whole or in part, except with Lessor's consent which Lessor shall not unreasonably withhold, condition or delay. Notwithstanding the preceding sentence, no consent shall be required for a transfer of this Agreement to an Affiliate by assignment, merger or otherwise or an assignment for collateral purposes. Lessor may assign this Agreement as a part of a sale of the Premises, the Common Areas or the limited Common Areas, as applicable. The transferor shall remain jointly and severally liable with the transferee for the full performance of the transferor's obligations under this Agreement unless the transferee assumes in writing all of the obligations of the transferor; any assignment not in accordance with the provisions of this Section shall be void and without force or effect. Lessee hereby acknowledges and agrees that it would not be unreasonable for Lessor to withhold approval of any transfer of this Lease based on the transferee's financial insecurity or lack of experience in the conduct of business operations as contemplated herein or if any such transfer is sought to a competitor of Lessor.

17.3    Survival. All rights accrued prior to the termination of this Agreement shall survive its termination.

17.4    Entire Agreement. The terms and provisions contained in this Agreement and the Supply Agreement (including all exhibits and appendices thereto) constitute the entire agreement between the Parties with respect to the subject matter hereof.

17.5    Notices. Any notice, demand or document that either Party is required or may desire to give under this Agreement must be (a) in writing and (b) except to the extent specifically provided otherwise in this Agreement, given by personal delivery, overnight courier, facsimile or United States registered or certified mail, return receipt requested, with the postage prepaid and properly addressed or communicated to such Party at its address or facsimile number shown below, or at such other address as either Party may have furnished to the other by notice given in accordance with this Section 17.5. Any notice delivered or made by personal delivery,

overnight courier, facsimile, or United States mail shall be deemed to be given on the date of actual delivery as shown by the receipt for personal delivery or overnight courier delivery, the addresser's machine confirmation for facsimile delivery, or the registry or certification receipt for registered or certified mail.

If to EFA:

Earthfirst Americas, Inc.
2515 East Hanna Avenue
Tampa, Florida 33610
Attn: D. Massari, Senior Vice President
Facsimile No.: 813.238.8490

With a copy to (which shall not constitute notice):

Squire, Sanders & Dempsey LLP
201 North Franklin Street, Suite 2100, Tampa, Florida 33602
Attn: Joseph D. Edwards, Esq.
Facsimile No.: 813.202.1313

If to Supplier:

Loders Croklaan USA, LLC
24708 West Durkee Road
Channahon, Illinois 60410
Attn: Julian Veitch
Facsimile No.: 815-730-5202

With a copy to (which shall not constitute notice):

DLA Piper US LLP
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
Attn: Donald A. Shindler, Esq.
Facsimile No.: 312-630-5344

17.6    Confidentiality.

(a)     *Obligation of Confidentiality.* Each Party agrees to hold in confidence for a period of five (5) years following the termination of this Agreement, any information supplied to such Party (the "Receiving Party") by the other Party (the "Disclosing Party") and related to the Lease Property, the Biodiesel Improvements and Equipment, the Movable Assets, the Operations or this Agreement as more fully described in the Confidentiality Agreement between the Parties dated September 8, 2006 (the "Confidential Information"). Each Receiving Party shall maintain in complete confidence and will not disclose to any Person any such information except (i) as may be required by court order, Applicable Law or a Governmental Authority (including, if required, to comply with the disclosure requirements of the Securities and Exchange Commission, the New York Stock Exchange, the American Stock Exchange or any

self-regulatory organization), (ii) to such Receiving Party's or its Affiliates' employees, auditors, consultants, banks, financial advisors and legal advisors, or (iii) as provided in Section 17.6(c).

(b)    *Exceptions*.    The provisions of Section 17.6(a) shall not apply to information within any one of the following categories or any combination thereof: (i) information that was in the public domain prior to the Receiving Party's receipt thereof from the Disclosing Party or that subsequently becomes part of the public domain by publication or otherwise except by the Receiving Party's wrongful act; (ii) information that the Receiving Party can show was lawfully in its possession prior to receipt thereof from the Disclosing Party through no breach of any confidentiality obligation; or (iii) information received by the Receiving Party from a third party having no obligation of confidentiality with respect thereto. It shall not be a breach of the obligation of confidentiality contained herein if the Receiving Party discloses confidential information as required by Applicable Law or any Governmental Authority.

(c)    *Tax Disclosure*.    Notwithstanding anything herein to the contrary, the Parties (and their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind from the commencement of discussions, the U.S. federal income and state tax treatment and tax structure of the transactions herein contemplated and all materials of any kind (including opinions or other tax analyses) that are provided to the Parties relating to such tax treatment and tax structure, except where confidentiality is reasonably necessary to comply with securities laws. For this purpose, "tax structure" is limited to facts relevant to the U.S. federal income and state tax treatment of the transactions herein contemplated and does not include information relating to the identity of the Parties, their Affiliates, agents or advisors.

17.7    No Waiver.    Any failure of any Party to enforce any of the provisions of this Agreement or to require compliance with any of its terms at any time during the term of this Agreement shall in no way affect the validity of this Agreement, or any part hereof, and shall not be deemed a waiver of the right of such Party thereafter to enforce any and each such provision.

17.8    Severability.    The invalidity of one or more phrases, sentences, clauses, sections or articles contained in this Agreement shall not affect the validity of the remaining portions of this Agreement so long as the material purposes of this Agreement can be determined and effectuated.

17.9    Further Assurances.    The Parties agree to provide such information, execute and deliver any such instruments and documents and to take such other actions as may be necessary or reasonably requested by the other Party (to the extent not inconsistent with the provisions of this Agreement and that do not involve the assumptions of obligations other than those provided for herein) in order to give full effect to this Agreement and to carry out the intent hereof.

17.10    Compliance with Laws; Officials Not to Benefit.    Lessee shall comply with all Applicable Laws applicable to its performance under this Agreement, including those dealing with improper or illegal payments, gifts or gratuities. In any event, each Party represents and warrants to the other that it has not paid, promised to pay or authorized the payment of, and agrees that it shall not pay, promise to pay or authorize the payment of, any money or anything

of value, directly or indirectly to any person (whether a government official or private individual) or Governmental Authority for the purpose of or where there is a likelihood of illegally or improperly inducing any official, political party or official thereof or Governmental Authority to obtain or retain business, or to take any other favorable action in relation to the Lease Property, the Movable Assets, the Operations, Lessor, Lessee, or any third party.

17.11   Commissions.  Each Party represents to the other that it has not authorized any broker or finder to act on its behalf in connection with this Agreement and that it has not dealt with any broker or finder purporting to act on behalf of any other Party. Each Party agrees to indemnify and hold harmless the other Party from and against any and all claims, losses, damages, costs or expenses of any kind or character arising out of or resulting from any agreement, arrangement or understanding alleged to have been made by such Party or on its behalf with any broker or finder in connection with the Agreement or the transactions contemplated hereby.

17.12   Rights Reserved to Lessor.  Lessor reserves the following rights, exercisable without notice and without liability to Lessee for damage or injury to property, person or business and without effecting an eviction or disturbance of Lessee's use or possession of the Lease Property or giving rise to any claim for setoff or abatement of Lease Payments or affecting any of Lessee's other obligations under this Lease:

(a)     to change the name or street address of the Channahon Facility;

(b)     to install and maintain signs on the exterior and interior of the buildings other than the Premises;

(c)     to reasonably prescribe the location and style of Lessee's identification sign or lettering on and for the Premises; provided, that Lessee's use of its unique name, style and lettering shall be Lessee's decision;

(d)     to retain at all times, and to use in appropriate instances, pass keys to the Premises.

17.13   Eminent Domain.  If the entire Premises, or a substantial part thereof, or any part thereof which includes all or a substantial part of the Premises or any necessary appurtenances (whether or not located on the Premises and including without limitation the River Cells) shall be taken or condemned by any competent authority for any public or quasi public use or purpose, the Lease Term shall end upon and not before the earlier of (a) the date when the possession of the part so taken shall be required for such use or purpose or (b) the effective date of the taking, and without apportionment of the award to or for the benefit of Lessee.  If any condemnation proceeding shall be instituted in which it is sought to take or damage any part of the Premises or the Property, the taking of which would, in Lessee's reasonable opinion, prevent the economical operation of the Premises or the Operations, or if the grade of any street or alley adjacent to the Premises is changed by any competent authority, and such taking, damage or change of grade makes it necessary or desirable to remodel the Premises to conform to the taking, damage or changed grade, Lessee shall have the right to terminate this Lease upon not less than ninety (90) days' notice prior to the date of termination designated in the notice.  In such event the Lease

Fees at the then-current rate shall be apportioned as of the date of the termination. No money or other consideration shall be payable by Lessor to Lessee for the right of termination and Lessee shall have no right to share in the condemnation award, whether for a total or partial taking, for any loss of Lessee's leasehold interests or Improvements or other loss or expenses, or in any judgment for damages caused by the change of grade; provided, that Lessee may, by separate action, seek an award for loss of its Improvements or other equipment fixtures and personal property and for moving expenses, if such separate action shall not reduce Lessor's condemnation proceeds or, if it so does, Lessor shall recover the reduction from such separate award. If this Lease is not terminated on account of any condemnation, Lessor shall proceed with reasonable promptness to repair and restore the Premises, subject to reasonable delays caused by matters beyond Lessor's reasonable control and also subject to zoning laws and building codes then in effect.

17.14  Patriot Act Requirements. The parties acknowledge that the President of the United States of America has issued Executive Order 13224 (the "Executive Order") prohibiting transactions with terrorists and terrorist organizations and that the government of the United States has adopted and may in the future adopt other anti-terrorism measures (the "Anti-Terrorism Measures"). Each party represents and warrants to the other that it is not and has not been determined to be a person listed in the Annex to Executive Order 13224, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as periodically amended (the "Prohibited Persons").

17.15  Attorney's Fees. If any Party brings a legal action or arbitration proceeding to enforce its rights or for declaration of its rights or an alleged breach or default hereunder or pursuant to the transactions contemplated hereby, the prevailing Party in such action or proceeding shall be entitled to an award of its reasonable attorney's fees and costs expended in any such court and/or arbitration proceeding, in addition to any other damages or relief awarded to such Party.

17.16  Waiver of Jury Trial. It is mutually agreed by and between Lessor and Lessee that the respective Parties hereto shall, and they hereby do, waive trial by jury in any action, proceeding or counterclaim brought by either of the Parties hereto against the other on any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Lessor and Lessee, Lessee's use of or occupancy of the Premises or any claim of injury or damage and any emergency statutory or any other statutory remedy related thereto.

17.17  Estoppel Certificates. Lessee agrees that, from time to time (but not more than once in any 12 month period) upon not less than twenty (20) days' prior request by Lessor or the holder of any Mortgage or any ground lessor, Lessee (or any permitted assignee of Lessee's rights hereunder) will deliver to Lessor, or to the holder of any Mortgage or any ground lessor, a statement in writing signed by Lessee certifying to the knowledge of Lessee that (a) this Lease is unmodified and in full force and effect (or if there have been modifications, that this Lease as modified is in full force and effect and identifying the modifications); (b) the date upon which Lessee began paying Lease Fees and the dates to which the Lease Fees and any Activity Based Charge have been paid; (c) Lessor is not in default under any provision of this Lease, or, if in default, the nature thereof; (d) Lessee is occupying the Premises and is paying Lease Fees on a current basis with no offsets or claims; (e) there has been no prepayment of Lease Fees other

than as provided for in this Lease; and (f) there are no actions, whether voluntary or otherwise, pending against Lessee under the bankruptcy laws of the United States or any state thereof.

17.18 Guaranty.    Contemporaneously with Lessee's execution of this Agreement, Lessee shall cause its parent entity, EarthFirst Technologies, Inc., to execute the guaranty attached hereto and deliver same to Lessor.  Further, in the event of any consolidation, transfer, combination or other action such that a new parent is created for Lessee or EarthFirst Technologies, Inc. becomes a subsidiary of another company, or both, then the entity which becomes the new parent of Lessee and/or the entity which becomes the new parent of EarthFirst Technologies, Inc. each, as the case may be, shall execute and deliver a guaranty, in the form attached, to Lessor and each such new guarantor shall be jointly and severally liable with EarthFirst Technologies, Inc. and Lessee for Lessee's duties and obligations under this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, each Party has caused its authorized representatives to execute this Agreement in the space provided below, effective as of the Execution Date.

LESSOR:                                          LESSEE:

Loders Croklaan/USA, LLC                         Earthfirst Americas, Inc.

By: _____                    By: _____
Name: Julian Veitch                              Name: Domenic Massari
Title: President                                 Title: Senior Vice President

IN WITNESS WHEREOF, each Party has caused its authorized representatives to execute this Agreement in the space provided below, effective as of the Execution Date.

LESSOR:                                        LESSEE:

Loders Croklaan USA LLC                        Earthfirst Americas, Inc.

By: _____                  By: _____
Name: Julian Veitch                            Name: Domenio Massari
Title: President                               Title: Senior Vice President

## GUARANTY

**THIS GUARANTY** (the "Guaranty") is made and entered into as of this _14_ day of April, 2007 by the undersigned ("Guarantor") who, having received a copy of that certain Lease Agreement dated April _11_, 2007 (the "Lease"), between **Loders Croklaan USA, LLC**, an Illinois limited liability company ("Lessor"), and **EarthFirst Americas, Inc.**, a Florida corporation ("Lessee"), has examined the Lease and is familiar with all the terms, covenants and provisions contained therein, and as an inducement to Lessor to enter into the Lease, does hereby unconditionally guarantee to Lessor: (i) the full and prompt payment of all Lease Fees, Activity Based Charges and all other sums and charges payable by Lessee under the Lease; (ii) the full and timely performance and observance of all the covenants, terms, conditions, and agreements therein provided to be performed and observed by Lessee; (iii) the full and prompt payment of all costs, expenses and reasonable attorneys' fees incurred by Lessor in enforcing the Lease and/or this Guaranty, to the extent Lessor is entitled to recover same under the Lease; and (iv) the full and prompt payment to Lessor of the amount of any payments made to Lessor which are recovered from Lessor by a trustee, receiver or creditor of the Guarantor or Lessee pursuant to applicable law; and the Guarantor hereby covenants and agrees to and with Lessor that if default shall at any time be made by Lessee in the payment of any Lease Fees, Activity Based Charges, or any other sum or charge payable by Lessee under said Lease, or if Lessee should default in the performance and observance of any of the covenants, terms, conditions, or agreements contained in said Lease, the Guarantor will forthwith pay such rent and such other sums and charges to Lessor, and any arrears thereof, and shall forthwith faithfully perform and fulfill all of such terms, covenants, conditions, and agreements.

This Guaranty is an absolute and unconditional guaranty of payment and of performance, and not of collection. It shall be enforceable against the Guarantor without the necessity of any suit or proceedings on Lessor's part of any kind or nature whatsoever against Lessee and without the necessity of any notice of nonpayment, nonperformance or nonobservance or of any notice of acceptance of this Guaranty or of any other notice or demand to which the Guarantor might otherwise be entitled, all of which the Guarantor hereby expressly waives; and the Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of the Guarantor hereunder shall in no way be terminated, affected, diminished, or impaired by reason of the assertion or the failure to assert by Lessor against Lessee, or against Lessee's successors and assigns, any of the rights or remedies reserved to Lessor pursuant to the provisions of said Lease or by relief of Lessee from any of Lessee's obligations under the Lease or otherwise, including, but not by way of limitation, the rejection of said Lease in connection with proceedings under the bankruptcy laws now or hereafter in effect.

This Guaranty shall be a continuing guaranty and the liability of the Guarantor hereunder shall in no way be affected, modified or diminished by reason of any assignment, renewal, modification, or extension of the Lease or by reason of any modification or waiver of or change in any of the terms, covenants, conditions, or provisions of the Lease, or by reason of any extension of time that may be granted by Lessor to Lessee, or a changed or different use of the Leased Premises, or by reason of any dealings or transactions or matters or things occurring between Lessor and Lessee, whether or not notice thereof is given to the Guarantor.

The Guarantor hereby unconditionally waives (a) presentment, notice of dishonor, protest, demand for payment, and all notices of any kind, including, without limitation, notice of acceptance hereof; notice of nonpayment, non-performance, or other default under the Lease; and notice of any action taken to collect upon or enforce any of the terms and provisions of the Lease; (b) any subrogation to the rights of Lessor against Lessee until all of the obligations of Lessee under the Lease have been fully complied with and the Lease has expired or terminated and such payments made by the Guarantor are not subject to a right of recovery; and (c) any setoffs or counterclaims against Lessor which would otherwise impair Lessor's rights against the Guarantor hereunder.

The assignment by Lessor of the Lease and/or the rents, profits, avails, and/or proceeds thereof made either with or without notice to the Guarantor shall in no manner whatsoever release the Guarantor from any liability as Guarantor.

All of Lessor's rights and remedies under the Lease and under this Guaranty are intended to be distinct, separate and cumulative and no such right or remedy therein or herein mentioned is intended to be in exclusion of or a waiver of any of the others.

Notice of acceptance of this Guaranty and any obligations or liabilities contracted or incurred by Lessee are all hereby waived by the Guarantor.

This Guaranty shall be governed by and construed in accordance with the laws of the State of Illinois.

All of the provisions of this Guaranty shall inure to the benefit of Lessor and its grantees, successors and assigns and shall inure to the benefit of any future owner of the fee title of which the Premises are a part, and all the provisions of this Guaranty shall be binding upon the Guarantor and its legal representatives, successors, and assigns.

Initially capitalized terms used but not otherwise defined herein have the same meanings given them in the Lease.

*[signature page follows next]*

**IN WITNESS WHEREOF**, the undersigned has executed this Guaranty as of the date first written above.

EARTHFIRST TECHNOLOGIES INC.

By: _____

Name: John Stanton

Its: Chairman and CEO

APPENDIX A

PREMISES

Developed Property
Loders Croklaan, Channahon





Developed Property
Loders Croklaan, Channahon
—— Outline Earth First Lease

CB002401692881.11

# Developed Property
## Loders Croklaan, Channahon
— Outline Earth First Lease



Inside berm of road

CH0020401692&1.1f

3

## APPENDIX B

## FIXED ASSETS

| System Asset # | Description | Class Code |
|---|---|---|
| 990 | Structural Concrete | BLD |
| 993 | Wall-INT General Constru | BLD |
| 994 | Capitalized Sales Tax | BLD |
| 998 | Capitalized Sales Tax | BLD |
| 1001 | Walls INT Genl Const Bld | BLD |
| 1013 | Addtl Concrete Extra Reb | BLD |
| 1017 | Vent/Duct Work Sales Tax | BLD |
| 1022 | Flooring Ctr Lines/2 FLR | BLD |
| 1023 | Walls Int Gen Constr BLD | BLD |
| 1029 | Capitalized Sales Tax | BLD |
| 1031 | Flexicore | BLD |
| 1042 | Capitalized Sales Tax | BLD |
| 1043 | Capitalized Sales Tax | BLD |
| 1046 | Expand 2nd Floor Opening | BLD |
| 1047 | Capitalized Sales Tax | BLD |
| 1048 | Metal Siding | BLD |
| 1049 | Electrical Grounding | BLD |
| 1063 | Capitalized Sales Tax | BLD |
| 1069 | Structural Steel | BLD |
| 1072 | Walls-Ext Plumb Bld/Set | BLD |
| 1077 | Capitalized Sales Tax | BLD |
| 1081 | Pipe Ballards | BLD |
| 1096 | Construction Management | BLD |
| 1098 | Soil Boring Analysis | BLD |
| 1101 | Blueprint Reproductions | BLD |
| 1102 | 4 Addtl Soil Borings | BLD |
| 1103 | Capitalized Sales Tax | BLD |
| 1104 | Plumbing Line-Grade 4 6" | BLD |
| 1105 | Walls Painting Interior | BLD |
| 1106 | Blueprint Reproductions | BLD |
| 1107 | Engineering Services | BLD |
| 1108 | Genrl Const on Bld-Walls | BLD |
| 1113 | Capitalize Sales Tax | BLD |
| 1115 | Addtl Engineer Services | BLD |
| 1117 | Engineering Services BLD | BLD |
| 1118 | Construction Management | BLD |
| 1119 | PAINTING | BLD |
| 1120 | Building RPRS/Upgrade | BLD |
| 1121 | Print Reductions | BLD |
| 1123 | Top Survey/Utility Locat | BLD |
| 1124 | Capitalized Sales Tax | BLD |
| 1127 | Fencing | BLD |
| 1135 | Footings/Foundation | BLD |
| 1137 | Soil Inspect/Concr Test | BLD |

| 1146 | Capitalized sales tax | BLD |
| 1147 | Land Impr seed & mulch b | BLD |
| 1148 | Paving RD construction | BLD |
| 1151 | Paving Rd-Construction | BLD |
| 1152 | Capitalized sales tax | BLD |
| 1153 | Grading Site Clear Road | BLD |
| 1182 | Reroute drainage ditch | BLD |
| 1186 | Capitalized Sales Tax | BLD |
| 1187 | Paving-Rd Construction | BLD |
| 1195 | Excavation-West of Site | BLD |
| 1198 | Capitalized sales tax | BLD |
| 1200 | Capitalized Sales Tax | BLD |
| 1201 | Capitalized Sales Tax | BLD |
| 1202 | Excavation Site | BLD |
| 1203 | Pave Rd-Layout & Constru | BLD |
| 1204 | Grading Site Clear/Drill | BLD |
| 1275 | Masonry | BLD |
| 1294 | Railing-Refrigerat Safty | BLD |
| 1315 | Fence-Security Gate Lock | BLD |
| 1326 | Additional Fence | BLD |
| 1342 | Addtl Cost-Foundation | BLD |
| 1344 | Capitalized Sales Tax | BLD |
| 1351 | Concrete Plasters | BLD |
| 2405 | Solvent Frac-Main Process | BLD |
| 2406 | Solvent Frac-Control Room | BLD |
| 2407 | Solvent Compressor/Refrig | BLD |
| 2408 | Solvent Frac-Plant | BLD |
| 1109 | UPS-Best | FF |
| 1332 | Refrigerator | FF |
| 1399 | Walls Panels-Knoll Grey | FF |
| 370 | Fractionation Water | ME |
| 457 | Solid Fat Assay System 1 | ME |
| 973 | Rebuild new sealbar-frac | ME |
| 975 | Automatd Solid Fat Assay | ME |
| 991 | Tank-Non Corrrosive #407 | ME |
| 992 | Tank-Non Corrosive #404 | ME |
| 995 | Float Control LSH-406 | ME |
| 996 | Float Control LSH-404 | ME |
| 997 | Float Control LSH-405 | ME |
| 999 | Electric Work Contrl BLD | ME |
| 1002 | Steam Flushing System | ME |
| 1003 | Electric Work Process | ME |
| 1004 | Value Temp Control #403 | ME |
| 1006 | Genl Electric Process | ME |
| 1007 | Electric Work Control Bd | ME |
| 1008 | Line 3" Inliner T42T STL | ME |
| 1011 | Sensor Toxgard | ME |
| 1012 | Value Temp Control #405 | ME |
| 1016 | Concrete/Sewer Work | ME |
| 1018 | Insulation | ME |

| 1019 | Refrigeration System | ME |
|------|----------------------|-----|
| 1020 | Electrical -Ref Bld | ME |
| 1021 | Electrical Ref Bld | ME |
| 1024 | Pipe Rack Foundations | ME |
| 1025 | Gasket Cutter | ME |
| 1026 | Addl Insulation | ME |
| 1027 | Pipe Racks | ME |
| 1028 | Float Controls LSH-409 | ME |
| 1030 | Tank-Non Corrosive #406 | ME |
| 1032 | Piping for 200/400 Tanks | ME |
| 1033 | Resuscitator W/CYL&MASK | ME |
| 1034 | Insulation Tank #408 | ME |
| 1035 | Tank Non Corrosive #408 | ME |
| 1036 | Design Refrigeration Sys | ME |
| 1037 | Insulation Tank #409 | ME |
| 1039 | Tank #405 | ME |
| 1040 | Spare Parts Process | ME |
| 1041 | Freight Charges | ME |
| 1044 | Agitator Chemineer TK487 | ME |
| 1045 | Pump Ingrsol P207 w/pump | ME |
| 1050 | Control Float LSHH-207 | ME |
| 1052 | Capitalized Sales Tax | ME |
| 1053 | Control Float LSHH-205 | ME |
| 1057 | Tank Non Corrosive #403 | ME |
| 1059 | Heat Trace-Tank 403 | ME |
| 1060 | Motor Toshiba Spare | ME |
| 1061 | Load Center Substation | ME |
| 1062 | Value-Temp Control #401 | ME |
| 1064 | Sewertop Survey/Soil Bor | ME |
| 1065 | Float Control-LSH 401 | ME |
| 1066 | Construction Management | ME |
| 1067 | Capitalized Sales Tax | ME |
| 1068 | Fire Protection System | ME |
| 1070 | Joints/Control Rods | ME |
| 1071 | Heat Trace DP Cell Nozzl | ME |
| 1073 | Maint Tools & Equip | ME |
| 1074 | First Aid Emergency Equi | ME |
| 1075 | Float Control LSH-402 | ME |
| 1076 | Alarm Panel & Sensors | ME |
| 1078 | Float Control LSH-403 | ME |
| 1079 | Relocate/Install Detectr | ME |
| 1080 | Nozzles | ME |
| 1082 | Sewer-Underground Utilit | ME |
| 1083 | Addl Engineer Service | ME |
| 1084 | Pump-Ingersol P210 w/MTR | ME |
| 1085 | Construction Management | ME |
| 1086 | Flowmeter FT-205 Proquip | ME |
| 1087 | Engineering Services | ME |
| 1088 | Engineering Services | ME |
| 1089 | Electrical Yard & Tank F | ME |

| | | |
|---|---|---|
| 1090 | Concrete Paid for Pump | ME |
| 1092 | Electrical Yard & Tank F | ME |
| 1093 | Flowmeter FT 264 PRO qui | ME |
| 1094 | Safety Equipment | ME |
| 1095 | Motor Toshiba Spare | ME |
| 1097 | Heat Exchanger #202 | ME |
| 1099 | Design Solvent Recovery | ME |
| 1100 | Electrical Wiring | ME |
| 1110 | Down Spout-Crystallizer | ME |
| 1111 | Down Spout | ME |
| 1112 | Slurry Line-Modify | ME |
| 1114 | Pump Ingersol Rand3x1.5x | ME |
| 1116 | Heat Exchanger #206 | ME |
| 1125 | Heat Exchanger #021 | ME |
| 1126 | Capitalized Sales Tax | ME |
| 1128 | Elect Hot Water & Fire | ME |
| 1129 | Motor-Toshiba-Spare | ME |
| 1130 | Motor-Marathon | ME |
| 1131 | Pump Sump P411-Weil | ME |
| 1132 | Motor-Toshiba-Spare | ME |
| 1133 | Pump Sump P411B-Weil | ME |
| 1134 | Capitalized Sales Tax | ME |
| 1136 | Electrical Wiring | ME |
| 1138 | Insulation-Solvent Recve | ME |
| 1139 | Sump Pump/w Brass Constr | ME |
| 1149 | Pump Ingersol P202 W/MTR | ME |
| 1150 | Capitalized sales tax | ME |
| 1154 | Motor Toshiba-Spare | ME |
| 1155 | Heater & Breakers | ME |
| 1156 | Pump Ingersol Rand | ME |
| 1157 | Pump Ingersol Rand | ME |
| 1158 | Pump Ingersol Rand | ME |
| 1159 | Capitalized Sales Tax | ME |
| 1160 | Pump Ingersol P264 w/mtr | ME |
| 1161 | Pump Piping | ME |
| 1162 | Compressor FES Screw RC3 | ME |
| 1163 | Pump Viking P307 120GPM | ME |
| 1164 | Pump MD3405 Gould P121 | ME |
| 1165 | Pump Weil series2500sump | ME |
| 1166 | Control Float LSHH 205 | ME |
| 1167 | Power Panel MCC#1 AB | ME |
| 1169 | Motor Toshiba Spare | ME |
| 1173 | Pump Ingrsol P205 W/MTR | ME |
| 1174 | MOTOR 15HP Aeration | ME |
| 1175 | Mixer-Chemineer TK307 | ME |
| 1176 | Control Float LSHH-241 | ME |
| 1177 | Aerator | ME |
| 1178 | Power Panel MCC #1 | ME |
| 1180 | Agitator-Chemineer-TK462 | ME |
| 1181 | Addtl 2 Complete Solu RE | ME |

| 1183 | Tank-Non Corrosive #116 | ME |
|------|-------------------------|-----|
| 1184 | Motor-Toshiba -Spare | ME |
| 1185 | Pump Vacumin | ME |
| 1188 | Insulation | ME |
| 1189 | Fire System Equipmnt | ME |
| 1190 | Final Check & Regulation | ME |
| 1191 | Safety Equipment-Solvent | ME |
| 1192 | Upgrade Alarm System | ME |
| 1193 | Pull Bars, Moldings, ETC | ME |
| 1194 | Flowmeter-FT-233-PROQUIP | ME |
| 1196 | Flowmeter-FT-211-PROQUIP | ME |
| 1197 | Heat Exchanger #203 | ME |
| 1199 | Sensor Oxygen | ME |
| 1205 | Seals-Various Spare | ME |
| 1206 | Sensor Oxygen | ME |
| 1207 | Tank-Non Corrosive #402 | ME |
| 1208 | Flowmeter FT 209-PROQUIP | ME |
| 1211 | Flowmeter FT242-PROQUIP | ME |
| 1212 | Flowmeter-Ft244-PROQUIP | ME |
| 1213 | Flowmeter-Ft222-PROQUIP | ME |
| 1215 | Transmitters | ME |
| 1217 | Add'l Parts For Pump | ME |
| 1220 | PUMP-Oil 400Area | ME |
| 1221 | Rack-Storage 36x72x84 | ME |
| 1222 | COMPRESSOR-FES SCREWRC2 | ME |
| 1223 | AGITATOR-CHEMINEER TK463 | ME |
| 1225 | Rack-Storage 36x96x84 | ME |
| 1226 | Rack-Storage 36x96x84 | ME |
| 1228 | Tank-Non Corrosive #409 | ME |
| 1231 | Addl Cost | ME |
| 1232 | Pressure Vessel-Philips | ME |
| 1233 | Heat Trace & Transmitter | ME |
| 1234 | POT-3' HORIZ-OIL | ME |
| 1235 | Power Panel-MCC #1 | ME |
| 1236 | Control Panel-Midwest | ME |
| 1237 | Control-Float LSHH-204 | ME |
| 1238 | PANLMCC #4 ALLEN BD | ME |
| 1239 | Compressor-FES Screw RC1 | ME |
| 1240 | Pump-Ingrsol Rand w/motr | ME |
| 1241 | Float Control LSHH-201 | ME |
| 1242 | Tank-Non Corrosive #206 | ME |
| 1243 | Control-Float LSHH-230 | ME |
| 1244 | Control-Float LSH-408 | ME |
| 1245 | Panlmcc #2 Allen BD | ME |
| 1246 | Panlmcc #3 Allen Bd | ME |
| 1249 | Drive Unit Filter C | ME |
| 1250 | Pump-APV Treated Water | ME |
| 1252 | Flowmeter FT 234 Proquip | ME |
| 1254 | Float Control-LSHH-202 | ME |
| 1256 | Power Panel-MCC#2 | ME |

| 1257 | Power Panel-MCC#3 | ME |
| 1258 | Process Piping-Solvent | ME |
| 1259 | Tank-Non Corrosive-#260 | ME |
| 1260 | Flowmeter FT-224-Proquip | ME |
| 1261 | Pump-Irigersol P406w/mtr | ME |
| 1262 | Cooler-ZC | ME |
| 1263 | Piping-Fract Stripper Ln | ME |
| 1264 | Pump Refrig Condensor | ME |
| 1265 | Custom Fees | ME |
| 1266 | Piping Cooler | ME |
| 1267 | Wiring-Electrical-Frac | ME |
| 1268 | Condensor-Evaporative | ME |
| 1269 | DRIVE UNIT FILTER D | ME |
| 1270 | Receiver-9' 7" HORZ HP | ME |
| 1271 | Cooler-ZB | ME |
| 1272 | Value-Temp Control #404 | ME |
| 1273 | Pump SIHI Duplex Vac Sys | ME |
| 1274 | Drive Carter 230 Filter | ME |
| 1276 | Filter-Crystallizer X100B | ME |
| 1277 | Motor 15 HP Aeration | ME |
| 1278 | Insulation Solvent Recov | ME |
| 1279 | Heat Trace T401 & wiring | ME |
| 1280 | Piping Cooler | ME |
| 1281 | Level/Adjust Crystallize | ME |
| 1282 | Concrete Pad for Pump | ME |
| 1283 | Tank-Noncorrosive #401 | ME |
| 1284 | Capitalized Sales Tax | ME |
| 1285 | Freight on Vacuum Sys | ME |
| 1286 | Modify N2 Pipe to Vacuum | ME |
| 1287 | Capitalized Sales Tax | ME |
| 1288 | Piping-Condensor | ME |
| 1289 | PUMP-Ingrsl P203 W/MTR | ME |
| 1290 | PUMP-Refrig Condensor | ME |
| 1291 | Pot-3' Horz-Oil | ME |
| 1292 | Electrical for Compresso | ME |
| 1293 | Accumulator 10'.5" Suctn | ME |
| 1295 | Tank WS-1 Condensor Wate | ME |
| 1296 | Pump-SIHI with Drive | ME |
| 1297 | Crarie-150TON Bridge | ME |
| 1298 | Install Pump | ME |
| 1299 | Pump Milton Roy | ME |
| 1300 | Accumulator-10'5" Suctio | ME |
| 1301 | Pot-3' Horiz-Oil | ME |
| 1302 | Maintenanc/Operate Train | ME |
| 1303 | Electrical for Compresso | ME |
| 1304 | Value-Temp Control #402 | ME |
| 1305 | Pump Ingersol P201 w/mtr | ME |
| 1306 | Pump Ingral P408 w/mtr | ME |
| 1307 | Capitalized Sales Tax | ME |
| 1308 | Pot 3' Horiz-Oil | ME |

| | | |
|---|---|---|
| 1309 | Capitalized Sales Tax | ME |
| 1310 | Electrical for Compresso | ME |
| 1311 | Float Control LSH-407 | ME |
| 1312 | Tank-Noncorrosive #209 | ME |
| 1313 | Flowmeter FT-221 Proquip | ME |
| 1314 | Flowmeter FT-214 Proquip | ME |
| 1316 | Meter Flow Yokagawa | ME |
| 1317 | Ultra Probe 2000 | ME |
| 1318 | Monitoring System-MSA | ME |
| 1319 | Motor-Toshiba-Spare | ME |
| 1320 | Tank-Non Corrosive #203 | ME |
| 1322 | Flowmeter FT-205 Proquip | ME |
| 1325 | Motor Toshiba 215T | ME |
| 1327 | Rack-Storage 36x72x84 | ME |
| 1328 | Level/Adjust Crystallize | ME |
| 1329 | Drive Unit Crystlr 100A | ME |
| 1330 | Crystallizer X 100C | ME |
| 1331 | Custom Fees | ME |
| 1333 | Flowmeter FT 232 Proquip | ME |
| 1335 | Drive Unit Crystlizer 100 | ME |
| 1336 | Tank-Non Corrosive #207 | ME |
| 1337 | Tank-Non Corrosive #201 | ME |
| 1338 | Tank-Non Corrosive #202 | ME |
| 1339 | Pump SIHI/Fractionation | ME |
| 1340 | Aerator 15HP Aquajet 460 | ME |
| 1341 | Filter-Crystallizer X100 | ME |
| 1343 | Piping Tanks | ME |
| 1345 | Capitalized Sales Tax | ME |
| 1346 | Valves and VLV ADJ | ME |
| 1347 | Valve adjustments | ME |
| 1348 | Pipe ID Signs & Warnings | ME |
| 1349 | Valves and VLV Adjustmen | ME |
| 1350 | Valves and VLV Adjustmen | ME |
| 1352 | Piping Refrig System | ME |
| 1353 | Tank Non-Corrosive #270 | ME |
| 1354 | Motor-Toshiba-Spare | ME |
| 1355 | Piping-200/400 Tanks | ME |
| 1356 | Value-Temp Control #406 | ME |
| 1357 | Strainers/Flanges/Pipe | ME |
| 1358 | Heat Trace - Tan #402 | ME |
| 1359 | Piping-400 Area | ME |
| 1360 | Value-Temp Control #407 | ME |
| 1361 | Pump-Ingersol-P204 w/mtr | ME |
| 1362 | Pump-Ingersol-P401 w/mtr | ME |
| 1363 | Condensate Lines | ME |
| 1364 | Control Float LSHH-209 | ME |
| 1365 | Level/Adjust Crystallize | ME |
| 1366 | Motor-Toshiba-Spare | ME |
| 1367 | Level/Adjust Crystallize | ME |
| 1368 | Custom Fees | ME |

| 1369 | Pump-Ingersol P402 w/mtr | ME |
| 1370 | Concrete Pad for Pump | ME |
| 1371 | Pump-Ingersol P209 w/mtr | ME |
| 1372 | Concrete Pad for Pump | ME |
| 1373 | Pump-Ingersol P404 w/mtr | ME |
| 1374 | Concrete Pad for Pump | ME |
| 1376 | Rack-Storage 36x72x84 | ME |
| 1377 | Custom Fees | ME |
| 1378 | Drive Unit for Filter A | ME |
| 1379 | Valve-Temp Control #406 | ME |
| 1382 | Flowmeter FT-263-Proquip | ME |
| 1383 | Flowmeter FT-203-Proquip | ME |
| 1384 | Flowmeter FT-202-Proquip | ME |
| 1385 | Drive Unit Crystalzer101 | ME |
| 1386 | Flowmeter FT-243-Proquip | ME |
| 1387 | Control-Float LSHH-211 | ME |
| 1388 | Control-Float LSHH-221 | ME |
| 1389 | Flowmeter FT-223-Proquip | ME |
| 1390 | Flowmeter FT-213-Proquip | ME |
| 1391 | Control-Float-LSHH-231 | ME |
| 1392 | Repair Test Drive | ME |
| 1393 | Flowmeter FT-231-Proquip | ME |
| 1395 | Custom Fees | ME |
| 1396 | Concrete pad for pump | ME |
| 1397 | Piping-Ref System | ME |
| 1398 | Pump-SIHI | ME |
| 1400 | Drive Unit Filter B | ME |
| 1401 | Filter C | ME |
| 1403 | Drive Unit Crystlzr 100C | ME |
| 1405 | Piping-Add'l Tank 307 | ME |
| 1406 | Custom Fees | ME |
| 1407 | Capitalized Sales Tax | ME |
| 1408 | Filter B | ME |
| 1409 | Filter D | ME |
| 1410 | Custom Fees | ME |
| 1411 | Pump-Ingersol P206 w/mtr | ME |
| 1412 | Power Backup Bypass | ME |
| 1413 | Pot-3' Horiz-Oil | ME |
| 1414 | Valve-Temp Control #407 | ME |
| 1415 | Filter A | ME |
| 1416 | Custom Fees | ME |
| 1417 | Reducer-Crystalizer x101 | ME |
| 1418 | Flowmeter-FT 212-Proquip | ME |
| 1419 | Tank-Non Corrosive #205 | ME |
| 1420 | Repairs & Adjustments | ME |
| 1421 | Flowmeter-FT-241-Proquip | ME |
| 1422 | Tank-Non Corrisive #204 | ME |
| 1424 | Radio-Portable | ME |
| 1425 | Temp-Gauge-Omega Handhel | ME |
| 1426 | Radio-Portable | ME |

| 1592 | Frac Condenser Replacemnt | ME |
| 1628 | PRN1865 Ammonia PSM Liptn | ME |
| 1672 | Matris for Y2K-fractionac | ME |
| 1881 | Parts for wiring fraction | ME |
| 1912 | Condensate Return System | ME |
| 1936 | Oxygen Analyzer | ME |
| 2182 | Ingersoll-Dresser Pump | ME |
| 4273 | Ashrae/Sheco Modificatns | ME |
| 467 | Minlspec Process Anlyzer | RE |

## APPENDIX C

Intentionally deleted.

## APPENDIX D

## DEVELOPMENT PLAN

To the extent that items shown on the Development Plan are preliminary, Lessee shall submit additional details on a monthly basis to Lessor for Lessor's approval.

## Overall Plan

There will be two phases of biodiesel process development at the Channahon Facility:

- Phase I – During the first year of operations, EarthFirst Americas will install and operate a 25 million gallon per year biodiesel production plant. This plant will use a mixture of purchased and onsite equipment, will ship biodiesel from the facility exclusively by truck, and generally use existing raw material delivery infrastructure; and

- Phase II – As the first year of production and sales is ongoing, EarthFirst will plan for expansion of the Channahon Biodiesel Facility and installation and operation of equipment to make higher value products from glycerin and certain methyl esters. This expansion, which will produce in the range of 50 million gallon per year of biodiesel and possibly other products, will require expansions in raw material and product shipping infrastructure.

The document below describes the tasks and milestones of the Phase I development. EarthFirst will prepare a similar plan for Phase II for review with Loders Croklaan within the first 9 months of Phase I operation.

## Phase I Development

Operation Summary: The design of the Phase I 25 million gallon per year facility is currently in early process design and will not be complete until the engineering study as described below is complete. Based upon a preliminary review, however, the following operation is anticipated:

- The existing tanks of the acetone separation facility will be sufficient for palm oil feedstock, methanol and production day tank requirements;
- A product storage tank of roughly 1 million gallons, together with truck loading racks, will be built adjacent to the Acetone Separation building;
- Two transesterification reactors, one or more distillation towers, and an ion exchange resin purification system are the major pieces of processing hardware that must be purchased and installed on the site;
- Pumps, motors, heat exchangers, and process tanks that are currently on site will be evaluated, examined and probably pressed into biodiesel processing service as ancillary equipment to support the transesterification and purification process trains; and
- Subject to successful completion of the engineering, environmental permitting, construction and start-up tasks outlined below, the Channahon biodiesel plant will begin processing up to 3,000 tons of biodiesel per month beginning on or about the end of May, 2007

Engineering

EarthFirst has retained R.C. Costello and Associates Inc. to design the biodiesel production process, including the selection and ordering of purchased hardware and evaluation and examination of onsite equipment. The planned milestones in this process include:

- December 8-12, 2006 – Completion of master process flow diagram;
- December 31, 2006 – Completion of Piping and Instrumentation Diagrams (P and ID's), process descriptions, equipment specifications, instrument specifications and other design documents;
- On or before January 15, 2007, EarthFirst will review the results of the engineering analysis and a plan for construction, including overall project schedules.

## Environmental Permitting

Loders Croklaan has retained Aware Environmental, working in consultation with EarthFirst and R.C. Costello Associates Inc., to prepare and expedite processing of modifications to Title V permit. The milestones for this process include:

- Preparation of a preliminary submission to the Illinois EPA, which will include a block flow diagram of the general biodiesel production process as well as identification of materials that will be delivered to the site, which will include methanol, catalysts, and approved cold flow agents. This will be provided to Aware Environmental on or before December 8, 2006.
- EarthFirst and RC Costello will provide Aware Environmental with supporting process and facilities descriptions to support a complete application, to include at a minimum a P and ID that will identify emission sources and expected emission rates.
- Aware Environmental will submit an application for a Title V permit modification on or about January 1 2007. With an expected 30 days of internal review and routing time at the Illinois EPA, a 90-day comment period should commence on or about January 31, 2007, completing at the end of April 2007.

## Construction and Start-Up

Following completion and review of the preliminary engineering plan on or before January 15, 2007, EarthFirst will contract, probably with R.C. Costello and Associates and their affiliate DeNovo NV, to oversee purchasing, fabrication, installation, instrumentation and control of the biodiesel plant as well as general oversight of the design and construction of product storage and truck loading facilities. EarthFirst will consult Loders Croklaan throughout this process.

During the month of February, 2007, EarthFirst and its contractors will meet with management and operational staff of Loders Croklaan to define operational plans, protocols and agreements for the following:

- Site Traffic Management – To include insurance, training and safety requirements for trucks supplying methanol and other supplies as well as product removal. This plan will also include details of traffic flow estimates and procedures for weights, measurements and operational logs.

- Biodiesel Process Manning – Staffing requirements, job descriptions, bidding procedures for dedicated and shared labor.

- Safety Manuals and Procedures – EarthFirst contractors will review planned biodiesel production processes with Loders Croklaan safety staff, draft safety manuals and operating procedures, and review with Loders Croklaan under both parties agree the manuals and procedures are consistent with applicable laws and regulations and Loders Croklaan operating philosophies.

- Laboratory Testing – EarthFirst and Loders Croklaan will review schedules, required equipment, calibration and Round-Robin verification practices and other factors and draft a mutually agreeable laboratory testing agreement.

## APPENDIX E

## ACTIVITY BASED CHARGES

The Activity Based Charges shall compensate Lessor for all services provided by Lessor with respect to the Lease Property and Lessee's use of privileges and services in connection with Lessor's Channahon Facility outside of the Premises in accordance with this Appendix E. These shall include such items as installation and maintenance of meters, the reasonable costs of Lessor's administration of the portion of the NPDES (defined below) permit relating to the Premises, Lessee's share of guardhouse and security expenses, including cost of maintenance, repair and replacement of security devices and systems, maintenance and upkeep of shared parking, personnel monitoring access and gate, reception service for visitors, unloading of barges and railcars, use of the River Cells, storage of oil, pumping, transfer, delivery of oil and other services, costs of snow, ice and trash and waste removal, cleaning and sweeping, landscaping, painting, maintenance, repair and replacement of all services and utilities, fire protection and other systems devoted to Common Areas, Limited Common Areas and the Premises, all elevators and escalators serving the Premises, floors, ceilings, walls, windows, entrances, docks, loading doors, roof and other components of the Premises, janitorial and cleaning service, pest control, insurance, management fees, if any, to the extent paid to any party or entity not related to or affiliated with Lessor, supplies, sundries, sales or use taxes on supplies or services; wages and salaries of all persons engaged in the operation, management, maintenance and repair of the Lease Property, and so-called fringe benefits, including social security taxes, unemployment insurance taxes, cost for providing coverage for disability benefits, cost of any pensions, hospitalization, welfare or retirement plans, or any other similar or like expenses incurred under the provisions of any collective bargaining agreement, or any other cost or expense which Lessor pays or incurs to provide benefits for employees so engaged in the operation, management, maintenance and repair of the Lease Property or the Common Areas; the charges of any independent contractor who, under contract with Lessor or its representatives, does any of the work of operating, managing, maintaining or repairing the Lease Property or the Common Areas; legal and accounting expenses, including, but not limited to, such expenses as relate to seeking or obtaining reductions in and refunds of real estate taxes; and any other expense or charge, whether or not hereinbefore mentioned, which, in accordance with generally accepted accounting and management principles, would be considered as an expense of owning, managing, operating, maintaining or repairing the Lease Property, except as hereinafter provided. Expenses shall not include costs or other items included within the costs of alterations of the premises of Lessor or other occupants of the Facility, costs of capital improvements to the Facility (except as otherwise provided), depreciation charges, interest and principal payments on mortgages, ground rental payments, real estate brokerage and leasing commissions and any expenditures for which Lessor has been reimbursed or which have been incurred solely for Lessor's use or benefit.

Additionally, Lessee shall pay to Lessor on a monthly or quarterly basis, at Lessor's election, such amounts of real estate taxes attributable to Lessee's leasehold estate in the Premises, if and to the extent separate property identification numbers and separate tax bills cannot be created for the Premises.

Further, certain of the foregoing costs and fees attributable to Lessee's activities, Premises, Limited Common Areas and use of Common Areas, including the River cells and use of storage facilities, shall be chargeable as set forth in the attached Appendices E1 and E2.

Payments shall be made by Lessee to Lessor monthly based upon the Fixed Assumptions set forth in Appendices E1 and E2 for the first year and thereafter based upon the actual charges incurred as may be increased in Lessor's reasonable judgment. Further, to the extent any Activity Based Charges are not included in said Appendices E1 and E2, they shall be handled as follows:

Lessee shall make payments on account of the Activity Based Changes as follows:

1.    Lessor may, prior to the end of any Lease Year from time to time during any Lease Year, deliver to Lessee a written notice or notices (each such notice being hereinafter referred to as a "Projection Notice") setting forth (A) Lessor's reasonable estimates, forecasts or projections (collectively, the "Projections") of either or both of real estate taxes and Activity Based Charges anticipated to be incurred for such Lease Year, and (B) Lessee's payment obligations therefor as well as Lessee's total payment to such date for such Lease Year and Lessee's revised charges as a result.

2.    Lessee shall commence payments of monthly installments of revised Activity Based Charges and real estate taxes on the first day of the first calendar month during the Term following Lessor's delivery of the first Projection Notice hereunder. On such date, and on or before the first day of each calendar month thereafter of the Lease Year covered by such Projection Notice, Lessee shall pay to Lessor one-twelfth (1/12) of the revised annual amounts shown in the Projection Notice. Within thirty (30) days following Lessor's delivery of a Projection Notice for a Lease Year in progress, Lessee shall also pay Lessor a lump sum equal to the amount shown in the Projection Notice less the sum of (A) any previous such payments made by Lessee with respect to such Lease Year, and (B) monthly installments on account of such charges due for the remainder of such Lease Year. Until such time as Lessor furnishes a Projection Notice for a Lease Year, Lessee shall continue to pay monthly installments in the amount shown by the most recent Projection Notice or, if the amount payable for the Lease Year covered by such Projection Notice has been determined, one-twelfth (1/12) of such amount, whichever is greater.

3.    Alternatively, at Lessor's option, Lessor may bill Lessee monthly or quarterly in arrears, with copies of invoices, bids or computation and allocations for such items attached, as such real estate taxes and Activity Based Charges are paid and Lessee shall pay Lessor for the same within thirty (30) days of billing therefor by Lessor.

4.    A.    Following the end of each Lease Year and after Lessor shall have determined the amount to be used in calculating the real estate taxes and Activity Based Charges for such Lease Year, Lessor shall notify Lessee in writing (any such notice hereinafter referred to as the "Expense Statement") of such taxes and Charges. If the Expense Statement reflects a net balance owed by Lessee, such amount shall, within thirty (30) days after the date of the Expense Statement, be paid to Lessor. If Lessee's payments exceed the amount owed for such Lease Year, then Lessor shall credit such excess to Lessee's Activity Based Charges payable after the

date of the Expense Statement, or may, at its option, credit such excess to any Lease Fees theretofore due and owing, until such excess has been exhausted. If this Lease shall expire or be terminated prior to full application of such excess, Lessor shall pay to Lessee the balance thereof not theretofore applied against such obligations and not reasonably required for payment of Lease Fees for the Lease Year in which this Lease expires, subject to Lessee's satisfaction of other obligations under the Lease and provided Lessee shall have vacated the Premises and otherwise surrendered the Premises to Lessor in accordance with this Lease and Lessee is not then in default under this Lease. No interest or penalties shall accrue on any amounts which Lessor is obligated to credit or pay to Lessee by reason hereof.

B.     Lessor shall maintain books and records showing the real estate taxes and Activity Based Charges in accordance with sound accounting and management practices. Lessee or its representative shall have the right to examine Lessor's books and records showing such amounts upon reasonable prior notice and during normal business hours at any time within thirty (30) days following the furnishing by Lessor to Lessee of the Statement provided for above. Unless Lessee shall take written exception to any item within thirty (30) days after the furnishing of the Lessor's Statement containing such item, such Lessor's Statement shall be considered as final and accepted by Lessee.

C,     If Lessee shall notify Lessor within such thirty (30) day period that Lessee disputes any specific item or items in any such Lessor's Statement and such dispute is not resolved between Lessor and Lessee within thirty (30) days after the date such notice is given by Lessee, either party may, during the fifteen (15) day period next following the expiration of the thirty (30) day period commencing on the date such notice is given, refer such disputed item or items for determination to an independent certified public accountant selected by such party and approved by the other party, which approval shall not be unreasonably withheld, and the determination of such accountant shall be final, conclusive and binding upon Lessor and Lessee. Lessee agrees to pay all costs involved in such determination except in the case where it is determined that Lessor has overcharged Lessee for such taxes and charges for such Lease Year by more than five percent (5%), in which case Lessor shall pay such costs.

D.     With respect to any Lease Year which does not fall entirely within the Term, Lessee shall be obligated to pay such real estate taxes and Activity Based Charges for such Lease Year only as incurred with respect to direct costs and on a pro rata basis otherwise based upon the number of days of the Term falling within the Lease Year. Following expiration or termination of this Lease, Lessee shall pay any such amount due to Lessor within fifteen (15) days after the date of each such Statement sent to Lessee. Without limitation of other obligations of Lessee which shall survive the expiration of the Term, the obligation of Lessee to pay such amounts provided herein accruing during the Term shall survive the expiration or termination of this Lease.

## APPENDIX E-1

### LEASE FIXED COSTS

| Summary | Per Year | Per Month |
|---|---|---|
| A) Fixed | $ 106,826 | $  8,902 |
| B) Palm Oil Storage * | $ 276,000 | $ 23,000 |
| C) Water & Waste Water * | $  36,902 | $   3,075 |
| Total | $419,728 | $ 34,977 |

*B - capped to forecast volume / Loders Tanks

*C - capped by effluent loading

Assumptions
Earth First to use the Building Locker Room, provide coffee machine & vending, contract your own janitorial.
These will all be Earth First Contracts and therefore not shared.
Waste Treatment, costs fixed if within Lease agreement boundaries

A) Fixed

Landscaping        $1,650
$11,000 annual contract @ 15%

Snow Removal       $2,250
$15,000 annual contract @ 15%

CHIGO2401692881.11

| | Per Year | Per Month |
|---|---|---|
| **Summary** | | |
| Security | $148,442 annual contract @ 15% | $22,266 |
| | | |
| Site Entry | Assume 10 people at $20 per person | $200 |
| | | |
| Loders Administrative Support | | $4,500 |
| | | |
| Fire Protection | Assume 10% of $100,000 per year | $10,000 |
| | | |
| Street Sweeping | Assume one Union employee for site upkeep @ 15% | $7,500 |
| | | |
| Shared Parking | 45,390 repavement of 1/2 parking lot in 22 years | $258 |
| | Assume 160 LC employees + 10 Earthfirst | |
| | | |
| Property Tax | 142000 budget for total site @ 15% | $21,300 |
| | | |
| Water & Waste Water Treatment – base charge | see below | $36,902 |
| | | |
| **Total Annual** | | **$106,826** |

B. Palm Oil Storage

Palm Oil fraction storage for Earth First
POF Storage and heating to forecast volume (Loders Tanks)    $276,000
23000 / month x 12 months
POF Storage and heating to forecast volume (Earth First Tanks).    $  12,000

CHG02440169281.11

2

Summary

|  | Per Year | Per Month |
|--|----------|-----------|

If Earth first volume is beyond the forecast volume, a handling charge of $4.50 / us ton will be charge for storage.
$4.50 / ton / event

C. Water and Waste Water for Earth First BioDiesel

Assumptions.
Earth First will have a water meter in, and both Water and Waste water will be initially based on that meter
Earth First will need 50 gpm of softened water and discharge 50 gpm to waste water with average treatment requirements
until we have factual history
Developing a cost per gallon of water that we will apply to their meter for start

Cost of Water and Waste Water

|  | Loders |  | Earth First |  | cost |
|--|--------|--|-------------|--|------|
| Total Water | 400 | gpm |  |  |  |
| Pump | 300 | hp | 50 |  |  |
| Salt | 78416 | $ |  | 0.125 | 2100 |
| $75.40 / ton @ 20 tons / week @ 52 weeks |  |  |  | 37.5 | 9802 |
| GE Betz | 100000 |  |  |  |  |
| Farm Sludge | 100000 |  |  |  | 12500 |
| Labor covered in Steam cost |  |  |  |  | 12500 |
| Total |  |  |  |  | 36902 |

If the Earth First Bological load in waste water exceeds Loders typical there will be loading charges, see below

36902   $ / year water and waste water at 50 gpm

0.070209   525600   Minutes per year
per gallon water if metered
If there is biological loading there will be a loading charge calculated based on Chemical Oxygen Demand analysis
of

CHGX2i40166281.11

3

Summary

Per Year

Per Month

Earth First Waste Water and weighted increase of those charges.

Waste Water Exceedances and Loading
Average flows to be determined but BOD5/COD average load of 100 pounds per day, maximum 400 pounds per day. Same limits (i.e. 100 avg. 400 max pounds each) for TSS and for FOG into their water discharge to Lessee.
BOD5 = Biochemical Oxygen Demand, 5 day
COD = Chemical Oxygen Demand
TSS = Total Suspended Solids
FOG = Fat, Oils and Grease.

Samples to be obtained by standard industry methods as agreed by both Lessor and Lessee before exceedance can be charged
For Samples isolated from Earth First, exceeding limits above there will be a usage charge of $3,000 per exceedance, not to exceed five (5) exceedances per calendar month.

4

CHI00240169281.11

## APPENDIX E-2

## LEASE ACTIVITY FEES

OIL MOVEMENT / STORAGE FEES

COSTS PER 100 POUNDS OF PRODUCT

|  | BARGE UNLOADING | RAIL UNLOADING | RAIL LOADING |
|---|---|---|---|
| Steam Cost | 0.0731 | 0.1456 | 0.0000 |
| Operator (Pumper) | 0.0075 | 0.0629 | 0.0943 |
| Supervision | 0.0092 | 0.0191 | 0.0382 |
| Transfer (Discharge) Fee | 0.1007 | 0.0000 | 0.0000 |
| Tankerman Fee | 0.0132 | 0.0000 | 0.0000 |
| Barge Mgt Fee | 0.0144 | 0.0000 | 0.0000 |
| Surveyor | 0.0132 | 0.0000 | 0.0000 |
| Demurrage | 0.0672 | 0.0000 | 0.0000 |
| Capital & Maintenance | 0.0002 | 0.0002 | 0.0002 |
| Total Load / Unload Cost per 100 Pounds of Product | 0.2986 | 0.2277 | 0.1326 |

Oil Storage Fee, see Attachment E1

See Waste Water Exceedance on Attachment E1

Dedicated Electricity -- as billed, and as actual metered volume into facility / Electric Meter needs to be installed

Dedicated Natural Gas -- as billed, and as actual metered volume into facility / Gas Meter needs to be installed

## Appendix E-3

### Cost of Steam

Cost To Produce Steam at 82% efficiency
(Assumption: 1 lb of steam produced from 1 scf of Natural gas at 100 % efficiency)

cost=0.0093*total delivered price of gas per therm ($/lb of steam)

100 scf =1 therm

| | TOTAL DELIVERED PRICE OF NATURAL GAS TO PLANT ($/THERM)>>> | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 0.8 | 0.9 | 1 | 1.1 | 1.2 | 1.3 | 1.4 | 1.5 |
| $GAS/LB OF STEAM | 0.00976 | 0.01098 | 0.0122 | 0.01342 | 0.01464 | 0.01586 | 0.01708 | 0.0183 |
| Water Treatment | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 |
| Electrical at 270 hp 0.07 $/kwh | 0.000328 | 0.000328 | 0.000328 | 0.000328 | 0.000328 | 0.000328 | 0.000328 | 0.000328 |
| Subtotal | 0.010188 | 0.011408 | 0.012628 | 0.013848 | 0.015068 | 0.016288 | 0.017508 | 0.018728 |
| Labor (4 operators) | 0.0009 | 0.0009 | 0.0009 | 0.0009 | 0.0009 | 0.0009 | 0.0009 | 0.0009 |
| Maintenance (@ 200,000 $/year) | 0.0003 | 0.0003 | 0.0003 | 0.0003 | 0.0003 | 0.0003 | 0.0003 | 0.0003 |
| management/administration @ $100,000 /year | 0.0003 | 0.0003 | 0.0003 | 0.0003 | 0.0003 | 0.0003 | 0.0003 | 0.0003 |
| Depreciation of two new boilers @100,000 per year | 0.0003 | 0.0003 | 0.0003 | 0.0003 | 0.0003 | 0.0003 | 0.0003 | 0.0003 |
| Distribution Costs @ $25,000/year | 0.000075 | 0.000075 | 0.000075 | 0.000076 | 0.000075 | 0.000075 | 0.000075 | 0.000075 |
| Grand Total | 0.011388 | 0.012608 | 0.013828 | 0.015048 | 0.016268 | 0.017488 | 0.018708 | 0.019928 |

CHC0034016928I.11

1

Using the above table at 0.93 $/therm gives a cost of $0.013 $/lb of steam

Price we pay for gas is calculated each month in accounting and reported

Another approach using office of industrial technologies benchmark phamplet

| | |
|---|---|
| $/therm gas cost | $0.93 |
| btu content of fuel btu/lb 100000 for natural gas | 100000 |
| enthalpy (increase of steam over feedwater | |
| btu/lb from 50 deg F feedwater to 150 psig | |
| saturated | 1178 |
| Combustion efficiency (81.7 for natural gas) | 81.7 |
| Steam cost $/1000 lb | $13.41 |
| Steam cost $/lb | $0.013 |

Conclusion

Earth First cost of Delivered Steam

Restore old Solvent Fract Steam meter and connect to new system or install new steam meter.

Earth First reports steam meter reading monthly to Loders

Loders Accounting uses the cost of Natural Gas to get the price of steam and applies it to usage.

2

CIBIG024-01692BL.11

## APPENDIX F

## LEASE FEES

The Lessee shall pay the following fees to the Lessor in consideration of this Agreement and the right to perform the Operations (in addition to the payment of the Activity Based Charges as set forth in Appendix E and other obligations of issue arising under the Lease):

## I.  GUARANTEED RENT PAYMENT

(a)    Rent Commencement Date through September 30, 2008 (Year 1) - $187,500.00 per calendar month

(b)    October 1, 2008 through September 30, 2009 (Year 2) - $250,000.00 per calendar month

(c)    October 1, 2009 through September 30, 2010 (Year 3) - $333,333.33 per calendar month

The above referenced payments ("Guaranteed Rent Payment") shall be paid in accordance with the terms of the Agreement. If the Rent Commencement Date is a day other than the first day of a calendar month, the Guaranteed Rent Payment for the calendar month of the Rent Commencement Date shall be prorated based on the number of days from and including the Rent Commencement Date through the end of the month divided by the total number of days in the month.

Upon each Renewal Term the Payment set forth in paragraph (c) above shall be increased to reflect the increase, if any, in the purchasing power of the Dollar based on increases in the Producers Price Index and the following formula:

"Producers Price Index or PPI" means the Final Producers Price Index; Industrial Commodities base 1982, published by the U.S. Department of Labor, Bureau of Labor Statistics.

On the date Lessee gives notice of renewal as provided in Section 2.2(b), the parties shall determine the most recently published final PPI and that index number shall be the numerator of a fraction the denominator of which shall be the corresponding number published for the date three (3) years prior to the number used for the numerator. That fraction shall be multiplied by the then current guaranteed annual payment and then divided by 12 and then rounded to the nearest dollar to determine the guaranteed monthly payment for the Renewal Term. In no event shall the guaranteed monthly payment during any Renewal Term be lower than the guaranteed monthly payments during any prior Renewal Term or Year 3 of the initial Term.

By way of example, if Lessee gives notice of renewal in May 2010 for a renewal Term beginning October 1, 2010 and the most recently published final PPI index at that time is for September 2009 at 175.0, that number shall be compared to the corresponding number for September 2006, 169.2. The fraction so determined 175.0/169.2 shall be multiplied by the then current guaranteed monthly payment of $333,333.33 to determine the guaranteed monthly payment of $344,760 for the Renewal Term.

## II. BIODIESEL OUTPUT PAYMENT

While Operations are ongoing, Lessee shall pay Lessor a production payment (the "Production Payment") based on the following formula:

**Production Payment= \$.01 x (WTI Index Price – Threshold Price) x Biodiesel Output**

Where:

"WTI Index Price" means the West Texas Intermediate Crude published price calculated on a daily average for a calendar month basis; and

"Threshold Price" means \$63.00 per barrel for oil; provided, however, if Lessor or its Affiliate which is supplying feedstock to Lessee for the Operations in accordance with the Supply Agreement does not charge or assess any fee or expense to Lessee for transporting such feedstock from the Port of New Orleans to the Premises pursuant to the Supply Agreement, then the Threshold Price shall be \$61.00 per barrel.

The Production Payment, if any, payable during the Lease Term shall be paid on the 15th day of the next calendar month for the prior calendar month's Biodiesel Output. The Production Payment shall be calculated based on full dollar increases in the WTI Index Price over the Threshold Price, with no pro-ration for incremental or fractional increases. No Production Payment shall be due until the WTI Index Price for a calendar month exceeds the Threshold Price by at least one dollar. Lessee shall certify the Biodiesel Output and calculation of the Production Payment on a monthly basis during the Lease Term and provide the same accompanied by the Production Report to Lessor with the monthly Production Payment.

By way of example, if the WTI Index Price for September 2007 is \$70.25, and Biodiesel Output for September 2007 totals 1,000,000 gallons, Lessee shall pay Lessor a Production Payment of \$70,000 on or before October 15, 2007.  [PP=\$.01 x (70.00-63.00) x (1,000,000)].  Provided, however, in the foregoing example, if Lessee (or its Affiliate who is the signatory to the Supply Agreement) was not charged for transportation of feedstock during September 2007 from New Orleans the Premises under the Supply Agreement, the Production Payment would be \$90,000.  [PP=\$.01 x (70.00-61.00) x (1,000,000)]

## APPENDIX G

INTENTIONALLY DELETED

# APPENDIX H

## DESCRIPTION OF OPERATIONS

[Description of Permitted Operations to be Inserted]

## APPENDIX I

### INSURANCE

All insurance shall name Lessor as an additional insured party.

(A) **Comprehensive General Liability Insurance** - Lessee shall procure and maintain at Lessee's sole cost and expense comprehensive general liability insurance with limit of liability of not less than one million dollars ($1,000,000) for all injuries or deaths resulting to any one person or from any one occurrence. This insurance shall include the "broad form contractual endorsement". Where Lessee's operations include the use of watercraft, the watercraft exclusion in the comprehensive general liability policy shall be eliminated.

(B) **Comprehensive Motor Vehicle Liability Insurance** - Lessee shall procure and maintain at Lessee's sole cost and expense comprehensive motor vehicle liability insurance which shall include hired car and non-ownership coverage with limit of liability of not less than one million dollars ($1,000,000) for all injuries or deaths resulting to any one person or from any one occurrence.

(C) **Workers' Compensation Insurance** - Lessee shall procure and maintain (either as an authorized self-insured or through an authorized insurance carrier) at Lessee's sole cost and expense workers' compensation insurance. The limit of liability under the employer's liability section of the workers' compensation insurance policy shall be not less than one million dollars ($1,000,000).

(D) **Operator's Liability Insurance** - Lessee shall procure and maintain at Lessee's sole cost and expense operator's liability insurance in the minimum amount of one million dollars ($1,000,000). This coverage may be included in or form part of Lessee's protection and indemnity insurance.

(E) **Property Insurance** - Lessee shall procure and maintain at Lessee's sole cost and expense property insurance on the Leased Premises in favor of Lessor in the agreed amount of five million ($5,000,000) dollars or such other amount to which the Parties may subsequently agree in writing. Such insurance shall be written in the name of Lessor and shall provide that any loss payable under the policy shall be adjusted and payable to Lessor.

(F) **Vessel Pollution Insurance** - Lessee shall procure and maintain at Lessee's sole cost and expense vessel pollution insurance with limits of at least one million dollars ($1,000,000).

(G) **Umbrella Liability Insurance** - Lessee shall procure and maintain at Lessee's sole cost and expense umbrella liability insurance which shall be excess to all underlying policies required herein with limits of not less than five million dollars ($5,000,000).

(H) **Construction Liability Insurance in amounts and types reasonably requested**

by Lessor from time to time.

(I)     Environmental Insurance in amounts and types reasonably requested by Lessor from time to time.

(J)     Business Interruption Insurance in amounts and types reasonably requested by Lessor from time to time.

(K)     If and at such time as Lessee elects to ship by rail, Lessee shall obtain and maintain railroad liability insurance in amounts and types reasonably requested by Lessor from time to time.

## APPENDIX J

## HAZARDOUS SUBSTANCES

1.    Defined Terms.

(a)    "Claim" shall mean and include any demand, cause of action, proceeding or suit (i) for damages (actual or punitive), losses, injuries to person or property, damages to natural resources, fines, penalties, interest, contribution or settlement, (ii) for the costs of site investigations, feasibility studies, information requests, health or risk assessments or Response Actions, and (iii) for enforcing insurance, contribution or indemnification agreements.

(b)    "Environmental Laws" shall mean and include all federal, state and local statutes, ordinances, regulations and rules relating to environmental quality, health, safety, contamination and clean up, including, without limitation, the Clean Air Act, 42 U.S.C. Section 7401 et seq.; the Clean Water Act, 33 U.S.C. Section 1251 et seq. and the Water Quality Act of 1987; the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. Section 136 et seq.; the Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. Section 1401 et seq.; the National Environmental Policy Act, 42 U.S.C. Section 4321 et seq.; the Noise Control Act, 42 U.S.C. Section 4901 et seq.; the Occupational Safety and Health Act, 29 U.S.C. Section 651 et seq.; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. Section 6901 et seq., as amended by the Hazardous and Solid Waste Amendments of 1984; the Safe Drinking Water Act, 42 U.S.C. Section 300f et seq.; the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. Section 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act, the Emergency Planning and Community Right to Know Act, and the Radon Gas and Indoor Air Quality Research Act; the Toxic Substances Control Act ("TSCA"), 15 U.S.C. Section 2601 et seq.; the Atomic Energy Act, 42 U.S.C. Section 2011 et seq., and the Nuclear Waste Policy Act of 1982, 42 U.S.C. Section 10101 et seq.; and the Illinois Environmental Protection Act ("IEPA"), 465 ILCS 5/1 et seq., and state superlien and environmental clean up statutes, with implementing regulations and guidelines. Environmental Laws shall also include all state, regional, county, municipal and other local laws, regulations and ordinances insofar as they are equivalent or similar to the federal laws recited above or purport to regulate Hazardous Materials, human health and safety or natural resources.

(c)    "Hazardous Materials" shall mean and include, without limitation, the following, including mixtures thereof: any hazardous substance, pollutant, contaminant, waste, by-product or constituent regulated under CERCLA; oil and petroleum products and natural gas, natural gas liquids, liquefied natural gas and synthetic gas usable for fuel; vegetable oil, biodiesel fuels, methanol and glycerine; pesticides regulated under the FIFRA; asbestos and asbestos containing materials, PCBs and other substances regulated under the TSCA; source material, special nuclear material, by product material and any other radioactive materials or radioactive wastes, however produced, regulated under the Atomic Energy Act or the Nuclear Waste Policy Act; chemicals subject to the OSHA Hazard Communication Standard, 29 C.F.R. Section 1910.1200 et seq.; and industrial process and pollution control wastes, whether or not hazardous within the meaning of RCRA.

(d)    "Manage" means to generate, manufacture, process, treat, store, use, re use, refine, recycle, reclaim, blend or burn for energy recovery, incinerate, accumulate speculatively, transport, transfer, dispose of or abandon Hazardous Materials.

(e)    "Release" or "Released" shall mean any actual or threatened spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of products into the environment, as "environment" is defined in CERCLA.

(f)    "Response" or "Respond" shall mean action taken in compliance with Environmental Laws to correct, remove, remediate, clean up, prevent, mitigate, monitor, evaluate, investigate, assess or abate the Release of a Hazardous Material.

2.    Lessee's Obligations with Respect to Environmental Matters.  During the term of the Lease: (a) Lessee shall comply with all Environmental Laws; (b) (other than consistent with the Development Plan and as required in connection with the Operations) Lessee shall not conduct or authorize the Management of any Hazardous Materials on the Premises, including installation of any underground storage tanks, without prior written disclosure to and approval by Lessor; (c) Lessee shall not take any action (other than consistent with the Development Plan and as required in connection with the Operations) that would subject the Premises to permit requirements under RCRA or any other Environmental Laws for storage, treatment or disposal of Hazardous Materials; (d) Lessee shall not dispose of Hazardous Materials except in strict compliance with Environmental Laws, which in no case shall include any on-site disposal other than discharges permitted pursuant to a valid air emissions permit and as allowed by Lessor's National Pollutant Discharge Elimination System ("NPDES") Permit; (e) Lessee shall at its own cost arrange for the lawful transportation and off site disposal of all Hazardous Materials that it generates; and (f) Lessee shall not undertake any action which would impact or change the Management of Hazardous Materials by Lessor with respect to the Property.

3.    Copies of Notices.  During the term of the Lease, Lessee shall promptly provide Lessor and Lessor shall promptly provide Lessee with copies of all summons, citations, directives, information inquiries or requests, notices of potential responsibility, notices of violation or deficiency, orders or decrees, Claims, complaints, investigations, judgments, letters, notices of environmental liens or Response actions in progress and other communications, written or oral, actual or threatened, from the United States Environmental Protection Agency, Occupational Safety and Health Administration, Illinois Environmental Protection Agency ("IEPA") or other federal, state or local agency or authority, or any other entity or individual received by such party concerning (a) any Release of a Hazardous Material on, to or from the Premises; (b) the imposition of any lien on the Premises or the Lease Property; or (c) any alleged violation of or responsibility under Environmental Laws with respect to the Premises or the Lease Property.  Lessor and Lessor's employees shall have the right at reasonable times and on reasonable notice and, if desired by Lessee, accompanied by Lessee or Lessee's representative, to enter the Premises and conduct appropriate inspections or tests in order to determine Lessee's compliance with Environmental Laws pursuant to the terms hereof.

4.    Tests and Reports.  Upon written request by Lessor, Lessee shall provide Lessor with the results of appropriate reports and tests in Lessee's possession, with transportation and

disposal contracts for Hazardous Materials in Lessee's possession, with any permits issued under Environmental Laws, and with any other applicable documents in Lessee's possession, including, without limitation, copies of required environmental plans and periodic filings, to demonstrate that Lessee complies with all Environmental Laws relating to the Premises.

5.   Access and Inspection.   Lessor and its agents and representatives shall have access during Lessee's normal business hours to the Premises and to the books and records of Lessee (and any occupant of the Premises claiming by, through or under Lessee) relating to Hazardous Materials for the purpose of ascertaining the nature of the activities being conducted thereon and to determine the type, kind and quantity of all products, materials and substances brought onto the Premises or made or produced thereon.   Upon reasonable prior notice Lessor and its agents and representatives shall have the right during Lessee's normal business hours to take samples in quantities sufficient for scientific analysis of all products, materials and substances present on the Premises, including but not limited to samples of products, materials or substances brought onto or made or produced on the Premises by Lessee or any other Person claiming by, through or under Lessee or otherwise present on the Premises.   Further, notwithstanding any provision of this Lease or applicable statutes or judicial decisions to the contrary, with respect to any assignment, subletting, grant of license or concession or any other permission to use the Premises by any person other than Lessee, Lessor shall have the right to withhold its consent thereto if, in Lessor's sole judgment and discretion, the assignee, sublessee, licensee, concessionaire or such other person is not capable of performing or is not sufficiently qualified to perform in accordance with the requirements of this Appendix J.   Any assignment, sublease, license or other permission to use the Premises from which Lessor withholds its consent as provided in this Appendix J shall be voidable at the Lessor's sole option.

6.   Lessee's Obligation to Respond.   If Lessee's Management of Hazardous Materials at the Premises (i) gives rise to liability or to a Claim under any Environmental Law, (ii) causes a significant public health effect or damage to natural resources, or (iii) creates a nuisance, Lessee shall promptly undertake all Response Actions, as required by Section 8.2(c) of the Lease.

7.   Lessor's Responsibility.   Lessor represents that it provided to Lessee at least 10 days prior to execution of this Lease access to review all documents in Lessor's possession regarding the environmental condition of the Premises, the Lease Property and underlying real property.

8.   Title V Permit.   Subject to the provisions of this Lease, Lessor has agreed to allow Lessee to operate Lessee's business on the Premises consistent with the terms of this Lease under the auspices of Lessor's Title V air permit, which permit governs Lessor's business operations, and which also governs certain air emissions sources on the Premises as such are configured as of the date of this Lease.   Lessee acknowledges that Lessor is not making any representations or warranties to Lessee regarding the Title V permit or Lessor's compliance with respect to said Title V permit, and that furthermore, Lessor makes no covenants to Lessee to obtain or attempt to obtain on Lessee's behalf any particular terms within the Title V permit that are favorable to Lessee, or to maintain or continue to maintain the Title V permit beyond the first date upon which Lessor ceases to require the Title V permit for its business and operations on the Property. Lessee has been provided by Lessor with a copy of Lessor's existing Title V permit and renewal or supplemental application therefor, and Lessor will furnish Lessee with the new Title V permit

once issued by the Illinois Environmental Protection Agency. Lessee agrees to comply at all times with all provisions of the Title V permit to the extent such provisions are applicable to Lessee's Operations on the Premises and to take no action inconsistent with Lessor's Title V permit, including but not limited to, air emissions excursions, failure to keep records, failure to notify Lessor of any potential or actual air emissions violations relating to Lessee's operations on the Premises, or modification of any equipment on the Premises that may require a change to the Title V permit such as construction of a new air emissions source. Lessee agrees to reimburse Lessor promptly upon request by Lessor for the reasonable costs of Lessor's administration of the portion of the Title V permit relating to the Premises, including those costs for any periodic tests required under the Title V permit's terms, costs to demonstrate compliance with the terms of the Title V permit, costs associated with maintaining records, costs to modify the Title V permit, or fines and penalties assessed by a governmental authority resulting from Lessee's failure in any way to comply with the terms of the Title V permit to the extent such provisions are applicable to Lessee's Operations on the Premises. If Lessee fails to comply with the terms of the Title V permit at any time to the extent such provisions are applicable to Lessee's operations, Lessee shall immediately notify Lessor and shall undertake all steps, at Lessee's sole cost and expense, as are necessary to comply fully with all terms of the Title V permit. If Lessee fails, within two (2) Days, to bring its operations and the Premises into compliance with the terms of the Title V permit, upon written notice to Lessee, Lessor shall have the right without further delay to undertake all steps necessary to bring Lessee's operations and the Premises into compliance with the Title V permit, and Lessee shall reimburse Lessor for all reasonable costs and expenses related to Lessor's actions. If Lessor is required pursuant to the terms of the Title V permit, to make compliance certifications to the Illinois Environmental Protection Agency, Lessee agrees to execute and provide an identical certification to Lessor with respect to the Premises promptly upon request of Lessor. Lessee hereby acknowledges that it has received copies of the Permit Amendments submitted by Lessor to the IEPA.

9. **NPDES Permit.** Subject to the provisions of this Lease, Lessor has agreed to allow Lessee to operate Lessee's business on the Premises consistent with the terms of this Lease under the auspices of Lessor's NPDES permit, which permit governs Lessor's business operations as of the date of this Lease. Lessee acknowledges that Lessor is not making any representations or warranties to Lessee regarding the NPDES permit or Lessor's compliance with respect to said NPDES permit, and that furthermore, Lessor makes no covenants to Lessee to obtain or attempt to obtain on Lessee's behalf any particular terms within the NPDES permit that are favorable to Lessee, or to maintain or continue to maintain the NPDES permit beyond the first date upon which Lessor ceases to require the NPDES permit for its business and operations on the Property. Lessee has been provided by Lessor with a copy of Lessor's existing NPDES permit. Lessee agrees to comply at all times with all provisions of the NPDES permit to the extent such provisions are applicable to Lessee's Operations on the Premises and to take no action inconsistent with Lessor's NPDES permit, including but not limited to, wastewater discharge exceedances that are not compliant with the limitations of the NPDES permit, failure to keep records, failure to notify Lessor of any potential or actual wastewater discharge violations relating to Lessee's operations on the Premises, or modification of any process or equipment on the Premises that may require a change to the NPDES permit. Lessee agrees to indemnify, defend and hold harmless Lessor and to reimburse Lessor promptly upon request by Lessor for the reasonable costs of Lessor's administration of the portion of the NPDES permit relating to the Premises, including those costs for any periodic tests required under the NPDES

permit's terms, costs to demonstrate compliance with the terms of the NPDES permit, costs associated with maintaining records, costs to modify the NPDES permit, or fines and penalties assessed by a governmental authority resulting from Lessee's failure in any way to comply with the terms of the NPDES permit to the extent such provisions are applicable to Lessee's Operations on the Premises. If Lessee fails to comply with the terms of the NPDES permit at any time to the extent such provisions are applicable to Lessee's Operations, Lessee shall immediately notify Lessor and shall undertake all steps, at Lessee's sole cost and expense, as are necessary to comply fully with all terms of the NPDES permit. If Lessee fails, within two (2) Days, to bring its Operations and the Premises into compliance with the terms of the NPDES permit, upon written notice to Lessee, Lessor shall have the right without further delay to undertake all steps necessary to bring Lessee's Operations and the Premises into compliance with the NPDES permit, and Lessee shall reimburse Lessor for all reasonable costs and expenses related to Lessor's actions. If Lessor is required pursuant to the terms of the NPDES permit, to make compliance certifications to the Illinois Environmental Protection Agency, Lessee agrees to execute and provide an identical certification to Lessor with respect to the Premises promptly upon request of Lessor.

## APPENDIX K

## TERMINATION PAYMENTS

If Lessee does not exercise its options to extend the Lease Term (other than as a result of a Lessor Event of Default or Force Majeure), Lessee shall pay the following Termination Payments:

| Lease Fee Payment Goal ("Payment Goal"): | Lessee Fails to Renew Lease Term Before: | Termination Payment: |
|---|---|---|
| $20,500,000 during the Initial Term | October 1, 2010 | Payment Goal less Lease Fees actually paid by Lessee, subject to a maximum termination payment of $1,500,000 |
| $26,650,000 during first renewal term | October 1, 2013 | Payment Goal less Lease Fees actually paid by Lessee, subject to a maximum termination payment of $1,000,000 |
| $26,650,000 during second renewal term | October 1, 2016 | Payment Goal less Lease Fees actually paid by Lessee, subject to a maximum termination payment of $500,000 |

## APPENDIX L

## RULES AND REGULATIONS

1.    Access to the Property:  Lessor may from time to time establish reasonable security controls for the purpose of regulating access to the Common Areas of the Property.  The Lessee shall abide by all such security regulations so established.   Notwithstanding the foregoing, Lessee shall have access to the Premises at all times.

2.    Protection of Premises:  To the extent applicable, before leaving the Premises unattended, Lessee shall close and securely lock all doors or other means of entry to the Premises.

3.    Signs:  Lessee shall not paint, display, inscribe, maintain or affix any sign, placard, picture, advertisement, merchandise, name, notice, lettering or direction on any part of the outside or inside of the Property, or on any part of the inside of the Premises which can be seen from the outside of the Property, without the written consent of Lessor, and then only such name or names or matter and in such color, size, style, character and material as may be first approved by Lessor in writing and as may be in accordance with any sign criteria established by Lessor.  Lessor reserves the right to remove at Lessee's expense all matter other than that above provided for without notice to Lessee.

4.    Defacing Premises and Overloading:  Lessee shall not place or permit to be placed any article of any kind on any window ledge or on the exterior walls.  Lessee shall not overload any floor or part thereof in the Premises, or any facility in the Premises or any public areas of the Property when bringing in or removing any large or heavy articles, and the Lessor may direct and control the location of machinery or equipment and all other heavy articles, if considered necessary by Lessor to protect the structure of the Premises, consistent with the Operations and the Development Plan.  Lessor also may require support (at the expense of Lessee) of such material as Lessor may deem reasonably necessary to properly distribute the weight.

5.    Obstruction of Public Areas:  Lessee shall not allow anything to remain in, place or store anything in, or obstruct in any way, any sidewalk, court, passageway, entrance, parking, loading or shipping area within the Common Areas (other than as part of the Limited Common Areas or as permitted under the Development Plan).  Lessee shall lend its full cooperation to keep such Common Areas free from all obstruction and in a clean and sightly condition, and move all supplies, machinery and equipment as soon as received directly to the Premises, and shall move all such items and waste that are at any time being taken from the Premises directly to the areas designated for disposal.  Neither Lessee nor any employee, contractor, agent, licensee or invitee of Lessee shall enter into areas reserved for the exclusive use of Lessor or its agents, employees, licensees or invitees.

6.    Keys and Additional Locks:  Lessee shall not attach or permit to be attached additional locks or similar devices to any door or window, change existing locks or the mechanism thereof, or make or permit to be made any keys for any door other than those

provided by Lessor. Lessor will provide two (2) initial sets of keys for the Premises to Lessee as needed. Additional keys shall be at the expense of Lessee. Lessee shall notify Lessor of the number of keys so made. Upon termination of the Lease or of the Lessee's possession of the Premises, the Lessee shall surrender all keys to the Premises and all keys of offices, rooms and toilet rooms which have been furnished the Lessee or which the Lessee shall have made, and in the event of a loss of any keys so furnished, Lessee shall pay Lessor its costs therefor.

7.      Communication or Utility Connections:  If Lessee desires signal, communication, alarm or other utility or similar service connections installed or changed, Lessee shall not install or change the same without the approval of Lessor (which shall not be unreasonably withheld, conditioned or delayed, and which shall be given if the request is consistent with the Development Plan), and then only under direction of Lessor and at Lessee's expense. Prior to installation of the Improvements Lessee shall ascertain from the Lessor the maximum amount of load or demand for or use of electrical current which can safely be permitted in the Premises, taking into account the capacity of the electric wiring in the Building and the Premises, and shall not in any event connect a greater load than such safe capacity.

8.      Service Requirements:  Service requirements of Lessee which may be Lessor's obligation will be attended to only upon application at the office of Lessor at the Channahon Facility. Employees of Lessor shall not perform any work or do anything outside of their duties unless under special instructions from the Lessor.

9.      Intoxication:  Lessor reserves the right to exclude or expel from the Property any person who, in the judgment of Lessor, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of any of the rules and regulations of the Property and the Channahon Facility.

10.     Advertising:  Lessee shall not in any manner use Lessor's name or use any picture or likeness of the Premises in any letter heads, envelopes, circulars, notices, advertisements, containers or wrapping material for any purpose other than identification of the location of Lessee's business without Lessor's express consent in writing.

11.     Nuisances and Certain Other Prohibited Uses:  Lessee shall not (a) conduct itself or permit its employees, licensees, contractors, agents or invitees to conduct themselves in a manner inconsistent with the comfort or convenience of other tenants on the Property, having regard to the nature of the Operations, (b) use the Premises for housing, lodging or sleeping purposes, (c) operate or permit to be operated any musical or sound producing instrument or device inside or outside the Premises which may be heard outside the Premises (other than as necessary to conduct the Operations), (d) operate any electrical device from which may emanate electrical waves which may interfere with or impair telecommunications broadcasting or reception from or in the Building or elsewhere, (e) disturb, solicit or canvass any other occupant of the Property, (f) do anything in or about the Premises tending to create or maintain a nuisance or do any act tending to injure the reputation of the Property as an industrial complex.

12.    Amendments:    Lessor from time to time may promulgate amendments, modifications and additions to these rules and regulations. Lessee agrees to comply with such amendments, modifications and additions upon notice of promulgation of same by or from Lessor, as long as such amendments, modifications and additions are applicable to the entire Channahon Facility Site and the Property and do not conflict with the terms and conditions of the Lease or have any potential adverse impact on the Operations or the Facility.

# EXHIBIT 6

# PRODUCT SUPPLY AGREEMENT

between

## EARTHFIRST AMERICAS, INC.

and

## LODERS CROKLAAN USA, LLC

Dated April/_/, 2007

## TABLE OF CONTENTS

Page

**ARTICLE 1** **DEFINITIONS AND CONSTRUCTION OF AGREEMENT** ........ 1
   1.1    Definitions ................................................................................................. 1
   1.2    Construction of Agreement ....................................................................... 8
**ARTICLE 2** **TERM AND TERMINATION** ....................................................... 9
   2.1    Commercial Start Date ............................................................................. 9
   2.2    Initial Term ............................................................................................... 9
   2.3    Renewal Term .......................................................................................... 9
**ARTICLE 3** **PRODUCT SUPPLY** ...................................................................... 9
   3.1    Commissioning Period ............................................................................. 9
   3.2    Supply and Purchase Obligations ............................................................ 9
   3.3    Products .................................................................................................. 11
   3.4    Conformance with Specifications ........................................................... 11
   3.5    EFA's Orders .......................................................................................... 11
   3.6    Supplier Notice Requirement For Orders ............................................... 11
**ARTICLE 4** **DELIVERY AND TRANSPORTATION** ................................. 11
   4.1    Delivery Obligations .............................................................................. 11
   4.2    Title and Risk of Loss ............................................................................ 11
   4.3    Warranty of Title ................................................................................... 12
   4.4    Vessels ................................................................................................... 12
   4.5    Vessel Nominations ............................................................................... 12
   4.6    Vessel Insurance .................................................................................... 12
   4.7    Loading, Shipment and Delivery Costs ................................................. 12
   4.8    Measurement ......................................................................................... 13
   4.9    Inspection of Vessel Deliveries ............................................................. 13
   4.10   Off-Spec Products ................................................................................. 13
   4.11   Quality and Quantity Claims ................................................................. 14
   4.12   Disclaimer of Warranties ....................................................................... 14
   4.13   Storage .................................................................................................. 14
   4.14   New Orleans Storage ............................................................................. 14
**ARTICLE 5** **PRICE** ............................................................................................ 14

CHGO130906740.10

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 5.1 | Purchase Price | 14 |
| 5.2 | Pre-Payment | 15 |
| 5.3 | Margin Payment | 15 |
| 5.4 | Method of Payment | 15 |
| ARTICLE 6 | INVOICING AND PAYMENT | 15 |
| 6.1 | Delivery Invoices and Cargo Documents | 15 |
| 6.2 | Other Invoices | 15 |
| 6.3 | Invoice Due Date | 15 |
| 6.4 | Monthly True-Up | 16 |
| 6.5 | Payment | 16 |
| 6.6 | Disputed Invoices | 16 |
| 6.7 | Interest | 16 |
| 6.8 | Mutual Guaranty | 16 |
| ARTICLE 7 | PRESS RELEASE/ANNOUNCEMENTS | 16 |
| ARTICLE 8 | REPRESENTATIONS AND WARRANTIES | 17 |
| ARTICLE 9 | LIMITATIONS ON LIABILITY | 18 |
| ARTICLE 10 | TAXES | 18 |
| 10.1 | Liability for Taxes | 18 |
| 10.2 | Import Duties | 19 |
| ARTICLE 11 | COMPLIANCE WITH LAWS | 19 |
| 11.1 | Pollution Prevention and Responsibility | 19 |
| 11.2 | Corrupt Practices | 20 |
| 11.3 | Applicable Law | 20 |
| ARTICLE 12 | FORCE MAJEURE | 20 |
| 12.1 | Event of Force Majeure | 20 |
| 12.2 | Notice of Force Majeure | 20 |
| 12.3 | Termination of Transactions | 20 |
| 12.4 | Alternative Supplies in the Event of Force Majeure | 21 |
| ARTICLE 13 | AUDIT RIGHTS | 21 |
| 13.1 | Books and Records | 21 |

ii

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 13.2 | Audit True-Up | 21 |
| **ARTICLE 14** | **INDEMNIFICATION** | 21 |
| 14.1 | Duty to Indemnify | 21 |
| 14.2 | No Third Party Rights | 22 |
| 14.3 | Third Party Claims | 22 |
| 14.4 | Claim Procedure | 22 |
| 14.5 | Settlement | 22 |
| 14.6 | Insurance | 22 |
| **ARTICLE 15** | **DEFAULT AND TERMINATION** | 23 |
| 15.1 | Events of Default | 23 |
| 15.2 | Remedies Upon Event of Default | 24 |
| 15.3 | EFA's Failure to Take Delivery | 24 |
| 15.4 | Supplier's Failure to Deliver | 24 |
| 15.5 | Early Termination of Transactions | 25 |
| 15.6 | Non-Exclusive Remedy | 25 |
| 15.7 | Indemnification | 26 |
| **ARTICLE 16** | **TERMINATION PROCESS** | 26 |
| 16.1 | Expiration or Termination in the Absence of an Event of Default | 26 |
| 16.2 | Final Accounting | 26 |
| 16.3 | Lease | 26 |
| **ARTICLE 17** | **GOVERNING LAW AND JURISDICTION** | 26 |
| 17.1 | Choice of Law | 26 |
| 17.2 | Arbitration | 26 |
| 17.3 | Waivers | 27 |
| 17.4 | Time Period for Making Claims | 27 |
| **ARTICLE 18** | **ASSIGNMENT** | 27 |
| 18.1 | Assignment | 27 |
| 18.2 | Assignment Absent Consent | 28 |
| **ARTICLE 19** | **NOTICES** | 28 |
| **ARTICLE 20** | **CONFIDENTIALITY** | 28 |

CHGO1\30906740.10

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 20.1 | Confidentiality | 28 |
| 20.2 | Disclosure | 29 |
| 20.3 | Tax Disclosure | 29 |
| **ARTICLE 21** | **MISCELLANEOUS** | 29 |
| 21.1 | Entire Agreement | 29 |
| 21.2 | Single Agreement | 30 |
| 21.3 | Mutual Cooperation | 30 |
| 21.4 | No Agency, Partnership or Joint Venture | 30 |
| 21.5 | No Waiver | 30 |
| 21.6 | Cumulative Remedies | 30 |
| 21.7 | Severability | 30 |
| 21.8 | Successors and Assigns and No Third-Party Beneficiaries | 30 |
| 21.9 | Further Assurances | 31 |
| 21.10 | Survival | 31 |
| 21.11 | Counterparts | 31 |

CHGO1\30906740.10

# PRODUCT SUPPLY AGREEMENT

This Product Supply Agreement (this "Agreement") is entered into this //ᴸ day of April 2007 (the "Effective Date") between Solar Diesel, Inc. f/k/a Earthfirst Americas, Inc., a Florida corporation ("EFA"), and Loders Croklaan USA, LLC, an Illinois limited liability company ("Supplier") (each of the foregoing referred to individually as a "Party" or collectively as the "Parties").

## RECITALS

**WHEREAS,** Supplier owns the Facility and is engaged in the business of storing, distributing, supplying and marketing Products;

**WHEREAS,** Supplier desires to lease the Facility to EFA for the purposes of operating a biodiesel manufacturing facility;

**WHEREAS,** EFA desires to lease the Facility from Supplier and to modify and improve the Facility as required in order to process Products into biodiesel fuel;

**WHEREAS,** in order to conduct its proposed business, EFA requires a long-term supply of Products from Supplier;

**WHEREAS,** Supplier desires to sell and supply Products to EFA and EFA desires to purchase and receive Products from Supplier on a regularly scheduled basis upon the terms and conditions hereof; and

**WHEREAS,** Supplier's Parent is willing to guarantee the Obligations of Suppler herein contained and EFA's Parent is willing to guarantee the obligations of EFA herein contained.

**NOW, THEREFORE,** in consideration of the premises and the respective promises, conditions and agreements contained herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, EFA and Supplier do hereby agree as follows:

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION OF AGREEMENT

1.1     Definitions. For purposes of this Agreement, including the foregoing Recitals, the following terms shall have the meanings indicated below:

"Affiliate" means, in relation to a Party, any Person that (i) directly or indirectly controls such Party; (ii) is directly or indirectly controlled by such Party; or (iii) is directly or indirectly controlled by a Person that directly or indirectly controls such Party. For this purpose, "control" of any entity or Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through the ownership of a majority of issued shares or voting power or control in fact of the entity or Person or otherwise.

"Agreement" or "this Agreement" means this Product Supply Agreement, as such agreement may be amended, modified, supplemented, extended, renewed or restated from time to time in accordance with the terms hereof, including the Exhibits attached hereto.

"Applicable Law" means, with respect to any Governmental Authority, (i) any law, statute, regulation, code, ordinance, license, decision, order, writ, injunction, decision, directive, judgment, policy, decree and any judicial or administrative interpretations thereof, (ii) any agreement, concession or arrangement with any other Governmental Authority and (iii) any license, permit or compliance requirement, in each case applicable to either Party, the Products, the Vessel or the Facility, and as amended or modified from time to time.

"Bankrupt" means that a Party (i) is dissolved, other than pursuant to a consolidation, amalgamation or merger, (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due, (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors, (iv) institutes a Proceeding or files a petition seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditor's rights, including a voluntary petition under chapter 7 or chapter 11 of the Bankruptcy Code (or any similar law applicable to a Party), (v) has instituted against it a Proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditor's rights, including an order for relief under the U.S. Bankruptcy Code (or any similar law applicable to a Party), or a petition is presented for its winding-up or liquidation, including an involuntary petition under chapter 7 or chapter 11 of the Bankruptcy Code (or any similar law applicable to a Party), and such Proceeding results in a judgment or is not dismissed or permanently stayed within 120 days of the filing of such Proceeding, (vi) has a resolution passed for its winding-up, official management or liquidation, other than pursuant to a consolidation, amalgamation or merger, (vii) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for all or substantially all of its assets, (viii) has one or more secured parties take possession of all or substantially all of its assets, or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all of its assets, (ix) files an answer or other pleading admitting or failing to contest the allegations of a petition filed against it in any Proceeding of the foregoing nature or (x) takes any other action to authorize any of the foregoing actions.

"Bankruptcy Code" means chapter 11 of Title 11, U.S. Code, as amended.

"Breakage Costs" means all out-of-pocket losses and expenses incurred by the Performing Party as a result of termination and liquidation of a Transaction, including reasonable attorneys' fees, court costs, collection costs, interest charges and other disbursements and any brokerage fees and commissions, damages, losses and expenses incurred in obtaining, maintaining, replacing or liquidating commercially reasonable hedges or trading positions relating to the Transactions that are being terminated and liquidated, actual transport and storage fees (including any fees resulting from unused cargo space on Vessels) and all applicable import duties, all as determined in a commercially reasonable manner by the Performing Party.

"Business Day" means a day on which banks are open for general commercial business in New York, New York.

"Claim" means a dispute, claim or controversy whether based on contract, tort, strict liability, statute or other legal or equitable theory (including any claim of fraud, misrepresentation or fraudulent inducement or any question of validity or effect of an agreement).

"Commercial Start Date" means the date on which the Facility has secured all permits, approvals and authorizations from all Governmental Authorities which are required to commence receiving and processing at least 3000 MT per month of Products into biodiesel fuel.

"Commissioning Period" means the period commencing on the Effective Date and terminating on the Commercial Start Date.

"Confidential Information" has the meaning set forth in the Confidentiality Agreement.

"Confidentiality Agreement" means that certain Confidentiality Agreement dated September 8, 2006 among Supplier, EFA and EarthFirst Technologies, Inc.

"Contract Value" means the U.S. dollar value of any Transaction for the purchase and sale of Products under this Agreement as specified in the applicable Transaction documents.

"Cover Costs" means as applicable, either (i) the positive difference between the Replacement Value and the Contract Value for replacement Products purchased by EFA in substitution for Products not delivered to EFA by Supplier (or properly rejected by EFA as non-conforming), or (ii) the positive difference between the Contract Value and the Replacement Value incurred by Supplier in disposing of Products improperly rejected or otherwise not properly accepted by EFA, in each case as evidenced by appropriate supporting documentation and pursuant to an arms-length purchase from or sale to, at no more than then current market rates and terms, a third party of the same quality of Products, in each case plus Breakage Costs incurred by the applicable Party.

"Default" or an "Event of Default" means an occurrence of any of the events or circumstances described in Section 15.1.

"Default Interest Rate" means the lesser of (i) twelve percent (12%) per annum and (ii) the maximum rate permitted by Applicable Law.

"Default Termination Date" has the meaning specified in Section 15.5.

"Defaulting Party" has the meaning specified in Section 15.2.

"Delivery Point" means either the First Delivery Point or the Second Delivery Point, as applicable.

"Disclosing Party" has the meaning specified in Section 20.1(a).

3

"Early Termination Date" has the meaning specified in Section 16.1.

"EFA" has the meaning specified in the Preamble of this Agreement.

"EFA's Parent" means EarthFirst Technologies, Inc., a Florida corporation.

"EFA Default" has the meaning specified in Section 15.3.

"Effective Date" means the date first written above, upon which this Agreement becomes binding upon and enforceable by and against the Parties.

"Environmental Law" means any existing Applicable Law that governs the protection of persons, natural resources or the environment (including the protection of ambient air, surface water, groundwater, land surface or subsurface strata, endangered species or wetlands), occupational health and safety and the manufacture, processing, distribution, use, generation, handling, treatment, storage, disposal, transportation, release, management or remediation of solid waste, industrial waste or hazardous substances or materials.

"Facility" means Supplier's inactive (as of the date hereof) fractionation facility located in Channahon, Illinois.

"Firm Order" means EFA's acceptance of Supplier's quotation for a specified quantity of each Product, at a specified price for delivery to the Load Port during a specified Loading Month.

"First Delivery Point" means the point where Product enters the inlet valve of EFA's tankage or receiving transport (which shall include rail cars, barges and motor carriage) in New Orleans, Louisiana or such other US port as the Parties agree in writing to be the First Delivery Point for the purposes of this Agreement. For purposes of this definition, EFA's tankage or receiving transport shall mean tankage leased or subleased by EFA and transports chartered or contracted for by EFA or its representatives or agents.

"Force Majeure" means any cause or event beyond the reasonable control of a Party and which a Party, with the exercise of due diligence and prudence, could not avoid or overcome (or avoid, overcome or mitigate the effects of), including fires, earthquakes, pandemic, lightning, floods, explosions, storms, adverse weather, landslides and other acts of natural calamity or acts of God; navigational accidents or maritime peril; Vessel damage or loss; strikes, grievances, actions by or among workers or lock-outs; accidents at, closing of, or restrictions upon the use of mooring facilities, docks, ports, pipelines, harbors, railroads or other navigational or transportation mechanisms; disruption or breakdown of or explosions or accidents to storage plants, terminals, machinery or other facilities; acts of war, hostilities (whether declared or undeclared), civil commotion, embargoes, blockades, terrorism, sabotage or acts of a public enemy; curtailment, interference, passage of an import or export fee, charge or tariff or other financial disincentive, prohibition or financial imposition on or relating to the Products or intended use of the Products by any Governmental Authority; failure or cessation of supplies reasonably beyond the control of a Party or an Affiliate of a Party; or any other cause reasonably beyond the control of a Party, whether similar or dissimilar to those above, which, by the exercise of due diligence, such Party should not have been able to avoid or overcome. Subject to

4

the foregoing, a Party's inability economically to perform its Obligations under any Transaction or this Agreement shall not constitute an event of Force Majeure hereunder.

"FOSFA" as used herein means the Federation of Oils, Seeds and Fats Associations Limited.

"FOSFA Contract" as used herein means the then current version of FOSFA Contract 81 dealing with delivery of palm oil products on a CIF basis, a copy of the current version of which is attached as Exhibit A.

"Governmental Authority" means any foreign or U.S. federal, state, regional, local or municipal governmental body, agency, instrumentality, board, bureau, commission, department, authority or entity established or controlled by a government or subdivision thereof, including any legislative, administrative or judicial body, or any person purporting to act therefor, exercising jurisdiction over either Party, which exercise of jurisdiction impacts this Agreement.

"Guarantor" means Supplier's Parent and EFA's Parent, as applicable.

"Indemnified Party" has the meaning specified in Section 14.1.

"Indemnifying Party" has the meaning specified in Section 14.1.

"Independent Inspector" means Intertek/Caleb-Brett Laboratories, or similar professional laboratory, mutually acceptable to the Parties, who performs any sampling, quality analysis and quantity determination of the Products purchased or sold hereunder.

"Initial Term" has the meaning specified in Section 2.2.

"Interest Rate" means the one-month LIBOR rate.

"ISPS Code" means the International Code for the Security of Ships and of Port Facilities and the relevant 2002 amendments to Chapter XI of the International Convention for the Safety of Life at Sea, 1974.

"Lease" means that certain Channahon Facility Lease Agreement by and between Supplier and EFA, dated on or about the date hereof.

"Liabilities" means any losses, charges, damages, deficiencies, assessments, interests, penalties, costs and expenses of any kind related to or that arise out of this Agreement or any Transaction (including reasonable attorneys' fees, other fees, court costs and other disbursements), including any liabilities that arise out of or are related to any Claim, Proceeding, judgment, settlement or judicial or administrative order made or commenced by any third party or Governmental Authority, as related to or that arise out of this Agreement or any Transaction.

"LIBOR" means, as of the date of any determination, the London Interbank Offered Rate for one-month U.S. dollar deposits appearing on Page 3750 of the Telerate screen (or any successor page) at approximately 11:00 a.m. (London time). If such rate does not appear on Page 3750 of the Telerate screen (or otherwise on such screen), LIBOR shall be determined by

reference to such other comparable publicly available service for displaying eurodollar rates as the Parties may mutually agree.  LIBOR shall be established on the first day on which a determination of the Interest Rate is to be made under this Agreement and shall be adjusted daily based on the one-month LIBOR quotes made available for such day through the foregoing sources.

"Load Port" means the port at which a cargo of Product is loaded onto a Vessel for transport to the Delivery Point.

"Loading Month" means the month specified by Supplier in which a vessel will load Product for shipment to the First or Second Delivery Point, as the case may be.

"Locked-In Market Price" means the Market Price quoted to EFA for a lot of the Products which quote is accepted and agreed to in a Firm Order.

"Market Price" means a price equal to the price, in U.S. dollars, which the Supplier would have to pay if ordering for itself the same quantity and Product (expressed in U.S. Dollars per MT, FOB Malaysian port) for the same shipment dates without mark-up, surcharge, enhancement or premium; provided that, such price shall be no more than the daily average price quotation for Products as published by Reuters and  adjusted as appropriate with respect to the actual nature, quality, location and method of delivery of a particular Product, subject to variances by an amount usually not to exceed +/-5$/MT.  If Reuters ceases to publish the foregoing price reports, the Parties shall cooperate in good faith to select an alternative publication or other reference source.

"Maximum Quantity" has the meaning specified in Section 3.2(c).

"Minimum Quantity" has the meaning specified in Section 3.2(b).

"MPOB" means the Malaysian Palm Oil Board.

"MT" means metric tons.

"MTSA" means the U.S. Maritime Transportation Security Act of 2002.

"Obligations" means a Party's prompt and complete payment and/or performance of its covenants and obligations required pursuant to this Agreement or under any Transaction.

"Order Completion Date" means the last day of the third calendar month prior to the Loading Month.  For example if the Loading Month is July, the Order Completion Date is April 30th.

"Party" or "Parties" has the meaning specified in the Preamble to this Agreement.

"Payment Date" means the date specified for payment in Supplier's commercial invoice for a Transaction, which date shall be no sooner than forty-five (45) days from the date the Vessel departs the Load Port and commences its voyage to the Delivery Point for the applicable

Transaction; with the exception that during the first three (3) months after the Commercial Start Date, Product delivered from Supplier's Channahon inventory shall be paid for prior to delivery.

"Performing Party" has the meaning specified in Section 15.2.

"Person" means any individual, sole proprietorship, partnership, joint venture, limited liability company, trust, unincorporated organization, association, corporation, institution, entity, party, Governmental Authority, court or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Proceeding" means any action, suit, Claim, investigation, review or other proceeding, at law or in equity, before any Governmental Authority or before any arbitrator, board of arbitration or similar entity.

"Products" means any of (i) RBD Olein, (ii) RBD Stearin, and (iii) RBD Palm Oil, or other similar palm products, including finished biodiesel which Supplier can acquire through its supply chain now or in the future, including those more fully set forth on Schedule 4.8A.

"Purchase Price" has the meaning specified in Section 5.1.

"Receiving Party" has the meaning specified in Section 20.1(a).

"Release" has the meaning specified in Section 11.1.

"Related Agreements" means the Lease Agreement for the Facility dated of even date herewith and executed contemporaneously herewith between the Parties and any other agreements or documents executed in connection with or as described or required in or under this Agreement or the Lease Agreement or for any transaction. The Parties acknowledge that this Agreement and the Lease Agreement comprise the controlling documents of a unitary transaction between the Parties for the purpose of allowing EFA to produce biodiesel at the Facility and that this Agreement and the Lease Agreement are interdependent and have little or no rationale or value independent of each other.

"Renewal Term" has the meaning specified in Section 2.3.

"Replacement Fee" has the meaning specified in Section 15.4(b).

"Replacement Value" means the U.S. dollar value of Products purchased or sold, as the case may be, from or to a third party as a substitute transaction for the purchase or sale, as the case may be, of Products pursuant to the terms of this Agreement.

"Second Delivery Point" means the point where Product enters the inlet valve to EFA's own tankage or processing unit at the Facility, whichever occurs first.

"Specifications" has the meaning specified in Section 3.4.

"Supplier" has the meaning specified in the Preamble of this Agreement.

the initial eighteen (18) months of the Term, EFA shall take delivery of Products at the Second Delivery Point, at Supplier's actual cost of transport. After the initial eighteen (18) months of the Term, EFA shall bear all risk of arranging transport to the Second Delivery Point. Notwithstanding the foregoing, Supplier will always use commercially reasonable efforts to help arrange delivery logistics for EFA to the Second Delivery Point.

(b)    Subject to the occurrence of an event of Force Majeure, EFA agrees to purchase and Supplier agrees to sell the minimum quantities of Products ("Minimum Quantity") and maximum quantities of Products ("Maximum Quantity") such that the volumes of Products delivered (which deliveries, for the initial eighteen (18) months of the Term, shall occur at the Second Delivery Point and thereafter, shall occur at the First Delivery Point) shall be as set forth on Schedule 3.2; provided, that, the Minimum Quantity shall be prorated, as applicable, for any period less than that so indicated.

(c)    If EFA requires quantities in excess of the Maximum Quantity, Supplier shall use its commercially reasonable efforts to procure such excess quantities.

(d)    Supplier agrees that during 12 months after the Commercial Start Date it shall not enter into any feedstock or supply agreement to provide any of the Products in the states of Indiana, Illinois, Iowa, Missouri, Kansas, Nebraska, Minnesota and South Dakota to or for any party, entity or person, who or which, to Supplier's knowledge, plan to use such Products as a biodiesel feedstock.

(e)    Nothing herein shall preclude EFA from acquiring any quantity of Product (in excess of the Minimum Quantity) or other biodiesel feedstock from any other source if the prices offered by Supplier to EFA exceed the prices offered by such sources by more than 5%. However, in such event EFA shall be solely responsible for all transportation to the Second Delivery Point and such transportation and delivery shall not interfere with Supplier's business operations at the Facility. Notwithstanding the foregoing, the limitations set forth in this paragraph shall not apply to any purchases of Products by EFA in excess of the Maximum Quantity.

(f)    Supplier warrants and represents that all Products provided hereunder are of Malaysian or Indonesian origin and that the growing of the fruit and production of the oil were in accordance with or are progressing towards compliance with the Roundtable on Sustainable Palm guidelines and member policies and in all ways consistent with Supplier and Supplier's Parent's published materials on the "sustainable" nature of the trees and plantations from which the Products are produced.

(g)    EFA warrants and represents that it shall not use any Product purchased from Supplier or other feedstock to be processed or sold from the Facility in any edible food application, except that EFA may manufacture and sell from the Facility USP or other grades of glycerin or glycerin based products or specialty resulting palm oleo-chemical biodiesel by-products in the nature of methylpalmitate, tocotrienol, carotene and phytosterol.

CHIGO1\0906740.10

all losses, contamination and damages attributable to handling, transportation, resale and use of the Products. If any Product loss occurs after the passage of title to EFA but prior to transfer of risk of loss in accordance with this Section, in Supplier's discretion, EFA shall have the right to either obtain substitute goods from Supplier for all or a part of the loss, or to receive insurance proceeds therefor. If Supplier elects to make an insurance claim, Supplier shall use commercially reasonable efforts to prosecute such claim against any insurance coverages applicable to such loss (on behalf of EFA) and EFA shall be entitled to receive any and all insurance proceeds received by Supplier therefrom solely with respect to the loss of such Product. Notwithstanding the foregoing, Supplier shall be responsible for the payment of any applicable insurance deductible or self-insured retention, and EFA's award of insurance proceeds shall be grossed up by an amount equal to such deductible or self-insured retention, to the extent applicable to EFA's claim.

4.3    Warranty of Title. Supplier represents and warrants that it has (and will have) good and marketable title to all Products delivered hereunder, and all Products will at the time of delivery to EFA at the applicable Delivery Point, be free and clear of all liens, claims, encumbrances and adverse claims of every type and description.

4.4    Vessels. The requirements of paragraph 5 of the FOSFA Contract shall apply. Supplier shall ensure that the Vessel is in compliance with all Applicable Laws, including, but not limited to, the ISPS Code and the MTSA.

4.5    Vessel Nominations. Upon the written request of EFA, not later than five (5) days prior to the scheduled loading date for cargo on a ship and not later than one (1) day prior to the scheduled loading date for cargo on a barge, Supplier shall notify EFA of the information specified below:

(a)    name of the Vessel and, in reasonable detail, the dimensions, specifications, operator and owner of such Vessel;

(b)    name of the Load Port;

(c)    expected departure date of the Vessel from Load Port;

(d)    estimated arrival date at the Facility; and

(e)    any changes in Firm Product Quantities.

4.6    Vessel Insurance. Supplier shall ensure that insurance coverage on all Products is maintained through the time that risk of loss passes to EFA. The value of the insurance shall be sufficient to fully compensate EFA for any lost or damaged Product.

4.7    Loading, Shipment and Delivery Costs. Supplier shall pay all the freight and insurance and other costs necessary to accomplish delivery of the Products to EFA. As part of the Purchase Price, EFA shall reimburse Supplier for its pro-rata share of Supplier's actual and documented cost for freight and insurance and directly related costs (including costs for tankage at the First Delivery Point and transport from the First Delivery Point to the Second Delivery Point, if applicable, as advised from time to time by Supplier) for a Transaction, without mark-

up, surcharge or premium; provided that, (i) charges incurred for freight, insurance and related costs shall be consistent with those normally incurred by Supplier in its customary supply chain and consistent with market rates at the time of contracting for such services, and (ii) Supplier shall use commercially reasonable efforts to obtain competitive rates.

4.8    Measurement. (a) The quality of the Products shall be determined in accordance with Schedule 4.8A and (b) and quantity of the Products shall be determined in accordance with the latest established API 17 standards for the method of delivery, provided on Schedule 4.8B hereto. Quantities delivered into or from pipelines shall be determined using the respective pipeline's calibrated meters. If there is a discrepancy between the volume used to calculate the Purchase Price and the volume of Product determined at the relevant Delivery Point, the latter shall control and the Purchase Price shall be adjusted pursuant to a post-delivery true-up, as more specifically set forth in Section 6.4.

4.9    Inspection of Vessel Deliveries. Each Party may have a representative present at the time of discharge, gauging and measurement of Products delivered from any Vessel. If a Party declines to have a representative present, the results of the other Party's measurements and tests shall be deemed to be correct. Unless otherwise agreed, the Parties shall share inspection costs equally. Upon arrival at the First Delivery Point, samples shall be taken by an Independent Inspector from each delivery method prior to transfer of the Risk of Loss to EFA. From these samples, a volumetrically correct composite sample of the Vessel's cargo compartments that are being discharged will be made and tested by the Independent Inspector in respect of the Products discharged at the applicable Delivery Point. The Parties shall instruct the Independent Inspector to obtain and retain appropriate samples of the Products for a period of ninety (90) days from the date of measurement. If discharge occurs at the Second Delivery Point, prior to unloading, a volumetrically correct composite sample from each barge, car or other container, will be made and tested by Supplier, the results of which will be promptly provided to EFA. If EFA does not object within 4 business hours after presentation of such results to EFA, then the shipment shall be deemed initially accepted. If EFA objects to the results of Supplier's testing within such time period, it may select an Independent Inspector to sample and test the Products to be discharged at the Second Delivery Point. Any certificates of quality and quantity countersigned by an Independent Inspector shall be final and binding on both Parties in the absence of manifest error or fraud.

4.10    Off-Spec Products. EFA may reject Products that do not conform to the applicable Specifications. If title and risk to the off-Specification Product has already passed to EFA, such title and risk shall be deemed to have reverted to Supplier. EFA may elect, at its sole discretion and at Supplier's sole expense, to return any off-Specification Products to Supplier. EFA shall have the option to either purchase replacement Products or have Supplier replace the off-Specification Products. Supplier shall bear all commercially reasonable costs associated with replacement of the off-Specification Products. If EFA purchases replacement Products, Supplier shall reimburse EFA upon receipt of EFA's invoice and supporting documentation for EFA's Cover Costs. If EFA accepts the off-Specification Products, the Parties shall agree in advance on a reduced price that reflects such Products' market value, quality or utility or such other agreement of the Parties. If EFA rejects Products that conform to the applicable Specifications, EFA shall reimburse Supplier upon receipt of Supplier's invoice and supporting documentation for Supplier's Cover Costs.

13

4.11   Quality and Quantity Claims. Any Claim regarding the quality or quantity of Products delivered shall be waived unless submitted to Supplier in writing, together with supporting documentation and reasonable details of the facts on which the Claim is based, within forty-five (45) days from the delivery date of the Products. The delivery date for Products shall be determined by the applicable bill of lading.

4.12   Disclaimer of Warranties. OTHER THAN THE WARRANTY OF TITLE AND CONFORMANCE OF THE PRODUCTS TO THEIR SPECIFICATIONS UNDER ANY TRANSACTION, SUPPLIER MAKES NO OTHER REPRESENTATION OR WARRANTY, WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OR WARRANTY THAT THE PRODUCTS WILL BE FIT, SUITABLE OR MERCHANTABLE FOR A PARTICULAR PURPOSE.

4.13   Storage. Supplier agrees to provide incoming feedstock storage on a co-mingled basis with its own products for a six (6) month period commencing three months after the Commercial Start Date. Thereafter, EFA shall have constructed and utilize its own incoming Product storage tanks (which tanks shall have a capacity of at least 6,000MT), provided Supplier in its capacity as landlord under the Lease has supervised or permitted the construction of pipelines and all other necessary infrastructure to allow Product unloading to EFA's incoming storage tanks, as more fully set forth in Section 5.1 of the Lease. EFA hereby acknowledges that Supplier has advised EFA to construct such storage tanks that are sufficient for the storage of at least 1.5x of EFA's monthly incoming and outgoing Products. All storage provided by Supplier shall be in suitable, heated tanks with connection by pipeline to EFA's biodiesel facility.

4.14   New Orleans Storage. EFA hereby acknowledges and agrees that any storage of Products in Supplier's transfer tanks at the First Delivery Point shall be for no longer than thirty (30) days after offloading from the delivery Vessel.

## ARTICLE 5
## PRICE

5.1   Purchase Price. The price to be paid to Supplier for any Transaction hereunder (the "Purchase Price") for the volumes of Products delivered to and received at the applicable Delivery Point where risk of loss transfers to EFA pursuant to this Agreement shall be equal to the Locked-In Market Price for the quantity of Products actually delivered, plus Supplier's actual and documented costs for the transportation (freight and insurance), storage and delivery of Products to the applicable Delivery Point at which EFA takes physical delivery and the applicable import duties. However, during the Commissioning Period and the first three (3) months after the Commercial Start Date, the Purchase Price shall be the Market Price as of the date of ordering plus $0.0585 per pound, and, if not ordered more than ninety (90) days in advance of required delivery, an additional charge of .015/lb.

5.2   Pre-Payment. Supplier shall be entitled to a partial pre-payment in an amount equal to ten percent (10%) of any Firm Order. This amount shall be payable on the date the Firm Order is accepted by EFA. This ten percent (10%) deposit shall be applied in reduction of the Purchase Price of the Transaction which is comprised, in part, by the Firm Order.

5.3    Margin Payment. Supplier shall be entitled to a margin payment by EFA, upon demand, in the event that at any time the Total Locked-In Market Price of all pending and unpaid Firm Orders, whether or not shipped, calculated on a Product by Product basis, is greater than ten percent (10%) more than the current Market Price of the applicable Products purchased in all pending and unpaid Firm Orders based on Supplier's price quotes for the same day. The margin payment shall be made on the next Business Day following a written demand from Supplier to EFA containing the detailed margin payment calculation, per Transaction or Firm Orders, as applicable. In addition, in the event that, following a margin payment by EFA, as a result of changed market conditions, there is an increase in the current Market Price of the applicable Products purchased, then EFA shall be entitled to a corresponding refund by Supplier of any excess margin payments made by EFA on the next Business Day following a written demand from EFA to Supplier containing the detailed margin refund calculation; provided, that in no event shall EFA be entitled to a refund of any portion of its deposit pursuant to Section 5.2. For purposes of this Section 5.3, the current Market Price shall be calculated daily on a Product by Product basis and margin payments attributable to any Transaction shall be applied in reduction of the Purchase Price of the Transaction. The following example is for illustrative purposes only:

In the event that, the Total Locked-In Price for pending and unpaid Firm Orders is $100 and, on a particular day, the Market Price is $90, no margin payment shall be due from EFA. If, however, the Market Price on such day is $85, Supplier shall be entitled to an $5 margin payment from EFA. If, on a subsequent day, the Market Price is further reduced to $80, Supplier shall be entitled to an additional $5 margin payment. If the Market Price increases to $86, Supplier shall refund $6 of EFA's excess margin payment and if the Market Price subsequently increases to $92, Supplier shall refund the remaining $4 of EFA's excess margin payment, but no part of said deposit shall be refunded.

5.4    Method of Payment. All payments made to Supplier hereunder shall be in U.S. dollars and shall be delivered by wire transfer to Supplier's designated U.S. banking account. All wire transfer costs shall be borne by EFA.

## ARTICLE 6
## INVOICING AND PAYMENT

6.1    Delivery Invoices and Cargo Documents.

(a)    Supplier shall invoice EFA for the Purchase Price for a Transaction on the date Supplier receives the Bill of Lading for a shipment containing the Products which are the subject of a Transaction.

(b)    Contemporaneously with the invoice, if available, Supplier or its representative shall furnish to EFA any and all documentation sufficient to enable the Vessel and its cargo to clear customs in the United States of America.

6.2    Other Invoices. Except as provided in Section 6.1, if any sums of money are due from one Party to the other Party hereunder, then the Party to whom such sums of money are

owed shall furnish to the other Party an invoice therefor, together with relevant supporting documents showing the basis for the calculation thereof.

6.3    Invoice Due Date. Each invoice referred to in Section 6.1 for Products delivered to EFA shall become due and payable to Supplier on the Payment Date upon Supplier's presentment of the shipping documents specified in Section 11 of the FOSFA Contract or the delivery of a guaranty or letter of indemnity, in form and substance customarily used in the industry, in substitution thereof.

6.4    Monthly True-Up. The parties agree that if any discrepancy or variation occurs from their intended Transaction or if any adjustments are due for differences in actual amounts delivered, the Parties agree to true-up with each other by the last Business Day of each month. Promptly after the completion of the delivery of Products at the applicable Delivery Point, EFA or its representative shall furnish to Supplier an outturn survey report of quantity and quality of Product received at the applicable Delivery Point at which EFA took actual delivery of the Product. EFA shall furnish to Supplier by e-mail or facsimile a true-up statement based on the outturn survey report with supporting documentation within ten (10) Business Days of the date of receipt of the outturn survey report. The Party to whom the aggregate net difference is owed shall pay the difference to the other Party within five (5) Business Days.

6.5    Payment. Any Party owing money pursuant to an invoice issued hereunder shall pay all undisputed amounts of any such invoice on or before the due date thereof. Such payments shall be made in immediately available funds in the United States of America to such account or accounts with such bank and in such location as shall have been designated in writing by a Party. If a Payment Date falls due on a non-Business Day, then payment shall be made no later than the next Business Day.

6.6    Disputed Invoices. If a Party in good faith disputes the amount of any invoice issued by the other Party, it shall pay the undisputed portion of the invoice by the due date and inform the other Party in writing why it disagrees with the balance of the invoice amount. The Parties shall cooperate in resolving the dispute expeditiously. If the Parties agree that the disputing Party owes some or all of the disputed amount, such Party shall pay such amount, together with interest at the Interest Rate from the original due date, within two (2) Business Days from the date of their agreement.

6.7    Interest. Except as provided in Section 6.6, interest shall accrue on late payments under this Agreement at the Default Interest Rate from the date that payment is due until the date that payment is actually received by the owed Party. The payment of interest shall not be construed as either Party's agreement to extend credit to the other Party or to extend the payment due date of any amounts payable hereunder.

6.8    Mutual Guaranty. Contemporaneously with the execution of this Agreement, Supplier's Parent and EFA's Parent shall each execute its respective guaranty following the signatures of Supplier and EFA, respectively, as additional security for performance of each Party's Obligations hereunder for the Initial Term, and each Renewal Term hereunder.

CHGO1\30906740.10

## ARTICLE 7
## PRESS RELEASE/ANNOUNCEMENTS

Subject to the provisions of Article 21 below and the Confidentiality Agreement, neither Party shall make any public announcement or issue any press release regarding this Agreement or the Related Agreements, the transactions contemplated hereby or thereby, or the status of negotiations between the Parties regarding the same, or otherwise release or file such documents with any Governmental Authority without first conferring with the other Party. If the Parties are unable to agree as to the text or time of release of any such announcement, or the release or filing of such documents, no announcement, release or filing shall be made unless the Party proposing the announcement, release or filing is advised by legal counsel that the announcement, release or filing is legally required to be made, in which case the other Party shall be immediately advised of the text and time of release of the announcement, or the timing with respect to the release or filing of the documents, as the case may be. Supplier acknowledges that EFA will be required to announce the existence of this Agreement and general terms, but not required to disclose the price or other financial terms and these shall be kept as confidential between the Parties. Notwithstanding the foregoing, in the event and to the extent either Party or any Affiliate of either Party is required to disclose any Confidential Information to any Governmental Authority, such disclosure shall not be deemed a violation of this Article 7 or of Article 21 below or of any Non-Disclosure and Confidentiality Agreement entered into between the parties hereto or that certain Lease Agreement executed by the Parties contemporaneously herewith.

## ARTICLE 8
## REPRESENTATIONS AND WARRANTIES

Each Party represents and warrants to the other Party as of the Effective Date and the date of each Transaction under this Agreement as follows:

(a)    Neither it nor any of its Affiliates has negotiated with any finder, broker or other intermediary in connection with the negotiations relating to this Agreement or the Related Agreements and the transactions contemplated hereby and thereby who is entitled to any compensation with respect thereto.

(b)    It is duly organized and validly existing under the Applicable Laws of the jurisdiction of its organization or incorporation and is in good standing under such Applicable Laws.

(c)    It has the legal capacity, authority and power to execute this Agreement and the Related Agreements, to deliver this Agreement and the Related Agreements and to perform its Obligations under this Agreement and the Related Agreements, and has taken all necessary action to authorize the foregoing.

(d)    The execution, delivery and performance of its respective Obligations set forth in this Agreement do not violate or conflict with any Applicable Law, any provision of its organizational or other charter documents, any order or judgment of any Governmental Authority applicable to it or any of its assets, or any contractual restriction binding on or affecting it or any of its assets.

17

(e)    All authorizations, approvals, consents, notices and filings of a Governmental Authority that are required to have been obtained or, to the extent not yet required, to be obtained in the future or submitted by it in respect of this Agreement and the Related Agreements, have been obtained or submitted and are in full force and effect or, to the extent not yet required, will be submitted on a timely basis, and all conditions of any such authorizations, approvals, consents, notices and filings have been complied with.

(f)    Its respective Obligations under this Agreement and the Related Agreements constitute its legal, valid and binding obligations, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application regardless of whether enforcement is sought in a Proceeding in equity or at law).

(g)    No Event of Default under <u>Article 15</u> with respect to it has occurred and is continuing.

(h)    There is no Proceeding pending or, to its actual knowledge, threatened against it or any of its Affiliates that is likely to affect the legality, validity or enforceability against it of this Agreement or its ability to perform its Obligations under this Agreement or the Related Agreements.

(i)    It is not relying upon any representations of the other Party other than those expressly set forth in this Agreement or the Related Agreements.

(j)    It has entered into this Agreement and the Related Agreements as a principal (and not as an advisor, agent, broker or in any other capacity, fiduciary or otherwise) and with a full understanding of the material terms and risks of this Agreement and the Related Agreements, and has made its own independent decision to enter into this Agreement and as to whether this Agreement and the Related Agreements are appropriate or suitable for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.

(k)    It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice) this Agreement and the Related Agreements and the transactions contemplated hereby and thereby, understands and accepts the terms, conditions and risks of this Agreement and the Related Agreements (and such transactions), and is capable of assuming, and assumes, the risks thereof.

**ARTICLE 9**
**LIMITATIONS ON LIABILITY**

A Party's liability for damages is limited to direct, actual damages only and neither Party shall be liable for specific performance, lost profits or other business interruption damages, or special, consequential, incidental, punitive, exemplary or indirect damages, in tort, contract or otherwise, of any kind, arising out of or in any way connected with the performance, the suspension of performance, the failure to perform or the termination of a Transaction or this

Agreement. Each Party acknowledges the duty to mitigate damages in a commercially reasonable manner.

## ARTICLE 10
## TAXES

10.1    Liability for Taxes. All taxes of any Governmental Authority related solely to the purchase, sale or import, transportation and storage of Products shall be for EFA's account and shall be included in the Purchase Price; provided that, notwithstanding the foregoing, EFA shall have no liability for any taxes imposed by any Governmental Authority as a result of Supplier's activities causing it to have a permanent establishment in the jurisdiction of the Delivery Point or which taxes are based on the income or revenue of Supplier. If Supplier subsequently receives any refund of taxes which EFA has paid as part of the Purchase Price, Supplier shall promptly pay such refund to EFA, subject to Supplier's right to offset any amounts then owed it by EFA. Supplier shall keep complete and accurate records of all taxes incident to Transactions hereunder. To the extent applicable, each Party shall provide the other Party with proper federal, state or local notification, exemption or resale certificates or direct pay permits as may be required or permitted by Applicable Law and shall take commercially reasonable actions to reduce any liability of either Party for taxes related to the transactions herein contemplated.

10.2    Import Duties. Supplier shall be responsible for paying to the applicable Governmental Authority all duties, charges and other fees that may be assessed by any Governmental Authority upon importation of the Products into the United States and such amounts shall be included in the Purchase Price to be paid by EFA. All duties, charges and other fees that may be assessed by any Governmental Authority upon the export of the Products from the Load Port or other point of origin shall be the responsibility of Supplier.

## ARTICLE 11
## COMPLIANCE WITH LAWS

11.1    Pollution Prevention and Responsibility. Upon the occurrence of any environmental spill or discharge reportable under Applicable Law or other environmental pollution or other disposal of Product (each a "Release") in connection with any transfer, delivery, transportation or receipt of Products pursuant to this Agreement, and without limitation of the rights and obligations of either Party hereunder or under Applicable Law, the Parties shall take any action required under Applicable Law, including actions to prevent or mitigate damage arising from a Release occurring in connection with the performance of this Agreement. Even if not required by Applicable Law, a Party may take such actions to prevent or mitigate damage arising from a Release occurring in connection with the performance of this Agreement as it deems appropriate or is required by any Governmental Authority, in which case such Party shall notify the other Party immediately of any such actions, and shall take such actions in accordance with Applicable Law, or as may be directed by the U.S. Coast Guard or any other Governmental Authority. If either Party incurs costs to clean up or contain a spill or discharge or to prevent or mitigate damage arising from a Release occurring in connection with the performance of this Agreement, such Party reserves any rights provided by Applicable Law or this Agreement to recover such costs from the other Party or from any third party. If a third party is found to be legally liable for such costs and expenses, each Party shall cooperate with the other Party for the

purpose of obtaining reimbursement from such third party. Each Party also shall cooperate with the other Party for the purpose of obtaining reimbursement from any other applicable entity or source under Applicable Law. Notwithstanding the foregoing, the Parties acknowledge that Supplier shall indemnify and hold EFA and its Affiliates and representatives harmless from any and all Liabilities arising from any environmental pollutions in connection with the purchase, transportation, storage, handling or disposal of Products prior to the transfer of risk of loss to EFA pursuant to Section 4.2, including without limitation any liability resulting from the negligence or other misconduct of the Vessel owner or operator.

11.2    Corrupt Practices. Each Party hereby acknowledges that certain laws of the United States of America (including the United States Foreign Corrupt Practices Act), as well as the laws of other Governmental Authorities where this Agreement is to be performed, prohibit any person from offering to make or making any payment of money or anything of value, directly or indirectly, to any governmental official, political party, candidate for political office, or official of a public international organization for the purpose of obtaining or retaining business or providing an improper advantage. Each Party hereby represents, warrants and covenants to the other Party that, in the performance of its obligations hereunder, it has not made or offered to make, and will not make or offer to make, any such prohibited payment. In the event of a breach of any such laws, the Party in breach shall fully indemnify (on an after tax basis), protect, defend and hold harmless the other Party and its affiliates, officers, directors, agents and employees from and against any and all claims, losses and liabilities attributable to any such breach.

11.3    Applicable Law. Each Party shall comply with all Applicable Law with respect to the performance of its Obligations under this Agreement.

## ARTICLE 12
## FORCE MAJEURE

12.1    Event of Force Majeure. Neither Party shall be liable to the other Party if it is rendered unable by an event of Force Majeure to perform in whole or in part any Obligation or condition of this Agreement, for so long as the event of Force Majeure exists and to the extent that performance is hindered by the event of Force Majeure; provided, however, that the Party unable to perform, has used and shall continue to use commercially reasonable efforts to avoid or remove the event of Force Majeure. During the period that a Party's performance of its Obligations has been suspended in whole or part by reason of an event of Force Majeure, the other Party likewise may suspend the performance of all or part of its Obligations affected by the event of Force Majeure to the extent that such suspension is commercially reasonable; provided, that the foregoing shall not include any Obligations of EFA related to Products subject to a Firm Order in the event of a Force Majeure due to a prohibition or financial imposition on or relating to the Products or intended use of the Products by any Governmental Authority.

12.2    Notice of Force Majeure. The Party rendered unable to perform shall inform the other Party by oral notification as soon as practicable but no later than within one (1) Business Day after learning of the occurrence of a Force Majeure event, including, to the extent feasible, the details and the expected duration of the Force Majeure event and the volume of Products affected. Promptly thereafter, the Party rendered unable to perform shall confirm such

information in writing. Such Party also shall promptly notify the other Party in writing when any such Force Majeure event is terminated.

12.3    <u>Termination of Transactions</u>.  If a Party's performance of this Agreement is suspended due to an event of Force Majeure, in excess of one hundred eighty (180) consecutive days from the date that notice of such event is given, and so long as such event is continuing, the non-claiming Party, in its sole discretion, may terminate this Agreement by written notice to the other Party, and neither Party shall have any further liability to the other Party in respect of this Agreement except for the rights and remedies previously accrued. For the avoidance of doubt, it is the intention of the Parties hereto that EFA shall not be entitled to claim Force Majeure with respect to any Transaction that is subject to a Firm Order in the event of a Force Majeure due to a prohibition or financial imposition on or relating to the Products or intended use of the Products by any Governmental Authority.

12.4    <u>Alternative Supplies in the Event of Force Majeure</u>.  Notwithstanding anything herein to the contrary, if Supplier notifies EFA that as a result of an event of Force Majeure it will be unable meet its delivery Obligations hereunder, EFA shall have the right, in its sole discretion, but only until such time as EFA shall have received notice that the event of Force Majeure declared by Supplier no longer is continuing, to procure from alternative sources volumes of Products to replace all or any portion of the volumes that Supplier is unable to deliver; and EFA's obligation to purchase the Minimum Quantity for the applicable period (as set forth on <u>Schedule 3.2</u>) shall be reduced by an amount equal to the volume of Product EFA was required to purchase from an alternate supplier.

## ARTICLE 13
## <u>AUDIT RIGHTS</u>

13.1    <u>Books and Records</u>.  Each Party shall keep accurate books of account and shall record all sales and other evidence of transactions in accordance with generally accepted accounting principles in the United States. All records relating to the transactions contemplated by this Agreement, including any stored electronically, shall be kept by each Party for two (2) years at such Party's office and shall be made available to the other Party for inspection (at the inspecting Party's sole cost and expense) at such offices upon reasonable notice during each Party's regular business hours.

13.2    <u>Audit True-Up</u>.  A Party or its authorized representative may, at the inspecting Party's sole cost and expense, appoint an independent accounting firm of international reputation to conduct an independent review of the manner in which the pricing and payment for Products during each month was calculated. If, as a result of such review, it is determined that there has been an overpayment by EFA, then Supplier shall reimburse EFA for such overpayment, with interest accruing on such amount at the Interest Rate from the date of such overpayment until the date of EFA's reimbursement. If, as a result of such review, it is determined that there has been an underpayment by EFA, then EFA shall pay Supplier the amount of such underpayment, with interest accruing at the Interest Rate from the date of such underpayment until the date that payment is made to Supplier. Any payment due pursuant to this <u>Section 13.2</u> from one Party to the other, which is not the subject of a good faith dispute by such other Party, shall be due and payable within three (3) Business Days of the date that the Party requesting payment provides

21

the other Party with a written invoice, together with supporting documentation of its claim. If the amount of an overpayment by a Party exceeds the greater of $10,000.00 or ten percent (10%) of the total amount of the payment examined, due to the other Party's error, the Party causing the overpayment shall be responsible for the costs of the inspection. Any dispute relating to the results of the review not resolved by the Parties within thirty (30) days after the completion of such review shall be handled pursuant to FOSFA rules and procedures.

## ARTICLE 14
## INDEMNIFICATION

14.1    Duty to Indemnify. Each Party (the "Indemnifying Party") shall indemnify and hold the other Party, its Affiliates, and their employees, directors, officers, representatives, agents and contractors (collectively, the "Indemnified Party") harmless from and against any and all Liabilities arising from the Indemnifying Party's (i) breach of this Agreement, (ii) failure to comply with Applicable Law with respect to the sale, transportation, storage, handling or disposal of the Products, unless and to such extent that such liability results from the Indemnified Party's negligence or willful misconduct or (iii) representations or warranties made under this Agreement which prove to be materially incorrect or misleading when made.

14.2    No Third Party Rights. The Parties' obligations to defend, indemnify and hold each other harmless under the terms of this Agreement shall not vest any rights in any third party, whether a Governmental Authority or private entity, nor shall they be considered an admission of liability or responsibility for any purposes other than those enumerated in this Agreement.

14.3    Third Party Claims. The Indemnified Party shall notify the Indemnifying Party as soon as practicable after receiving notice of any Claim or Proceeding brought against it that might give rise to an indemnity Claim under this Agreement (each, a "Third Party Claim") and shall furnish to the Indemnifying Party the complete details within its knowledge. Any delay or failure by the Indemnified Party to give notice to the Indemnifying Party shall not relieve the Indemnifying Party of its Obligations except to the extent, if any, that the Indemnifying Party shall have been materially prejudiced by reason of such delay or failure.

14.4    Claim Procedure. The Indemnifying Party shall have the right to assume the defense, at its own expense and by its own counsel, of any Third Party Claim; provided, however, that such counsel is reasonably acceptable to the Indemnified Party. Notwithstanding the Indemnifying Party's appointment of counsel to represent an Indemnified Party, the Indemnified Party shall have the right to employ separate counsel, and the Indemnifying Party shall bear the reasonable fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the Indemnifying Party to represent the Indemnified Party would present such counsel with a conflict of interest or (ii) the Indemnifying Party shall not have employed counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such Third Party Claim. If requested by the Indemnifying Party, the Indemnified Party agrees to reasonably cooperate with the Indemnifying Party and its counsel in contesting any Claim or Proceeding that the Indemnifying Party defends, including, if appropriate, making any counterclaim or cross-complaint. All costs and expenses incurred in connection with the Indemnified Party's cooperation shall be borne by the Indemnifying Party.

22

14.5    Settlement. No Third Party Claim may be settled or compromised (i) by the Indemnified Party without the consent of the Indemnifying Party or (ii) by the Indemnifying Party without the consent of the Indemnified Party, which shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, an Indemnifying Party shall not be entitled to assume responsibility for and control of any Proceeding if such Proceeding involves a continuing Event of Default incurred by or which is the responsibility of the Indemnifying Party under this Agreement.

14.6    Insurance. The mere purchase and existence of insurance does not reduce or release either Party from any liability incurred or assumed under this Agreement or any Transaction. Notwithstanding the foregoing, Supplier shall at all times during the Term keep in full force and effect the insurance coverages substantially similar to those set forth in Exhibit B (subject to such changes as Supplier may determine in its reasonable discretion) and shall provide EFA with evidence of such insurance coverages (including evidence that EFA is an additional insured with respect to such coverages).

## ARTICLE 15
## DEFAULT AND TERMINATION

15.1    Events of Default. Notwithstanding any other provision of this Agreement or the Related Agreements, a "Default" or "Event of Default" shall be deemed to occur under this Agreement when:

(a)    Either Party fails to make payment when due under this Agreement within three (3) Business Days of a written demand therefor.

(b)    Any representation or warranty contained in this Agreement or the Related Agreements shall prove untrue in any material respect on or as of the date it was made.

(c)    Either Party fails to perform any Obligation to the other Party or breaches any covenant made to the Party under this Agreement, which, if capable of being cured, is not cured to the satisfaction of the other Party (in its sole and reasonable discretion) within thirty (30) Business Days from the date that such Party receives notice that corrective action is needed.

(d)    Either Party defaults under the Related Agreements, which is not cured within the applicable time period, if any; provided, however, the Party defaulting under such Related Agreement may not claim the default as an Event of Default under this Agreement.

(e)    Either Party becomes Bankrupt.

(f)    Any material covenant, agreement or obligation of any Party contained in or evidenced by this Agreement or any Related Agreement shall cease to be enforceable in accordance with its terms.

(g)    Either Party to this Agreement or any Related Agreement shall repudiate, deny or disaffirm its Obligations under this Agreement or any Related Agreement.

23

(h)   This Agreement or any Related Agreement is canceled, terminated, revoked or rescinded without the express prior consent of the other Party.

(i)   Any court or other Governmental Authority shall issue a judgment, order, decree or ruling to the effect that any of the Obligations of any Party to this Agreement or any Related Agreement is illegal, invalid or unenforceable.

(j)   Either Party repeatedly fails to perform its Obligations under this Agreement and as a result of such failure (i) the Performing Party has reasonable grounds for insecurity concerning the breaching Party's performance of its Obligations under this Agreement, and (ii) the business and/or operations of the Performing Party is materially and adversely affected as a result thereof.

15.2   Remedies Upon Event of Default.  Notwithstanding any other provision of this Agreement or any Related Agreements, upon the occurrence of an Event of Default with respect to either Party (the "Defaulting Party"), the other Party (the "Performing Party") may, in its sole discretion, in addition to all other remedies available to it and without incurring any Liabilities to the Defaulting Party or to third parties (for demurrage or any other costs arising from delay or otherwise), do any one or more of the following: (i) withhold or suspend its Obligations under this Agreement and any Transaction and enter into substitute transactions (including Supplier's right to sell Product in the case of EFA's default and EFA's right to purchase replacement Product in the case of Supplier's default) without prior notice to the Defaulting Party, (ii) proceed against the Defaulting Party for damages occasioned by the Defaulting Party's failure to perform in accordance with the provisions of Sections 15.3 and 15.4, and (iii) upon one (1) Business Day's prior notice to the Defaulting Party, immediately terminate this Agreement and, at the Performing Party's option, the Related Agreements and liquidate all Transactions between the Parties by calculating the Termination Payments in the manner set forth in Section 15.5. Notwithstanding the foregoing, in the case of an Event of Default described in Section 15.1(e), no prior notice shall be required.

15.3   EFA's Failure to Take Delivery.  Except as otherwise provided in Section 15.5, if for any reason not expressly permitted under this Agreement, other than (i) Force Majeure or (ii) reasons attributable to Supplier or any of its agents, EFA fails to take delivery of a cargo of Products included in a Firm Order (any such event, an "EFA Default"), the Parties shall use reasonable efforts to reschedule such cargo. If the Parties are unable to reschedule such cargo, Supplier shall use reasonable efforts to sell such cargo to a third party. In the event of an EFA Default where the cargo cannot be rescheduled, Supplier shall issue EFA an invoice pursuant to Article 6 and EFA shall pay to Supplier:

(a)   if Supplier is able to sell such total or partial cargo of Products to a third party, a net amount equal to (x) the Contract Value of such Products, less (y) the Replacement Value of a substitute sale, plus (z) documented Breakage Costs incurred by Supplier as a result of EFA's failure to take delivery, plus actual shipping costs (to the extent not included in Breakage Costs), less any shipping cost saved in such actual sale; provided, however, that if the net amount is negative, such net amount shall be retained by Supplier for its own account; and

(b)     if Supplier is unable to sell such total or partial cargo of Products to a third party, an amount equal to the Contract Value, plus documented Breakage Costs incurred, plus actual shipping costs by Supplier as a result of EFA's failure to take delivery.

Any payments made pursuant to this Section 15.3 shall be Supplier's sole and exclusive monetary remedy for any EFA Default where the cargo cannot be rescheduled.

15.4     Supplier's Failure to Deliver.  Except as otherwise provided herein, if for any reason not expressly permitted under this Agreement, other than (i) Force Majeure, (ii) reasons attributable to EFA, or (iii) reasons attributable to the Facility, Seller fails to deliver a cargo of Products included in a Firm Order (any such event, a "Supplier Default"), the Parties shall use reasonable efforts to reschedule such cargo.  If the Parties are unable to reschedule such cargo, then EFA may notify Supplier that it requires Supplier not to deliver such cargo, and EFA shall use reasonable efforts to procure equivalent Products from a third party.  In the event of a Supplier Default where the cargo cannot be rescheduled, EFA shall issue to Supplier an invoice pursuant to Article 6 and Supplier shall pay to EFA:

(a)     if EFA is able to procure replacement Products from a third party, the net amount equal to (x) the Replacement Value of such substitute Products of equivalent volume and specifications, plus (y) documented Breakage Costs incurred by EFA as a result of Supplier's failure to deliver, less (z) the Contract Value plus any shipping and insurance costs (to the extent not included in Breakage Costs); provided, however, if the net amount is negative, such net amount shall be retained by EFA for its own account; and

(b)     if EFA is unable to procure from a third party substantially equivalent replacement Products, an amount equal to (i) the Contract Value if, but only if, EFA has already paid Supplier such Contract Value in connection with the subject Transaction, and (ii) a fee (the "Replacement Fee") equal to twelve percent (12%) of the greater of the Contract Value or the Replacement Value for the subject Transaction.  If EFA is able to procure a volume less than the Transaction volume, then the payment provided for in this Section 15.4(b) shall be prorated to reflect the volume of Product not delivered.  For the avoidance of doubt, the Replacement Fee shall only apply to volumes not delivered to EFA or not otherwise covered in a replacement transaction pursuant to Section 15.4(a).  In lieu of payment to EFA, EFA may elect that any Replacement Fee instead be offset against any Guaranteed Rent Payment (as such term is defined in the Lease) then due from EFA under the Lease.

15.5     Early Termination of Transactions.

(a)     When an Event of Default has occurred and is continuing, the Performing Party may, by notice given to the Defaulting Party, designate a date not earlier than the date of such notice (the "Default Termination Date") on which all Transactions shall terminate and the Performing Party shall then determine the liquidation amount which shall be based on Cover Costs.  For purposes of this Section 15.5, the phrase "all Transactions" means only those Transactions subject to a Firm Order prior to and including the Default Termination Date.  The Performing Party shall notify the

Defaulting Party of the liquidation amount due from or due to the Defaulting Party, after taking into account any margin held by either Party (the "Termination Payment").

(b)    As soon as reasonably practicable after the Default Termination Date, the Performing Party shall provide the Defaulting Party with a statement showing, in reasonable detail, the calculation of the Termination Payment. If the Defaulting Party owes the Termination Payment to the Performing Party, the Defaulting Party shall pay the Termination Payment on the first Business Day after it receives the statement. If the Performing Party owes the Termination Payment to the Defaulting Party, the Performing Party shall pay the Termination Payment once it has reasonably determined all amounts, if any, owed by the Defaulting Party to it, which date shall be no more than forty-five (45) days from the date of the statement.

15.6    Non-Exclusive Remedy. Except as set forth herein to the contrary, a Performing Party's rights under this Article 15 shall be in addition to, and not in limitation or exclusion of, any other rights of setoff, recoupment, combination of accounts, lien or other right which it may have, whether by other provisions of this Agreement, other agreements, operation of law or otherwise. No delay or failure on the part of a Performing Party to exercise any right or remedy shall constitute an abandonment of such right or remedy and the Performing Party shall be entitled to exercise such right or remedy at any time after an Event of Default has occurred.

15.7    Indemnification. Subject to Article 9 and without limitation of the monetary remedies specified in Sections 15.3 and 15.4, a Defaulting Party shall indemnify and hold harmless the Performing Party for all Liabilities incurred as a result of the Default or in the exercise of any remedies under this Article 15. A Party shall reimburse the other Party for its costs and expenses, including reasonable attorneys' fees, incurred in connection with the other Party's enforcement of, suing for or collecting any amounts payable by it under this Agreement.

## ARTICLE 16
## TERMINATION PROCESS

16.1    Expiration or Termination in the Absence of an Event of Default. Prior to expiration of the Term of this Agreement and in the absence of an Event of Default, the Parties mutually may agree on a termination date ("Early Termination Date"), at which time Supplier shall cease supplying Products to EFA for the Facility. EFA shall purchase all Products that are in transit on the Early Termination Date and such purchases otherwise shall be subject to the terms and conditions set forth in this Agreement. In such event, the Parties shall cooperate fully with each other in terminating this Agreement and resolving all then outstanding items as a result.

16.2    Final Accounting. Upon expiration or termination of this Agreement (other than due to the declaration of an Early Termination Date) as provided in Section 16.1 above, Supplier shall calculate a final accounting and true-up of all amounts owed by one Party to the other Party hereunder and shall prepare an invoice with appropriate supporting documentation. Such invoice shall be payable by the owing Party within five (5) Business Days after the date of receipt thereof.

16.3    Lease.  Any termination of, or expiration of the Term of, this Agreement shall not result in a termination of the Lease, unless otherwise terminated pursuant to Section 15.2.

## ARTICLE 17
## GOVERNING LAW AND JURISDICTION

17.1    Choice of Law.  This Agreement and the rights and duties of the Parties shall be governed by and construed in accordance with the substantive laws of the State of Illinois, without regard to its conflict of laws provisions.

17.2    Arbitration.  If any controversy or dispute shall arise between the Parties hereto in connection with, arising from, or in respect to this Agreement, any provision hereof, or any provision of any instrument, document, agreement, certification or other writing delivered pursuant hereto, or with respect to the validity of this Agreement or any such document, agreement, certification or other writing, and if such controversy or dispute shall not be resolved within thirty (30) days after the same shall arise, then such dispute or controversy shall be submitted for arbitration in accordance with the arbitration provisions set forth in the Lease, except that substantive matters shall be determined in accordance with the substantive rules of FOSFA then in effect. The arbitrators may award any relief deemed proper in the circumstances, without regard to the relief which would otherwise be available to either Party hereto in a court of law or equity, including, without limitation, an award of money damages (including interest on unpaid amounts, calculated from the due date of any such amount, at a rate per annum determined by said arbitrator), specific performance and injunctive relief.

The award and findings of the arbitrators shall be conclusive and binding upon the parties thereto, and judgment upon such award may be entered in any court of competent jurisdiction. If not expressly set forth in the arbitrators' award, the Party against whom the arbitrators' award is issued shall pay the fees of the arbitrators. With respect to any enforcement of an arbitral award, each Party hereby irrevocably submits to the exclusive jurisdiction of any federal court of competent jurisdiction situated in the City of Chicago, Illinois, or, if any such federal court declines to exercise or is determined not to have jurisdiction, to the jurisdiction of any Illinois state court in or serving the City of Joliet, Illinois (without recourse to arbitration unless both Parties agree in writing), and to service of process by certified mail, delivered to the Party at the most recent designated address, as set forth herein. The provisions of the UN Convention on International Sale of Goods (1980) are hereby excluded from this Agreement.

17.3    Waivers.  Each Party further hereby irrevocably waives, to the fullest extent permitted by Applicable Law, any objection to personal jurisdiction, whether on grounds of venue, residence or domicile. Each Party further waives, to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any Proceeding relating to this Agreement.

17.4    Time Period for Making Claims.  Except when a shorter period is expressly provided under this Agreement, any Claim arising under this Agreement or any Transaction shall be made within two (2) years from the first date of the event (or events) giving rise to the Claim, and, if not made within such time period, shall be deemed waived and barred without recourse to litigation.

## ARTICLE 18
## ASSIGNMENT

18.1    Assignment.  Neither Party shall transfer or assign this Agreement or any of its rights or interests hereunder, in whole or in part, or delegate its obligations hereunder, in whole or in part, without the prior consent of the other Party, which shall not be unreasonably withheld; provided, however, that no consent shall be required for (i) transfer of this Agreement to an Affiliate by assignment, merger or otherwise, (ii) an assignment for collateral security purposes, or (iii) an assignment in connection with the sale of the Supplier or substantially all of the assets of the Supplier; provided that the assignee in any such case is at least as creditworthy as the assignor and is able to fulfill the supply and delivery obligations under this Agreement.  The transferor shall remain jointly and severally liable with the transferee for the full performance of the transferor's Obligations under this Agreement unless the transferee assumes in writing all of the Obligations of the transferor.

18.2    Assignment Absent Consent.  Any attempted assignment in violation of this Article 18 shall be null and void *ab initio* and the non-assigning Party shall have the right, without prejudice to any other rights or remedies it may have hereunder or otherwise, to terminate this Agreement effective immediately upon notice to the Party attempting such assignment.

## ARTICLE 19
## NOTICES

Any notice, demand or document that either Party is required or may desire to give under this Agreement must be (i) in writing and, (ii) except to the extent specifically provided otherwise in this Agreement, given by personal delivery, overnight courier, facsimile or United States registered or certified mail, return receipt requested, with the postage prepaid and properly addressed or communicated to such Party at its address or facsimile number shown below, or at such other address as either Party may have furnished to the other by notice given in accordance with this Article 19.  Any notice delivered or made by personal delivery, overnight courier, facsimile, or United States mail shall be deemed to be given on the date of actual delivery as shown by the receipt for personal delivery or overnight courier delivery, the addresser's machine confirmation for facsimile delivery, or the registry or certification receipt for registered or certified mail.

If to EFA:

Earthfirst Americas, Inc.
2515 East Hanna Avenue
Tampa, Florida  33610
Attn: Domenic Massari
Facsimile No.: 813.238.8490

If to Supplier:

Loders Croklaan USA, LLC
24708 West Durkee Road
Channahon, Illinois 60410
Attn: Julian Veitch
Facsimile No.: 815.730.5202

## ARTICLE 20
## CONFIDENTIALITY

20.1   Confidentiality.

(a)    *Obligation of Confidentiality.*  Each Party shall maintain in complete confidence any Confidential Information supplied to such Party (the "Receiving Party") by the other Party (the "Disclosing Party") except (i) as may be required by court order, Applicable Law or a Governmental Authority (including, if required, to comply with the disclosure requirements of the U.S. Securities and Exchange Commission, the New York Stock Exchange, the American Stock Exchange, the Kuala Lumpur Stock Exchange or any self-regulatory organization), whether with respect to either Party or either Party's Affiliates (ii) to such Party's or its Affiliates' employees, auditors, consultants, banks, financial advisors and legal advisors, or (iii) as provided in Section 20.3.  The confidentiality obligations under this Agreement shall survive termination of this Agreement for a period of two (2) years following termination.  In the event that any of the provisions of this Agreement (including Article 7 and Article 20) conflict with the provisions of the Confidentiality Agreement, the provisions of this Agreement shall govern.

(b)    *Exceptions.*  The provisions of Section 20.1(a) shall not apply to information within any one of the following categories or any combination thereof: (i) information that was in the public domain prior to the Receiving Party's receipt thereof from the Disclosing Party or that subsequently becomes part of the public domain by publication or otherwise except by the Receiving Party's wrongful act; (ii) information that the Receiving Party can show was lawfully in its possession prior to receipt thereof from the Disclosing Party through no breach of any confidentiality obligation; or (iii) information received by the Receiving Party from a third party having no obligation of confidentiality with respect thereto.  It shall not be a breach of the obligation of confidentiality contained herein, or contained in the Lease, if the Receiving Party discloses confidential information as required by Applicable Law or any Governmental Authority.

20.2   Disclosure.  In the case of disclosure covered by clause (a) of Section 20.1 (other than disclosures required by the organizations described in the parenthetical) and if the disclosing Party's counsel advises that it is permissible to do so, the disclosing Party shall notify the other Party in writing of any Proceeding of which it is aware which may result in disclosure, and use reasonable efforts to prevent or limit such disclosure. The Parties shall be entitled to all

29

remedies available at law, or in equity, to enforce or seek relief in connection with the confidentiality obligations contained herein.

20.3    Tax Disclosure. Notwithstanding anything herein to the contrary, the Parties (and their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind from the commencement of discussions, the U.S. federal income and state tax treatment and tax structure of the transactions herein contemplated and all materials of any kind (including opinions or other tax analyses) that are provided to the Parties relating to such tax treatment and tax structure, except where confidentiality is reasonably necessary to comply with securities laws. For this purpose, "tax structure" is limited to facts relevant to the U.S. federal income and state tax treatment of the transactions herein contemplated and does not include information relating to the identity of the Parties, their Affiliates, agents or advisors.

### ARTICLE 21
### MISCELLANEOUS

21.1    Entire Agreement. This Agreement together with the Related Agreements constitute the entire and exclusive agreement between the Parties and supersedes all prior oral or written and all contemporaneous oral agreements and understandings between the Parties with respect to the subject matter hereof and thereof. Neither this Agreement, nor any Related Agreement may be altered, amended, modified or otherwise changed in any respect or particular whatsoever except in writing duly executed by the authorized representative of each Party.

21.2    Single Agreement. The Parties intend that this Agreement and all Transactions shall comprise a single integrated agreement between them and are willing to enter into Transactions in reliance on that fact.

21.3    Mutual Cooperation. From time to time after the Commencement Date of this Agreement, each of the Parties will execute and deliver or cause to be executed and delivered, such reasonable documents and instruments, and take such other reasonable and lawful action as the other Party may deem necessary to enforce its obligations and enjoy its material rights and benefits under this Agreement and the Related Agreements or to otherwise effectuate the purposes of this Agreement and the Related Agreements.

21.4    No Agency, Partnership or Joint Venture. Nothing in this Agreement will serve to create any agency, employment or other master and servant relationship or partnership or joint venture relationship between the Parties, and neither Party shall have the right or power to bind the other Party.

21.5    No Waiver. Neither the failure nor any delay on the part of any Party to exercise any right, remedy, power or privilege under this Agreement will operate as a waiver of such right, remedy, power or privilege. No single or partial exercise of any right, remedy, power or privilege under this Agreement will preclude any other or further exercise of such right, remedy, power or privilege or of any other right, remedy, power or privilege. No waiver of any right, remedy, power or privilege with respect to any occurrence will be construed as a waiver of such right, remedy, power or privilege with respect to any subsequent or other occurrence.

30

21.6    Cumulative Remedies.  Each and every right granted to a Party under this Agreement or allowed it by law or equity shall be cumulative and may be exercised from time to time in accordance with the terms thereof and Applicable Law.

21.7    Severability.  If any part of this Agreement is contrary to, prohibited by, or deemed invalid under Applicable Law, such provision will be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid.  The remainder of this Agreement will not be invalidated by such Applicable Law and will be given effect so far as possible, provided that each Party can continue to fulfill its material obligations and enjoy its material rights and benefits under this Agreement.

21.8    Successors and Assigns and No Third-Party Beneficiaries.  This Agreement and the Related Agreements are for the exclusive benefit of the Parties and no other Persons (other than the respective Guarantors) will have any right or Claim against any Party under any of the terms or provisions of it or be entitled to enforce any of the terms or provisions of it against any Party.  This Agreement and the Related Agreements shall be binding on the Parties and their respective successors and permitted assigns.

21.9    Further Assurances.  Each Party agrees, from time to time and upon reasonable request, to execute, deliver and acknowledge, or to use commercially reasonable efforts to cause any third party to execute, deliver and acknowledge, such further agreements, documents and instruments as one Party might reasonably request in order to more fully effect the purposes of the transactions contemplated hereby, including acknowledgements or certificates certifying each Party's continued performance hereunder.

21.10   Survival.  All audit rights, payment, confidentiality and indemnification obligations shall survive the expiration or termination of this Agreement

21.11   Counterparts.  This Agreement may be executed by the Parties in separate counterparts and initially delivered by facsimile transmission or otherwise, with original signature pages to follow, and all such counterparts shall together constitute one and the same instrument.

[Remainder of Page Intentionally Left Blank]

CHGO\3\0906740.10

Product Supply Agreement Signature Page

**IN WITNESS WHEREOF**, each Party has caused its authorized representatives to execute this Agreement in the space provided below, effective as of the Effective Date.

**SUPPLIER:**                                      **EFA:**

Loders Croklaan USA, LLC                          Earthfirst Americas, Inc.

By: _____                             By: _____
Name: Julien Veitch                               Name: Dominic Massari
Title: President                                  Title: Senior Vice President

## GUARANTY BY SUPPLIER'S PARENT

The undersigned, the parent company of Loders Croklaan USA, LLC, ("Supplier"), hereby irrevocably agrees to and does hereby guaranty the full and faithful performance by Supplier of all of its Obligations under the Product Supply Agreement set forth above.

**IOI Corporation Berhad**

By: _____
Name: Dato' Lee Yeow Chor
Title: Group Executive Director

## GUARANTY BY EFA'S PARENT

The undersigned, the parent company of EarthFirst Americas, Inc. ("EFA"), hereby irrevocably agrees to and does hereby guaranty the full and faithful performance by EFA of all of its obligations under the Product Supply Agreement set forth above.

**EarthFirst Technologies, Inc.**

By: _____
Name: John Stanton
Title: Chairman and Chief Executive Officer

Product Supply Agreement Signature Page

**IN WITNESS WHEREOF,** each Party has caused its authorized representatives to execute this Agreement in the space provided below, effective as of the Effective Date.

**SUPPLIER:**                                          **EFA:**

**Loders Croklaan USA, LLC**                          **Earthfirst Americas, Inc.**

By: _____                          By: _____
Name: Julien Veitch                                   Name: Domenic Massari
Title: President                                       Title: Senior Vice President

## GUARANTY BY SUPPLIER'S PARENT

The undersigned, the parent company of Loders Croklaan USA, LLC, ("Supplier"), hereby irrevocably agrees to and does hereby guaranty the full and faithful performance by Supplier of all of its Obligations under the Product Supply Agreement set forth above.

**IOI Corporation Berhad**

By: _____
Name: Dato' Lee Yeow Chor
Title: Group Executive Director

## GUARANTY BY EFA'S PARENT

The undersigned, the parent company of EarthFirst Americas, Inc, ("EFA"), hereby irrevocably agrees to and does hereby guaranty the full and faithful performance by EFA of all of its obligations under the Product Supply Agreement set forth above.

**EarthFirst Technologies, Inc.**

By: _____
Name: John Stanton
Title: Chairman and Chief Executive Officer

Product Supply Agreement Signature Page

**IN WITNESS WHEREOF**, each Party has caused its authorized representatives to execute this Agreement in the space provided below, effective as of the Effective Date.

**SUPPLIER:**                                    **EFA:**

**Loders Croklaan USA, LLC**                     **Earthfirst Americas, Inc.**

By: _____             By: _____
Name:  Julien Veitch                             Name:  Domenic Massari
Title:  President                                Title:  Senior Vice President

## GUARANTY BY SUPPLIER'S PARENT

The undersigned, the parent company of Loders Croklaan USA, LLC, ("Supplier"), hereby irrevocably agrees to and does hereby guaranty the full and faithful performance by Supplier of all of its Obligations under the Product Supply Agreement set forth above.

**IOI Corporation Berhad**

By: _____
Name:  Dato' Lee Yeow Chor
Title:  Group Executive Director

## GUARANTY BY EFA'S PARENT

The undersigned, the parent company of EarthFirst Americas, Inc. ("EFA"), hereby irrevocably agrees to and does hereby guaranty the full and faithful performance by EFA of all of its obligations under the Product Supply Agreement set forth above.

**EarthFirst Technologies, Inc.**

By: _____
Name:  John Stanton
Title:  Chairman and Chief Executive Officer

32

**SCHEDULE 3.2**

**SCHEDULE OF DELIVERY VOLUMES**
**(VOLUMES IN MT)**

| Months Purchase | Calendar | Contract Minimum Per Month | Max per Month | Minimum Purchase Period | Maximum Purchase Period |
|---|---|---|---|---|---|
| I – Months 1-3 | Oct - Dec 2007 | 0 | 4,500 | 3,000 total | 4,500 |
| II– Months 4-6 | Jan - Mar 2008 | 1,000 | 4,500 | 4,000 total | 4,500 |
| III – Months 7-9 | Apr – Jun 2008 | 3,000 | 6,000 | Total 12 months Periods I thru IV to be 20,000 | Total 12 months Periods I thru IV to be 30,000 |
| IV – Months 10-12 | Jul – Sep 2008 | 3,000 | 6,000 | | |
| V – Months 13-18 | Oct 2008 – Mar 2009 | 3,000 | 6,000 | Total 12 months periods V through VI to be 36,000 | Total 12 months periods V through VI to be 54,000 |
| VI – Months 19-24 | Mar – Sep 2009 | 3,000 | 6,000 | | |
| VII- Months 25-36 | Oct 2009 – Sep 2010 | 6,000 | 12,000 | 72,000 | 144,000 |

**SCHEDULE 4.8A**

## PRODUCT QUALITY

*THE PALM OIL REFINERS ASSOCIATION OF MALAYSIA (PORAM)*

1. Refined, Bleached & Deodorised (RBD) Palm Oil
Shipped Quality
FFA (As Oleic) 0.15%
FFA (As Palmitic) 0.14% max
M&I   0.1% max
I.V. (Wijis) 50-55
Mettler Drop Pt. °C  33-39
(AOCS Cc 325)
Color  5 Red Max Lovibond
(5 ¼" Lovibond cell)


2. Refined, Bleached & Deodorised (RBD) Palm Olein
Shipped Quality
FFA (As Oleic) 0.15%
FFA (As Palmitic) 0.14% max
M&I   0.1% max
I.V. (Wijis)  55 min
Mettler Drop Pt °C   24 max
(AOCS Cc 325)
Color  5 Red Max Lovibond
(5 ¼" Lovibond cell)


3. Double Fractionated Palm Olein
Shipped Quality
FFA (As Oleic) 0.40%
FFA (As Palmitic) 0.36% max
M&I   0.1% max
I.V. (Wijis)  60 min
Mettler Drop Pt °C   19 max
(AOCS Cc 325)
Color  5 Red Max Lovibond
(5 ¼" Lovibond cell)

*THE MALAYSIAN EDIBLE OIL MANUFACTURERS' ASSOCIATION (MEOMA) STANDARD SPECIFICATIONS FOR PALM KERNEL PRODUCTS*

4. RBD Palm Kernel Oil
Shipped Quality
FFA (As Oleic) 0.15%
FFA (As Lauric) 0.10% max
M&I   0.1% max
I.V. (Wijis)   19 max at time of shipment
Color (5 ¼ Lovibond cell)   Red 1.5 max Lovibond

## SCHEDULE 4.8B

## API 17 STANDARD PROCEDURES

Chapter 3 – Section 1 A – Standard Practice for the Manual Gauging of Petroleum and
Petroleum Products

Chapter 7 – Temperature Determination

Chapter 8 – Section 1 – Standard Practice for Manual Sampling of Petroleum and Petroleum
Products

Chapter 17 – Section 1 – Guidelines for Marine Cargo Inspection

– Section 2 – Measurement of Cargoes on Board Tank Vessels

– Section 3 – Guidelines for Identification of the Source of Free
Waters Associated with Marine Petroleum Cargo Movements

– Section 4 – Method of Qualifications of Small Volumes of Marine Vessels
(OBQIROB)

– Section 5 – Guidelines for Cargo Analysis and Reconciliation of Cargo Quantities

– Section 6 – Guidelines for Determining the Fullness of Pipelines Between Vessels
and Shore Tanks

– Section 7 – Recommended Practices for Developing Barge Control Factors
(Volume Ration)

– Section 8 – Guidelines for Pre-Loading Inspection of Marine Vessel Cargo Tanks

– Section 9 – Vessel Experience Factor

EXHIBIT A

FOSFA CONTRACT

AS38
FOSFA/PORAM/MEOMA CONTRACT No. 81

The following clause becomes effective on and from 1st March 2001 and is for use when agreed between Buyers and Sellers.
The FOSFA Qualifications and Operational Procedures for Ships Engaged in the Carriage of Oils and Fats in Bulk for Edible and Oleo-Chemical use, the FOSFA Certificate of Compliance, Cleanliness and Suitability of Ship's Tank, the FOSFA Combined Masters Certificate and the FOSFA List of Banned Immediate Previous Cargoes shall be those in force at the date of the contract.

© FOSFA Copyright 2006

# FEDERATION OF OILS, SEEDS AND FATS ASSOCIATIONS LIMITED
## FOSFA INTERNATIONAL

ISSUED AND APPROVED JOINTLY WITH THE PALM OIL REFINERS ASSOCIATION OF MALAYSIA (PORAM)
AND THE MALAYAN EDIBLE OIL MANUFACTURERS' ASSOCIATION (MEOMA)
CONTRACT FOR PALM AND PALM KERNEL OIL PRODUCTS IN BULK

**CIF TERMS**

**81**

Revised and Effective
from 1st October 2006

| | Reference Nos |
|---|---|

SELLERS: .................................................

.................................................

BUYERS: .................................................

.................................................

BROKERS: .................................................

.................................................

Date: ..............................................

*An asterisk denotes alternative wording, and should be matter of agreement between the parties.

Sellers have agreed to sell and Buyers have agreed to buy:

1

| Contract No: | | Date: | |
|---|---|---|---|
| Product: | | | |
| Origin: | | | |

| Quantity in metric tons | Shipment Period | Discharge Port | Contract Price CIF |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Special Conditions:

Payment in

2

* (i)   in accordance with the provisions of paragraph (a) of the Payment Clause; 3
  (ii)   in accordance with the provisions of paragraph (b) of the Payment Clause; 4

  (iii) ............................................................................ 5

............................................................................ 6

Discharge in accordance with the provisions of the Discharge Clause and at an average rate of minimum ............... 7
metric tons per hour, Sundays and holidays included. 8

Domicile and Arbitration in .................................................. as per Domicile and Arbitration Clauses. 9

1. TOLERANCE:   Sellers have the option of shipping 5% more or less of the mean contract quantity. In the event of more than one shipment being made each 10
shipment is to be considered as a separate contract but the tolerance on the mean contract quantity is not to be affected thereby. 11

2. QUALITY AND SPECIFICATIONS:   Minimum flash point of 250°F (121°C). 12
Free Fatty Acid content shall be expressed as follows: 13

For Palm Oil Products - as Palmitic acid calculated on a molecular weight of 256. For Palm Kernel Oil Products - as Lauric acid calculated on a molecular weight of 200. 14

.................................................................................. 15

.................................................................................. 16

At time and place of shipment, the oil shall be of good merchantable quality of the agreed description and specifications. 17
It shall not contain substances of non oil-palm origin or materials used in its processing and not customarily found in oil of the contract description. 18
If the oil is loaded in more than one tank of the same ship, the analysis details of the oil in each separate tank shall conform with the above. 19
The specifications shall be those established by the Palm Oil Refiners Association of Malaysia (PORAM) for Palm Oil Products and by the Malayan Edible Oil 20
Manufacturers' Association (MEOMA) for Palm Kernel Oil Products as standard for the export of these products and in force at the date of contract and always 21
provided they are not in contradiction with the above. 22
Where the specification refers to Malaysian Standards, Sellers warrant that the oil will be produced from crude palm oil complying with the relative Standards and 23
Industrial Research Institute of Malaysia (SIRIM) Standards and will in all respects conform to the requirements and restrictions of the Palm Oil Industry (Quality 24
Control) Regulations 1983 and any amendment or extension thereto and/or other relevant Malaysian Government standards/regulations in force at the date of the 25
contract. 26
However, should the analysis relating to the oil in any tank/s fall outside the contract specifications:- 27
   (a) as to palm oil/olein/stearin and/or palm kernel oil/olein/stearin by no more then one unit in respect of iodine value; 28
   (b) as to palm acid oil/fatty acid distillate and/or palm kernel acid oil/fatty acid distillate by no more than 2% in respect of total fatty matter and/or free 29
   fatty acids; 30
The oil is not to be rejected provided always that the analysis of the composite sample representing the full quantity loaded complies with the contract specifications 31
and provided that the oil so loaded and analysed emanates from the same Seller and is tendered to the same Buyer. 32
Where the contract refers to bleached deodorised palm oil/olein/stearin and/or bleached deodorised Palm kernel Oil/Olein/Stearin, the quality and specifications as 33
ascertained on samples taken from ship's tanks after loading shall be final and the provisions of the Arrival Quality Adjustment Clause and the Sampling and 34
Analysis Clause paragraph (d) shall not apply. 35

**3. ARRIVAL QUALITY-ADJUSTMENT:** When this contract refers to neutralised palm oil or to neutralised palm kernel oil or to crude palm liquid fraction/palm solid fraction or to palm acid oil/fatty acid distillate and/or palm kernel acid oil/fatty acid distillate the price shall be subject to adjustment based on the arrival analysis ascertained in accordance with the provisions of the Sampling and Analysis Clause paragraph (d) and specifically as follows: 36 37 38

  (i)  Unless otherwise stipulated, in the case of neutralised palm oil the basis shall be 0.25% FFA (as palmitic); and in the case of neutralised palm kernel oil the basis shall be 0.25% (as lauric). Should the FFA on arrival be less than 0.25% Buyers shall pay to Sellers a premium of 0.5% of the contract price for each 0.05% below 0.25%, fractions in proportion; should the FFA on arrival be greater than 0.25% Sellers shall pay to Buyers an allowance of 1% of the contract price for each 0.05% above 0.25% up to and including 0.5% and 2% of the contract price for each 0.05% above 0.5%, all fractions in proportion 39 40 41 42

  (ii) In the case of crude palm liquid fraction/palm solid fraction the basis shall be 5% (as palmitic); should the FFA on arrival be less than 5% Buyers shall pay to Sellers a premium of 1% of the contract price for each 1% below 5% and should the FFA on arrival be greater than 5% Sellers shall pay to Buyers an allowance of 1% of the contract price for each 1% above 5%, all fractions in proportion. 43 44 45

  (iii) In the case of palm acid oil/fatty acid distillate and/or palm kernel acid oil/fatty acid distillate the total fatty matter/total saponifiable matter shall be 95% minimum at time of shipment and the basis shall be 97% at time of arrival; Buyers shall pay to Sellers a premium of 1% of the contract price for each 1% above 97% and Sellers shall pay to Buyers and allowance of 1% of the contract price for each 1% below 97%, all fractions in proportion. 46 47 48

**4. DECLARATION OF DESTINATION:** The goods are sold for shipment to . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

but Buyers have the option to declare . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

as the port/s of destination with a minimum of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . metric ton/s to any one port. 51

To exercise this option Buyers shall declare the port/s of destination to Sellers by any means of rapid written communication (E-mail excluded) not later than 16.00 52

hours on . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
The Notices Clause and the Non-Business Days Clause shall not apply to such declaration. 54

**5. SHIPMENT AND CLASSIFICATION:** Shipment in good condition in ship/s which comply with the FOSFA Qualifications and Operational Procedures for Ships Engaged in the Carriage of Oils and Fats in Bulk for Edible and Oleo-Chemical Use in force at the date of the Bill of Lading. The oil is to be shipped on a ship which, after loading in one or more origin port, will proceed directly or indirectly, on a geographically normal route from the port/s of shipment to the port/s of destination. 55 56 57 58
For the purposes of this contract the words 'ship' or 'ships' shall mean any full-powered engine-driven ship. 59
Transhipment shall only be allowed under a through Bill of Lading and will be restricted to the area of origin and/or customary transhipment ports in the area of destination for the goods specified in the contract, provided that transhipment at origin is completed within the original contract shipment period and/or agreed extension period. 60 61 62
In case of transhipment at origin, shipping documents shall include FOSFA Certificate of Compliance, Cleanliness and Suitability of Ship's Tank and a FOSFA Combined Master's Certificate in respect of the ocean carrier. In the event of such transhipment at origin the Declaration of Shipment shall include the name of the ocean carrier and transhipment location. Nothing in this clause shall affect the Master's rights or Ship's obligations under Maritime Law. 63 64 65

**6. INSURANCE:** Insurance in accordance with the Institute/FOSFA Trades Clauses (A) and the Institute War and Strikes Clauses (FOSFA Trades) - including risk of contamination irrespective of percentage on each or on the whole - to be effected at Sellers' option with first class underwriters or companies but for whose solvency the Sellers shall not be responsible. Claims to be payable in the currency of the contract. Policies and/or certificates and/or Letters of Insurance required under this contract shall be for not less than 5% over the invoice amount including freight. 66 67 68 69
Buyers shall accept insurance including Exclusion Clauses on the FOSFA Insurance Exclusion Clause List. 70
In the event that Buyers receive an allowance under the Quality and Specifications Clause, Buyers to return the insurance policy to Sellers in order that they may make any recovery thereunder. Any benefit under the insurance in respect of loss in weight shall be for Sellers' account. 71 72

**7. WAR RISKS INSURANCE:** War risks insurance shall be effected on the terms and conditions in force and approved at the time of shipment by the Institute of London Underwriters (Institute War Clauses [FOSFA Trades]). Any expense for covering war risks insurance in excess of ½ % shall be for account of Buyers. The rate of such insurance shall not exceed the rate ruling in London at the time of shipment or date of ship's sailing whichever may be adopted by underwriters. Notice of extra expense to be borne by Buyers shall be given by Sellers at the time of declaration under this contract or not later than 3 business days after the rate has been agreed with the underwriters whichever is the later. Failure to give such notice shall invalidate the Sellers' claim unless in the opinion of the arbitrators the delay is justifiable. 73 74 75 76 77 78

**8. DECLARATION OF SHIPMENT:** Notice stating ship's name, date of Bill/s of Lading and approximate quantity shipped shall be despatched by first Sellers to their Buyers not later than 10 days after the date of the Bill/s of Lading. Notices by intermediate Sellers shall be accepted by their Buyers although received by them after such time, if from the 10th day after the date of Bill/s of Lading such notices have been passed on with due despatch. The date of the "on board" Bill/s of Lading shall be considered proof of the date of shipment in the absence of conclusive evidence to the contrary. Notices shall be deemed to be under reserve for errors and/or delays in transmission. Any slight variation in the ship's name shall not invalidate the declaration. A valid declaration cannot be withdrawn except with the Buyers' consent. 79 80 81 82 83 84
Should the ship arrive before receipt of declaration of shipment and extra expenses be incurred, such expenses are to be paid by Sellers. 85
Should extra lighterage expenses be incurred owing to Sellers tendering less than 50 tons for a contract of a greater quantity, the extra costs to be borne by Buyers and Sellers equally. The provisions of this clause is inoperative if the goods have been sold afloat. Presentation of documents does not constitute a notice under the terms of this clause. 86 87 88

**9. SUPERINTENDENTS:** Reference in the contract to superintendents, surveyors or representatives shall mean member superintendents of FOSFA International. 89 90
The use of member superintendents shall be mandatory except where:- 91
  (i)  the contract or national laws or regulations require the use of Governmental or other agencies not recognised by FOSFA International/PORAM; 92
  (ii) no member superintendent/s is/are available or proximate to the port/s concerned. 93

**10. ANALYSTS:** Reference in the contract to analysts shall mean analysts who are members of FOSFA International and represented in the Oils and Fats Section. The use of member analysts shall be mandatory except where the contract or national laws or regulations require the use of Governmental or other analysts. 94 95

**11. PAYMENT AND SHIPPING DOCUMENTS:** Payment shall be made at the above-named place as stipulated in the Preamble for 99% of Sellers' provisional invoice (or for 100% in the case where shipped weights are final) against a complete set of shipping documents:- 96 97
 \*(a)  by irrevocable and confirmed letter of credit unrestricted for negotiation established in Sellers' favour through a recognised bank for 105% of the mean contract quantity. Unless otherwise agreed between the parties such credit shall be advised and available to Sellers not later than 10 days from date of contract or the business day prior to commencement of loading, whichever shall first arise. Should the credit be opened on terms inconsistent with the contract, Sellers may demand amendment which shall be arranged by Buyers and notified to Sellers within 7 days of the demand being received but in no case later than the business day prior to commencement of loading. The negotiating bank may claim reimbursement by telex/cable from the credit-opening bank upon confirmation that all documents conform to the credit requirements. 98 99 100 101 102 103
 \*(b)  by cash on presentation; 104
 \*(c)  as stated in the Preamble; 105
If Sellers choose to present documents to Buyers through the intermediary of a bank/s all bank charges incurred including those raised by Buyers bank shall be for Sellers' account unless Buyers demand presentation through a bank of their choice in which case those bank charges shall be for Buyers account. 106 107
Any charges for telegraphic remittance of funds to Sellers shall be for Buyers' account. 108
Shipping document shall consist of:- 109
(1) Commercial invoice; 110
(2) Full set of clean "on board" Bill/s of Lading and/or Ship's Delivery Order/s and/or other Delivery Order/s in negotiable and transferable form, such other Delivery Order/s guaranteed by a recognised bank if required by Buyers; 111 112
  (i)  In the absence of evidence that the freight has been paid the amount of freight shall be deducted from the provisional invoice and paid by Buyers on Sellers' behalf, Buyers to send copy of the freight note to Sellers for final invoicing purposes. If freight is to be paid in a currency other than the currency of this contract, the conversion in the final invoice shall be made at the rate of exchange on the day of actual freight payment; 113 114 115
  (ii) If the Bill/s of Lading refer/s to a Charter Party and/or any other documents relating to the freight booking, Sellers shall be responsible for any detrimental consequences from clauses of such documents being contrary to the terms of this contract. If such Bill/s of Lading is/are signed by parties other than the Master then the Bill/s of Lading shall be accompanied by photostat copy of written authority from shipowner or Master authorising the signatory to the Bill/s of Lading; 116 117 118 119
  (iii) The Bill/s of Lading must identify the ship's tank/s into which the oil is loaded but should the oil be commingled with other parcels the Bill/s of Lading must indicate the total commingled quantity; 120 121
  (iv) Delivery Order/s shall be accompanied by non-negotiable or photostat copy of the relative Bill/s of Lading if required by Buyers. 122
(3) Policy/ies and/or Insurance Certificate/s and/or Letter/s of Insurance in the currency of the contract and identifying the parcel insured. Letter/s of Insurance shall specify the insurance company/ies and/or underwriter/s and policy number/s and shall be guaranteed by a recognised bank if required by Buyers. After payment Letter/s of Insurance shall be endorsed by policy/ies and/or certificate/s on request; 123 124 125
(4) FOSFA Certificate of Compliance, Cleanliness and Suitability of Ship's Tank from superintendents in the form in force at the date of the Bill/s of Lading; 126
(5) Certificate of Analysis, based on independently sealed samples taken from the relevant ship's tank/s at time of loading, and issued by an independent certified analyst; 127 128
(6) A Certificate of Origin and/or other documents as per the Duties, Taxes, Etc., Clause of the contract where applicable; 129

(7)  A FOSFA Combined Master's Certificate in the form in force at the date of the Bill/s of Lading.  130
(8)  A copy of the notice to the Master instructing him to follow the PORAM Hosting Instructions, and  131
(9)  Certificate/s from superintendents certifying:  132
   (a)  the shipped weight ascertained at port of loading and specifying at what point the weight was ascertained;  133
   (b)  particulars of the time and place of loading, sampling and establishment of shipped weight;  134
   (c)  that pre-shipment and contractual loading samples were drawn in accordance with the Sampling and Analysis Clause and quoting details of the seals  135
     applied.  136
In relation to items (4) and (7), the immediate previous cargo in the tank/s receiving the oils or fats shall not have been a product appearing on the FOSFA List of  137
Banned Immediate Previous Cargoes in force at the date of the Bill/s of Lading. The Restrictions beyond the Immediate Previous Cargo on the FOSFA List of  138
Banned Immediate Previous Cargoes shall apply.  139
Buyers to accept photostat or certified copy/ies of items (4), (5), (7) and (9) relating to the whole parcel/s.  140
Buyers agree to accept Bill/s of Lading containing the Chamber of Shipping War Risk Clause and/or any other recognised War Risk Clause.  141
Should documents be presented with incomplete set/s of Bill/s of Lading, payment shall be made provided that delivery of such Bill/s of Lading be guaranteed,  142
such guarantee to be signed, if required by Buyers, by a first class bank. Acceptance of this guarantee shall not prejudice Buyers' rights under this contract.  143
Should Sellers have failed to present shipping documents on arrival of the ship at destination, Buyers shall take delivery under a guarantee acceptable to the  144
shipowners to be provided by the Buyers, such guarantee to be signed by a first class bank if required by the shipowners. Buyers shall pay for the documents when  145
presented. Any reasonable extra expenses, including costs of such guarantee or extra handling charges incurred by reason of the failure of Sellers to provide such  146
documents, shall be borne by Sellers and allowed for in the final invoice. In the event that Buyers take delivery as above and Sellers fail to provide shipping  147
documents and if the guarantee provided by Buyers as above is exceeded by the shipowners, Sellers shall be responsible for all damages, costs and consequences  148
arising from their failure to present documents. Buyers shall inform Sellers immediately there is a claim against the guarantee and Sellers shall have the right to  149
be joined in any legal action arising therefrom.  150
Payment shall not be deemed to have been effected before receipt of cleared funds by the payee or his bank. If payment is agreed to be by bank transfer, the party  151
shall effect payment to the payee's bank on or before the due date for payment and payment instructions shall specify a value date not later than the second bank  152
working day after the day of payment.  153
Any monies due by either party to the contract to the other for final invoices and/or accounts for items on shipments fulfilling this contract shall be settled by either  154
party not later than 21 days from the date of the invoice, (except as otherwise provided under awards of arbitration or appeal as governed by the other provisions  155
in the contract), and if not settled a dispute shall be deemed to have arisen which may be referred to arbitration.  156

**12. INTEREST:**  If any payment is not paid on or before the due date for payment, interest shall be payable.  157
If there is no due date for payment, interest shall be payable if there has been unreasonable delay in payment. Interest payable shall be appropriate to the currency  158
involved. If the amount of interest is not mutually agreed, a dispute shall be deemed to exist which shall be settled by arbitration in accordance with the Arbitration  159
Clause.  160
Nothing in this clause shall affect a party's rights to invoke the provisions of the Default Clause in a case where a failure to effect timely payment could give rise  161
to a claim under that clause.  162

**13. CHARTER PARTY:**  If the Bill/s of Lading refer/s to a Charter Party, then, if required by Buyers, Sellers shall provide a copy of the Charter Party.  163

**14. WAR DEVIATION:**  Buyers agree to accept Bill/s of Lading containing the Chamber of Shipping War Deviation Clause and/or any other recognised official  164
War Deviation Clause.  165
Any extra charges, duties and taxes incurred by reason of such deviation or detention are for Buyers' account and cost.  166

**15. UNASCERTAINED GOODS:**  In every instance where a parcel of goods paid for under this contract forms an unidentified part of a larger identified  167
quantity of goods of the same description, whether in packages or in bulk, no separation or distinction shall be necessary and, until separation and identification  168
of the parcel paid for hereby from the larger quantity has taken place the Buyer of the parcel is a pro rata owner of the whole of the larger quantity in common  169
with Sellers and Buyer/s of other parts of the larger quantity.  170

**16. DISCHARGE:**  The oil shall be discharged at the port of destination at a berth suitable for the discharge of oils or, if practicable and mutually agreed, and  171
provided the ship is willing to and can safely berth, at Buyers' own or appointed premises within harbour limits. Despatch shall take delivery with customary quick  172
despatch after notice of readiness has been given by the shipowner or representative/s in accordance with the Bill/s of Lading, Charter Party or Contract of  173
Affreightment.  174
Where FOSFA International/PORAM Standard Fixture Terms apply, Buyers shall take delivery at the rate per hour stipulated in the Preamble or where no such  175
rate is stated at an average rate of 150 metric tons per hour Sundays and Holidays included (except gazetted port holidays) or the rate stipulated in the Charter Party  176
or Contract of Affreightment whichever is the lower. Otherwise Buyers to be liable to pay demurrage at the rate stipulated in the Charter party or Contract of  177
Affreightment.  178
Sellers are responsible for all expenses for pumping out and for connecting to ship's outlet/s and for sweeping and/or pudding but discharging expenses arising  179
after the oil has passed the ship's rail shall be for Buyers' account. Any loose collected remaining in the ship's tank/s to be discharged by the Sellers and delivered  180
to the Buyers at the discharging berth in packages to be provided by the Buyers.  181
If the packages are supplied by the Buyers but the residue is not delivered, such residue or unpumpable oil shall not be included in the delivered weight.  182

**17. WEIGHTS:**  At loading:  The shipping weight shall be ascertained by a superintendent appointed by Sellers at their expense by gauging either in officially  183
calibrated land tank/s or tank barge/s from which the oil is delivered or by delivery via certified weigh scales or from tank cars which, if not calibrated, shall be  184
weighed before and after loading by single weighing only (front and back axle weighing not allowed). If none of these is possible then the shipping weight to be  185
ascertained by the most practicable alternative means.  186
For goods sold for shipment or and/or discharged at USA/Canadian port/s: In the event that the oil shipped under this contract or this and other contracts with the  187
same Buyer is loaded in separate tank/s not commingled with other parcel/s, Sellers shall declare Bill of Lading weights final and shall ensure that the insurance  188
policy/certificate included with the documents covers Buyers against any difference between certified shipped and certified landed weights in excess of ½% and  189
the provisions of the Adjustment of Outturn Clause as to price adjustment shall be based on the Bill of Lading weights.  190
At discharge: Buyers' superintendents shall ascertain the weight at Buyers' expense conjointly with Sellers' superintendents, if in attendance, by gauging either in  191
officially calibrated tank/s or tank barge/s in which the oil is received or by overside delivery to certified weigh scales, or in rail/road tank cars which, if not  192
calibrated, shall be weighed before and after loading by single weighing only (front and back axle weighing not allowed). If none of these methods is possible  193
then the discharged weight to be ascertained by the most practicable alternative means. In the event of disagreement between Buyers' and Sellers' superintendents  194
on the question of mass per volume (litre weight in air), scaled samples shall be submitted to an analyst whose decision shall be final.  195
If establishment of weight/s is not completed within 5 working days after discharge Sellers may submit an interim invoice which shall become due and payable  196
based on Bill of Lading weights. Weights shall then be established as soon as it is deemed practicable by the superintendents representing the parties and a final  197
invoice shall be issued accordingly.  198

**18. ADJUSTMENT OF OUTTURN:**  Any excess over or deficit under the mean contract quantity arrived at without taking into consideration the margin of  199
5% more or less and the quantity delivery, is to be added up to and including the first 2% variation from contract quantity at contract price and the variation  200
above 2% of the contract quantity at the price fixed by the appropriate Price Settlement Committee appointed by FOSFA International/PORAM/MEOMA, and  201
published by the Federation or, if no prior to fixed by the Price Settlement Committee then at the market price to be mutually agreed or fixed by arbitration for the  202
day of arrival of the last ship to arrive at the berth/place where the contracted goods are to be discharged at the port of destination.  203

**19. COMMINGLING:**  Sellers may load the oil commingled with other parcel/s provided that:  204
(a) the oil is of the same description, origin, grade and contractual quality specifications; and  205
(b) the oil emanates from the same country in this contract shall be deemed to mean the party responsible for freight).  206
The provisions of paragraphs (a) and (b) shall not apply:-  207
(i)  where this contract refers to palm acid oil/fatty acid distillate and/or palm kernel acid oil/fatty acid distillate.  208
(ii)  where the oil is sold for shipment to optional ports and the final destination/s is/are not declared to Sellers within one month prior to the commencement of  209
the shipment period.  210

**20. SAMPLING AND ANALYSIS:**  211
(a) General:  Sampling shall be done in accordance with the method in the FOSFA International/PORAM/MPOB/Processed Palm Oil Storage,  212
Transportation, Sampling and Survey Guide.  213
Should either party fail to appoint a superintendent then the samples drawn by the superintendent present shall be valid samples for the purpose of  214
analysis and/or arbitration.  215
The analyses shall be carried out in accordance with the methods laid down in the FOSFA International/PORAM Standard Contractual Methods List.  216
The certificate/s shall bear the FOSFA International official seal except where the contract or national laws or regulations require the use of  217
Governmental or other analysts.  218
Details of seals and labels shall be given on both loading and discharge survey reports and analysis certificate/s.  219
All samples drawn under this contract when delivered to FOSFA International or to the analyst/s to become and be their absolute property.  220
(b) Pre-shipment Samples:  To ensure samples are available in the event of a contamination claim not less than 5 pre-shipment samples of the oil loaded  221
shall be taken at the ship's rail or the nearest practicable point prior to loading. These samples are to remain sealed with Sellers' superintendents at origin  222
but be available on demand to any receiver in the event of a contamination claim. Samples to be kept for 3 months from date of Bill of Lading.  223

(c) **At loading:** Not less than 5 samples representative of the oil to be drawn from each ship's tank/s and sealed by superintendent for analysis. Two sets of these samples shall be handed to the Master with instructions to hand over to the receivers at port of discharge or their superintendents. Tests to be made from a set of sample/s by an analyst in the country of shipment (in the case of Malaysia by an independent licensed analyst registered with the Malaysian Palm Oil Board), who shall issue the appropriate certificate. The remaining sets of samples to be retained by the superintendent at the port of loading.

(d) **At discharge:** Buyers' and Sellers' superintendents shall conjointly draw 5 representative samples during discharge at the ship's rail or the nearest practicable point thereafter. These to be conjointly sealed for analysis and/or arbitration purposes. Any unpumpable and/or off-quality oil discharged and stored separately shall be analysed separately.

Buyers or their superintendents shall retain 3 sealed samples and, if requested, with due despatch send 1 sealed sample for analysis to an analyst represented in the Oils and Fats Section. The remaining 2 sealed samples shall be retained by Sellers or their representatives. If Buyers fail to send a sample for analysis Sellers have the right to submit a sample and the results of this analysis shall stand as the first analysis. The analysis fee shall be equally divided between Sellers and Buyers.

Buyers and Sellers have the right to claim at their own expense a second and/or third analysis for any one or more individual specification. The party requesting such analysis shall, within 5 business days after receipt of the preceding analysis, notify the other party, arrange for a sealed sample to be sent to another analyst represented in the Oils and Fats Section, and give the necessary instructions to the analyst. If 2 analyses are made the mean of the 2 results, and if 3 analyses are made, the mean of the 3 results closest to each other, as the case may be, shall be binding and form the basis of final settlement. Where the results of the 3 analyses are such that the above formula does not apply, the mean of the 3 shall be taken as final.

Parties shall pass on certificates of analysis with due despatch.

**21. DUTIES, TAXES, ETC:** All export duties, taxes, levies, etc., present or future in country of origin/port of shipment shall be for Sellers' account. All import duties, taxes, levies, etc., present or future in port of discharge/country of destination shall be for Buyers' account. Where the goods are entitled to free entry into or preferential duty in the port of destination named in this contract, Sellers shall furnish together with the shipping documents a Certificate of Origin and/or necessary documents in the form valid at the time of shipment; otherwise Sellers shall be responsible for any extra duty incurred by Buyers through the non-production of such Certificate and/or document/s.

At Buyers' request and cost, Sellers shall endeavour to supply any alternative or additional certificate of origin and/or other documents but payment shall not be withheld for any delay incurred in complying with such request.

**22. NOTICES:** Notices to be despatched by any means of rapid written communication (E-mail excluded). All notices shall be under reserve for errors in transmission. Notices shall be passed on with due despatch by intermediate Buyers and Sellers. Any notices received after 16.00 hours on a business day shall be deemed to have been received on the following business day. Notice from a broker shall be a valid notice under this contract.

**23. NON-BUSINESS DAYS:** Should the time limit for doing any act or giving any notice expire on a Saturday, Sunday or any public holiday in the country where the party required to do the act or give the notice resides or carries on business or in the country where the act has to be done or the notice has to be received or on any day which the Federation of Oils, Seeds and Fats Associations Ltd and the Palm Oil Refiners Association of Malaysia and the Malayan Edible Oil Manufacturers Association shall declare to be a non-business day the time so limited shall be extended until the first business day thereafter. All business days which shall be deemed to end at 16.00 hours Mondays to Fridays inclusive. The contract shipment period not to be affected by this clause.

**24. ODD DAYS:** In any month containing an odd number of days the middle day shall be reckoned as belonging to both halves of the month.

**25. FORCE MAJEURE:** Should shipment of the goods or any part thereof be prevented at any time during the last 30 days of the contract shipment period by reason of Act of God, strikes, lockouts, riots, civil commotions, fires or any other cause comprehended by the term Force Majeure at port/s of loading or elsewhere preventing transport of the goods to such port/s, the time allowed for shipment shall be extended to 30 days beyond the termination of such cause, but should the contract shipment period be less than 30 days such extension shall be limited to the number of days allowed for shipment under the contract shipment period. Should such cause exist for a period of 60 days beyond the contract shipment period the contract or any unfulfilled part thereof so affected shall be cancelled. Sellers invoking this clause shall notify Buyers with due despatch.

When goods of a specific origin are sold with the option of shipment from alternative ports and shipment from all alternative ports is not prevented Sellers may only invoke this clause with regard to the specific port/s provided that the port/s has/have been notified to Buyers as the intended port/s of loading prior to or within 7 days of the occurrence but if the occurrence commences within the last 7 days of the contract shipment period the port/s of loading to be notified no later than the first business day following the contract shipment period. Shipment after the contract shipment period shall be limited to the port/s so nominated. Buyers have the option against Sellers for delay in shipment or cancellation under this clause provided that Sellers shall have supplied to their Buyers, if required, satisfactory evidence justifying delay or non-fulfilment to establish any claim for extension or cancellation under this clause.

In case of default after extension the default date shall be similarly deferred.

**26. PROHIBITION:** In the event, during the contract shipment period, of prohibition of export or any other executive or legislative act by or on behalf of the Government of the country of origin or of the territory where the port/s of shipment named herein is/are situate, or of blockade or hostilities, restricting export, whether partially or otherwise, any such restriction shall be deemed by both parties to apply to this contract and to the extent of such total or partial restriction to prevent fulfilment whether by shipment or by any other means whatsoever and to that extent this contract or any unfulfilled portion thereof shall be extended by 30 days.

In the event of shipment during the extended period still proving impossible by reason, of any of the causes in this clause the contract or any unfulfilled part thereof shall be cancelled. Sellers invoking this clause shall advise Buyers with due despatch. If required, Sellers must produce proof to justify their claim for extension or cancellation under this clause.

**27. BANKRUPTCY/INSOLVENCY:** If before the fulfilment of this contract, either party shall suspend payment, notify any of his creditors that he is unable to meet his debts or that he has suspended payment or that he is about to suspend payment of his debts, convene, call or hold a meeting of his creditors, propose a voluntary arrangement, apply for an official moratorium, have an administration order made, have a winding up order made, have a receiver or manager appointed, convene, call or hold a meeting to go into liquidation (other than for reconstruction or amalgamation), become subject to an Interim Order under Section 252 of the Insolvency Act 1986 or have a Bankruptcy Petition presented against him, the contract shall forthwith be closed, either at the actual or estimated market price then current for similar goods or, at the option of the other party, at a price to be ascertained by re-purchase or re-sale and the difference between the contract price then and such closing-out price shall be the amount which the other party shall be entitled to claim or shall be liable to account for under this contract. Should either party be dissatisfied with the price ascertained by re-purchase or re-sale then the matter shall be referred to arbitration. If no re-purchase or re-sale takes place and if the parties cannot agree to a closing-out price, then on application of either party, the closing-out price shall be fixed by a sole arbitrator appointed by the Federation subject to the right of appeal under the Federation's Rules of Arbitration and Appeal.

**28. CIRCLE:** Where a Seller repurchases from his Buyer, or from any subsequent Buyer, the same goods or part thereof, a circle shall be considered to exist as regards the particular goods so repurchased, and the provisions of the Default Clause shall not apply. (For the purpose of this clause, the same goods shall mean goods of the same description, of the same country of origin, of the same quality and where applicable, of the same analysis warranty, for shipment to the same port/s of destination during the same period of shipment.) Different currencies shall not invalidate the circle. If goods are not declared or, having been declared, documents are not presented as a result of a circle having been established, invoices based on the mean contract quantity shall be settled between each Buyer and his Seller in the circle by payment by each Buyer to his Seller of the excess of the Seller's invoice amount over the lowest invoice amount in the circle. Where the circle includes contract/s expressed in different currencies, the lowest invoice amount shall be replaced by the market price on the first business day for contractual shipment and invoice/s shall be settled between each Buyer and his Seller in the circle by payment of the difference between the market price and the relevant contract price in the currency of the contract. Failing amicable agreement the market price shall be that declared by a Price Settlement Committee of the Federation appointed for that purpose on application of either party.

Such settlement shall be due for payment not later than 15 consecutive days after the last day for declaration or, should the circle not be established before the expiry of this time, then settlement shall be due for payment not later than 7 days after the circle is established. No circle shall be considered to exist if its existence is not established within 45 days after the last day of shipment.

All Sellers and Buyers shall give every assistance to the establishment of the circle and where a circle shall have been established same shall be binding on all parties to the circle. Should any party in the circle commit prior to the due date for payment any act comprehended in the Bankruptcy/Insolvency Clause, the invoice amount for the goods calculated at the closing-out price as provided for in the Default Clause shall invalidate the circle. Should this be taken as the basis for settlement instead of the lowest invoice amount in the circle, and in this event each Buyer shall make payment to his Seller or each Seller shall make payment to his Buyer of the difference between the closing-out price and the contract price, as the case may be.

In the event of a claim under the Prohibition Clause or the Force Majeure Clause the date for settlement shall be deferred until the expiry of the extended shipment period. Thereafter, if the contract is cancelled under the terms of the Prohibition Clause or the Force Majeure Clause, this clause is not applicable.

**29. DEFAULT:** In default of fulfilment of this contract by either party the other party at his discretion shall, after giving notice, have the right either to cancel the contract, or the right to sell or purchase, as the case may be, against the defaulter who shall on demand make good the loss, if any, on such sale or purchase. If the party liable to pay shall be dissatisfied with the price of such sale or purchase, or if neither of the above rights is exercised, the damages, if any, shall, failing amicable settlement, be determined by arbitration. The damages awarded against the defaulter shall be limited to the difference between the contract price and either the actual or estimated market price on the day of default. Damages to be computed on the mean contract quantity.

If the arbitrators consider the circumstances of the default justify it they may, at their absolute discretion, award damages on a different quantity and/or award additional damages.

Prior to the last day for making a declaration of default a Seller may notify his Buyer of his inability to ship but the date of such notice shall not become the default date without the agreement of the Buyer. If, for any other reason, either party fails to fulfil his contract and is declared to be in default by the other party and default is either agreed between the parties or subsequently found by arbitrators to have occurred, then the day of the default shall, failing amicable settlement, be decided by arbitration.

30. INTERNATIONAL CONVENTIONS:  The following shall not apply to this contract:- 320
   (a)  the Uniform Law on Sales and the Uniform Law on Formation to which effect is given by the Uniform Laws on International Sales Act 1967; 321
   (b)  the United Nations Convention on Contracts for the International Sale of Goods of 1980; 322
   (c)  the United Nations Convention on the Limitation Period in the International Sale of Goods of 1974 and the amending Protocol of 1980. 323

31. DOMICILE:  Where both parties at or subsequent to the date of the contract agree, the contract shall be deemed to have been made in Malaysia and the 324
construction, validity and performance thereof shall be governed in all respects by Malaysian law. 325
Otherwise this contract shall be deemed to have been made in England and the construction, validity and performance thereof shall be governed in all respects by 326
English law. 327

32. ARBITRATION:  Where both parties at or subsequent to the date of the contract agree, any dispute arising out of or in connection with this contract shall be 328
submitted to arbitration in Malaysia in accordance with the Arbitration Act of Malaysia 1952 (as revised in 1972) and in accordance with the PORAM Rules of 329
Arbitration and Appeal in force at the date of the contract. 330
In all other cases, any dispute arising out of the contract, including any question of law arising in connection therewith, shall be referred to arbitration in London 331
(or elsewhere if so agreed) in accordance with the Rules of Arbitration and Appeal of the Federation of Oils, Seeds and Fats Associations Limited, in force at the 332
date of this contract and of which both parties hereto shall be deemed to be cognizant. 333
Neither party hereto, nor any persons claiming under either of them, shall bring any action or other legal proceedings against the other of them in respect of any 334
such dispute until such dispute shall first have been heard and determined by the arbitrators, umpire or Board of Appeal (as the case may be), in accordance with 335
the Rules of Arbitration and Appeal governing the dispute; and it is hereby expressly agreed and declared that the obtaining of an Award from the arbitrators, umpire 336
or Board of Appeal (as the case may be), shall be a condition precedent to the right of either party hereto or of any person claiming under either of them to bring 337
any action or other legal proceedings against the other of them in respect of any such dispute. 338

SPECIAL CONDITIONS FOR PALM AND PALM KERNEL OIL PRODUCTS OF MALAYSIAN OR INDONESIAN ORIGIN: 339
EXTENSION OF SHIPMENT/CONTINUOUS LOADING:Where the contract shipment period does not exceed 31 days the period of shipment shall, at the 340
request of Sellers, be extended by an additional period not exceeding 8 days provided notice is given to Buyers of their intention to invoke the continuous loading 341
provisions or claim such extension not later than the first business day following the last day of the original contract shipment period. Successive Sellers must pass 342
on this notification with due despatch. Sellers shall at the same time nominate the ship they intend to load and shall provide, together with shipping documents, 343
satisfactory evidence that the ship was originally booked with lay days/cancelling within the original contract shipment period. 344
No allowance shall be payable provided the ship commenced loading at the loadport from which the goods appropriated under this contract are shipped during the 345
contract shipment period and provided loading of the goods appropriated under this contract is completed within 5 days of the end of the original contract shipment 346
period. If loading did not so commence or, having commenced, did not complete within the said 5 days, Sellers shall make an allowance to their Buyers, on the 347
quantity not loaded, to be deducted in the invoice from the contract price, as follows: 348
   ½% for 1, 2, 3 or 4 days 349
   1% for 5 or 6 days 350
   1½% for 7 or 8 days. 351
If Sellers invoke the continuous loading provisions or claim an extension and fail to ship within the 8 days, the original contract shipment period shall be considered 352
to have been extended by 8 days and the contract price reduced by 1½%. 353
Should Sellers not claim the above extension and fail to ship within the contract period any penalty whether arrived at by amicable settlement or arbitration shall 354
not be related to the allowances of this clause. 355
Where the conditions of this clause are invoked Sellers undertake not to load on the same ship similar goods sold for the then current shipment period, without the 356
prior consent of Buyers. 357

© FOSFA Copyright 2006

# EXHIBIT B

## INSURANCE COVERAGES

## Loders Croklaan

### Policy Schedule

| COVERAGE/ POLICY NUMBER | INSURANCE COMPANY | POLICY TERM | LIMITS | DEDUCTIBLE/ RETENTION | PREMIUM |
|---|---|---|---|---|---|
| Local US Property:    Policy Number: US00000981GP806A | XL Insurance | June 30, 2006 - June 30, 2007 | | $129,574 PD/BI combined at locations with values greater than $5,627,455 otherwise $64,787 except Channahon $647,870 PD/7 days waiting period for BI | $290,161 |
| Loss Limit/Limit per Occurrence | | | $129,573,961 | | |
| Business Interruption | | | Included | 7 days | |
| Indemnity period for business Interruption | | | 12 months | | |
| Extra Expense | | | $6,478,698 | Same as above | |
| Named storm and high hazard wind zones for all locations combined | | | $51,829,584 | Same as above except high hazard wind zones 2% of property value and 2% of business interruption value subject to a minimum deductible of $323,935 | |
| Windstorm per location excluding Channahon | | | $12,957,396 | see above | |
| Windstorm per location in high hazard wind zones | | | $6,478,698 | see above | |
| Earthquake and Flood | | | Flood and Earthquake for all locations combined, per occurrence and annual aggregate $12,957,396 each except high hazard zones | Earthquake same as above for loss limit except CA, and other high hazard earth movement zones where a 2% of property value and 2% of business interruption value subject to a minimum deductible of $323,935 applies. Flood $647,870 | |
| Property in the course of construction or erection | | | $6,478,698 | | |
| Hoist or Disputed Loss Agreement on Boiler & Machinery losses | | | $12,957,396 | | |
| | | | $100,000,000 | | |
| Local Canadian Property: Policy Number: CA00001262PR06A | XL Insurance | June 30, 2006 - June 30, 2007 | | $140,514 per occurrence except at locations valued at less than $7,025,700 where the deductible is $70,257 | CAD $13,512.96 |
| Loss Limit/Limit per Occurrence | | | $11,073,000 | | |
| Business Interruption | | | Included | 365 days | |
| Indemnity period for business Interruption | | | $7,025,700 | | |
| Extra Expense | | | | see above | |
| Earth Movement - Annual Aggregate | | | $11,073,000 | 2% of property value and 2% of business interruption value subject to a minimum deductible of $351,285 | |
| Flood - Annual Aggregate | | | $11,073,000 | $351,285 | |
| Windstorm | | | $11,073,000 | see EQ above | |
| Newly Acquired Property - 90 days | | | $11,073,000 | see loss limit above | |
| Miscellaneous Unnamed Locations | | | $1,405,140 | see loss limit above | |
| Fire Department Service Charges | | | $702,570 | see loss limit above | |

NOTE: This Policy Register is only an outline of coverages that have been prepared for your convenience.
Actual policy language must be consulted for any definitive evaluation of coverage terms and conditions.

## Loders Croklaan

### Policy Schedule

| COVERAGE/ POLICY NUMBER | INSURANCE COMPANY | POLICY TERM | LIMITS | DEDUCTIBLE/ RETENTION | PREMIUM |
|---|---|---|---|---|---|
| **PROPERTY DAMAGE:** | | | | | |
| Global Master Property: Policy Number: 35336J820001 | XL Insurance (40%), RSA (25%), Gerling (25%), HDI (10%) | June 30, 2006 - June 30, 2007 | Exchange rate US $ = .77176, CAD = .70773, EGP = .13580 | | |
| Loss Limit for Property Damage and Business Interruption Combined except for Egypt or Canada/Limit per Occurrence | | | € 100,000,000 | Production locations €500,000 / Other locations €100,000 | |
| Loss Limit for Property Damage and Business Interruption Combined for Egypt or Canada/Limit per Occurrence | | | € 40,000,000 | Production locations €500,000 / Other locations €100,000 | |
| Business Interruption | | | € 91,674,838 | 7 days | |
| Indemnity period for business interruption | | | 52 weeks | Production locations €500,000 / Other locations €100,000 | |
| Business Interruption sublimits for Group interdependency/specified suppliers and customers, public utilities and increased cost of working | | | € 5,000,000 | Production locations €500,000 / Other locations €100,000 | |
| Business Interruption sublimits for unspecified suppliers and customers and denial of access (damage only) | | | € 2,500,000 | Production locations €500,000 / Other locations €100,000 | |
| Named storm and high hazard wind zones | | | | 2% of location Total Insured Value or €500,000 | |
| Windstorm for Channelton | | | € 5,000,000 | 2% of location Total Insured Value or €500,000 | |
| Windstorm - rest of world | | | € 40,000,000 | 2% of location Total Insured Value or €500,000 | |
| | | | € 10,000,000 | Flood - amount recoverable under NFIP (Dwelling $500,000/Contents $500,000) is US or €500,000 whichever is greater; Flood outside the US €500,000. Earthquake - the greater of 2% of location Total Insured Value or €500,000 or €500,000 whichever is higher | |
| Earthquake and Flood | | | € 10,000,000 | | |
| Capital Additions at existing locations | | | € 10,000,000 | Production locations €500,000 / Other locations €100,000 | |
| Key exclusions: Machinery breakdown, Pollution and Contamination, Crime, Computer Virus, Worldwide Sabotage & Terrorism, Overhead T&D Lines, Mold, Fidelity Guarantee, Marine Cargo, Asbestos, Loss of Profits and Flood in the Netherlands | | | | | |

NOTE: This Policy Register is only an outline of coverage that have been prepared for your convenience. Actual policy language must be consulted for any definitive evaluation of coverage terms and conditions.

## Loders Croklaan

### Policy Schedule

| COVERAGE/POLICY NUMBER | INSURANCE COMPANY | POLICY TERM | LIMITS | DEDUCTIBLE/RETENTION | PREMIUM |
|---|---|---|---|---|---|
| **BOILER AND MACHINERY/EQUIPMENT BREAKDOWN** | | | | | |
| Local US & Canadian:    Policy Number: BM 5085204-02 | Zurich American Insurance Company | June 30, 2006 - June 30, 2007 | | | $25,020 |
| Property Damage | | | $100,000,000 | $100,000 | |
| Business Interruption and Extra Expense | | | $37,120,000 | 72 hours | |
| Utility Interruption | | | $1,000,000 | see 24 hours | |
| Expediting Expense | | | $100,000 | | |
| Spoilage/Ammonia Contamination | | | $250,000 | see property damage above | |
| Hazardous Substances | | | $100,000 | see property damage above | |
| Contingent Business Income at scheduled vendors, customers | | | $100,000 | 72 hours | |
| **RAILCARS** | | | | | |
| Local US & Canadian:    Policy Number: RAP 1374 | Essex Insurance Company | July 27, 2006 - July 27, 2007 | | | $10,654 |
| Limit of Liability | | | $5,000,000 per occurrence / $89,896 any one railcar | $250,000 | |
| Rental Expense Reimbursements | | | $15,000 | | |
| Debris Removal, Rerail and Rerouting Expense | | | $25,000 | | |
| Pollutant Clean Up and Removal | | | $10,000 | | |
| **OCEAN CARGO** | | | | | |
| Global Ocean Cargo:    Policy Number: 33316JKO002 | Fortis Corporate Ins N.V./Oudo Ins Co of Europe | July 1, 2006 - July 1, 2007 | | | € 56,000 |
| Limit During Transport Maximum each conveyance | | | € 4,000,000 | | |
| "First Loss" during storage Maximum per location | | | € 1,000,000 | Bulk shipments 5% of insured value min. €6,000    $10,000 | |
| During Transport/Stay/Use Maximum per occurrence | | | € 1,000,000 | Increased value up to max. €25,000 | |

NOTE: This Policy Register is only an outline of coverages that have been prepared for your convenience. Actual policy language must be consulted for any definitive evaluation of coverage terms and conditions.

## Loders Croklaan

### Policy Schedule

| COVERAGE/ POLICY NUMBER | INSURANCE COMPANY | POLICY TERM | LIMITS | DEDUCTIBLE/ RETENTION | PREMIUM |
|---|---|---|---|---|---|
| **CASUALTY/AUTO/USA** | | | | | |
| **LIABILITY** | | | | | |
| Global Master Liability and Excess Liability: Policy Number: 3531638 V0002 | XL Insurance | July 1, 2006 - July 1, 2007 | | €200,000 excluding US & Canada | €390,066 US, Malaysia, Canada and Egypt have local premiums |
| Limit of Liability Per Occurrence | | | €50,000,000 €25,000,000 | | |
| Local US General Liability: Policy Number: US00000990L106A | XL Insurance | | | $250,000 SIR | $149,071 |
| Claims-made coverage   Retroactive date: November 29, 1997 | | | | | |
| General Aggregate (Other Than Products/Completed Operations) | | | $2,000,000 | see above | |
| Products/Completed Operations Aggregate | | | $2,000,000 | see above | |
| Each Occurrence Limit | | | $1,000,000 | see above | |
| Personal & Advertising Injury Liability | | | $1,000,000 | see above | |
| Damage To Premises Rented to You Limit | | | $100,000 | see above | |
| Medical Expense Limit | | | $10,000 | see above | |
| Employee Benefits Liability - Aggregate and Per Claim | | | $1,000,000 | $1,000 | $201 |
| Claims-made coverage   Retroactive date: July 1, 2006 | | | | | |
| Local Canadian General Liability: Policy Number: CA00001043L106A | XL Insurance | | | CAD $250,000 SIR | CAD $3,244.32 |
| General Aggregate (Other Than Products/Completed Operations) | | | $1,400,000 | see above | |
| Products/Completed Operations Aggregate | | | $1,400,000 | see above | |
| Each Occurrence Limit | | | $1,400,000 | see above | |
| Personal & Advertising Injury Liability | | | $1,400,000 | see above | |
| Damage To Premises Rented to You Limit | | | $100,000 | see above | |
| Medical Expense Limit | | | $10,000 | see above | |
| Non-Owned Automobile | | | $1,000,000 | see above | |
| Employee Benefits Liability - Aggregate and Per Claim | | | $1,000,000 | $1,000 | |
| **AUTOMOBILE LIABILITY AND PHYSICAL DAMAGE:** | The Hartford | November 29, 2006 - November 29, 2007 | | | $10,898.58 |
| US Policy Number: 81UENA35267 | | | | | |
| Included Owned and Leased Vehicles | | | | | |
| Any Vehicle Liability | | | $1,000,000 | $1,000/$1,000 | |
| Primary Physical Damage for Owned and Hired Vehicles | | | $50,000 | | |
| Rental Reimbursement | | | $100 per day / $3,000 total | | |
| Canadian Policy Number: 05 CON 0130277 BA | The Hartford | November 29, 2006 - November 29, 2007 | | | CAD $1,994 |
| Included Owned and Leased Vehicles | | | | | |
| Liability per accident | | | $1,000,000 | $1,000/$1,000 | |
| Physical Damage | | | | | |
| Loss of Use | | | $1,000 | | |

**NOTE: This Policy Register is only an outline of coverages that have been prepared for your convenience. Actual policy language must be consulted for any definitive evaluation of coverage terms and conditions.**

## Loders Croklaan

### Policy Schedule

| COVERAGE/ POLICY NUMBER | INSURANCE COMPANY | POLICY TERM | LIMITS | DEDUCTIBLE/ RETENTION | PREMIUM |
|---|---|---|---|---|---|
| **WORKERS COMPENSATION & EMPLOYERS LIABILITY** Local US Work Comp/EL  Policy Number: 81WBCRBFD4 | The Hartford | November 29, 2006 - November 29, 2007 | | | $173,680 |
| Workers' Compensation Limit: | | | Statutory | | |
| Employers' Liability Limit: | | | | | |
| Bodily Injury by Accident- Each Accident | | | $1,000,000 | | |
| Bodily Injury by Disease – Policy Limit | | | $1,000,000 | | |
| Bodily Injury by Disease – Each Employee | | | $1,000,000 | | |
| **FINANCIAL PRODUCTS** | | | | | |
| **FRAUD/CRIME** | | | | | |
| Global Fraud/Crime          Policy Number: 8186-22-56A | Chubb | June 30, 2006 - June 30, 2007 | | | € 22,738 |
| Financial Loss of Insured from Crime by employee or 3rd party | | | €12,500,000 | € 100,000 | |
| Financial Loss of a client from Crime by employee | | | € 500,000 | € 100,000 | |
| Expenses from Financial Loss of Insured | | | € 100,000 | € 100,000 | |
| Expenses from Computer Violation | | | € 100,000 | € 100,000 | |
| Maximum Limit of Liability for all caused | | | € 2,500,000 | € 100,000 | |
| Maximum Limit of Expenses | | | € 100,000 | € 100,000 | |
| Worldwide Coverage | | | | No deductible applies to Employee Benefit Plans | |
| **EMPLOYMENT PRACTICES LIABILITY** | | | | | |
| Global Employment Practices Liability    Policy: 30 03 2808 | AIG Europe | June 30, 2006 - June 30, 2007 | | | € 31,875 |
| Total Limit of Liability including Defense Costs | | | $12,500,000 | | |
| US Claims only | | | | | |
| Company and indemnifiable loss - Class Action/Multiple plaintiffs | | | included | $250,000 | |
| Single Plaintiff | | | included | $75,000 | |
| Non-US Claims | | | | | |
| Indemnifiable loss | | | included | € 25,000 | |
| **FIDUCIARY – Claims Made**   Policy Number: 104644645 | St. Paul Travelers | November 29, 2005 - November 29, 2008 | | | $8,080 |
| Total Limit of Liability | | | $2,000,000 | $10,000 | |
| Defense Costs Limit | | | $2,000,000 | | |
| Applicable to the US and Canada | | | | | |
| **ERISA - Loss Discovered**      Policy Number: 83BDDC57748 | Hartford | November 29, 2005 - November 29, 2008 | | | $1,550 |
| Employee Theft | | | $2,000,000 | | |
| | | | 10% of Plan Assets or $500,000 | | |
| Single Loss Occurrence | | | | | |

**NOTE:** This Policy Register is only an outline of coverages that have been prepared for your convenience. Actual policy language must be consulted for any definitive evaluation of coverage terms and conditions.

# Loders Croklaan

## Policy Schedule

| COVERAGE/ POLICY NUMBER | INSURANCE COMPANY | POLICY TERM | LIMITS | DEDUCTIBLE/ RETENTION | PREMIUM |
|---|---|---|---|---|---|
| **BONDS** | | | | | $100 |
| **SURETY BOND** Policy Number: 81BSBED4649 General Contractors License bond for obligee Will County & City of Channahon, IL | Hartford | March 11, 2006 - March 11, 2007 | $10,000 | | |
| **ENVIRONMENTAL** | Illinois Union Insurance Co | | | | |
| **POLLUTION-Claims made,** Policy Number: PPL G33794373.001 | | 05/17/06-09 | $5,000,000 | $500,000 | $78,858 |
| Retroactive date: 05/17/06 | | | | | |
| Total Limit of Liability including defense costs | | | | | |
| Defense costs erode the SIR/deductible | | | | | |
| Coverage at seven scheduled locations | | | | | |

NOTE: This Policy Register is only an outline of coverage that have been prepared for your convenience. Actual policy language must be consulted for any definitive evaluation of coverage terms and conditions.